# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF NEW YORK

——————————————————————— x
                                              :
**JEFFREY A. LIEBERMAN, M.D.,**               :
                                              :
                     **Plaintiff,**           :
                                              :
              **- against -**                 :        Civil Action No.  23-cv-4195
                                              :
**ANN MARIE T. SULLIVAN, M.D., in her individual**   :
**capacity and in her official capacity as Commissioner**   :
**of the New York State Office of Mental Health;**   :        **PLAINTIFF DEMANDS**
**MOIRA TASHJIAN, in her individual capacity and**   :        **A TRIAL BY JURY**
**in her official capacity as Deputy Commissioner of**   :
**the New York State Office of Mental Health;**   :
**THOMAS E. SMITH, M.D., in his individual capacity**   :
**and in his official capacity as Chief Medical Officer of**   :
**the New York State Office of Mental Health; HELEN**   :
**BLAIR SIMPSON, M.D., in her individual capacity**   :
**and in her official capacity as Acting Executive**   :
**Director of the New York State Psychiatric Institute;**   :
**THE TRUSTEES OF COLUMBIA UNIVERSITY IN**   :
**THE CITY OF NEW YORK; and THE NEW YORK**   :
**AND PRESBYTERIAN HOSPITAL, d/b/a**   :
**NEWYORK-PRESBYTERIAN HOSPITAL,**   :
                                              :
                     **Defendants.**          :
——————————————————————— x

# **COMPLAINT**

## TABLE OF CONTENTS

**Page**

PARTIES ………………………………………………………………….. 1

A.  Plaintiff Jeffrey A. Lieberman, M.D. …………………………………... 1

B.  Defendant Ann Marie T. Sullivan, M.D. ……..………………………. 4

C.  Defendant Moira Tashjian ……………..………………………………… 6

D.  Defendant Thomas E. Smith, M.D. …………………………………… 7

E.  Defendant Helen Blair Simpson, M.D. ………………………………… 9

F.  Defendant The Trustees of Columbia University in the
    City of New York ………………………………………………………… 11

G.  Defendant The New York and Presbyterian Hospital …………………… 16

H.  Collective and Joint References To the Defendants ……………………... 19

JURISDICTION AND VENUE ………………………………………………. 20

NATURE OF THE ACTION ………..………………………………………… 22

BACKGROUND ………………………………………………………………… 35

I.  1966-1980: DR. LIEBERMAN PURSUES HIS DREAM OF
    BECOMING A PHYSICIAN AND MARRIES ROSEMARIE
    FERNANDEZ-LARIOS ………………………………………………… 35

II.  1980-1996: DR. LIEBERMAN'S ACADEMIC AND
     PROFESSIONAL APPOINTMENTS IN NEW YORK ……………….... 36

III.  1996-2005: DR. LIEBERMAN'S ACADEMIC AND
      PROFESSIONAL APPOINTMENTS IN NORTH CAROLINA ………. 38

**Page**

IV.     2005-2022: DR. LIEBERMAN'S LEADERSHIP OF
        NYSPI/COLUMBIA/PRESBYTERIAN PSYCHIATRY ……………..…     39

V.      DR. LIEBERMAN'S MEMBERSHIP AND LEADERSHIP
        POSITIONS IN MEDICAL ORGANIZATIONS ………………………     46

VI.     DR. LIEBERMAN'S PROFESSIONAL HONORS AND
        AWARDS ………………………………………………………………..     48

VII.    DR. LIEBERMAN'S SERVICE ON THE EDITORIAL
        BOARDS OF DISTINGUISHED MEDICAL PUBLICATIONS ………     50

VIII.   DR. LIEBERMAN'S PROFESSIONAL PUBLICATIONS ……………     51

IX.     UNDER DR. LIEBERMAN'S LEADERSHIP, THE MENTAL HEALTH
        SERVICES OF NYSPI/COLUMBIA/PRESBYTERIAN PSYCHIATRY
        WERE MADE MORE WIDELY AVAILABLE TO UNDERSERVED
        COMMUNITIES ……………………………………………………………     53

X.      DR. LIEBERMAN'S COMMITMENT TO DIVERSITY
        INITIATIVES ………………………………………………………………     65

XI.     THE PROFESSIONAL AND PERSONAL RESPECT THAT DR.
        LIEBERMAN HAS EARNED FROM COLLEAGUES, FRIENDS AND
        ACQUAINTANCES OF DIVERSE ETHNIC, RACIAL, RELIGIOUS
        AND OTHER CULTURAL BACKGROUNDS …………………………     69

XII.    ALL OF THE DEFENDANTS ARE STATE ACTORS FOR PURPOSES
        OF THE WRONGDOING ALLEGED HEREIN UNDER
        42 U.S.C. § 1983 …………………………………………………………..…     71

        A.     The Individual State Actor Defendants Are Employed
               and Paid By the State of New York ……………………………….     71

        B.     For Purposes of the Wrongdoing Alleged Herein Under 42 U.S.C.
               §§ 1983, *et seq.*, New York State Is Fully Integrated Into,
               Exercises Control Over and Provides Significant Encouragement
               and Support To the Columbia Medical School Department of
               Psychiatry, the Presbyterian/Columbia Hospital Department of
               Psychiatry and the Overlapping Personnel of NYSPI/Columbia
               Presbyterian Psychiatry ……………………………………………     74

ii

|  |  |  | **Page** |
|---|---|---|---|
| (i) | | Summary Overview …………………………………... | 74 |
| (ii) | | The Historical Evolution of NYSPI/Columbia/Presbyterian Psychiatry ………………………………………………. | 77 |
| | (1) | The 1923 New York State Bond Issue ……………. | 77 |
| | (2) | The 1924-1926 New York State Agreements …….. | 78 |
| | (3) | 1952: The Ties Between NYSPI and the Columbia Medical School Department of Psychiatry Deepen ……………………………………………... | 78 |
| | (4) | The 1974 Deed …………………………………….. | 80 |
| | (5) | The 1984 NYS OMH-Columbia University Memorandum of Understanding …………………... | 80 |
| | (6) | The 1985 NYS OMH-Columbia University Revocable Permit …………………………….….... | 82 |
| | (7) | The 2011 NYSPI Audit Report …………………….. | 82 |
| | (8) | The 2011 Memorandum of Understanding ……....... | 91 |
| | (9) | The 2015 Recruitment of a Vice Chair to the Columbia Medical School Department of Psychiatry …………………………………….….. | 95 |
| | (10) | The 2016 Business Associate Agreement …………. | 101 |
| | (11) | The 2018 Peer Review of the Columbia Medical School Department of Psychiatry ………... | 102 |
| | (12) | The 2021 Overview of NYSPI/Columbia/ Presbyterian Psychiatry …………………………... | 110 |
| | (13) | The March 2022 NYSPI/Columbia/ Presbyterian Psychiatry Meeting ………………...... | 117 |

4890-9158-2565, v. 1

**Page**

|  |  | (14) | NYSPI/Columbia/Presbyterian Psychiatry Has Historically Held Itself Out, and Continues Presently To Hold Itself Out, To the Public As a Thoroughly Integrated State-Infused Association ……………………………………… | 118 |

XIII. NYAKIM GATWECH: AN INTERNATIONALLY-RECOGNIZED FASHION MODEL CELEBRITY …………………….   123

XIV. DR. LIEBERMAN'S FEBRUARY 19, 2022 PERSONAL TWEET IN RESPONSE TO A TWITTER POSTING ABOUT CELEBRITY FASHION MODEL NYAKIM GATWECH …………….   136

XV. FREE SPEECH AND VIEWPOINT DIVERSITY WITHIN THE ACADEMIC ENVIRONMENT OF NYSPI/COLUMBIA/ PRESBYTERIAN PSYCHIATRY, COLUMBIA UNIVERSITY AND PRESBYTERIAN/COLUMBIA HOSPITAL …………………….   146

   A.   First Amendment Free-Speech Protections: Generally ………….   146

   B.   Free-Speech Protections in Academic Environments …………...   148

   C.   Columbia University's Free-Expression Policies Govern the Activities of NYSPI/Columbia/Presbyterian Psychiatry, Columbia University and Presbyterian/Columbia Hospital ………   154

   D.   The Individual State Actor Defendants (as Well as the Entity Defendants) Were Fully Aware That Their Punishment of Dr. Lieberman For Posting His February 19, 2022 Personal Tweet Violated His Clearly Established Right To Free Speech Under the First Amendment …………………………………………………   164

XVI. FEBRUARY 22, 2022 THROUGH FEBRUARY 28, 2022: THE DRACONIAN PUNISHMENT IMPOSED UPON DR. LIEBERMAN BY THE INDIVIDUAL STATE ACTOR DEFENDANTS AND THE ENTITY DEFENDANTS IN RETALIATION FOR THE CONTENT OF HIS FEBRUARY 19, 2022 PERSONAL TWEET ………………………….............................................   167

4890-9158-2565, v. 1

**Page**

A.     February 22, 2022: Dr. Lieberman Attempts to
       Appease Certain Misguided Twitter Users ...........................     169

B.     By February 22, 2022, Dr. Lieberman Becomes Concerned
       That Defendants Might Seek To Wrongfully Reprimand
       or Otherwise Censure Him For Exercising His Constitutional Right
       To Post His February 19, 2022 Personal Tweet .......................     170

C.     Tuesday, February 22, 2022: The Longest, Most Unjust and Most
       Crushing Day of Dr. Lieberman's Professional Life ..................     180

       (i)     Dr. Lieberman's February 22, 2022 Morning
               Meeting With His Vice Chairs .................................     181

       (ii)    Interim Dean Rustgi Cancels a Scheduled Zoom
               Meeting With Dr. Lieberman and Others on the
               Morning of February 22, 2022 ................................     185

       (iii)   Dr. Lieberman's February 22, 2022 Morning
               Telephone Conversation With Dr. Smith .......................     186

       (iv)    Sometime in the Early Afternoon of February 22,
               2022: Dr. Lieberman's Team Provides Him With a
               Recommended Apology To Be Circulated To
               NYSPI/Columbia/Presbyterian Psychiatry ....................     188

       (v)     The Close of Business on February 22, 2022: Dr.
               Lieberman Decides To Take From His Home the
               Upcoming Telephone Conference With Certain of
               the Individual State Actor Defendants .......................     194

       (vi)    4:44 p.m. on February 22, 2022: Unbeknownst To
               Dr. Lieberman, Defendants Launch a Negative Public
               Relations Campaign in Furtherance of Their Unlawful
               Scheme ......................................................     197

       (vii)   The Evening of February 22, 2022: Dr. Lieberman Is
               Blindsided by the Individual State Actor Defendants
               During Multiple Telephone Conferences .......................     207

4890-9158-2565, v. 1

**Page**

D.      February 23, 2022: The Entity Defendants, in Concert With
        the Individual State Actor Defendants, Impose Additional
        Punishment Upon and Further Humiliate Dr. Lieberman For
        Having Exercised His Constitutional Right to Post His
        February 19, 2022 Personal Tweet ………………………………..      221

        (i)     February 23, 2022: The 7:30 a.m. Rustgi-
                Initiated Lieberman Zoom Meeting ……………………....      221

        (ii)    February 23, 2022: Dr. Rustgi and Dr. Corwin Expand the
                Negative PR Campaign Against Dr. Lieberman …………..      225

        (iii)   The Afternoon of February 23, 2022: Dr. Sullivan
                Expands Upon the Negative PR Campaign Against
                Dr. Lieberman ………………………………………………..      236

        (iv)    The Evening of February 23, 2022: Dr. Smith
                Expands Upon the Negative PR Campaign
                Against Dr. Lieberman …………………………………….      237

E.      February 24, 2022: Courageous Persons Begin To Reject
        Defendants' Unlawful Scheme Against Dr. Lieberman …………….      245

        (i)     Courageous Voices Within the NYSPI/Columbia/
                Presbyterian Psychiatry Community and Columbia
                University Generally …………………………………………      245

        (ii)    Courageous Voices Outside the NYSPI/Columbia/
                Presbyterian Psychiatry Community and Columbia
                University Generally …………………………………………      254

F.      Thursday, February 24, 2022: Defendants' Negative PR
        Campaign Against Dr. Lieberman Roars Into Overdrive ………….      260

G.      Friday, February 25, 2022: Defendants Continue To
        Punish and Humiliate Dr. Lieberman in Response To
        the Content of His February 19, 2022 Personal Tweet …………….      265

4890-9158-2565, v. 1

**Page**

H.    Monday, February 28, 2022: The Town Hall Meetings Continue and Defendants' Unlawful Scheme Continues To Bear Fruit ........   269

XVII.  MARCH 2022: DEFENDANTS' PERSECUTION AND EXPLOITATION OF DR. LIEBERMAN CONTINUES ....................   271

A.    March 1, 2022: Defendants Hold Yet Another Town Hall Meeting To Advance Their Political, Social and Academic Agendas By Again Condemning Dr. Lieberman ......................   271

B.    Early March 2022: Dr. Armstrong Meets With Dr. Lieberman ...............................................................   272

C.    The March 7, 2022 NYSPI/Columbia/Presbyterian Psychiatry Meeting ...................................................   273

D.    March 18, 2022: The *New York Times* Editorial Board Speaks Out Generally Against Cancel Culture ........................   281

E.    The Second Half of March 2022: Defendants Continue To Punish Dr. Lieberman For His February 19, 2022 Personal Tweet ...................................................................   282

XVIII. APRIL-JUNE 2022: DEFENDANTS IMPOSE ADDITIONAL PUNITIVE MEASURES AS CONDITIONS TO DR. LIEBERMAN'S RESUMPTION OF HIS ACADEMIC, CLINICAL AND RESEARCH ACTIVITIES ...........................................................   284

A.    April 2022: Defendants Continue To Punish Dr. Lieberman For His February 19, 2022 Personal Tweet ...............   285

B.    May 2022: Defendants Continue To Impose Additional Roadblocks To the Resumption of Dr. Lieberman's Academic, Clinical and Research Activities ...........................   295

C.    June 2022: The June 1, 2022 Lieberman Activities-Resumption Agreement Is Executed .....................................   305

4890-9158-2565, v. 1

**Page**

XIX.  ALMOST IMMEDIATELY AFTER THE EXECUTION OF THE
      JUNE 1, 2022 LIEBERMAN ACTIVITIES-RESUMPTION
      AGREEMENT, DEFENDANTS BREACH THE AGREEMENT IN
      FURTHERANCE OF THEIR UNLAWFUL SCHEME ......................   307

XX.   THE JUNE 23, 2022 ZOOM MEETING AMONG DR. SIMPSON,
      DR. LIEBERMAN AND OTHERS .............................................   311

XXI.  THE BUILDINGS-ACCESS PROHIBITION IMPOSED
      BY DEFENDANTS AGAINST DR. LIEBERMAN AS
      FURTHER PUNISHMENT FOR THE CONTENT OF HIS
      FEBRUARY 19, 2022 PERSONAL TWEET .................................   323

      A.   Defendants Cannot Lawfully Bar Dr. Lieberman From
           the State-Owned Buildings in Which NYSPI/Columbia/
           Presbyterian Psychiatry Operates .......................................   324

      B.   Defendants' Buildings-Access Prohibition Has Severely Hampered
           Dr. Lieberman's Ability To Resume His Academic, Clinical
           and Research Activities ...................................................   327

XXII. LATE SUMMER OF 2022: DEFENDANTS CONCEDE THE
      POLITICAL MOTIVES FOR THEIR UNLAWFUL SCHEME,
      AS THEY CONTINUE TO PUNISH DR. LIEBERMAN FOR
      HIS FEBRUARY 19, 2022 PERSONAL TWEET, INCLUDING
      PROHIBITING HIM FROM ENGAGING IN TEACHING
      ACTIVITIES AT PRESBYTERIAN/COLUMBIA HOSPITAL .............   334

      A.   The August 3, 2022 Smith-Lieberman Telephone
           Conversation ..............................................................   334

      B.   By Means of Defendants' August 22, 2022 Hospital
           Teaching Prohibition and Other Actions, Defendants
           Continue To Punish Dr. Lieberman For His
           February 19, 2022 Personal Tweet ...................................   336

**Page**

    C.    By Undermining Dr. Lieberman's Ability To Resume His Academic, Clinical and Research Activities in Retaliation For His February 19, 2022 Personal Tweet, Defendants Not Only Breached the June 1, 2022 Lieberman Activities-Resumption Agreement, But Also Deliberately Contravened the Faculty Policy of the Columbia Medical School Department of Psychiatry…………………………………………………………….. 341

XXIII. SINCE FEBRUARY 2022, DEFENDANTS HAVE CONTINUED TO DELIBERATELY THWART DR. LIEBERMAN'S ABILITY TO RESUME HIS ACADEMIC, CLINICAL AND RESEARCH ACTIVITIES BY DENYING HIM NECESSARY ADMINISTRATIVE SUPPORT AND FUNDING ……………………… 343

    A.    Defendants' Petty Insults To Dr. Lieberman Continue …………… 345

    B.    Defendants Continue To Deny Research Funding To Dr. Lieberman …………………………………………………… 346

    C.    The Deficient Haven Avenue Office Space To Which Dr. Lieberman Has Been Relegated ……………………… 350

XXIV. THROUGH THEIR UNLAWFUL SCHEME, DEFENDANTS HAVE DELIBERATELY SOUGHT TO UNDERMINE DR. LIEBERMAN'S RELATIONSHIPS WITH THIRD PARTIES ………….. 357

XXV. THE INJURIES AND DAMAGES SUFFERED BY DR. LIEBERMAN AS A DIRECT AND PROXIMATE RESULT OF THE EGREGIOUS WRONGDOING PERPETRATED AGAINST HIM BY DEFENDANTS ………………….. 365

FIRST CLAIM FOR RELIEF (AGAINST THE INDIVIDUAL STATE ACTOR DEFENDANTS, IN THEIR INDIVIDUAL CAPACITIES, FOR MONEY DAMAGES UNDER 42 U.SC. § 1983 FOR THEIR INTENTIONAL, ONGOING RETALIATION AGAINST DR. LIEBERMAN FOR EXERCISING HIS FREE-SPEECH RIGHTS UNDER THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION) …………………………………………. 367

ix

**Page**

A.     Each of the Individual State Actor Defendants
       Acted Under Color of New York State Law ………………………     370

B.     Dr. Lieberman's February 19, 2022 Personal Tweet
       Was Posted in His Personal Capacity ……………………………..     373

C.     Through His February 19, 2022 Personal Tweet, Dr.
       Lieberman Commented Upon a Matter of Public Concern ……….     373

D.     Through Defendants' Unlawful Scheme, the Individual State
       Actor Defendants Retaliated Against Dr. Lieberman For
       the Content of His February 19, 2022 Personal Tweet ……………     376

E.     Dr. Lieberman's February 19, 2022 Personal Tweet Caused
       No Disruption To the Functioning of the Operations of NYSPI/
       Columbia/Presbyterian Psychiatry or the Entity Defendants,
       Especially in Light of Their Strong Commitment To Free
       Expression and the Exchange of Competing Viewpoints ………….     377

F.     Because Dr. Lieberman's February 19, 2022 Personal Tweet
       Caused No Disruption To the Functioning of the Operations of
       NYSPI/Columbia/Presbyterian Psychiatry or the Entity
       Defendants, the Individual State Actor Defendants (in Concert
       With the Entity Defendants) Endeavored Disingenuously To
       Manufacture the Appearance of Disruption Among the Targeted
       Constituencies ……………………………………………………     384

G.     The Individual State Actor Defendants Are
       Not Entitled To Qualified Immunity …………………………........     388

       (i)     The Individual State Actor Defendants Knew Full Well
               That the Willful, Intentional and Malicious Acts Perpetrated
               by Them (in Concert With the Entity Defendants) Against
               Dr. Lieberman Pursuant To Defendants' Unlawful Scheme
               Violated Dr. Lieberman's First Amendment Free-Speech
               Rights …………………………………………………………     388

4890-9158-2565, v. 1

**Page**

    (ii)    It Was Not Objectively Reasonable For the Individual State Actor Defendants To Have Acted (and To Continue To Act) With the Willfulness, Intent and Malice Embodied in the Unlawful Scheme Perpetrated Against Dr. Lieberman in Retaliation For the Content of His February 19, 2022 Personal Tweet …………………….................................. 389

SECOND CLAIM FOR RELIEF (AGAINST THE ENTITY DEFENDANTS, AS STATE ACTORS, FOR MONEY DAMAGES UNDER 42 U.SC. § 1983 FOR THEIR INTENTIONAL, ONGOING RETALIATION AGAINST DR. LIEBERMAN FOR EXERCISING HIS FREE-SPEECH RIGHTS UNDER THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION) ……………………………………… 390

    A.    The Entity Defendants Are State Actors With Respect To Their Intimate Involvement With the State of New York Through NYSPI/Columbia/Presbyterian Psychiatry and Defendants' Unlawful Scheme …………………………….......... 390

    B.    The Entity Defendants Are Liable For Willfully, Intentionally and Maliciously Engaging in Defendants' Unlawful Scheme (in Concert With the Individual State Actor Defendants) in Retaliation For the Content of Dr. Lieberman's February 19, 2022 Personal Tweet …………..... 396

    C.    Dr. Lieberman's February 19, 2022 Personal Tweet Was Posted in His Personal Capacity ………….................................. 402

    D.    Through His February 19, 2022 Personal Tweet, Dr. Lieberman Commented Upon a Matter of Public Concern ……….... 402

    E.    Through Defendant's Unlawful Scheme, the Entity Defendants Retaliated Against Dr. Lieberman For the Content of His February 19, 2022 Personal Tweet ………………... 403

4890-9158-2565, v. 1

**Page**

F.    Dr. Lieberman's February 19, 2022 Personal Tweet
      Caused No Disruption To the Functioning of the Operations
      of NYSPI/Columbia/Presbyterian Psychiatry or the Entity
      Defendants, Especially in Light of Their Strong Commitment
      To Free Expression and the Exchange of Competing Viewpoints …       404

G.    Because Dr. Lieberman's February 19, 2022 Personal Tweet Cause
      Caused No Disruption To the Functioning of the Operations of
      NYSPI/Columbia/Presbyterian Psychiatry or the Entity Defendants,
      the Entity Defendants (in Concert With the Individual State Actor
      Defendants) Endeavored Disingenuously To Affirmatively
      Manufacture the Appearance of Disruption Among the Targeted
      Constituencies …………………………………………………       406

H.    The Entity Defendants Are Not Entitled
      To Qualified Immunity …………………………..............................       408

THIRD CLAIM FOR RELIEF (AGAINST THE INDIVIDUAL STATE
ACTOR DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR
PERMANENT INJUNCTIVE RELIEF UNDER 42 U.SC. § 1983 FOR
THEIR INTENTIONAL, ONGOING RETALIATION AGAINST DR.
LIEBERMAN FOR THE CONTENT OF HIS FEBRUARY 19, 2022
PERSONAL TWEET) …………………………………………………..       409

FOURTH CLAIM FOR RELIEF (AGAINST THE ENTITY
DEFENDANTS, AS STATE ACTORS, FOR PERMANENT INJUNCTIVE
RELIEF UNDER 42 U.S.C. § 1983 FOR THEIR INTENTIONAL, ONGOING
RETALIATION AGAINST DR. LIEBERMAN FOR THE CONTENT OF HIS
FEBRUARY 19, 2022 PERSONAL TWEET) ………………………………       411

FIFTH CLAIM FOR RELIEF (AGAINST THE ENTITY DEFENDANTS
FOR VIOLATION OF SECTION 201-d(2)(c) OF THE NEW YORK
LABOR LAW) …………………………………………………………..       414

A.    Dr. Lieberman's February 19, 2022 Personal Tweet Was
      Posted From His Own Twitter Account From Home
      Over a Holiday Weekend ……………………………………       416

**Page**

    B.     Dr. Lieberman's February 19, 2022 Personal
        Tweet Constituted Recreational Activity ……………………….    416

SIXTH CLAIM FOR RELIEF (AGAINST THE ENTITY DEFENDANTS
FOR BREACH OF THE JUNE 1, 2022 LIEBERMAN ACTIVITIES-
RESUMPTION AGREEMENT) ……………………………………………….    425

SEVENTH CLAIM FOR RELIEF (AGAINST THE ENTITY
DEFENDANTS FOR PROMISSORY ESTOPPEL) ……………………………..    430

EIGHTH CLAIM FOR RELIEF (AGAINST THE ENTITY DEFENDANTS FOR
BREACH OF THE AGREEMENTS THAT GRANT DR. LIEBERMAN, AS A
COLUMBIA UNIVERSITY FACULTY MEMBER, ACCESS TO AND USE OF
NYS OMH/NYSPI FACILITIES) ………………………………………………..    437

NINTH CLAIM FOR RELIEF (AGAINST THE INDIVIDUAL STATE ACTOR
DEFENDANTS, IN THEIR INDIVIDUAL CAPACITIES, AND THE ENTITY
DEFENDANTS FOR CIVIL CONSPIRACY) ……………………………………    445

TENTH CLAIM FOR RELIEF (AGAINST THE INDIVIDUAL STATE ACTOR
DEFENDANTS, IN THEIR INDIVIDUAL CAPACITIES, AND
THE ENTITY DEFENDANTS FOR INTENTIONAL INFLICTION OF
EMOTIONAL DISTRESS) …………………………………………………….    447

ELEVENTH CLAIM FOR RELIEF (AGAINST THE ENTITY
DEFENDANTS FOR AN ACCOUNTING) ……………………………………...    452

TWELFTH CLAIM FOR RELIEF (AGAINST ALL DEFENDANTS
FOR A DECLARATORY JUDGMENT) …………………………………………    454

THROUGH THE CONTINUAL PERPETRATION OF THEIR
UNLAWFUL SCHEME SINCE FEBRUARY 22, 2022,
DEFENDANTS HAVE ENGAGED IN CONTINUING WRONGFUL
CONDUCT DURING THE PAST 15 MONTHS …………………………………    455

IN LIGHT OF DEFENDANTS' INTENTIONAL, WILLFUL AND MALICIOUS
CONDUCT IN PERPETRATING THEIR UNLAWFUL SCHEME AGAINST
HIM, DR. LIEBERMAN IS ENTITLED TO AN AWARD OF PUNITIVE
DAMAGES ………………………………………………………………………..    455

4890-9158-2565, v. 1

**Page**

DR. LIEBERMAN IS ENTITLED TO AN AWARD OF ATTORNEYS'
FEES, EXPERT FEES AND COSTS UNDER 42 U.S.C. § 1988 ………………..    457

PLAINTIFF'S JURY DEMAND ……………………………………………….    457

PRAYER FOR RELIEF ……………………………………………………..    458

LIST OF DEFINED TERMS ………………………………………………..    Appendix

Jeffrey A. Lieberman, M.D. ("***Dr. Lieberman***" or "***Plaintiff***"), complaining of defendants Ann Marie T. Sullivan, M.D. ("***Dr. Sullivan***"); Moira Tashjian ("***Ms. Tashjian***"); Thomas E. Smith, M.D. ("***Dr. Smith***"); Helen Blair Simpson, M.D. ("***Dr. Simpson***"); The Trustees of Columbia University in the City of New York, of which Columbia University in the City of New York ("***Columbia University***") and Columbia University Vagelos College of Physicians and Surgeons ("***Columbia Medical School***") are a part; and The New York and Presbyterian Hospital (d/b/a NewYork-Presbyterian Hospital), of which NewYork-Presbyterian/Columbia University Irving Medical Center ("***Presbyterian/Columbia Hospital***" or the "***Hospital***") is a part, alleges as follows:

## PARTIES

### A.       Plaintiff Jeffrey A. Lieberman, M.D.

1.       Dr. Lieberman is an adult over the age of 18 years, who resides in New York County, New York.

2.       During a portion of the period relevant to the matters addressed herein (the "***Relevant Time Period***"), Dr. Lieberman held various positions, including, among others, Executive Director of the New York State Psychiatric Institute (the "***NYS Psychiatric Institute***" or "***NYSPI***"), which is a part of the New York State Office of Mental Health (the "***NYS Office of Mental Health***" or "***NYS OMH***"); Chair and tenured faculty member of the Columbia Medical School Department of Psychiatry; and Psychiatrist-in-Chief of Presbyterian/Columbia Hospital.

3.      Through a deep love for and unwavering commitment to his profession over many decades, Dr. Lieberman became a world-renowned psychiatrist and a leader in academic and clinical psychiatry.

4.      Through much hard work and a passionate dedication to his chosen field, Dr. Lieberman, in his roles as Executive Director of NYSPI, Chair and tenured faculty member of the Columbia Medical School Department of Psychiatry (sometimes referred to hereinafter as "***Columbia Psychiatry***" or the "***Department***") and Psychiatrist-in-Chief of Presbyterian/ Columbia Hospital, elevated the profile, practice and capabilities of NYSPI, the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry (also referred to hereinafter as the "***Hospital Department of Psychiatry***").

5.      Over the past century or so, NYSPI, the Columbia Medical School Department of Psychiatry and the Hospital Department of Psychiatry have melded their overlapping medical and other personnel; their shared infrastructure (including office, laboratory and other physical space); their shared administration; their collective funding initiatives; their integrated clinical research efforts; their collective efforts to teach and train medical students and other personnel; their collective outreach to underserved communities; and their shared patient-care goals and objectives into an intimately intertwined and interdependent New York State-dominated association dedicated to providing top-notch psychiatric research and patient care (collectively, "***NYSPI/Columbia/Presbyterian Psychiatry***" or the "***Association***").

2

6.     An overview of Dr. Lieberman's professional accomplishments and achievements, including on behalf of NYSPI/Columbia/Presbyterian Psychiatry, is set forth in Background Sections II-XI, below.

7.     Dr. Lieberman served in his tripartite role as Executive Director of NYSPI, Chair and tenured faculty member of Columbia Psychiatry and Psychiatrist-in-Chief of Presbyterian/Columbia Hospital from January 2005 through February 2022, when, as demonstrated in detail herein, he was willfully, intentionally, maliciously, unconstitutionally and otherwise unlawfully removed from those positions by Defendants in retaliation for having exercised — in his personal capacity from his own home on Saturday, February 19, 2022, of Presidents' Day Weekend — his rights under the First Amendment to the United States Constitution to post a comment via the social media platform Twitter (a "***Tweet***") that consisted of 15 innocuous words that were obviously intended to compliment a public figure, the internationally renowned fashion model, Nyakim Gatwech.

8.     Ms. Gatwech had been the subject of an initial Tweet (the "***Original Gatwech Tweet***") that was authored by a third party unknown to Dr. Lieberman and which appeared in Dr. Lieberman's Twitter feed after his wife, Rosemarie Fernandez Larios (sometimes referred to hereinafter as "***Rosemarie***"), had quite enthusiastically brought to Dr. Lieberman's attention on the evening of February 19, 2022 the stunning photo of Ms. Gatwech that had also accompanied the Original Gatwech Tweet.

3

9.      It was to the Original Gatwech Tweet that Dr. Lieberman responded spontaneously with his 15-word Tweet of February 19, 2022 (the "***February 19, 2022 Personal Tweet***").  *See* Nature of the Action and Background Section XIV, below.

10.      As also demonstrated in detail herein, Defendants' choreographed, unconstitutional and otherwise unlawful removal of Dr. Lieberman from his leadership positions with NYSPI/Columbia/Presbyterian Psychiatry in retaliation for his February 19, 2022 Personal Tweet constituted only the first salvo in a series of ongoing willful, intentional and malicious retaliatory acts against Dr. Lieberman that have taken place over the past 15 months.

B.      **Defendant Ann Marie T. Sullivan, M.D.**

11.      Upon information and belief, defendant Dr. Sullivan resides in and is employed and paid by the State of New York (also referred to hereinafter as "***New York State***" or the "***State***").

12.      Upon information and belief, Dr. Sullivan graduated from New York University Medical School and is licensed to practice medicine in the State of New York.

13.      During the Relevant Time Period, Dr. Sullivan participated in the affairs, management and/or oversight of NYSPI/Columbia/Presbyterian Psychiatry.

14.      During the Relevant Time Period, Dr. Sullivan served as the Commissioner of the NYS Office of Mental Health.  Upon information and belief, during the Relevant Time Period, Dr. Sullivan reported directly to New York State Governor Kathy Hochul.

4

15.     During his tenure as Executive Director of NYSPI, Dr. Lieberman worked with Dr. Sullivan in connection with myriad New York State psychiatric and mental health initiatives.  For some period of time, Dr. Lieberman, in his role as President of the American Psychiatric Association, worked with Dr. Sullivan in her role as Speaker of the Assembly of said Association.  Moreover, in or about 2014, Dr. Lieberman supported Dr. Sullivan's candidacy to become Commissioner of the NYS OMH.

16.     In direct retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Sullivan deliberately conspired and worked in concert with the other defendants named herein to, among other things, willfully, intentionally, wrongfully and maliciously (a) strip Dr. Lieberman of his positions as Executive Director of NYSPI, Chair of the Columbia Medical School Department of Psychiatry and Psychiatrist-in-Chief of Presbyterian/ Columbia Hospital; (b) destroy Dr. Lieberman's personal and professional reputations; (c) deny Dr. Lieberman the ability to resume the academic, clinical and research activities to which he is entitled and expected to engage on behalf of The Trustees of Columbia University in the City of New York (of which Columbia University, Columbia Medical School and the Columbia Medical School Department of Psychiatry are a part) and The New York and Presbyterian Hospital (of which Presbyterian/Columbia Hospital is a part) (jointly, the "***Entity Defendants***"); and (d) tout the destruction of Dr. Lieberman to advance the overlapping political, social and academic agendas of Dr. Sullivan, the Office of the New York State Governor (also referred to as "***Chambers***") and the other defendants named herein.

5

17.     Dr. Sullivan is sued herein (a) in her individual capacity in connection with the claim for money damages alleged against her under 42 U.S.C. § 1983 (the "***Section 1983 Money Damages Claim***") and the common law claims that are alleged against her and (b) in her official capacity in connection with the claim alleged against her for injunctive relief under 42 U.S.C. § 1983 (the "***Section 1983 Injunctive Relief Claim***").

### C.     Defendant Moira Tashjian

18.     Upon information and belief, defendant Ms. Tashjian resides in and is employed and paid by the State of New York.

19.     Upon information and belief, Ms. Tashjian earned a Masters in Public Administration from Marist College.

20.     During the Relevant Time Period, Ms. Tashjian participated in the affairs, management and/or oversight of NYSPI/Columbia/Presbyterian Psychiatry.

21.     During the Relevant Time Period, Ms. Tashjian served as the Executive Deputy Commissioner of the NYS Office of Mental Health.  Upon information and belief, during the Relevant Time Period, Ms. Tashjian reported directly to Dr. Sullivan.

22.     Dr. Lieberman interacted with Ms. Tashjian in connection with NYSPI/Columbia/Presbyterian Psychiatry matters from in or about October 2021, when she was appointed Executive Deputy Commissioner of NYS OMH, through February 22, 2022.

6

23.     In direct retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Ms. Tashjian deliberately conspired and worked in concert with the other defendants named herein to, among other things, willfully, intentionally, wrongfully and maliciously (a) strip Dr. Lieberman of his positions as Executive Director of NYSPI, Chair of the Columbia Medical School Department of Psychiatry and Psychiatrist-in-Chief of Presbyterian/ Columbia Hospital; (b) destroy Dr. Lieberman's personal and professional reputations; (c) deny Dr. Lieberman the ability to resume the academic, clinical and research activities to which he is entitled and expected to engage on behalf of the Entity Defendants; and (d) tout the destruction of Dr. Lieberman to advance the overlapping political, social and academic agendas of Ms. Tashjian, the Office of the New York State Governor (Chambers) and the other defendants named herein.

24.     Ms. Tashjian is sued herein (a) in her individual capacity in connection with the Section 1983 Money Damages Claim and the common law claims that are alleged against her and (b) in her official capacity in connection with the Section 1983 Injunctive Relief Claim that is alleged against her.

**D.     <u>Defendant Thomas E. Smith, M.D.</u>**

25.     Upon information and belief, defendant Dr. Smith resides in the State of Connecticut and is employed and paid by the State of New York and the Entity Defendants. Upon information and belief, Dr. Smith works in the State of New York.

4890-9158-2565, v. 1

26.     Upon information and belief, Dr. Smith graduated from Wayne State University Medical School and is licensed to practice medicine in the State of New York.

27.     During the Relevant Time Period, Dr. Smith participated in the affairs, management and/or oversight of NYSPI/Columbia/Presbyterian Psychiatry.

28.     During the Relevant Time Period, Dr. Smith served as the Chief Medical Officer of the NYS Office of Mental Health and held a position on the faculty of the Columbia Medical School Department of Psychiatry.  Upon information and belief, during the Relevant Time Period, Dr. Smith, in his position as Chief Medical Officer of the NYS Office of Mental Health, reported directly to Dr. Sullivan and Ms. Tashjian.

29.     Sometime in or about 2001, Dr. Lieberman was instrumental in recruiting Dr. Smith to join the Columbia Medical School Department of Psychiatry, where Dr. Smith remains a Special Lecturer.  Dr. Lieberman also supported Dr. Smith's candidacy for Chief Medical Officer of NYS OMH in or about 2019.

30.     In direct retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Smith deliberately conspired and worked in concert with the other defendants named herein to, among other things, willfully, intentionally, wrongfully and maliciously (a) strip Dr. Lieberman of his positions as Executive Director of NYSPI, Chair of the Columbia Medical School Department of Psychiatry and Psychiatrist-in-Chief of Presbyterian/ Columbia Hospital; (b) destroy Dr. Lieberman's personal and professional reputations; (c) deny Dr. Lieberman the ability to resume the academic, clinical and research activities to which he is

4890-9158-2565, v. 1

entitled and expected to engage on behalf of the Entity Defendants; and (d) tout the destruction of Dr. Lieberman to advance the overlapping political, social and academic agendas of Dr. Smith, the Office of the New York State Governor (Chambers) and the other defendants named herein.

31.     As a result of deliberately conspiring and working in concert with the other defendants named herein to perpetrate the willful, intentional, wrongful and malicious acts referenced in the immediately preceding paragraph, above, and addressed in more detail hereinafter, Dr. Smith was named to serve for a brief period of time as the Acting Executive Director of NYSPI.

32.     Dr. Smith is sued herein (a) in his individual capacity in connection with the Section 1983 Money Damages Claim and the common law claims that are alleged against him and (b) in his official capacity in connection with the Section 1983 Injunctive Relief Claim that is alleged against him.

### E.     Defendant Helen Blair Simpson, M.D.

33.     Upon information and belief, defendant Dr. Simpson resides in and is employed and paid by the State of New York and the Entity Defendants.

34.     Upon information and belief, Dr. Simpson graduated from Weill Cornell Medical College and is licensed to practice medicine in the State of New York.

4890-9158-2565, v. 1

35.     During the Relevant Time Period, Dr. Simpson participated in the affairs, management and/or oversight of NYSPI/Columbia/Presbyterian Psychiatry.

36.     During a portion of the Relevant Time Period, Dr. Simpson served as the Vice Chair of Research for the Columbia Medical School Department of Psychiatry and reported directly to Dr. Lieberman.

37.     During the Relevant Time Period, Dr. Simpson served as a member of the faculty of the Columbia Medical School Department of Psychiatry.

38.     During Dr. Lieberman's tenure as the head of NYSPI/Columbia/Presbyterian Psychiatry, Dr. Lieberman supported Dr. Simpson's academic and research career, served as her mentor, arranged for an executive coach to work with her and appointed her as the Vice Chair for Research for the Columbia Medical School Department of Psychiatry.

39.     In direct retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Simpson deliberately conspired and worked in concert with the other defendants named herein to, among other things, willfully, intentionally, wrongfully and maliciously (a) strip Dr. Lieberman of his positions as Executive Director of NYSPI, Chair of the Columbia Medical School Department of Psychiatry and Psychiatrist-in-Chief of Presbyterian/Columbia Hospital; (b) destroy Dr. Lieberman's personal and professional reputations; (c) deny Dr. Lieberman the ability to resume the academic, clinical and research activities to which he is entitled and expected to engage on behalf of the Entity Defendants; and (d) tout the destruction of Dr. Lieberman to advance the overlapping political, social and

10

academic agendas of Dr. Simpson, the Office of the New York State Governor (Chambers) and the other defendants named herein.

40.     As a reward for deliberately conspiring and working in concert with the other defendants named herein to perpetrate the intentional, malicious and wrongful acts referenced in the immediately preceding paragraph, above, and addressed in more detail hereinafter, Dr. Simpson was named the Interim Executive Director of NYSPI, the Interim Chair of the Columbia Medical School Department of Psychiatry and the Interim Psychiatrist-in-Chief of Presbyterian/Columbia Hospital, positions that she continues to hold to date.

41.     Dr. Simpson is sued herein (a) in her individual capacity in connection with the Section 1983 Money Damages Claim and the common law claims that are alleged against her and (b) in her official capacity in connection with the Section 1983 Injunctive Relief Claim that is alleged against her.

### F.     Defendant The Trustees of Columbia University in the City of New York

42.     Upon information and belief, The Trustees of Columbia University in the City of New York is headquartered at Low Memorial Library, 535 West 116th Street, New York, New York.

43.     Upon information and belief, Columbia University, which is a part of The Trustees of Columbia University in the City of New York, is an institution of higher learning located in the City of New York.

11

44.     According to its website, Columbia University "was founded in 1754 as King's College by royal charter of King George II of England" and is "the oldest institution of higher learning in the [S]tate of New York and the fifth oldest [institution of higher learning] in the United States."  *See* Columbia University Website, *https://www.columbia.edu/content/ history-columbia-university*.

45.     According to Columbia University's website, "[i]n July 1754, Samuel Johnson held the first classes in a new schoolhouse adjoining Trinity Church, located on what is now lower Broadway in Manhattan."  The website notes proudly that, "[a]t King's College, the future leaders of colonial society could receive an education designed to 'enlarge the Mind, improve the Understanding, polish the whole Man, and qualify them to support the brightest Characters in all the elevated stations in life.'"  *See* Columbia University Website, *https://www.columbia.edu/content/history-columbia-university*.

46.     Columbia University's website also explains:  "The American Revolution brought the growth of the college to a halt, forcing a suspension of instruction in 1776 that lasted for eight years.  However, the institution continued to exert a significant influence on American life through the people associated with it.  Among the earliest students and trustees of King's College were John Jay, the first chief justice of the United States; Alexander Hamilton, the first secretary of the treasury; Gouverneur Morris, the author of the final draft of the U.S. Constitution; and Robert R. Livingston, a member of the five-man committee that drafted the Declaration of Independence."  *See* Columbia University Website, *https://www.columbia.edu/ content/history-columbia-university*.

4890-9158-2565, v. 1

47.     "The college reopened in 1784 with a new name — Columbia — that embodied the patriotic fervor that had inspired the nation's quest for independence." *See* Columbia University Website, *https://www.columbia.edu/content/history-columbia-university*.

48.     "When Seth Low became Columbia's president in 1890, he vigorously promoted the university ideal for the College, placing the fragmented federation of autonomous and competing schools under a central administration that stressed cooperation and shared resources." *See* Columbia University Website, *https://www.columbia.edu/ content/history-columbia-university*.

49.     "In 1896, the trustees officially authorized the use of yet another new name, Columbia University, and today the institution is officially known as Columbia University in the City of New York." *See* Columbia University Website, *https://www.columbia.edu/ content/history-columbia-university*.

50.     Upon information and belief, Columbia Medical School, which is a part of Columbia University, which, in turn, is a part of The Trustees of Columbia University in the City of New York, is an institution of higher learning located at 630 West 168th Street, New York, New York.

51.     Upon information and belief, Columbia Medical School was established in 1767, when Columbia University was known as King's College.  Upon information and belief, Columbia Medical School was the first school in the American Colonies to grant a Doctor of Medicine degree.  *See* Columbia Medical School Website, *https://www.vagelos.columbia.edu/ about-us/history-vagelos-college-physicians-and-surgeons*.

52.     According to Columbia University's website, "the medical school came under the aegis of [Columbia] University in 1891[.]"  *See* Columbia University Website, *https://www.columbia.edu/content/history-columbia-university*.

53.     Upon information and belief, Columbia Medical School partnered with Presbyterian Hospital "in developing the Columbia-Presbyterian Medical Center in 1928, putting patient care, research and education on the same campus.  The hospital, since renamed NewYork-Presbyterian Hospital, is the primary teaching hospital for Columbia [Medical School.]"  *See* Columbia Medical School Website, *https://www.vagelos.columbia.edu/about-us/history-vagelos-college-physicians-and-surgeons*.

54.     The Columbia Medical School Department of Psychiatry is a part of Columbia Medical School, which, in turn, is a part of Columbia University, which, in turn, is a part of The Trustees of Columbia University in the City of New York.

55.     The Columbia Medical School Department of Psychiatry is a world-renowned teaching and clinical department devoted to mental health and mental illness.

56.     Upon information and belief, the Columbia Medical School Department of Psychiatry is located predominantly at 1051 Riverside Drive, New York, New York, which is the same building in which NYSPI is housed.

57.     The Columbia Medical School Department of Psychiatry website states: "From its origins as the New York State Pathological Institute in 1896, its more than 90-year-old affiliation with Columbia University, and its partnership with NewYork-Presbyterian Hospital, Columbia Psychiatry has become an international leader in understanding mental health and mental illness.  Currently, Columbia Psychiatry ranks #3 in research funding from the National Institutes of Health and has been in the top 3 for the past decade." *See* Columbia Medical School Department of Psychiatry Website, *https://www.columbiapsychiatry.org/sites/default/files/media/ documents/2022-03/columbia_psychiatry_at_a_glance_2021-2022_052121_1.pdf*.

58.     The Columbia Medical School Department of Psychiatry website also states: "Columbia Psychiatry is supported in its vital mission by appropriations from the state of New York, public and private research grants, clinical services, and philanthropic gifts.  In the current fiscal year, our annual budget [is comprised of] $82 million in New York State support and $126.4 million in sponsored research funds (CU: $33.7; [Research Foundation for Mental Hygiene, Inc. ("***RFMH***")]: $92.7), of which $119 million came from federal sources.  Clinical services adds an additional $48 million, and gifts and endowments provided an additional $19 million.  It is through this support that we are expanding our understanding of mental health and better understanding how to provide support and treatment to those who need it most." *See*

15

Columbia Medical School Department of Psychiatry Website, *https://www.columbia psychiatry.org/sites/default/files/media/documents/2022-03/columbia_psychiatry_at _a_glance_2021-2022_052121_1.pdf*.

59.     The Columbia Medical School Department of Psychiatry website also states:  "Columbia Psychiatry provides exemplary care in a variety of settings in New York City and its surrounding communities, [including] the many in- and out-patient programs and studies offered at the New York State Psychiatric Institute and NewYork-Presbyterian Hospital at Columbia University Irving Medical Center."  *See https://www.columbiapsychiatry.org/sites/ /files/media/documents/2022-03/columbia_psychiatry_at_a_glance_2021-2022_052121_1.pdf*.

60.     Upon information and belief, Columbia University and the Columbia Medical School Department of Psychiatry have had a longstanding and intimate affiliation with NYSPI.  Indeed, the Columbia University website notes proudly that "[t]he University . . .  is also home to the New York Psychiatric Institute[.]"  *See* Columbia University Website, *https://www.columbia.edu/content/history-columbia-university*.  *See also* Background Section XII, below.

### G.      Defendant The New York and Presbyterian Hospital

61.     Upon information and belief, The New York and Presbyterian Hospital (d/b/a NewYork-Presbyterian Hospital) maintains an office at 630 West 168th Street, New York, New York.

16

62.     Upon information and belief, Presbyterian/Columbia Hospital, which is a part of The New York and Presbyterian Hospital (d/b/a NewYork-Presbyterian Hospital), is headquartered at Fort Washington and West 165th Street in Manhattan.  The Presbyterian/ Columbia Hospital headquarters is linked by walkways to 1051 Riverside Drive, which, as noted, is the building in which NYSPI and the Columbia Medical School Department of Psychiatry are predominantly housed.

63.     Presbyterian/Columbia Hospital is "affiliated with Columbia University College of Physicians and Surgeons [and] is one of the leading academic medical centers in the world.  Providing emergency, primary, and specialty care in virtually every field of medicine, the 738-bed Medical Center offers a number of distinguished programs."  *See* NewYork-Presbyterian Hospital Website, *https://www.nyp.org/about*.

64.     The Presbyterian/Columbia Hospital Department of Psychiatry is a part of Presbyterian/Columbia Hospital.

65.     The Presbyterian/Columbia Hospital Department of Psychiatry is world-renowned for its training of psychiatrists and clinical care of patients suffering from mental illness.

66.     "The faculty of the Departments of Psychiatry at Weill Cornell Medicine and Columbia University Vagelos College of Physicians and Surgeons are leaders in psychiatric research and education and experts in their fields.  Through [its] affiliation with two of the nation's top universities, [its] behavioral healthcare providers engage in the pursuit of knowledge

17

and the advancement of patient care.  They are joined by clinical psychologists, social workers, psychiatric nurses, and other professionals who work as a team to provide each patient with customized care."  *See* NewYork-Presbyterian Hospital Website, *https://www.nyp.org/ psychiatry*.

67.     Like the Columbia Medical School Department of Psychiatry, the Hospital Department of Psychiatry has had a longstanding and intimate relationship with NYSPI. NYSPI's website explains:  "The New York State Psychiatric Institute (NYSPI), established in 1895, was one of the first institutions in the United States to integrate teaching, research, and therapeutic approaches to the care of patients with mental illnesses.  In 1925, NYSPI affiliated with Presbyterian Hospital, adding general hospital facilities to the Institute's psychiatric services and research laboratories."  *See* NYSPI Website, *https://nyspi.org/nyspi/about-us*.

68.     The NYSPI website further explains:  "These treatment, training, and research facilities were supplemented in 1983 by a 14-floor Psychiatric Research Building, the Kolb Annex.  . . .  Walkway bridges to and from the Kolb Annex and NewYork-Presbyterian Hospital (NYPH) provide comfortable and efficient all-weather avenues for patient and staff travel within the Columbia University Irving Medical Center[.]  . . .  Through the years, distinguished figures in American psychiatry have served as directors of the Psychiatric Institute. . . .  The Institute is the flagship for the Columbia University Department of Psychiatry, for which it is the primary location of research and educational activities."  *See* NYSPI Website, *https://nyspi.org/nyspi/about-us*.

18

69.     As noted, the Presbyterian/Columbia Hospital Department of Psychiatry is headquartered at Fort Washington and West 165th Street in Manhattan and is linked by walkways to 1051 Riverside Drive, the building in which NYSPI and the Columbia Medical School Department of Psychiatry are predominantly located.

### H.     Collective and Joint References To the Defendants

70.     Defendants Dr. Sullivan, Ms. Tashjian, Dr. Smith, Dr. Simpson, The Trustees of Columbia University in the City of New York (of which Columbia University, Columbia Medical School and the Columbia Medical School Department of Psychiatry are a part) and The New York and Presbyterian Hospital (of which Presbyterian/Columbia Hospital and the Hospital Department of Psychiatry are a part) are referred to hereinafter collectively as the "***Defendants***."

71.     Defendants Dr. Sullivan, Ms. Tashjian, Dr. Smith and Dr. Simpson are referred to hereinafter collectively as the "***Individual State Actor Defendants***."

72.     As noted, The Trustees of Columbia University in the City of New York (of which Columbia University, Columbia Medical School and the Columbia Medical School Department of Psychiatry are a part) and The New York and Presbyterian Hospital (of which Presbyterian/Columbia Hospital and the Hospital Department of Psychiatry are a part) are referred to jointly herein as the Entity Defendants.

73.     Dr. Lieberman expressly reserves his right to seek to amend this Complaint if, upon engaging in discovery in this lawsuit or through other means, he learns the

19

identities of persons who should be included as additional Individual State Actor Defendants or otherwise and/or the identities of entities that should be included as additional Entity Defendants.

## JURISDICTION AND VENUE

74.     The federal claims alleged herein arise under the First Amendment to the United States Constitution; the Fourteenth Amendment to the United States Constitution; and 42 U.S.C. § 1983 and 42 U.S.C. § 1988.  Accordingly, this Court has subject-matter jurisdiction of the federal claims alleged herein pursuant to 28 U.S.C. § 1331 because the Court has original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States.

75.     This Court also has subject-matter jurisdiction of the federal claims alleged herein pursuant to 28 U.S.C. § 1343(a)(3), which provides this Court with original jurisdiction of any civil action authorized by law to be commenced by any person to redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States.

76.     This Court has supplemental subject-matter jurisdiction of the state-law claims alleged herein pursuant to 28 U.S.C. § 1367 because said state-law claims are so related to the federal claims alleged herein that the state-law claims form part of the same case or controversy under Article III of the United States Constitution.

20

77.     This Court may properly exercise personal jurisdiction over Defendants pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure because each of the Defendants is subject to the jurisdiction of a court of general jurisdiction in the State of New York, where this Court is located.  Defendants are subject to the jurisdiction of a court of general jurisdiction in the State of New York because (a) upon information and belief, all Defendants, except for Dr. Smith, are residents of the State of New York and (b) Dr. Smith (and any other Defendant who is determined to reside outside the State of New York) is subject to the long-arm jurisdiction of a court of general jurisdiction in the State of New York pursuant to Section 302(a) of the New York Civil Practice Law and Rules.

78.     This Court may also properly exercise personal jurisdiction over Defendants because the exercise of such jurisdiction is consistent with the United States Constitution and laws, including the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

79.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the Southern District of New York is the judicial district in which all or a substantial portion of the events and/or omissions giving rise to the claims alleged herein occurred.

4890-9158-2565, v. 1

## NATURE OF THE ACTION

80.     This lawsuit arises out of the willful, intentional, malicious and wrongful conspiratorial acts engaged in by Defendants against Dr. Lieberman continually from February 22, 2022 through the present in direct retaliation for the content of Dr. Lieberman's 15-word February 19, 2022 Personal Tweet.

81.     This Complaint exposes the incredible lengths to which Defendants have gone during the past 15 consecutive months to achieve their common sinister objectives of (a) destroying Dr. Lieberman's career as a professor, a physician and a researcher, (b) besmirching his hard-earned professional and personal reputations and (c) advancing Defendants' overlapping political, social and academic agendas.

82.     In so doing, this Complaint demonstrates in chronological detail the conspiratorial overt acts that Defendants have perpetrated continuously against Dr. Lieberman since February 22, 2022 and provides the crucial, detailed context in which those acts have been perpetrated.  To that end, the Complaint addresses, among other matters, Dr. Lieberman's professional background and accomplishments during his 17-year tenure as the head of NYSPI/Columbia/Presbyterian Psychiatry; the critical century-old synergistic relationship among the State of New York (through NYS OMH and NYSPI), the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry that has driven much of Defendants' unconscionable mistreatment of Dr. Lieberman; and the overlapping political, social and academic agendas of Defendants that were advanced by their

22

coordinated punitive acts against Dr. Lieberman in retaliation for the content of his February 19, 2022 Personal Tweet.

83.     While this Complaint addresses in chronological detail the coordinated, wrongful overt acts perpetrated by Defendants against Dr. Lieberman since February 22, 2022, the pleading can necessarily address only those acts of which Dr. Lieberman is currently aware. Given the nature of Defendants' conspiracy, it may well be that Defendants have engaged in additional clandestine conspiratorial wrongful acts against Dr. Lieberman that are currently unknown to Dr. Lieberman, but which will be uncovered during the discovery phase of this lawsuit or otherwise.

84.     Defendants have willfully, intentionally and maliciously violated — and continue to date to violate — Dr. Lieberman's rights and protections under the First Amendment to the United States Constitution, New York State statutory law and New York State common law.

85.     Posting a photo of Ms. Gatwech, the Original Gatwech Tweet — which, as noted, was authored by a third party unknown to Dr. Lieberman — declared: "It is not a work of art made of black stone or granite.  She is Sudanese model Nyakim Gatwech.  The most beautiful among the black beauties.  She is in the Guinness Book of World Records for having the darkest skin ever seen on earth.  She is also known as the QUEEN OF DARK."  (With her enthusiastic approval, Ms. Gatwech, as reflected in Background Section XIII, below, has been

referred to as both "Queen of Dark" and "Queen of the Dark."  For the sake of consistency, in non-quoted material hereinafter, the term "Queen of the Dark" will be used.)

86.     In response to the Original Gatwech Tweet (the photo in connection with which had been brought to Dr. Lieberman's attention enthusiastically earlier that evening by his wife, Rosemarie, a lover of art who had previously managed a Latin American art gallery in Manhattan), Dr. Lieberman posted his February 19, 2022 Personal Tweet as a spontaneous compliment to the extraordinary beauty of the internationally-renowned fashion model known as "Queen of the Dark," stating:  "Whether a work of art or freak of nature she's a beautiful sight to behold."

87.     When he sent his February 19, 2022 Personal Tweet, Dr. Lieberman had no idea whatsoever that, in exercising his First Amendment right to comment upon a public figure from his home in his personal capacity via his personal Twitter account during the evening of a holiday weekend, he was unleashing the cowardly, Machiavellian and punitive instincts of the New York State-controlled and dominated leadership of NYSPI/Columbia/Presbyterian Psychiatry, including the Individual State Actor Defendants and the leadership of the Entity Defendants.

88.     Although he did not immediately recognize it at the time, Dr. Lieberman's February 19, 2022 Personal Tweet triggered his inexorable tumble down the rabbit hole with Alice.  *See* Lewis Carroll, *Alice's Adventures in Wonderland* (1865).  Unbeknownst to Dr. Lieberman, he was about to enter a world in which up is down and down is up and where, as

4890-9158-2565, v. 1

famously decreed by the Queen of Hearts, the imposition of a shamefully punitive sentence would precede any consideration of the facts — a world in which the Individual State Actor Defendants and the senior leadership of the Entity Defendants would conspire to extract increasingly absurd and self-abasing apologies from Dr. Lieberman only to declare callously and malevolently, once they had been issued, that Dr. Lieberman must still be sacrificed on the altar of modern "**_Cancel Culture_**."

89.     As used herein, the term Cancel Culture refers to the pernicious, self-righteous practice of destroying the reputations and careers of those who have the temerity to utter opinions, commentary or other thoughts, no matter how well-intentioned, that are deemed to conflict with or differ from the orthodoxy embraced and advanced by the power elite.

90.     During his precipitous descent down the rabbit hole — as he was sucked ever more deeply into the vortex — Dr. Lieberman's entire professional, personal and emotional life, all that he had worked so hard to achieve during his 40-year career, was upended.  Like a boxer who has absorbed a flurry of punches to the solar plexus, Dr. Lieberman — stunned, dazed and confused — tried desperately to hang on, as he complied robotically with the increasingly humiliating demands of the Individual State Actor Defendants and the senior leadership of the Entity Defendants.

91.     As demonstrated in detail below, by Tuesday, February 22, 2022, the first business day following Dr. Lieberman's February 19, 2022 Personal Tweet, the Individual State Actor Defendants entered into a shameful conspiracy with the leadership of the Entity

Defendants to launch a campaign designed to willfully, intentionally and maliciously destroy Dr. Lieberman professionally and personally in direct retaliation for the content of said Tweet, thereby advancing Defendants' overlapping political, social and academic agendas.

92.     Defendants have perpetrated their sinister campaign against Dr. Lieberman continuously from February 22, 2022 to the present.

93.     As demonstrated in detail in the Background Section, below, the cascading avalanche of carefully choreographed punitive measures imposed and actions taken by the Individual State Actor Defendants, in conspiratorial coordination with the leadership of the Entity Defendants, in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet have included, but are not limited to, the following:

(a)     Willfully, intentionally and maliciously extracting from Dr. Lieberman ever more absurdly self-flagellating apologies for the content of his well-intentioned Tweet — by suggesting that their issuance was the *quid pro quo* for retaining his leadership positions with NYSPI/Columbia/ Presbyterian Psychiatry — and then, once such apologies had been secured, proceeding callously and shamefully to nevertheless destroy him;

(b)     Willfully, intentionally and maliciously forcing Dr. Lieberman to resign as the Executive Director of NYSPI;

(c)     Willfully, intentionally and maliciously stripping Dr. Lieberman of his Chairmanship of the Columbia Medical School Department of Psychiatry;

(d)     Willfully, intentionally and maliciously removing Dr. Lieberman as the Psychiatrist-in-Chief of Presbyterian/Columbia Hospital;

(e)     Willfully, intentionally and maliciously suspending Dr. Lieberman from engaging in various other academic, clinical and research activities;

(f)     Willfully, intentionally and maliciously denying to Dr. Lieberman the ability to communicate with faculty, students, staff, patients and donors;

26

(g)    Willfully, intentionally and maliciously denying to Dr. Lieberman the access to the buildings of NYSPI/Columbia/Presbyterian Psychiatry that was guaranteed to him as a member of a class of intended beneficiaries under various instruments and agreements between New York State and Columbia University and which is critical to his ability to perform the academic, clinical and research activities in which he is entitled and expected to engage on behalf of the Entity Defendants;

(h)    Willfully, intentionally and maliciously promising Dr. Lieberman falsely that he would be able to fully resume his academic, clinical and research activities on behalf of the Entity Defendants by the spring of 2022;

(i)    Willfully, intentionally and maliciously breaching the terms of the activities-resumption agreement that the Entity Defendants induced Dr. Lieberman to execute in June 2022;

(j)    Willfully, intentionally and maliciously denying to Dr. Lieberman the use of grants and funds that he had been instrumental in obtaining for his research and other professional activities on behalf of NYSPI/Columbia/ Presbyterian Psychiatry;

(k)    Willfully, intentionally and maliciously destroying Dr. Lieberman's personal and professional reputations by disseminating a knowingly false narrative about the February 19, 2022 Personal Tweet and Dr. Lieberman himself through the implementation of a concerted negative public-relations campaign against Dr. Lieberman (the "***Defendants' Negative PR Campaign***" or the "***Negative PR Campaign***");

(l)    Willfully, intentionally and maliciously demonizing and humiliating Dr. Lieberman before his students, colleagues, peers, patients, donors and the public at large;

(m)    Willfully, intentionally and maliciously ostracizing Dr. Lieberman from the NYSPI/Columbia/Presbyterian Psychiatry community and the Entity Defendants' communities;

(n)    Willfully, intentionally and maliciously denying to Dr. Lieberman the ability to train, communicate or otherwise interact with Psychiatry Residents at Presbyterian/Columbia Hospital; and

(o)    Willfully, intentionally and maliciously causing Dr. Lieberman severe and continuing emotional and physical distress.

27

94.     The non-exhaustive list of willful, intentional and malicious acts set forth in the immediately preceding paragraph, above (referred to collectively hereinafter as "***Defendants' Unlawful Scheme***" or the "***Unlawful Scheme***"), comprise some, but not all, of the wrongful acts perpetrated by Defendants against Dr. Lieberman.

95.     In short, as demonstrated in detail below, despite Dr. Lieberman's faithful and successful commitment year in and year out since 2005 to all aspects of NYSPI/Columbia/ Presbyterian Psychiatry and the communities served thereby — a period during which the reputation of and funding for NYSPI/Columbia/Presbyterian Psychiatry soared — the Individual State Actor Defendants, along with their co-conspirators at the Entity Defendants, orchestrated and implemented their Unlawful Scheme to retaliate against Dr. Lieberman for exercising his rights under the First Amendment, by means of his February 19, 2022 Personal Tweet, to comment upon a public figure from his home in his personal capacity via his personal Twitter account during the evening of a holiday weekend.

96.     As demonstrated in detail below, in perpetrating Defendants' Unlawful Scheme against Dr. Lieberman, the Individual State Actor Defendants, who also represented that they were choreographing their actions closely with certain persons in the Office of the New York State Governor (Chambers), worked in concert with the senior leadership of the Entity Defendants.

97.     As demonstrated in detail below, by means of their willful, intentional, malicious and continuing Unlawful Scheme against Dr. Lieberman in retaliation for the content

of his February 19, 2022 Personal Tweet, Defendants have endeavored to thoroughly destroy Dr. Lieberman's reputation and cripple his career, thereby currying favor with and gaining the support of certain selected constituencies in a strategic effort to advance Defendants' overlapping political, social and academic agendas.

98.     As demonstrated in detail below, upon learning of Dr. Lieberman's February 19, 2022 Personal Tweet, Defendants pounced immediately and ferociously in an effort to distort and exploit the language of the Tweet to advance their already-percolating common political, social and academic agendas.

99.     As demonstrated in detail below, by means of their Unlawful Scheme, Defendants endeavored to accomplish at least the following objectives:

(a)     Through their carefully conceived Negative PR Campaign, which was a core element of Defendants' Unlawful Scheme against Dr. Lieberman, Defendants endeavored to foment a sense of community backlash against Dr. Lieberman to justify Defendants' instantaneous destruction of his reputation and career.

(b)     To this end, Defendants held multiple town hall meetings and other assemblies for the purpose of persuading certain selected constituencies of the NYSPI/Columbia/Presbyterian Psychiatry community and the public at large (collectively, the "***Targeted Constituencies***") — through, among other techniques, subtle and not-so-subtle intimidation and peer pressure — that said Targeted Constituencies should feel victimized by Dr. Lieberman's well-intentioned February 19, 2022 Personal Tweet and therefore, despite his constitutional and statutory rights to so express himself, applaud and endorse Defendants' swift destruction of Dr. Lieberman's reputation and career.

(c)     Defendants recognized that it was not enough to simply convince the Targeted Constituencies to view themselves as traumatized victims of Dr. Lieberman's February 19, 2022 Personal Tweet and to endorse his destruction by Defendants.  Defendants recognized that, through their

29

dissemination of the false narrative that underlay the Negative PR Campaign, they also had to convince the Targeted Constituencies to embrace Defendants as heroes whose destruction of Dr. Lieberman had "saved" the community and whose hosting of "safe" discussion spaces through town hall meetings and the like was the only way for the Targeted Constituencies to "heal."

(d)     By continuing to espouse Defendants' false narrative about Dr. Lieberman's February 19, 2022 Personal Tweet and redoubling their efforts to fan the manufactured flames of victimization, Defendants sought (and continue to seek) to secure the critical support of the Targeted Constituencies that Defendants believe is so desperately required to advance Defendants' overlapping political, social and academic agendas.

(e)     Defendants believed that, by pandering to the Targeted Constituencies by means of Defendants' Unlawful Scheme, Defendants would, among other things, (i) enhance New York Governor Kathy Hochul's 2022 electoral prospects by making her a more attractive candidate among certain minority voters and (ii) provide the Individual State Actor Defendants and the leadership of the Entity Defendants with the political and social capital to insulate themselves from personal criticism from these very same Targeted Constituencies and thereby strengthen Defendants' hold on power.

100.    Since February 22, 2022, Defendants' Unlawful Scheme has been founded upon Defendants' retaliation for the content of the February 19, 2022 Personal Tweet and their desperate courtship of the Targeted Constituencies to advance Defendants' overlapping political, social and academic agendas.  To obtain that support, Defendants, in Orwellian fashion, have undertaken since February 22, 2022 to demonstrate to the Targeted Constituencies that Dr. Lieberman is guilty of having expressed "wrong thoughts" in his February 19, 2022 Personal Tweet, the penalty for which is his continual brutal punishment, marginalization and ostracism.

101.    Since Defendants' unconstitutional removal of Dr. Lieberman from his leadership positions in NYSPI/Columbia/Presbyterian Psychiatry in late February 2022, Dr.

Lieberman has not sought (and does not seek through this lawsuit) reinstatement as Executive Director of NYSPI, Chair of the Columbia Medical School Department of Psychiatry or Psychiatrist-in-Chief of Presbyterian/Columbia Hospital.

102.    Instead, having suffering those wrongful removals at the hands of Defendants, Dr. Lieberman has sought (and continues to seek) to simply be able to resume the academic, clinical and research activities on behalf of the Entity Defendants in which he, as a continuously-tenured Columbia University Professor and a physician who is a member of the Presbyterian/Columbia Hospital Department of Psychiatry, is entitled (and, indeed, expected) to engage.

103.    Despite finally agreeing in June 2022 to permit Dr. Lieberman to resume his academic, clinical and research activities, Defendants, as part of the Unlawful Scheme that they implemented in retaliation for the content of the February 19, 2022 Personal Tweet to pander to the Targeted Constituencies for the purpose of advancing Defendants' overlapping political, social and academic agendas, have willfully, intentionally and maliciously continued to thwart Dr. Lieberman's ability to fully resume such activities.

104.    Significantly, ***almost six months after Dr. Lieberman was forced to resign from NYSPI, Dr. Smith admitted to Dr. Lieberman that, as Dr. Lieberman had suspected, Defendants' Unlawful Scheme was indeed driven by Defendants' overlapping political, social and academic agendas***.

4890-9158-2565, v. 1

105.     During a telephone conversation that Dr. Smith held with Dr. Lieberman on or about August 3, 2022 (the "***August 3, 2022 Smith-Lieberman Telephone Conversation***"), Dr. Smith, referring to Defendants' retaliation against Dr. Lieberman for the content of his February 19, 2022 Personal Tweet, admitted, in words or substance, that, the decision to summarily dismiss and exile Dr. Lieberman from NYSPI "***went to the Governor, or at least it went to her chief of staff***" ***and that the Governor's Office made clear that there had to be*** "***a complete and full break***" ***with Dr. Lieberman and that he was*** "***not to be onsite moving forward***."

106.     During the August 3, 2022 Smith-Lieberman Telephone Conversation, Dr. Smith also admitted, in words or substance, that, in orchestrating Dr. Lieberman's forced resignation from NYSPI and otherwise perpetrating Defendants' related wrongful conduct in furtherance of Defendants' Unlawful Scheme, ***Defendants became immersed*** "***in the politics and the optics of the Governor and her circumstances***" ***insofar as, in connection with her electoral campaign, the*** "***new Governor***" ***was conscious of the optics of*** "***ethno-racial disparities, equity, etc.***"

107.     While, as demonstrated in detail herein, Dr. Lieberman's February 19, 2022 Personal Tweet was quite clearly intended as an enthusiastic compliment to Ms. Gatwech's extraordinary beauty, even if the Tweet somehow had been intended to criticize Ms. Gatwech (which, of course, was certainly not even remotely the case), all of the willful, intentional and malicious acts, omissions and other conduct on the part of Defendants would still have constituted deliberate and egregious violations of Dr. Lieberman's rights and protections under

the First Amendment to the United States Constitution, New York State statutory law and New York State common law.

108.     But for Dr. Lieberman's posting of his February 19, 2022 Personal Tweet, Defendants would not have unleashed against him the willful, intentional, malicious and coordinated Unlawful Scheme that, as Defendants fully intended, has so severely injured and damaged — and continues to date to so severely injure and damage — Dr. Lieberman.

109.     In their respective roles on behalf of the Entity Defendants, the leadership members thereof — including, but not limited to, Dr. Simpson; Dr. Katrina Armstrong ("***Dr. Armstrong***" or "***Dean Armstrong***"), who became Dean of Columbia Medical School on or about March 1, 2022; Dr. Anil Rustgi ("***Dr. Rustgi***"), who served as the Interim Dean of Columbia Medical School during the period from at least February 22, 2022 through March 1, 2022, when he was replaced by Dr. Armstrong; and Dr. Steven Corwin ("***Dr. Corwin***"), the Chief Executive Officer of Presbyterian/Columbia Hospital — were duly authorized, and did at all times have the actual and/or apparent authority, to bind the Entity Defendants.

110.     Dr. Simpson, like multiple other members of the Entity Defendants' leadership team, served simultaneously in a paid role with NYSPI.  *See* Background Section XII, below; First, Second, Third and Fourth Claims for Relief, below.

111.     Each of the Defendants is liable for perpetrating against Dr. Lieberman some or all of the wrongful conduct described in detail herein.

112.    At all times referenced herein in connection with the matters comprising and relating to Defendants' Unlawful Scheme, Dr. Armstrong (along with Dr. Rustgi, Dr. Simpson and the other individual employees of Columbia University and Columbia Medical School who are referenced herein) was authorized and empowered to act on behalf of and bind, and did in fact act on behalf of and bind, The Trustees of Columbia University in the City of New York, Columbia University, Columbia Medical School and, with Dr. Corwin's agreement, The New York and Presbyterian Hospital (d/b/a NewYork-Presbyterian Hospital) and Presbyterian/Columbia Hospital.

113.    At all times referenced herein in connection with the matters comprising and relating to Defendants' Unlawful Scheme, Dr. Corwin (along with Dr. Steven Kaplan ("**_Dr._** **_Kaplan_**"), Dr. Lauren Wasson ("**_Dr. Wasson_**") and the other individual employees of Presbyterian/Columbia Hospital who are referenced herein) was authorized and empowered to act on behalf of and bind, and did in fact act on behalf of and bind, The New York and Presbyterian Hospital (d/b/a NewYork-Presbyterian Hospital) and Presbyterian/Columbia Hospital.

114.    Unless otherwise noted, all time referenced herein is Eastern Time.

34

**BACKGROUND**

**I.**

**1966-1980: DR. LIEBERMAN PURSUES HIS
DREAM OF BECOMING A PHYSICIAN AND
MARRIES ROSEMARIE FERNANDEZ-LARIOS**

115.     Dr. Lieberman was born and raised in Cleveland, Ohio.  Since he was 16 years old, it was his dream to pursue a career in the medical profession.

116.     During the period from 1966 to 1970, Dr. Lieberman earned his Bachelor of Science degree in Biology from Miami University in Oxford, Ohio.

117.     During the period from 1970 to 1975, Dr. Lieberman earned a Medical Doctor degree from The George Washington University in Washington, D.C.

118.     After earning his Medical Doctor degree from The George Washington University, Dr. Lieberman devoted the next four years, from 1975 to 1979, to the completion of his medical internship and residency at St. Vincent's Hospital and Medical Center of New York, New York Medical College.

119.     During the period from 1979 to 1980, Dr. Lieberman completed a one-year Research Fellowship at the Bronx Psychiatric Center, Albert Einstein College of Medicine in Bronx, New York.

4890-9158-2565, v. 1

120.    In May 1980, Dr. Lieberman married Rosemarie Fernandez-Larios.  Over the past 43 years, Dr. Lieberman and Rosemarie have blended their diverse cultural backgrounds — he, raised in a Jewish family in Cleveland, Ohio, and Rosemarie, raised in a Catholic family in Santiago, Chile — into a vibrant marriage that has produced two children.

121.    Since 1980, Dr. Lieberman has thoroughly immersed himself in the field of psychiatry, working tirelessly — for him, it has been a labor of love — in his chosen field.

122.    Over the course of his career, Dr. Lieberman has made an unwavering commitment to his patients, his students, his myriad research projects, the community at large and the advancement of psychiatry generally.

123.    Since 1975, Dr. Lieberman has been accredited and certified by the National Board of Medical Examiners.

124.    Since 1979, Dr. Lieberman has been a Diplomate of the American Board of Psychiatry and Neurology.

## II.

### 1980-1996: DR. LIEBERMAN'S ACADEMIC AND PROFESSIONAL APPOINTMENTS IN NEW YORK

125.    From 1980 to 1982, Dr. Lieberman served as an Instructor of Psychiatry at Mount Sinai School of Medicine in New York City.

4890-9158-2565, v. 1

126.     From 1980 to 1982, Dr. Lieberman also served as Director of Day Hospital Programs, Ambulatory Psychiatry Service at Mount Sinai Medical Center, Mount Sinai School of Medicine in New York City.

127.     From 1982 to 1985, Dr. Lieberman served as a Research Psychiatrist at the Hillsdale Hospital division of Long Island Jewish Medical Center, State University of New York School of Medicine, in Glen Oaks, New York.

128.     From 1983 to 1986, Dr. Lieberman served as an Assistant Professor of Psychiatry at Stony Brook University School of Medicine in Stony Brook, New York.

129.     From 1986 to 1989, Dr. Lieberman served as an Associate Professor of Psychiatry at Stony Brook University School of Medicine in Stony Brook, New York.

130.     From 1985 to 1988, Dr. Lieberman served as Assistant Director of Research Psychiatry at the Hillsdale Hospital division of Long Island Jewish Medical Center, State University of New York School of Medicine, in Glen Oaks, New York.

131.     From 1989 to 1992, Dr. Lieberman served as an Associate Professor of Psychiatry at Albert Einstein College of Medicine in Bronx, New York.

132.     From 1988 to 1996, Dr. Lieberman served as Director of Research at the Hillsdale Hospital division of Long Island Jewish Medical Center, Albert Einstein College of Medicine, in Glen Oaks, New York.

4890-9158-2565, v. 1

133.     From 1992 to 1996, Dr. Lieberman served as a Professor of Psychiatry at Albert Einstein College of Medicine in Bronx, New York.

134.     From 1994 to 1996, Dr. Lieberman served as a Professor of Neuroscience at Albert Einstein College of Medicine in Bronx, New York.

135.     From 1990 to 1996, Dr. Lieberman served as Co-Director of the Neuroimaging Laboratory at Long Island Jewish Medical Center, Albert Einstein College of Medicine in Glen Oaks, New York.

136.     From 1993 to 1996, Dr. Lieberman served as a member of the Medical Staff of the Clinical Research Center of the Medical Department of Brookhaven National Laboratory in Upton, New York.

### III.

### 1996-2005:  DR. LIEBERMAN'S ACADEMIC AND <u>PROFESSIONAL APPOINTMENTS IN NORTH CAROLINA</u>

137.     From 1996 through 2004, Dr. Lieberman served as the Thad and Alice Eure Distinguished Professor of Psychiatry, Pharmacology and Radiology at the University of North Carolina School of Medicine in Chapel Hill, North Carolina.

138.     Since 1998, Dr. Lieberman has served as an Adjunct Professor of Psychiatry and Radiology at Duke University School of Medicine in Durham, North Carolina.

4890-9158-2565, v. 1

139.    Since 2005, Dr. Lieberman has served as an Adjunct Professor of Psychiatry at the University of North Carolina School of Medicine in Chapel Hill, North Carolina.

140.    From 1996 to 2005, Dr. Lieberman served as the Vice Chairman for Scientific Affairs and the Director of the Mental Health and Neuroscience Clinical Research Center at the University of North Carolina School of Medicine in Chapel Hill, North Carolina.

141.    From 1996 to 2005, Dr. Lieberman served as the Director of the Division of Clinical Research at Dorothea Dix Hospital in Raleigh, North Carolina.

### IV.

### 2005-2022: DR. LIEBERMAN'S LEADERSHIP OF NYSPI/COLUMBIA/PRESBYTERIAN PSYCHIATRY

142.    Sometime in 2004, Dr. Lieberman accepted an offer to return to New York to lead NYSPI/Columbia/Presbyterian Psychiatry, the longstanding tripartite association comprised of NYSPI, the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry.  *See also* Background Section XII, below.

143.    In a letter to Dr. Lieberman dated September 17, 2004, the then Dean of Columbia Medical School wrote:  "I am delighted to offer you the post as Chair of the Department of Psychiatry at Columbia because I have every expectation that you will take this excellent department to new levels.  . . .  We are certain that your leadership will make it possible

39

for the department and the Psychiatric Institute [NYSPI] to achieve the overall goal of mobilizing a rational basis for the future of diagnosis and therapy of psychiatric disorders."

144.     In a separate letter to Dr. Lieberman dated September 17, 2004, the then Dean of Columbia Medical School and Steven Corwin, the then Senior Vice President and Chief Medical Officer of Presbyterian/Columbia Hospital, wrote, in part:  "We believe your own academic contributions and your leadership of the department will realize the aspirations of the New York State Office of Mental Health (NYSOMH), New York Presbyterian Hospital (NYPH), and Columbia University.  . . .  We laud your objective to develop treatment related research with the establishment of programs in experimental therapeutics.  As you know, we have an excellent Clinical Trials Office under the ownership of the School of Medicine and NYPH.  . . .  Your goal to strengthen the relationship between DOP [the Columbia Medical School Department of Psychiatry] and NYSOMH will be an extremely positive force in ensuring the success of the Department and the public service mission of the collaborating institutions. . . .  We believe that your lab space request is appropriate, and should be primarily based in the Psychiatric Institute [NYSPI] (PI) and the PI Annex.  . . .  In closing, we want to reemphasize how excited we are at the prospect of your joining the faculty and leading our Department of Psychiatry.  We expect your input in guiding major initiatives in the Department, School, Hospital, and NYSOMH will greatly benefit us and the public at large."

145.     In a letter to Dr. Lieberman dated January 10, 2005, the then Commissioner of NYS OMH wrote:  "This is to confirm your appointment to the full-time

position of Director, Psychiatric Research Institute at NYS Psychiatric Institute, effective January 1, 2005."

146.     In a letter to Dr. Lieberman dated October 25, 2005, the President of Columbia University, Lee Bollinger, wrote that he was "pleased to inform [Dr. Lieberman] that the Trustees of the University have approved my recommendation that you be appointed Lieber Professor of Psychiatry (full-time), with tenure, from March 5, 2005" and asked that Dr. Lieberman "[p]lease accept this designation as a small measure of our appreciation for all that you are contributing to our common life."

147.     In a letter to Dr. Lieberman dated November 10, 2006, the then Secretary of Columbia University advised that Dr. Lieberman had been appointed "Lawrence C. Kolb Professor of Psychiatry (full-time), without stated term, from January 1, 2005."

148.     In a letter to Dr. Lieberman dated December 7, 2006, the then Dean of Columbia Medical School wrote:  "By tradition, this professorship [Lawrence C. Kolb Professor of Psychiatry] is held by the Chair of the Department of Psychiatry. . . .  Conferring the title of professor on a member of the faculty is a reflection of the high esteem in which that nominee is held by colleagues at the University and throughout the country, as well as my own admiration. Thank you for everything you have done for Columbia."

149.     Upon taking the reins of NYSPI/Columbia/Presbyterian Psychiatry in 2005, Dr. Lieberman worked diligently to elevate it to a world-class New York-based academic, clinical and research psychiatric Association.  He did so by, among other things, surmounting

41

myriad administrative, fundraising and other challenges and strengthening the historical, pervasive relationships between and among the members of NYSPI/Columbia/Presbyterian Psychiatry.

150.    From 2005 until his employment was summarily and wrongfully terminated by the Individual State Actor Defendants on February 22, 2022 in direct retaliation for the content of his February 19, 2022 Personal Tweet, Dr. Lieberman served as the Executive Director of NYSPI.  *See* Background Sections XII and XVI, below.

151.    From 2005 until he was summarily and wrongfully stripped of his titles and functions on or about February 23, 2022 in direct retaliation for the content of his February 19, 2022 Personal Tweet, Dr. Lieberman served as the Chair of the Columbia Medical School Department of Psychiatry.  *See* Background Sections XII and XVI, below.

152.    From 2005 until he was summarily and wrongfully stripped of his titles and functions on or about February 23, 2022 in direct retaliation for the content of his February 19, 2022 Personal Tweet, Dr. Lieberman served as the Psychiatrist-in-Chief of Presbyterian/ Columbia Hospital.  *See* Background Sections XII and XVI, below.

153.    From 2005 until he was summarily and wrongfully stripped of his titles and functions with NYSPI/Columbia/Presbyterian Psychiatry in late February 2022 in direct retaliation for the content of his February 19, 2022 Personal Tweet, Dr. Lieberman also served as the Lawrence C. Kolb Professor of Psychiatry at Columbia Medical School.

154.    During his tenure with NYSPI/Columbia/Presbyterian Psychiatry, Dr. Lieberman led the Association and its constituent members to new professional heights.

155.    Upon information and belief, the National Institutes of Health (the "***NIH***") "is the primary Federal agency for conducting and supporting medical research" (*see* NIH Website, accessible at *https://www.usa.gov/federal-agencies/national-institutes-of-health*) and "is the largest public funder of biomedical research in the world[,]" having invested in fiscal 2022 "most of its $45 billion appropriations in research seeking to enhance life, and to reduce illness and disability" (*see* NIH Website, accessible at *https://www.nih.gov/grants-funding*).

156.    Upon information and belief, under Dr. Lieberman's leadership during the period from 2007 through 2014, the combined NIH grant awards received by the Columbia Medical School Department of Psychiatry and NYSPI ranked the Columbia Medical School Department of Psychiatry number one in the nation.

157.    In 2014, under the leadership of Dr. Lieberman, the Department of Psychiatry of Presbyterian/Columbia Hospital earned the number one ranking in New York and the number two ranking nationally in the *U.S. News & World Report* rankings for hospitals. Upon information and belief, this was the first time that the Hospital had ever had a clinical service ranked number one in any category.

158.    As a critical member of NYSPI/Columbia/Presbyterian Psychiatry, NYSPI took much pride in its contributions to the stellar *U.S. News & World Report* hospital rankings, publishing the following announcement on July 15, 2014:

"In the annual U.S. News & World Report 'Best Hospitals' rankings, published online today, NewYork-Presbyterian Hospital ranks second in the nation for psychiatry and number one in New York.  Psychiatry jumped two places this year, with a very strong score — less than one percentage point behind the first place program.  . . .  Our stellar clinical services, with Dr. Grant Mitchell at the helm, are currently expanding to provide greater access to psychiatric care to more patients.  The growth and excellence of the clinical programs rely in no small part on the insights gained from our research studies, enabling clinicians to deliver the highest quality patient-centered and evidence-based care.

"'This recognition in the US News & World Report is a credit to the talent and professionalism of our faculty and the staff who support their efforts on a daily basis,' said Dr. Jeffrey Lieberman, Psychiatrist-in-Chief at New York Presbyterian Hospital-Columbia University Medical Center and Chairman of Psychiatry at Columbia University College of Physicians and Surgeons.  'Every individual in the department of Psychiatry, working collaboratively and efficiently, is dedicated to helping people with psychiatric disorders and ensure that they receive the best possible care and the support they need to reach their fullest potential as contributing members of our society.  This acknowledgment — on such a national scale — is a tribute to the efforts of the entire department.'"  *See* NYSPI Website, accessible at *https://nyspi.org/new-york-presbyterians-psychiatry-programs-jump-2-nation-us-news-world-report-ranking*.

159.    In 2015, under the leadership of Dr. Lieberman, the Presbyterian/ Columbia Hospital Department of Psychiatry earned the number one national ranking in the *U.S. News & World Report*.  The Columbia Medical School Department of Psychiatry published the following announcement regarding the ranking:

"NewYork-Presbyterian Hospital has been named the No. 1 hospital in the nation for psychiatry in the annual *U.S. News & World Report* 'Best Hospitals' survey.  The hospital has consistently ranked among the top five hospitals for psychiatry over the last decade.

"'It is an honor to be named the top hospital for psychiatry in the country by *U.S. News and World Report*,' said Dr. Jeffrey A. Lieberman, psychiatrist-in-chief, NewYork-Presbyterian/Columbia University Medical Center. 'We take tremendous pride in providing the best and most advanced treatments for people with mental illness, addiction and intellectual disabilities.'"  *See* Columbia Medical School Department of Psychiatry Website, accessible at

44

*https://www.columbiapsychiatry.org/news/newyork-presbyterian-hospital-1-hospital-psychiatry-according-us-news-world-report.*

160.    In a summary of Columbia Psychiatry that appeared in a May 2015 Korn Ferry memorandum in connection with efforts to recruit a candidate to fill the position of Vice Chair, Administration and Finance, the following was stated:  "Columbia Psychiatry has been awarded more federal research dollars than any other psychiatry research program in the nation for eight consecutive years.  Columbia Psychiatry has been the site of many of the major discoveries in psychiatry, including much of the pioneering work leading to today's understanding of mental health and mental illness."

161.    Upon information and belief, from 2016 through 2021, under the leadership of Dr. Lieberman, the Presbyterian/Columbia Hospital Department of Psychiatry was ranked no lower than number four nationally by *U.S. News & World Report*.

162.    Upon information and belief, from 2016 through 2021, the combined NIH grant awards received by the Columbia Medical School Department of Psychiatry and NYSPI ranked Columbia Psychiatry no lower than number four nationally among psychiatry departments.

163.    In 2022, under the leadership of Dr. Lieberman, the Presbyterian/Columbia Hospital Department of Psychiatry was ranked number four nationally by *U.S. News & World Report*.  *See U.S. News & World Report,* accessible at *https://health.usnews.com/best-hospitals/rankings/psychiatry*.

164.     In 2022, under the leadership of Dr. Lieberman, the Columbia Medical School Department of Psychiatry was ranked number two nationally by *U.S. News & World Report*.  *See U.S. News & World Report*, accessible at *https://www.usnews.com/best-graduate-schools/top-medical-schools/psychiatry-rankings*; Columbia Medical School Department of Psychiatry Website, accessible at *https://www.columbiapsychiatry.org/news/columbia-psychiatry-medical-education-program-jumps-no-2-nation-u-s-news-and-world-report*.

## V.

## DR. LIEBERMAN'S MEMBERSHIP AND LEADERSHIP POSITIONS IN MEDICAL ORGANIZATIONS

165.     Dr. Lieberman is or has been a member or fellow of various scientific and professional medical organizations, including the American Association for the Advancement of Science (fellow); the American College of Neuropsychopharmacology (fellow); the American College of Psychiatrists (fellow); the American Psychiatric Association (distinguished fellow); the American Psychopathological Associations (fellow); the American Medical Association; the Collegium Internationale NeuroPsychopharmacologium; the Institute of Medicine, National Academy of Sciences; the International Society for Magnetic Resonance in Medicine; the International Society for Neuroimaging in Psychiatry; the New York Academy of Science; the Society for Biological Psychiatry; and the Society for Neuroscience.

166.     Dr. Lieberman has served in various leadership positions in the myriad medical organizations, including those referenced in the immediately preceding paragraph,

above, with which he has been affiliated.  Among the leadership positions held by Dr. Lieberman
were the following:

(a)   President, American Psychiatric Association;

(b)   President, American Psychopathological Association;

(c)   Board of Directors, American Psychiatric Foundation;

(d)   Vice President, Collegium Internationale
       NeuroPsychopharmacologicum;

(e)   Board of Directors, American Psychiatric Institute for
       Research and Education;

(f)   Council, Collegium Internationale
       NeuroPsychopharmacologicum;

(g)   Chair, Council on Research, American Psychiatric Association;

(h)   President, Society of Biological Psychiatry;

(i)   Chair of Credentials Committee, American College of
       Neuropsychopharmacology;

(j)   Scientific Council, Brain and Behavior Research
       Foundation;

(k)   Vice President, North America, International Early
       Psychosis Association;

(l)   Chair of the Human Subjects Research Council Workgroup
       of the National Advisory Mental Health Council to the
       National Institute of Mental Health ("*NIMH*");

(m)   NIMH, National Advisory Mental Health Council;

(n)   Chair of the American Psychiatric Association Task Force
       on Ethics in Psychiatric Research;

(o)   Executive Council, American College of
       Neuropsychopharmacology;

47

(p)   Chair of National Institute of Mental Health Data and
     Safety Monitoring Board;

(q)   Planning Board for the Surgeon General's Report on Mental
     Health, U.S. Department of Health and Human Services;

(r)   Chair, Brain Disorders and Clinical Neuroscience Review
     Committee (BDCN-6), National Institutes of Health;

(s)   Chair, Treatment Assessment Review Committee, NIMH; and

(t)   Psychopharmacologic Drugs Advisory Committee,
     United States Food and Drug Administration.

## VI.

## DR. LIEBERMAN'S PROFESSIONAL HONORS AND AWARDS

167.   Dr. Lieberman has earned a number of honors and awards in connection

with his various leadership positions in the field of psychiatry.  Among those honors and awards

are the following:

(a)   Elected to the National Academy of Medicine;

(b)   Media Award, American College of Neuropsychopharmacology;

(c)   Distinguished Service Award, American Psychiatric Association;

(d)   Jeffrey Lieberman Professorship in Neuroscience established at The
     George Washington University School of Medicine;

(e)   Julius Axelrod Award for Mentorship, American College of
     Neuropsychopharmacology;

(f)   Ed Hornick Award, New York Academy of Medicine;

(g)   Scientific Research Award, National Alliance on Mental Illness;

(h)   C. Charles Burlingame Award, The Institute of Living, Hartford Hospital;

48

(i)     Fellow, American Association for the Advancement of Science;

(j)     Adolph Meyer Award, American Psychiatric Association;

(k)     The George Washington University's Distinguished Alumni
         Scholar Award;

(l)     Eugene A. Hargrove Mental Health Research Award, North Carolina
         Foundation for Mental Health Research, Inc., North Carolina
         Psychiatric Association;

(m)    Lieber Prize for Schizophrenia Research, Brain and Behavior
         Research Foundation;

(n)     Best Doctors in America®;

(o)     Lilly Neuroscience Award, The Collegium Internationale
         Neuro-Psychopharmacologicum;

(p)     Institute of Medicine, National Academy of Sciences;

(q)     Stanley Dean Award, Schizophrenia Research, American College
         of Psychiatry;

(r)     Ziskind-Somerfield Award, Society of Biological Psychiatry;

(s)     Kempf Fund Award, Research in Psychobiological Psychiatry,
         American Psychiatric Association;

(t)     Gralnick Award, Schizophrenia Research, National Association of
         Private Psychiatric Hospitals;

(u)     Edward A. Strecker Award for Psychiatric Research, University of
         Pennsylvania Hospital;

(v)     American Psychiatric Association Research Award;

(w)    Exemplary Psychiatrist, National Alliance for the Mentally Ill, NAMI;

(x)     Thad & Alice Eure Award, Distinguished Professor in Psychiatry,
         UNC School of Medicine;

(y)     Independent Scientist Award, National Institute of Mental Health, NIMH;

(z)     Presidential Award, Research, National Association of Psychiatric Health Systems;

(aa)    MERIT (Method to Extend Research in Time) Award, National Institute of Mental Health, NIMH;

(bb)    Research Scientist Development Award, Levels I, II and Independent Scientist Award, NIMH;

(cc)    Sandoz Award for outstanding achievement by medical student in psychiatry, The George Washington University School of Medicine; and

(dd)    William S. Schafirt Award from The George Washington University School of Medicine for best article on Medicine and Public Policy.

## VII.

## DR. LIEBERMAN'S SERVICE ON THE EDITORIAL BOARDS OF DISTINGUISHED MEDICAL PUBLICATIONS

168.    During his career as a psychiatrist, Dr. Lieberman has served in various capacities on the editorial boards of some of the most prestigious medical publications in the world.  The following are among the positions that Dr. Lieberman has held:

(a)     Editorial Board, *New England Journal of Medicine*;

(b)     Editorial Board, *Shanghai Archives of Psychiatry*;

(c)     Editorial Board, *European Archives of Psychiatry & Clinical Neuroscience*;

(d)     Editorial Board, *Psychiatry and Clinical Neurosciences*;

(e)     Editorial Board, *American Journal of Psychiatry*;

(f)     Editorial Board, *Current Psychiatry Reviews*;

(g)     Editorial Board, *Neuropsychopharmacology*;

50

(h)     Editorial Board, *Journal of Psychiatric Research*;

(i)     Editorial Board, *Current Psychosis and Therapeutics Reports*;

(j)     Editorial Board, *Current Opinion in Psychiatry*;

(k)     Editorial Board, *Schizophrenia Research*;

(l)     Editorial Board, *International Journal of Neuropsychopharmacology*;

(m)    Editorial Board, *Biological Psychiatry*;

(n)     Editorial Board, *Psychiatry Research*;

(o)     Editorial Board, *Schizophrenia Bulletin*;

(p)     Associate Editor, *ACTA Psychiatrica Scandinavica*;

(q)     Associate Editor, *American Journal of Psychiatry*;

(r)     Associate Editor, *Psychiatric Quarterly*;

(s)     Section Editor, *Experimental Neurology*; and

(t)     Clinical Field Editor, *Neuropsychopharmacology*.


## VIII.

## DR. LIEBERMAN'S PROFESSIONAL PUBLICATIONS

169.    Over the course of his distinguished career, Dr. Lieberman has authored or co-authored more than 700 published articles in the scientific literature.  According to Google Scholar, Dr. Lieberman's so-called "H-Index" (or Hirsch Index) score — a metric that measures the volume and quality of an author's published research papers by tracking, among other things, the number of times those papers have been cited or not cited to arrive at an estimate of the importance and impact of a scientist's cumulative research contributions — is currently 187 (*see*

4890-9158-2565, v. 1

*https://scholar.google.com/citations?user=eZuhor 0AAAAJ&hl=en.*), which, upon information and belief, places Dr. Lieberman in the top one percent (1%) of academic medical researchers in the world.

170.    Over the course of his career, Dr. Lieberman has authored 17 published books for professional medical and scientific audiences, including the following:

(a)    *Understanding and Caring for People with Schizophrenia: Fifteen Clinical Cases* (Routledge 2020);

(b)    *Psychiatry, V1* (4th Edition, John Wiley & Sons, Ltd. 2015);

(c)    *Psychiatry, V2* (4th Edition, John Wiley & Sons, Ltd. 2015);

(d)    *Essentials of Schizophrenia* (American Psychiatric Publishing, Inc. 2012);

(e)    *Antipsychotic Trials in Schizophrenia: The CATIE Project* (Cambridge University Press 2010);

(f)    *Psychiatry, V2* (3rd Edition, John Wiley & Sons, Ltd. 2008);

(g)    *Handbook of Psychiatric Drugs* (John Wiley & Sons, Ltd. 2006);

(h)    *Comprehensive Care of Schizophrenia: A Textbook of Treatment* (1st Edition, Martin Dunitz and Co. 2001);

(i)    *Psychiatric Drugs* (W.B. Saunders and Co. 1999);

(j)    *Re-Integration of the Schizophrenic Patient* (Science Press Limited 1998);

(k)    *Ethical Issues in Psychiatric Research: A Resource Manual on Human Subjects Protection* (American Psychiatric Press, Inc. 1998);

(l)    *Pocket Companion to Accompany Psychiatry* (W.B. Saunders and Co. 1997);

(m)    *Psychiatry* (1st Edition, W.B. Saunders and Co. 1996);

52

(n)  *Adverse Effects of Psychotropic Drugs* (Guilford Press, 1992); and

(o)  *Predictors of Relapse in Schizophrenia* (American Psychiatric
      Press, Inc., 1986).

171.  Over the course of his career, Dr. Lieberman has also authored the

following two published books for lay persons:

(a)  *Malady of the Mind: Schizophrenia and the Path to Prevention*
      (Simon & Schuster 2023); and

(b)  *Shrinks: The Untold Story of Psychiatry* (Little, Brown and
      Company 2015).

## IX.

## UNDER DR. LIEBERMAN'S LEADERSHIP, THE MENTAL HEALTH SERVICES OF NYSPI/COLUMBIA/ PRESBYTERIAN PSYCHIATRY WERE MADE MORE WIDELY AVAILABLE TO UNDERSERVED COMMUNITIES

172.  Under Dr. Lieberman's leadership, NYSPI/Columbia/Presbyterian

Psychiatry launched innovative initiatives designed to provide mental health care services to

underserved New York communities.

173.  In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian

Psychiatry, he oversaw the establishment of outreach programs addressing the debilitating

mental health impact of the COVID-19 Pandemic in Northern Manhattan to serve low-income,

Black and Hispanic communities.

174.  In May 2021, the Columbia Medical School Department of Psychiatry

announced its partnership with the New York Public Library (the "***Columbia Psychiatry/New***

*York Public Library Outreach Program*") in a release titled, "Columbia Psychiatry Partners

with New York Public Library to Support NYC Communities Hardest Hit by COVID-19" (May

24, 2021), accessible at Columbia Medical School Department of Psychiatry Website,

*https://www.columbiapsychiatry.org/news/columbia-psychiatry-partners-new-york-public-*

*library-support-nyc-communities-hardest-hit-covid-19*.

      175.    The published announcement of the Columbia Psychiatry/New York

Public Library Outreach Program declared:

> "Columbia University Department of Psychiatry and The New York Public
> Library [NYPL] have joined forces in an innovative public health initiative
> centered on assisting New York City neighborhoods dealing with the mental
> health fallout of the COVID-19 pandemic, which continues to hit low-income
> and Black and Latinx New Yorkers the hardest.
>
> "The post-COVID Community Mental Health Project, made possible through
> support from the Leon Levy Foundation, aims to increase public access to mental
> health information; educate communities on mental health risks, including
> addiction; engage residents in supporting each other's wellbeing; and improve
> connections to behavioral health services.
>
> "'The expertise of Columbia Psychiatry when coupled with the well-earned
> community trust of NYPL creates a powerful collaboration that the Leon Levy
> Foundation is proud to support, helping to bring free mental health resources to
> the city's most underserved communities,' said Shelby White, founding trustee of
> the Leon Levy Foundation.
>
> "To ensure the program reaches the city's most vulnerable populations, NYPL and
> Columbia have partnered with the National Black Leadership Commission on
> Health (Black Health), a nonprofit that seeks to achieve health equity within the
> Black community.  The organization will facilitate racially and ethnically diverse
> roundtable discussions to identify areas of behavioral health most relevant to the
> community."  *See* Columbia Medical School Department of Psychiatry Website,
> accessible at *https://www.columbiapsychiatry.org/news/columbia-psychiatry-*
> *partners-new-york-public-library-support-nyc-communities-hardest-hit-covid-19*.

176.     The May 2021 announcement of the launch of the Columbia

Psychiatry/New York Public Library Outreach Program included comments from, among others,

Dr. Lieberman:

> "'The effects of the COVID-19 pandemic will be extensive and enduring, and
> Columbia can no longer wait for communities to seek out support,' said Dr.
> Jeffrey A. Lieberman, professor and chair of the Department of Psychiatry at
> Columbia University.  'Working with NYPL and Black Health, Columbia
> Psychiatry will be able to further extend our reach to diverse populations
> throughout the city.  We are motivated and ready to help.'
>
> "C. Virginia Fields, president and CEO of Black Health, said it is imperative that
> the organization continue to advocate for improved mental health access in the
> Black community.
>
> "'The increased incidence of mental health challenges is related to a lack of access
> to culturally appropriate and responsive care, prejudice, and racism inherent to
> healthcare systems, as well as trauma related to violence, constant policing,
> implicit bias, poverty, and other forms of oppression,' Fields said.  'At Black
> Health, we strive to engage the communities we serve in dialogue about their
> needs, mobilizing resources and partnering with organizations committed to
> addressing the intersectional stigma related to mental health access.'"  *See*
> Columbia Medical School Department of Psychiatry Website, accessible at
> *https://www.columbiapsychiatry.org/news/columbia-psychiatry-partners-new-*
> *york-public-library-support-nyc-communities-hardest-hit-covid-19*.

177.     In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian

Psychiatry, he was involved in the Columbia Public Mental Health COVID-19 Rescue Plan,

which included virtual Internet-based communication platforms, digital technology and

facilitated access to care for persons most severely affected by the Pandemic.  Dr. Lieberman

was interviewed about the Rescue Plan by *Columbia Magazine*:

> "When COVID-19 raged across the globe in early 2020, people were terrified of
> the novel pathogen. Health-care professionals were taxed to their limits as
> hospitals filled with patients struggling to breathe. . . .  Meanwhile, Columbia's

4890-9158-2565, v. 1

psychologists and psychiatrists began to prepare for a second pandemic: one of widespread mental-health challenges.

"'There's a link between events where people have traumatic experiences and then some sort of psychological sequelae,' explains Jeffrey Lieberman, chair of the Department of Psychiatry at the Vagelos College of Physicians and Surgeons. But predicting the exact psychological sequelae, or mental-health effects, of the COVID-19 pandemic presented a challenge.

\* \* \*

"While all of us have been affected by COVID-19, some are more vulnerable to long-term mental-health effects. 'For some individuals who have a predisposition or constitutional susceptibility to a particular disorder, the pandemic will be the precipitant that causes them to manifest symptoms of that disorder,' says Lieberman. . . .

\* \* \*

". . . 'The usual way psychological disorders are treated in America, which is not the preferred way, is that people develop symptoms, and if they're bad enough they'll seek treatment,' explains Lieberman. "But a better way would be to be more proactive and to have already initiated a public mental-health plan to deal with the aftereffects of the pandemic.'" *See* B. Weinhouse, "The Mental Weight of Covid-19," *Columbia Magazine* (Fall 2021), accessible at *https://magazine. columbia.edu/article/mental-weight-covid-19*.

178.     In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian

Psychiatry, he recruited personnel with whom he established the Center for Practice Innovations

at Columbia Psychiatry/New York State Institute of Psychiatry ("***CPI***").  The CPI "is supported

by the New York State Office of Mental Health (NYS-OMH) [of which NYSPI is a part].  The

CPI serves as a key resource in spreading those practices identified by NYS-OMH as most

critical to accomplish the transformation of behavioral health care service delivery in New York.

In addition to training and implementation support, the CPI provides guidance and expertise to

OMH that is rooted in research on evidence-based practices, implementation science, and

behavioral health care policy."  *See* CPI Website, accessible at *https://practiceinnovations. org/about*.

56

179.    The May 2021 announcement of the launch of the Columbia Psychiatry/ New York Public Library Outreach Program also addressed the objectives of the CPI, explaining:  "The initiative also capitalizes on the expertise of the Department of Psychiatry and its Center for Practice Innovations (CPI), which brings best practices to mental health programs across New York State based on evidence-based recovery outcomes.  CPI will develop educational resources, including animated videos and books, both in English and Spanish, as well as online programs featuring Columbia mental health experts on topics identified by Black Health and library staff."  *See https://www.columbiapsychiatry.org/news/columbia-psychiatry-partners-new-york-public-library-support-nyc-communities-hardest-hit-covid-19*.

180.    In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian Psychiatry, he, in conjunction with the then Dean of the Columbia University School of Nursing, founded what is now known as The Program for the Study of LGBTQI+ Health (the "***LGBTQI+ Health Program***").  The LGBTQI+ Health Program was designed to "advance the science of LGBTQ+ health and educate the next generation of health providers by: [b]uilding a comprehensive understanding of the development of gender identity and sexual orientation, [d]eveloping models of comprehensive multi-disciplinary care, [p]roducing evidence-based guidelines to address specific health care needs, and [p]roviding scientific evidence to inform public policy."  The LGBTQI+ Health Program brings "together a critical mass of investigators, teachers, service providers, and policymakers from various disciplines who work in synergy to advance LGBTQ+ health."  *See* LGBTQI+ Health Program Website*, accessible at https://www. lgbthealthprogram.org/what-we-do*.

57

181.     The LGBTQI+ Health Program lists the NYSPI/Columbia/Presbyterian

Psychiatry office address at 1051 Riverside Drive in Manhattan as the Program's office location

and notes that the Program is affiliated with the "NYS Psychiatric Institute/Columbia University

Department of Psychiatry with the Columbia University School of Nursing." *See* LGBTQI+

Health Program Website, accessible at *https://www.lgbthealthprogram.org/location*.

182.     In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian

Psychiatry, he was involved in the expansion of the Comprehensive Psychiatric Emergency

Program, through the Emergency Room at Presbyterian/Columbia Hospital.  The Program

provides hospital-based "emergency psychiatric services[,]" including "full psychiatric

assessment, stabilization, extended observation, treatment, and referral of patients 18 and

older[,]" through the efforts of "psychiatrists, social workers, and nurses [who] are trained in

emergency psychiatry and work together as a team to develop a rapid response to acute care

needs." *See* Presbyterian/Columbia Hospital Website, accessible at *https://www.nyp.org/*

*psychiatry/comprehensive-psychiatric-emergency-program*.

183.     In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian

Psychiatry, he was involved in the expansion of Washington Heights Community Services,

which is a comprehensive community-based program for individuals with serious mental illness

who live in Northern Manhattan.  The program consists of an "inpatient unit at NYSPI often

referred to as '5 South' (formerly 4 South) and three outpatient clinics: the Audubon Clinic, the

Inwood Clinic, and the OnTrackNY/WHCS clinic, a specialized clinic for early psychosis."  The

program serves "approximately 1000 people and aim[s] to promote mental health recovery in a

4890-9158-2565, v. 1

culturally sensitive environment.  [The] services are located in designated mental health shortage areas by the National Health Service Corps.  English and Spanish language services are offered in each of [the] settings."  *See* NYSPI Website, accessible at *https://nyspi.org/nyspi/patients-and-families/washington-heights-community-services*.

184.     Washington Heights Community Services lists the NYSPI/Columbia/ Presbyterian Psychiatry office address at 1051 Riverside Drive in Manhattan as the location of the Service's administrative office and in-patient unit.  *See* NYSPI Website, accessible at *https://nyspi.org/nyspi/patients-and-families/washington-heights-community-services*.

185.     In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian Psychiatry, he was involved in the expansion of the Outpatient Child & Adolescent Mental Health Services program, which provides medical/psychiatric clinics, school-based mental health clinics in local schools and child and adolescent anxiety, depression and behavioral assessment and treatment programs.  *See* Columbia Medical School Department of Psychiatry Website, accessible at *https://childadolescentpsych.cumc.columbia.edu/outpatient-child-adolescent-mental-health-services-chony-6*.

186.     In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian Psychiatry, he was involved in establishing the Harlem Wellness Center, which addresses the physical, mental, social and spiritual health of the Harlem community.  Among other things, the Center works "to diminish the racial health gap in Harlem by offering women's health education focusing on physical, emotional, and mental health, nutrition workshops, and community

4890-9158-2565, v. 1

wellness events and self-compassion programs" and seeks to create "an inclusive environment for cross-generational health and racial healing."  *See* Harlem Wellness Center Website, accessible at *https://harlemwellness.org/wellness/*.

187.     In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian Psychiatry, he was involved in establishing, along with another physician, the Hope Mental Health Clinic, which offers mental health education, training and depression services in churches with predominantly Black congregations in Harlem.

188.     In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian Psychiatry, he teamed with Dr. Anna Chapman and The Bronx Family Justice Center to establish what is now known as the Chapman Perelman Domestic Violence Initiative.  A January 2017 funding announcement from the Columbia Medical School Department of Psychiatry summarized the history and objectives of the Initiative as follows:

> "The Domestic Violence Initiative was created in 2014 with an initial $1 million gift from the Foundation to establish a prototype for providing mental health services to victims of domestic violence, a neglected area in the care of this social problem.  Anna Chapman, MD, a Columbia College of Physicians and Surgeons graduate, and Jeffrey Lieberman, MD, chair of psychiatry at CUIMC, conceived this innovative program to provide on-site clinical psychiatric services in concert with the NYC Family Justice Centers, which were established by the Bloomberg administration to provide legal and social assistance to domestic violence victims who tend, more often than not, to be women and children.  This innovative private-academic-public partnership began with a pilot program at the Bronx Family Justice Center (BxFJC).  Services provided include psychiatric evaluations, psychopharmacologic treatment and psychotherapy, and training of other service providers at the BXFJC.
> *   *   *

60

"Dr. Lieberman noted that 'if not for the humanitarian interest and civic mindedness of generous people like Anna Chapman and Ron Perelman too many public health problems would go untreated.  Our goal is to provide each person with the best possible care while contributing to a greater understanding of the causes and generational patterns of domestic violence, in order to break the cycle of violence.  It is our hope that the Chapman Perelman Domestic Violence Initiative will provide a model of care that can be adopted by other cities and become a standard component of public health care.'"  *See* Columbia Medical School Website, accessible at *https://www.cuimc.columbia.edu/news/gift-expands-reach-program-assist-victims-domestic-violence*.

189.    In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian Psychiatry, he was instrumental in establishing on behalf of the Department of Psychiatry of Presbyterian/Columbia Hospital the Promise Project, which provides learning disabilities services for underprivileged children in New York City:  "For children living in poverty, undiagnosed and untreated learning disabilities are the underlying source of so many struggles. Left untreated, learning disabilities often lead to devastating outcomes, including debilitating low self-esteem, drug use, teenage pregnancy, crime and lifelong poverty.  Learning disabilities have nothing to do with how smart a child is — a learning disability is simply a neurological disorder that affects the brain's ability to process information in a traditional way.  But without the proper assessment and supports — which are nearly impossible for poor families to access — learning and pursuing a life of opportunity becomes nearly impossible."  *See* Promise Project Website, accessible at *https://www.promise-project.org/promise2/about/promiseProject/*.

190.    The Promise Project "is committed to being the most effective, all-encompassing program to help children with learning disabilities get the support they need to succeed. Children receive state-of-the-art neuropsychological assessments, clinical

61

recommendations and the follow-up necessary to get the services they need to learn." *See* Promise Project Website, accessible at *https://www.promise-project.org/promise2/ columbia/promiseColumbia/*.

191.    In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian Psychiatry, he, along with NYS OMH, RFMH, Center for Practice Innovations and the Nathan Kline Institute for Psychiatric Research, was involved in efforts to establish the OnTrackNY system, which is "a mental health treatment program that empowers young people to make meaning of their experiences and to pursue their goals for school, work, and relationships.  [The program] support[s] the well-being of young people across New York State who are impacted by unexpected changes in their thinking and perceptions.  Equity, inclusion, rapid access, and self-determination are at the core of everything [OnTrackNY] do[es]."  *See* OnTrackNY Website, accessible at *https://ontrackny.org/Our-Program/About-OnTrackNY*.

192.    In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian Psychiatry, he contributed to the work that led to the creation in late 2022 of Project Engage, which "is focused on improving access and quality of care for racial minorities, the socioeconomically disadvantaged, and sexual and gender minorities—and employing and creating career paths for community members."  *See* Columbia Medical School Department of Psychiatry Website, accessible at *https://www.columbiapsychiatry.org/news/scaling-community-mental-health-services-northern-manhattan*.

4890-9158-2565, v. 1

193.    In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian Psychiatry, he was involved in the efforts of Columbia University's Global Mental Health Programs Consortium, which consists of "a large group of faculty from across Columbia University's colleges and departments, including the Department of Psychiatry" to address "the complexity of mental health challenges around the world." *See* Global Mental Health Programs Consortium Website, accessible at *https://www.cugmhp.org/people/*.

194.    In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian Psychiatry, he was involved in establishing the Columbia Medical School Department of Psychiatry's Center for Intergenerational Psychiatry.  The Center is "committed to studying the transmission of vulnerability and resilience to mental illness between and across generations and to develop interventions and preventive strategies to interrupt and avert this transmission, limiting the impact of mental illness earlier than ever thought possible.  The Center's expertise spans epidemiology, developmental neuroscience, neuroimaging and psychophysiology, data science, genetics, epigenetics, and maternal-fetal biology[,] [w]ith a strong focus on mental health equity, [dedicating] substantial efforts to produc[ing] knowledge [that is] relevant to under-served individuals." *See https://www.columbiapsychiatry.org/research/research-centers-interdisciplinary-programs/center-intergenerational-psychiatry-cip*.

195.    In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian Psychiatry, he expanded and restructured under new leadership the Columbia Center of Prevention and Evaluation (or COPE) Program, which is an outpatient research program for teenagers and young adults who have experienced changes in thoughts and feelings that have led

63

to problems in relationships, school or the workplace.  As explained in the summary set forth on

its website, "COPE was developed to provide a setting for the evaluation and treatment of

*prodromal or high-risk symptoms*.  These are symptoms which develop relatively early in life

(from childhood to young adulthood) and which resemble symptoms found in some psychiatric

disorders but occur in individuals who do not have a definite psychiatric illness.  In some

individuals, these symptoms may represent the early stages of a disorder which will develop over

time, while in others the symptoms seem to fade with time or remain mild, and no psychiatric

illness develops.  We are located at the Columbia University Irving Medical Center / New York

State Psychiatric Institute (NYSPI) in New York City."  *See* Columbia Medical School

Department of Psychiatry Website, accessible at *https://www.columbiapsychiatry.org/research-*

*clinics/cope.*

196.    In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian

Psychiatry, he worked with the criminal justice system in Miami, Florida, to develop a program

called the Miami Center for Mental Health and Recovery to "provide a comprehensive system of

care for individuals with serious mental illnesses and substance use disorders who frequently

cycle through the criminal justice and other acute care treatment systems."  *See* Miami Center for

Mental Health and Recovery Website, accessible at *https://miamifoundationformentalhealth.org/*

*about-us/.  See also* Background Section XX, below.

# X.

## DR. LIEBERMAN'S COMMITMENT
## TO DIVERSITY INITIATIVES

197.     In his role as head of NYSPI/Columbia/Presbyterian Psychiatry, Dr.

Lieberman appointed Dr. Jean-Marie Alves Bradford to serve as the inaugural Director of the

Columbia Medical School Department of Psychiatry's Office of Equity, Diversity & Inclusion.

The e-mail that Dr. Lieberman circulated to the Columbia Medical School Department of

Psychiatry in late September 2020 read, in part, as follows:

> "I am pleased to announce that Jean-Marie Alves-Bradford, MD has been
> appointed the inaugural Director of a new Office of Equity, Diversity &
> Inclusion.  In this pivotal role, she will work with senior leadership (vice chairs,
> area leaders, division, service and program directors) to advise, develop and
> implement policies, programs and practices related to diversity, equity and
> inclusion across the department.  Under her leadership, this office will serve as a
> source or guidance and support to all components of our department and
> ombudsman on issues related to equity, diversity and inclusion.

> "Dr. Alves-Bradford is well prepared for this important leadership role.  For the
> past 6 years she has co-chaired the Faculty Affairs Committee of Diversity and
> Inclusion in the department and served on various CUIMC diversity efforts
> including the VP&S Diversity Council and the NYP GME Diversity Alliance.
> Her experience will be a huge asset as we work toward inclusive excellence in our
> department.
>
>                         *   *   *
>
> "In her new role, she will also serve as liaison with the leaders of similar
> initiatives in other departments and the Dean's office of the medical school, as
> well as external consultants who we have engaged like Dr. Patrice Harris who was
> recently appointed as a Visiting Professor to Columbia Psychiatry as a prelude to
> her recruitment.  Please join me in congratulating and offering your enthusiastic
> support to Dr. Alves-Bradford on her appointment.  While assuming this new
> role, she will retain her position as Director of the Washington Heights
> Community Services.  I am proud and delighted to see Jean Marie's flour[ish]ing
> in this way and providing yet another example of how 'coming to Columbia is the
> opportunity of a lifetime, and a lifetime of opportunity.'"

198.    On or about October 6, 2020, the Columbia Medical School Department of Psychiatry announced publicly that Dr. Lieberman had appointed Dr. Jean-Marie Alves Bradford to serve as the inaugural Director of the Columbia Medical School Department of Psychiatry's Office of Equity, Diversity & Inclusion.  The Department's October 6, 2020 public announcement reads, in part, as follows:

> "The Columbia University Department of Psychiatry announced today that Jean-Marie Alves-Bradford, MD has been appointed the inaugural Director of the new Office of Equity, Diversity & Inclusion.  In this pivotal role, Dr. Alves-Bradford will work with department leaders to advise, develop and implement policies, programs and practices that create and support an environment of diversity, equity and inclusion.  Her office will serve as a source or guidance to all components of Columbia Psychiatry and ombudsman on issues related to equity, diversity and inclusion.
>
> "'It is not enough that we create a workplace environment of respect, fairness, honesty and safety at Columbia and NYSPI,' said Jeffrey A. Lieberman, MD, Lawrence C. Kolb Professor and Chairman of Columbia Psychiatry.  'We must do all we can to extend our values and principles to the society we live in beginning with our communities, city, state and country.'
>
> *   *   *
>
> "'Dr. Alves-Bradford is well prepared for this important leadership role,' said Dr. Lieberman.  'Her experience both in our department and as a physician will be a huge asset as we work toward inclusive excellence in our department.'
>
> "During her time with the Department, Dr. Alves-Bradford has been dedicated to community mental health services treating the underserved and subsequently assumed a leadership role as the Director of the Washington Heights Community Service[s] (WHCS) and Associate Clinical Director of NYSPI, positions which she will retain.  .  .  .
>
> "'This is an important opportunity,' said Dr. Alves-Bradford.  'I'm looking forward to working together to increase representation, cultural humility and inclusion in our department.'"  *See* Columbia Medical School Department of Psychiatry Website, accessible at *https://www.columbiapsychiatry.org/news/columbia-psychiatry-appoints-dr-jean-marie-alves-bradford-director-new-office-equity-diversity-inclusion.*

199.    In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian Psychiatry, he met with Dr. Alves-Bradford, as the Columbia Medical School Department of Psychiatry's Director of the Office of Equity, Diversity & Inclusion, on a generally monthly basis to review the progress of the Office.  At Dr. Lieberman's invitation, Dr. Alves-Bradford attended meetings that he hosted of his Vice Chairs of the Columbia Medical School Department of Psychiatry.

200.    Among the initial initiatives that Dr. Lieberman discussed with Dr. Alves-Bradford, in her role as the Columbia Medical School Department of Psychiatry's Director of the Office of Equity, Diversity & Inclusion, was a plan to modify the signage, wall coverings and other aesthetics of the NYSPI building in which the Department was headquartered to reflect a more culturally diverse, inclusive environment.  For example, Dr. Lieberman approved and helped implement a wall makeover plan pursuant to which mural photos of faculty and staff, inspirational statements and updated historical photographs, plaques and other memorabilia were placed on the interior walls of the NYSPI building to more broadly reflect the contributions to the field of psychiatry made by minorities.  (The terms "minority" and "minorities" are used herein to include, among others, Asian American, Native Hawaiian, Pacific Islander, African American, Hispanic, Puerto Rican, Native American and Alaska Native persons, as identified by the United States Government in 42 U.S.C. § 7141(f)(1), Office of Minority Economic Impact.)

201.    In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian Psychiatry, he was involved in efforts to recruit and retain minority faculty and students on behalf of the Columbia Medical School Department of Psychiatry.  As noted in a July 17, 2018

Department Review for the Columbia Medical School Department of Psychiatry, these efforts were "informed by the mandate to achieve greater gender, racial, and ethnic diversity to reflect the patient population that we serve."

202.    In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian Psychiatry, he was also involved in efforts to recruit and retain minority personnel for NYSPI and Presbyterian/Columbia Hospital.

203.    In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian Psychiatry, he supported and obtained funding to establish the Dr. June Jackson Christmas First Year Medical Student Summer Clinical Fellowship.  The objectives of the Fellowship, which is supported by The Leon Levy Foundation, are summarized as follows:

> "The Dr. June Jackson Christmas Medical Student Summer Clinical Fellowship offers a chance for medical students who belong to historically underrepresented groups to explore a career in psychiatry.  The initiative is a five-week experience for medical students in the summer after completing their first year of medical school.
>
> *  *  *
>
> "Applicants will be considered on an individual basis with special consideration given to those applicants who:
>
> •  Were the first in their family to attend graduate school[.]
>
> •  Grew up in a single parent household[.]
>
> •  Have, either as a result of their socio-economic background, their status as a member of an historically underrepresented group in medical school, their disability status, or their LGBTQ status, or other challenging life experiences, overcome obstacles on their journey to medical school[.]
>
> •  Have lived or worked in a diverse environment[.]

- Have, through their education or work experience, demonstrated a commitment to serving historically underprivileged populations." *See* Columbia Medical School Department of Psychiatry Website, accessible at *https://www.columbiapsychiatry.org/dr-june-jackson-christmas-first-year-medical-student-summer-clinical-fellowship*.

204.    In Dr. Lieberman's role as head of NYSPI/Columbia/Presbyterian Psychiatry, he recruited and mentored countless students, scientists, clinicians and staff of diverse ethnic, racial, religious, gender, socio-economic and other cultural backgrounds and sexual/gender orientation.

### XI.

### THE PROFESSIONAL AND PERSONAL RESPECT THAT DR. LIEBERMAN HAS EARNED FROM COLLEAGUES, FRIENDS AND ACQUAINTENANCES OF DIVERSE ETHNIC, RACIAL, RELIGIOUS AND OTHER CULTURAL BACKGROUNDS

205.    As noted, Dr. Lieberman has devoted much of his time and energy to establishing, expanding and maintaining psychiatric services for underserved communities and to advancing diversity initiatives at NYSPI/Columbia/Presbyterian Psychiatry.

206.    Dr. Lieberman's longtime devotion to enhancing psychiatric outreach programs for the poor; for minorities; for the elderly; for children; for adolescents; for prisoners and others navigating the criminal justice system; for members of the LGBTQ+ community; and for members of other underserved communities, as well as his support for diversity and equality initiatives at NYSPI/Columbia/Presbyterian Psychiatry, was born of a deep personal commitment to equality, tolerance and fairness.

69

207.     Because of his deep personal commitment to equality, tolerance and fairness, Dr. Lieberman has earned over the years the professional and personal respect and admiration of countless persons of diverse ethnic, racial, religious and other cultural backgrounds and sexual/gender orientation.

208.     Dr. Lieberman's deep personal commitment to his profession has left an indelible mark upon colleagues, friends, family and acquaintances alike.  This deep commitment, including his "unrivaled" dedication to fostering "the next generation of young leaders," was the focus, for example, of a celebratory dinner hosted at The Modern in the Museum of Modern Art by the Board of Advisors of the Columbia Medical School Department of Psychiatry to honor Dr. Lieberman's first decade of service as Chair of the Department.  One speaker at the dinner offered the following observations, in words or substance, concerning Dr. Lieberman:

> "While his academic and professional achievements are impressive, it's so much more that brings us here tonight.  Many of us know how he makes himself available to friends and families in times of crisis.  Some of them are local; others are around the world.  They all seek his guidance for treatment of mental disorders and addictions at all hours and days of the week.  He is always ready to help with compassion and wisdom, in moments of acute need, and in helping us contend with longer-term challenges.
>
> "Because of Jeff and the Department's incredible accomplishments, Columbia Psychiatry has become a magnet for talent.  The best, most accomplished and most ambitious students, scientists and clinicians want to be here — because they know that they will have every opportunity to succeed."

70

# XII.

## ALL OF THE DEFENDANTS ARE STATE ACTORS FOR PURPOSES OF THE WRONGDOING ALLEGED HEREIN UNDER 42 U.S.C. § 1983

209.    For purposes of the Section 1983 Claims alleged herein against the Individual State Actor Defendants, in conspiring with the Entity Defendants to perpetrate against Dr. Lieberman from February 22, 2022 through the present the Unlawful Scheme that is described in detail herein, Dr. Sullivan, Ms. Tashjian, Dr. Smith and Dr. Simpson have each functioned (and continue to function) under color of state law as a New York State actor.

210.    For purposes of the Section 1983 Claims alleged herein against the Entity Defendants, in conspiring with the Individual State Actor Defendants to perpetrate against Dr. Lieberman from February 22, 2022 through the present the Unlawful Scheme that is described in detail herein, Columbia University and Presbyterian/Columbia Hospital have each functioned (and continue to function) under color of state law as a New York State actor.

### A.    The Individual State Actor Defendants Are Employed and Paid By the State of New York

211.    From the time he became the head of NYSPI/Columbia/Presbyterian Psychiatry in 2005 through late February 2022, when Defendants, through their carefully choreographed Unlawful Scheme, willfully, intentionally and maliciously removed him from his leadership positions in retaliation for the content of his February 19, 2022 Personal Tweet, Dr. Lieberman was employed and paid by the State of New York in connection with his position as Executive Director of NYSPI.

71

212.     From the time he became the head of NYSPI/Columbia/Presbyterian Psychiatry in 2005 through late February 2022, when Defendants, through their carefully choreographed Unlawful Scheme, willfully, intentionally and maliciously removed him from his leadership positions in retaliation for the content of his February 19, 2022 Personal Tweet, Dr. Lieberman was also employed and paid by Columbia University in connection with his position as Chair of the Columbia Medical School Department of Psychiatry.

213.     From the time he became the head of NYSPI/Columbia/Presbyterian Psychiatry in 2005 through late February 2022, when Defendants, through their carefully choreographed Unlawful Scheme, willfully, intentionally and maliciously removed him from his leadership positions in retaliation for the content of his February 19, 2022 Personal Tweet, Dr. Lieberman was also employed by Presbyterian/Columbia Hospital as its Psychiatrist-in-Chief. Dr. Lieberman was paid for his service as Psychiatrist-in-Chief of the Hospital by Columbia University pursuant to what, upon information and belief, was a payment-allocation arrangement between Columbia University and the Hospital.

214.     Upon information and belief, during the Relevant Time Period, Dr. Sullivan has been paid by the State of New York in connection with her position as Commissioner of NYS OMH.

215.     Upon information and belief, during the Relevant Time Period, Ms. Tashjian has been paid by the State of New York in connection with her position as the Executive Deputy Commissioner of NYS OMH.

216.     Upon information and belief, during the Relevant Time Period, Dr. Smith has been paid by the State of New York in connection with his respective positions with NYS OMH, including his position as its Chief Medical Officer.

217.     Upon information and belief, during the Relevant Time Period, Dr. Smith has been paid by Columbia University in connection with his position as a Special Lecturer at the Columbia Medical School Department of Psychiatry.

218.     Upon information and belief, during the Relevant Time Period, Dr. Smith has been paid by Presbyterian/Columbia Hospital, through the Hospital's payment-allocation arrangement with Columbia University, as an attending physician in the Hospital Department of Psychiatry.

219.     Upon information and belief, during the Relevant Time Period, Dr. Simpson has been paid by the State of New York in connection with her respective positions with NYSPI, including, since late February 2022, her position as Interim Executive Director of NYSPI.

220.     Upon information and belief, during the Relevant Time Period, Dr. Simpson has been paid by Columbia University in connection with her various positions therewith, including her position as Interim Chair of the Columbia Medical School Department of Psychiatry.

221.     Upon information and belief, during the Relevant Time Period, Dr. Simpson has been paid by Presbyterian/Columbia Hospital, through the Hospital's payment-

73

allocation arrangement with Columbia University, as an attending physician in the Hospital Department of Psychiatry and, since late February 2022, as the Hospital's Interim Psychiatrist-in-Chief.

**B.    For Purposes of the Wrongdoing Alleged Herein Under 42 U.S.C. §§ 1983, *et seq*., New York State Is Fully Integrated Into, Exercises Control Over and Provides Significant Encouragement and Support To the Columbia Medical School Department of Psychiatry, the Presbyterian/Columbia Hospital Department of Psychiatry and the Overlapping Personnel of NYSPI/Columbia Presbyterian Psychiatry**

**(i)    <u>Summary Overview</u>**

222.    As noted above and addressed in more detail below, NYSPI/Columbia/Presbyterian Psychiatry is a closely intertwined Association consisting of NYSPI (which, as noted, is a part of NYS OMH), the Columbia Medical School Department of Psychiatry and Presbyterian/Columbia Hospital Department of Psychiatry.

223.    Through NYSPI/Columbia/Presbyterian Psychiatry, NYSPI, the Columbia Medical School Department of Psychiatry, the Presbyterian/Columbia Hospital Department of Psychiatry and their respective overlapping personnel have maintained for a century or so an intimate, symbiotic relationship with the State of New York.

224.    Upon information and belief, NYSPI/Columbia/Presbyterian Psychiatry is regarded as one of the most successful public-academic accredited medicine partnerships in the United States.

4890-9158-2565, v. 1

225. The State of New York exercises control over and provides significant encouragement and support to NYSPI/Columbia/Presbyterian Psychiatry and its overlapping personnel.

226. As noted, the key personnel of NYSPI/Columbia/Presbyterian Psychiatry (including, but not limited to, Dr. Smith and Dr. Simpson) are employed by and hold various positions with NYSPI, on the one hand, and with the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry, on the other hand.

227. NYSPI/Columbia/Presbyterian Psychiatry has been in existence for approximately a century, including during Defendants' perpetration of their Unlawful Scheme against Dr. Lieberman during the past 15 consecutive months.

228. NYSPI/Columbia/Presbyterian Psychiatry has engaged in myriad endeavors relating to the field of psychiatry, including, but not limited to, psychiatric research; the teaching of psychiatry; the publication of academic and medical papers, articles and books; the establishment and maintenance of psychiatric community outreach programs; the hospital-based and other training of psychiatric medical students; the provision of psychiatric patient care; the funding of and fundraising for psychiatric programs; and the administration of the medical professionals, professors, adjunct professors, lecturers and other employees and staff who comprise NYSPI/Columbia/Presbyterian Psychiatry, including, but not limited to, the recruiting, hiring, promoting, demoting and firing of said personnel (collectively, the "***Psychiatric Activities***").

75

229.     As demonstrated in detail herein, for the past century or so, the State of New York, through NYS OMH and NYSPI, has exercised such coercive and pervasive power over the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry that the Psychiatric Activities of NYSPI/Columbia/ Presbyterian Psychiatry — as well as the Psychiatric Activities of each of NYSPI, the Columbia Medical School Department of Psychiatry, the Hospital Department of Psychiatry and their respective personnel separately — have constituted the actions of the State of New York.

230.     As demonstrated in detail herein, for the past century or so, the State of New York, through NYS OMH and NYSPI, has provided such significant encouragement and support, overtly and covertly, to the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry that the Psychiatric Activities of NYSPI/Columbia/Presbyterian Psychiatry — and the Psychiatric Activities of each of NYSPI, Columbia Medical School Department of Psychiatry, the Hospital Department of Psychiatry and their respective personnel separately — have constituted the actions of the State of New York.

231.     As demonstrated in detail herein, for the past century or so, there has existed such an intimately close nexus between and among the State of New York, through NYS OMH and NYSPI, and the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry that the Psychiatric Activities of NYSPI/Columbia/Presbyterian Psychiatry — and the Psychiatric Activities of each of NYSPI, Columbia Medical School Department of Psychiatry, the Hospital Department of Psychiatry and their respective personnel separately — have constituted the actions of the State of New York.

4890-9158-2565, v. 1

### (ii)      The Historical Evolution of NYSPI/ Columbia/Presbyterian Psychiatry

### (1)      The 1923 New York State Bond Issue

232.    The genesis of NYSPI/Columbia/Presbyterian Psychiatry dates to 1923. In that year, voters in the State of New York approved a $50 million bond issue to be spent at the rate of $12.5 million per year for four years to finance the construction of new and the renovation of existing hospitals and other structures devoted to the care of the mentally ill.  *See* "New York Bond for Construction of Buildings for Institutions of Wards of the State, Proposition 1 (1923)," *Ballotpedia*, accessible at *https://ballotpedia.org/New_York_Bond_for_Construction_of_ Buildings_for_Institutions_of_Wards_of_the_State,_Proposition_1_(1923)*.

233.    In or about 1926, the Governor of the State of New York issued a document titled, *What the State of New York is doing with the money realized from the Fifty Million Dollar Bond Issue authorized by the people on Election Day 1923* (the "***1923 Bond Issue Update***").  The 1923 Bond Issue Update noted that, "[i]n 1923, by an overwhelming majority, the people of the State voted to issue bonds to the extent of fifty million dollars, making twelve and one-half millions available each year for four years for the addition of new hospitals and the reconstruction of old ones, and additional buildings for the care of the feeble-minded and the wards of the State in various State charitable institutions."

234.    The 1923 Bond Issue Update contains a rendition of what is described as the "Psychiatric Institute or hospital which is to be constructed as part of the new Medical Centre at Riverside Drive and 168th Street in New York City and which will be used for research into

77

the causes of insanity and the teaching of Psychiatry to the State Hospital Service.  The site was presented to the State by Columbia University."

### (2)    The 1924-1926 New York State Agreements

235.    Upon information and belief, the New York State Hospital Commission and the Columbia University Joint Administrative Board, acting for Columbia University and Presbyterian/Columbia Hospital, entered into an agreement, dated November 12, 1924 and June 10, 1925, pursuant to which New York State agreed to construct a new 20-story building to house NYSPI, which building would be made available to the Columbia Medical School Department of Psychiatry in perpetuity (the "*1924/1925 NYS-Columbia Agreement*").

236.    Upon information and belief, the deed pursuant to which Columbia University or an affiliate thereof transferred to the State of New York the land upon which the NYSPI building was constructed at 1051 Riverside Drive in Manhattan was dated May 14, 1926 (the "*May 1926 Columbia Deed To NYS*").

### (3)    1952:  The Ties Between NYSPI and the Columbia Medical School Department of Psychiatry Deepen

237.    Upon information and belief, in or about 1952, the State of New York created RFMH (the Research Foundation for Mental Hygiene, Inc.), a non-profit corporation under Section 501(c)(3) of the Internal Revenue Code, for the purpose of administering the grants that support the research conducted by, among other entities, NYSPI.

4890-9158-2565, v. 1

238.    On its website, RFMH describes itself as follows:

"The Research Foundation for Mental Hygiene, Inc[.] (RFMH) is a private, not-for-profit membership corporation organized in 1952, for the purpose of assisting and enhancing the research and training objectives of the New York State Department of Mental Hygiene and its component agencies; the Office of Mental Health (OMH), the Office for People with Developmental Disabilities (OPWDD) and the Office of Addiction Services and Supports (OASAS).

"RFMH is separate from the NYS Department of Mental Hygiene and does not receive services provided to New York State agencies or state appropriation to support corporate functions.  .  .  .

"Through an agreement with New York State, RFMH has been designated as the organization responsible for administering and directing the conduct of all sponsored research programs carried out by scientists at Department of Mental Hygiene institutes or facilities.  Sponsored research activities are carried out at the central offices of the Department as well as at the Department['s three research institutes[.]

"RFMH provides an organizational bridge between the scientist and those wishing to support his or her work, be it the Federal Government, State Government, Individuals, Foundations or, as is frequently the case, a combination of multiple sponsors.  RFMH provides the Department of Mental Hygiene and their scientists with the independence and administrative flexibility to respond quickly to the special demands of sponsored programs in a manner that facilitates their scientific or technical execution.  These are needs that could not be as easily accommodated through state processes[.]"  *See http://corporate.rfmh.org/corporate_info/index. asp?page=about_the_rf*.

239.    Upon information and belief, in or about 1952, NYSPI and the Columbia Medical School Department of Psychiatry formally joined their educational programs (the "***1952 NYSPI-Columbia Psychiatry Educational Partnership***").  As a result of the 1952 NYSPI-Columbia Psychiatry Educational Partnership, Columbia Medical School Department of Psychiatry faculty appointments were bestowed upon NYSPI faculty and NYSPI trainees received Columbia diplomas.

4890-9158-2565, v. 1

240.    In connection with the 1952 NYSPI-Columbia Psychiatry Educational

Partnership, the positions of Executive Director of NYSPI, Chair of the Columbia Medical

School Department of Psychiatry and Psychiatrist-in-Chief of Presbyterian/Columbia Hospital

were formally consolidated and held by a single person.  As noted, Dr, Lieberman held these

three positions from January 2005 through late February 2022, when, through Defendants'

perpetration of their Unlawful Scheme, he was willfully, intentionally and maliciously stripped

of those positions in direct retaliation for the content of his February 19, 2022 Personal Tweet.

### (4)    **The 1974 Deed**

241.    Upon information and belief, by deed dated November 8, 1974, Columbia

University transferred to the State of New York for one dollar ($1.00) the land upon which

NYSPI's 14-story Kolb Annex was to be constructed adjacent to the original NYSPI building

located at 1051 Riverside Drive in Manhattan (the "***1974 Columbia Deed To NYS***").

242.    Upon information and belief, construction of the Kolb Annex was

completed in or about 1983.

### (5)    **The 1984 NYS OMH-Columbia University**
### **Memorandum of Understanding**

243.    In or about June 1984, NYS OMH, on behalf of NYSPI, entered into an

agreement with Columbia University, through the latter's Deputy Vice President for Health

Science, titled *Memorandum of Understanding Between New York State Psychiatric Institute and*

*Columbia University in the City of New York For Affiliation With the Howard Hughes Medical*

80

*Institute* (the "***1984 NYS OMH-Columbia MOU***").  The 1984 NYS OMH-Columbia MOU was to govern "the conduct of research in neurobiology and behavior in affiliation with the Howard Hughes Medical Institute."

244.    Among the terms of the 1984 NYS OMH-Columbia MOU were certain funding commitments by Columbia University and the commitment on the part of NYSPI to "provide the space and facilities" for psychiatry research.

245.    The 1984 NYS OMH-Columbia MOU provides that "Columbia University and NYS Psychiatric Institute anticipate that this agreement will remain in effect for thirty years[,]" with certain termination rights upon notice after January 1, 1990.

246.    The 1984 NYS OMH-Columbia MOU requires "[a]ll employees of Columbia University" to "abide by the rules and regulations of the State of New York, the Office of Mental Health, and the New York State Psychiatric Institute."

247.    The 1984 NYS OMH-Columbia MOU also empowers Columbia University, at its expense, to make "[r]enovations and alterations" to the building space provided by NYSPI for the research activities in accordance with said MOU.

248.    The 1984 NYS OMH-Columbia MOU provides that "[a]ll scientific publications and awards will cite Columbia University, the Howard Hughes Medical Institute, and[] NYS Psychiatric Institute."

81

(6)     **The 1985 NYS OMH-Columbia University Revocable Permit**

249.    In June 1985, Columbia University and NYS OMH entered into an agreement titled *In the Matter of the Application of the Trustees of Columbia University in the City of New York for Permission To Occupy and Use Certain Portions of State Controlled Real Property at New York Psychiatric Institute For the Purpose of Conducting Psychiatric and Related Research* (the "*1985 NYS OMH-Columbia Revocable Permit*").

250.    In accordance with the 1985 NYS OMH-Columbia Revocable Permit, NYS OMH agreed to permit Columbia University to occupy and use "for the purpose of conducting psychiatric and related research" four floors of NYS OMH's Lawrence Kolb Building.

(7)     **The 2011 NYSPI Audit Report**

251.    On January 28, 2011, the Office of the New York State Comptroller, Division of State Government Accountability, transmitted to the Commissioner of NYS OMH a report of the Comptroller's audit of NYSPI titled *Office of Mental Health: New York State Psychiatric Institute Control Over State Resources (Report 2008-S-145)* (the "*2011 NYSPI Audit Report*"), accessible at *https://web.osc.state.ny.us/audits/allaudits/093011/08s145.pdf*.

252.    As stated therein, the audit reflected in the 2011 NYSPI Audit Report was conducted in accordance with the following methodology:  "Our audit focused on the Institute's payroll and personnel practices, its office and laboratory space sharing arrangements with

82

Columbia, and its management of the State's ownership rights in patents for discoveries made at the Institute.  To accomplish our objectives, we interviewed OMH and Institute officials and staff, and reviewed applicable Institute records including employee time and attendance reports, payroll summaries, building leases, and support for selected expenses.  We also selected a judgmental sample of 21 Institute employees who were identified as receiving salaries from both the State and Columbia.  We visited their assigned work locations during their scheduled work hours to confirm that they were engaged in their official Institute work duties."  2011 NYSPI Audit Report at 12, accessible at *https://web.osc.state.ny.us/audits/allaudits/093011/08s145.pdf*.

253.    Among other things, the 2011 NYSPI Audit Report examined and reported on the intensely close relationship among the three entities that comprise NYSPI/ Columbia/Presbyterian Psychiatry — NYSPI, the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry — concluding that NYSPI/Columbia/Presbyterian Psychiatry functions as a unified entity and urging New York State to exert even greater control over it.

254.    The 2011 NYSPI Audit Report explains that NYSPI (referred to in the Audit Report as the "Institute") "*has a long-standing collaborative relationship with Columbia University (Columbia), and Columbia's affiliated hospital, New York Presbyterian Hospital (Presbyterian).  These three entities share professional and administrative staff, facilities and equipment, and participate in joint training, research and clinical trial endeavors.  Many [I]nstitute staff are also [dual-salaried] employees of Columbia.*"  2011 NYSPI Audit Report at 7, accessible at *https://web.osc.state.ny.us/audits/allaudits/093011/08s145.pdf* (emphasis added).

83

255.     The 2011 NYSPI Audit Report examined in further detail NYSPI/ Columbia/Presbyterian Psychiatry's overlapping employment of personnel:  "*Many Institute staff also work for Columbia.  In fact, as of October 31, 2008, 195 Institute staff were also being paid by Columbia.  In most cases, these staff work on multiple projects receiving separate salaries from the Institute and Columbia, respectively*.  .  .  . *[A]nd in several cases (based on their reported salaries) employees are paid as full-time employees at both entities*."  2011 NYSPI Audit Report at 15 (emphasis added), accessible at *https://web.osc.state.ny.us/ audits/allaudits/093011/08s145.pdf*.

256.     The 2011 NYSPI Audit Report found that there was a complete blurring of any entity distinction with respect to research projects conducted by NYSPI/Columbia/ Presbyterian Psychiatry.  For example, the Audit Report explained:  "We found all 21 [sampled NYSPI/Columbia/Presbyterian Psychiatry] employees to be at their assigned work locations. However, only ten of them were working on projects that we could trace back to the Institute. We could not trace the work being performed by the remaining 11 employees to the Institute. One of the 11 was being paid half-time (50 percent) by the Institute ($48,305) as a Research Scientist 5.  However, at the time of our floor check, he informed us that he was working exclusively on two projects for Columbia."  2011 NYSPI Audit Report at 16, accessible at *https://web.osc.state.ny.us/audits/allaudits/093011/08s145.pdf*.

257.     The 2011 NYSPI Audit Report noted that "*Institute officials stated that the activities of the Institute and Columbia are so intertwined that it is difficult to differentiate*

84

*Institute activities from Columbia activities*."  2011 NYSPI Audit Report at 8 & 16 (emphasis

added), accessible at *https://web.osc.state.ny.us/audits/allaudits/093011/08s145.pdf*.

258.    The 2011 NYSPI Audit Report concluded that NYSPI/Columbia/

Presbyterian Psychiatry operates as a unified psychiatric entity:  "*The Institute, located in upper*

*Manhattan, has a long-standing collaborative relationship with neighboring Columbia*

*University (Columbia), and Columbia's affiliated hospital, New York Presbyterian Hospital*

*(Presbyterian).  These three entities share professional and administrative staff, facilities and*

*equipment, and participate in joint training, research and clinical trial endeavors.  Many*

*institute staff are also employees of Columbia.  Institute operations and staff are overseen by*

*the Institute's Executive Director who also serves as the Chair of Columbia's Department of*

*Psychiatry, and as Psychiatrist-in-Chief at Presbyterian.  In effect, Columbia's Department of*

*Psychiatry, Presbyterian's Department of Psychiatry and the Institute operate as a unified*

*psychiatric facility*."  2011 NYSPI Audit Report at 11 (emphasis added), accessible at

*https://web.osc.state.ny.us/audits/allaudits/093011/08s145.pdf*.

259.    The 2011 NYSPI Audit Report addressed the sharing by NYS

OMH/NYSPI of building space with the Columbia Medical School Department of Psychiatry

and the Hospital Department of Psychiatry:

> "The Institute operates from two OMH-owned buildings and from leased space in
> three privately-owned buildings.  One of the privately-owned buildings is owned
> by Columbia and houses Columbia's School of Public Health. This building is
> located on land that had been previously donated to the State by Columbia.  Since
> February 2005, the Institute has leased 2 of the building's 19 floors, about 10.5
> percent of the total floor space, and under the lease agreement, has paid Columbia
> 14.1 percent of the building's total operating and maintenance expenses ($611,547
> for the year ended June 30, 2008).

"Conversely, Columbia staff occupies space in two OMH-owned buildings free of charge.  According to an agreement between the parties, Columbia donated the land upon which one of the buildings is situated.  Therefore, Columbia has free access to, and use of, the Lawrence Kolb Research Laboratory.  However, Columbia also occupies space in the Institute's Riverside Drive Building, located at a different site on land owned by OMH, and for which no similar agreement exists."  2011 NYSPI Audit Report at 17, accessible at *https://web.osc.state. ny.us/audits/allaudits/093011/08s145.pdf*.

260.    The 2011 NYSPI Audit Report also made clear that NYSPI views the building-sharing arrangements among itself, the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry as critical reciprocal arrangements that benefit all NYSPI/Columbia/Presbyterian Psychiatry constituents:

"According to Institute officials, Columbia staff has occupied space in the Riverside Drive Building since the building opened in May 1998.  .  .  .

"***Institute officials told us they were not charging Columbia rent for its use of the Riverside Drive Building because they believed the agreement granting Columbia free use of the Kolb Building also applied to the Riverside Drive Building.  Institute officials also indicated that there are circumstances where the Institute has been granted access to Columbia research facilities, the use of which has been — and is — invaluable to the Institute, and for which no payments are made to Columbia.  Citing the close working relationship between the two entities, the Institute and OMH believe that the space-sharing arrangements work well and benefit both Institutions***."  2011 NYSPI Audit Report at 17 (emphasis added), accessible at *https://web.osc.state.ny.us/audits /allaudits/093011/08s145.pdf*.

261.    Annexed to the 2011 NYSPI Audit Report are the comments of NYS OMH/NYSPI in response to the Report's findings (the "***NYSPI Audit Response***").  The NYSPI Audit Response touts the unique, symbiotic relationship among the members of NYSPI/ Columbia/Presbyterian Psychiatry, explaining as follows:

86

"The NYSPI is a psychiatric research institute that is owned by New York State (NYS) and operated by OMH. . . .

"We begin with some background on the importance of our longstanding partnership with Columbia University (CU), as this relationship is the focus of the OSC [Office of State Comptroller] audit report. . . . We feel that a more complete understanding of the nature and benefits of this kind of collaborative research enterprise is necessary for the required evaluation of NYSPI's use and control of State resources.

"***OMH and NYSPI recognize that NYSPI, and its complex historical relationship with CU, are not typical of most State facilities, agencies and institutions that OSC reviews. We appreciate the significant time and effort invested by OSC in trying to understand this unique affiliation. We recognize that the complexity of the affiliation*** in operation ***made it difficult, in some cases, to discern between NYSPI and Columbia Department of Psychiatry activities; however, we would like to emphasize that the same integration and synergism that makes that exercise difficult is what makes the affiliation so successful and so valuable to the State***. NYSPI agrees with OSC about the importance of ensuring the proper utilization of State resources.

"We at NYSPI sincerely believe and are confident that the State's investment in personnel and facilities, and its interests in intellectual property are managed appropriately and directly in the service of NYS. ***Moreover, we believe that the affiliation between NYSPI and CU provides enormous value in scientific progress, quality of mental health care services and economic development to the citizens of New York State***." 2011 NYSPI Audit Report at 22 (non-boldfaced italicized emphasis in original; boldfaced italicized emphasis added), accessible at *https://web.osc.state.ny.us/audits/allaudits/093011/08s145.pdf*.

262. The NYSPI Audit Response provided further historical background with respect to NYSPI/Columbia/Presbyterian Psychiatry:

"***In 1924 NYS resolved to locate the NYSPI on the health sciences campus of CU and established a covenant with CU setting forth the principles of this affiliation. In the ensuing 86 years the New York State OMH/Columbia affiliation has become an historic and uniquely successful public-private partnership in academic medicine. The decision to locate NYSPI on the campus of a major university and medical center ushered in a new era for care for the mentally ill and for the field of psychiatric medicine***. Columbia's intellectual resources, technologies and facilities made available to NYSPI by the

University and Medical School, then, as now, enrich and complement the State's own resources and further its mission.

"*Today, the vast majority of NYSPI researchers and many clinicians at NYSPI maintain faculty appointments at Columbia University because a Columbia title provides access to university collaboration (e.g., genetics, brain imaging, laboratory facilities, and clinical populations)*.  It enables NYSPI to compete for grants and awards in an increasingly competitive funding environment.  It enables multi-disciplinary collaborations (e.g., with neurology, neuroscience, psychology, maternal-fetal medicine) so that we may contribute to a broader understanding of brain and behavior.  *In simplest terms, Columbia enables NYSPI to recruit and retain world-class scientists and clinicians to perform cutting edge scientific research and provide state of the art health care*.

"*A highly integrated NYSPI-Columbia Department of Psychiatry is now widely viewed as one of the foremost academic and research centers in psychiatry in the world*.  Last year we received more grant income from NIH than any other psychiatric research program in the U.S.  Such grants bring revenue to New York and serve to create and maintain jobs.  Finally, together NYSPI and Columbia have educated and trained generations of scientists, clinicians, and administrators in the range of mental health disciplines in New York and around the world.  Such efforts require sharing and coordination of commitment, resources, and staff toward common goals."  2011 NYSPI Audit Report at 23 (emphasis added), accessible at *https://web.osc.state.ny.us/audits/allaudits/093011/08s145.pdf*.

263.    The NYSPI Audit Response continued to elaborate upon the benefits of the intimate affiliation of NYSPI, the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry within NYSPI/Columbia/ Presbyterian Psychiatry, hearkening back to the above-referenced 1924, 1925 and 1926 agreements:

"*OMH/NYSPI considers sharing space at the Institute with Columbia to be a vital part of their public-private partnership.  Indeed, the principle of sharing space and facilities was integral to the original covenant between CU and NYS in 1926.  Space sharing serves OMH and the NYSPI's interests by providing for the integration and exchange of research and academic resources, contributing significantly to the Institute's success in realizing its mission.  It also promotes efficiency for researchers who have roles in supervising both NYSPI and*

88

*Department-funded research projects, taking care of NYSPI patients, managing NYSPI programs and teaching future mental health professionals*.

"*For more than eighty years, Columbia professional staff working in the Department of Psychiatry have occupied space alongside NYSPI staff while NYSPI staff have had access to the resources of a world class academic medical center.  The result has been a uniquely rich collaboration in research, training and clinical care, which has substantially enhanced NYSPI's ability to attract grants to support its mission*.  In fiscal 2009/2010, for example, NYSPI/CU brought nearly $117.5 million dollars in federal and private grant revenue into New York State, of which $90.52 million went to RFMH for NYSPI, a significant return on the State's annual investment.  In 2009/2010,  NYSPI/CU  captured more  than  $34 million  in  federal  stimulus  dollars, of which $21.74 million went to RFMH for NYSPI.  *This infusion of grant income  . . .  is a product of the partnership between NYSPI/OMH and Columbia*.

"To treat Columbia's occupancy of Institute space as a commercial lease transaction and apply a fair market value rent is not only inconsistent with the affiliation, the 1924 and 1925 agreements, and two existing deed covenants, it would undermine the historical foundation of the relationship upon which the affiliation was built.  *The co-location of Columbia and Institute staff is an important part of the architecture of the agreement Columbia and OMH conceived of in 1924*.  At that time, OMH agreed to accept the donation of land for NYSPI subject to the condition that 'the Student bodies and professional staffs of the University and the Hospital and associated institutions shall have [such facilities] available [to them] during the continuance and existence of the said Psychiatric Institute and Hospital, subject to the rules and regulations of the State Hospital Commission.'  That land donation was the land upon which the former Building 1 of NYSPI was built.  The condition for the use of NYSPI by the students and professional staffs of the University and the Hospital was incorporated into the deed for the property and a second agreement between the parties.

"In 1974, Columbia donated a second parcel of land to the State for NYSPI's Kolb Annex, providing in the deed a covenant that 'the student bodies and professional staffs of [Columbia] and The Presbyterian Hospital in the City of New York and associate institutions shall have available during the continuance and existence of the said extension to the Psychiatric Institute  and Hospital, the facilities of said extension to the Psychiatric Institute and Hospital in the same manner as they have available the facilities of the main Psychiatric Institute  and  Hospital pursuant to the Agreement between [Columbia and NYSPI], dated December 16, 1925.'  *Like the earlier covenant, this covenant was intended to support the affiliation between NYSPI and the Department by providing for the sharing of*

89

*resources and efficiencies in operation which were considered integral to achieving their common objectives*."  2011 NYSPI Audit Report at 25-26 (emphasis added), accessible at *https://web.osc.state.ny.us/audits/allaudits/ 093011/08s145.pdf*.

264.    For their part, the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry have benefitted enormously from their close affiliation with NYS OMH and NYSPI through NYSPI/Columbia/Presbyterian Psychiatry.  Among other things, that deeply intertwined relationship with New York State has enabled the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry to recruit, fund and provide top-notch research facilities for the most talented clinicians, researchers and other professional personnel.

265.    The NYSPI Audit Response also contrasted the unique, intimate relationship that NYSPI has through NYSPI/Columbia/Presbyterian Psychiatry with the Columbia Medical School Department of Psychiatry and the Hospital Department of Psychiatry, on the one hand, with the arm's-length relationship that NYSPI has with the Columbia University School of Public Health, on the other hand:

"There are important differences between OMH's occupancy of space in the School of Public Health and Columbia's occupancy of space at the Institute[,] which warrant treating them differently.  ***The School of Public Health and OMH do not have an affiliation, do not share a common mission, do not share a leadership structure, and have distinct faculties unlike the Department of Psychiatry and NYSPI***.  The location of OMH in premises owned and occupied by the School of Public Health does not serve any interest of the School of Public Health or the Columbia University Medical Center or the Columbia Department of Psychiatry.  Columbia owns the building free and clear of any deed restrictions on its use.  From a legal perspective, OMH's location in the School of Public Health is the equivalent of occupying a building owned by a private landlord with no connection to Columbia and from whom one would expect no concessions.

90

"***From the inception, NYSPI/OMH and CU have interpreted the 'sharing' provision in the agreement and in the deed covenants to apply to the resources of NYSPI as a whole and not only to those located on the particular land at issue in the particular deed***.  When NYSPI outgrew its original building and was re-located, there simply was never an intention on the part of any party to change the way in which the affiliation operated or the amount of costs any party would be expected to assume.  For all these reasons, OMH believes that it would be detrimental to the affiliation, and thus detrimental to NYSPI's mission, to pursue rent for the space occupied at NYSPI by Columbia psychiatry employees."  2011 NYSPI Audit Report at 27 (emphasis added), accessible at *https://web.osc.state. ny.us/audits/ allaudits/093011/08s145.pdf*.

### (8)    The 2011 Memorandum of Understanding

266.    In late 2011, there was executed a *Memorandum of Understanding between the New York State Office of Mental Health and The Trustees of Columbia University in the City of New York, College of Physicians and Surgeons, Dated October 21, 2011* (the "***2011 NYS OMH-Columbia MOU***").

267.    As stated therein, the purpose of the 2011 NYS OMH-Columbia MOU was to "clarify and strengthen" the relationship "going forward" among the members of NYSPI/Columbia/Presbyterian Psychiatry, including with respect to the "commitment to the principle of dual appointments and sharing of resources[.]"

268.    Initially, the 2011 NYS OMH-Columbia MOU summarized the long, intimate relationship among the members of NYSPI/Columbia/Presbyterian Psychiatry, as follows:

"[S]ince 1924, the New York State Office of Mental Health ('OMH') and The Trustees of Columbia University in the City of New York, College of Physicians and Surgeons [Columbia Medical School] ('Columbia University'), have had a longstanding academic affiliation at New York State Psychiatric Institute

91

4890-9158-2565, v. 1

('NYSPI') involving collaborative programs of interdisciplinary research and training in fields relevant to mental health[.]

"[T]he historical foundation of the affiliation was the recognition that NYSPI and the Columbia [Medical School] Department of Psychiatry (the 'Department') had such substantially similar and compatible missions with respect to research, education and training in fields relevant to mental health and in the treatment of people with mental illness that the sharing of resources to support both their individual and joint activities would substantially enhance the ability of each institution to maximize the achievement of its objectives to their mutual benefit[.]

"OMH and Columbia University have maintained that affiliation for over 80 years to their mutual benefit[.]

"*[I]n carrying out their affiliation, OMH and Columbia University have long recognized the benefit of concurrent University and State appointments, under which qualified professional personnel of NYSPI may, subject to compliance with State law and policy, hold appointments and, where appropriate, receive salaries for service to Columbia University as faculty members or professional and administrative staff*[.]"  (Emphasis added.)

269.    Through the 2011 NYS OMH-Columbia MOU, the members of NYSPI/Columbia/Presbyterian Psychiatry intended "to acknowledge, continue and strengthen the historical affiliation" among the members of NYSPI/Columbia/Presbyterian Psychiatry "by recognizing, establishing, fostering and continuing collaborative linkages" among them "in the conduct of interdisciplinary research and training in fields relevant to mental health and in the treatment of people with mental illness" and "by supporting and facilitating the continued sharing of resources, where appropriate, to support endeavors of mutual interest and benefit."

270.    The 2011 NYS OMH-Columbia MOU confirmed the basic organizational structure of NYSPI/Columbia/Presbyterian Psychiatry, which structure has been in place

92

continuously since Defendants' willful, intentional and malicious removal of Dr. Lieberman from

his leadership positions at NYSPI/Columbia/Presbyterian Psychiatry in late February 2022.

271.    The 2011 NYS OMH-Columbia MOU explained:

"NYSPI shall continue to operate as an OMH research institute under the direction of an Executive Director (the 'Director') appointed by the Commissioner of OMH (the 'Commissioner') in consultation with the Dean of the Faculties of Health Sciences and of Medicine of Columbia University (the 'Dean'). The Department shall operate under the direction of a Chair ('the Chair') appointed by the Dean in consultation with the Commissioner.

"***It is anticipated that the same individual shall serve in the position of both [Executive] Director [of NYSPI] and Chair [of the Columbia Medical School Department of Psychiatry]***, subject to compliance with . . . OMH policy with respect to outside employment, . . . State law and policy and NYSPI policy . . . and Columbia University . . . policies[.]

"The day-to-day operation and management of NYSPI shall be at the direction of the [Executive Director of NYSPI].  The day-to-day operation and management of the Department [the Columbia Medical School Department of Psychiatry] shall be at the direction of the Chair [of the Columbia Medical School Department of Psychiatry, which person shall also serve as Executive Director of NYSPI]." (Emphasis added.)

272.    The 2011 NYS OMH-Columbia MOU affirmed that, "[a]s a State

employee, the [Executive Director of NYSPI] shall report to the Commissioner [of OMH] or his

or her designee with respect to all matters pertaining to OMH or NYSPI.  On matters relating to

the operation of the [Columbia Medical School Department of Psychiatry], the Chair shall report

to the Dean [of Columbia Medical School]."

93

273.     The 2011 NYS OMH-Columbia MOU confirmed that "[a]ll staff at NYSPI shall report to the [Executive Director of NYSPI] and be appointed in accordance with the regular appointment procedures for OMH."  Moreover, "***[a]ll qualified professional personnel of NYSPI may be appointed to the Columbia [Medical School Department of Psychiatry] Faculty of Medicine" in accordance with the appointment procedures of Columbia Medical School and its Department of Psychiatry***.  (Emphasis added.)

274.     The 2011 NYS OMH-Columbia MOU also reaffirmed that "***employees at NYSPI may receive compensation from Columbia University in addition to their State salary***[.]"  (Emphasis added.)

275.     The 2011 NYS OMH-Columbia MOU reaffirms that "[g]rants and contracts for sponsored projects conducted under the auspices of NYSPI or [the Columbia Medical School Department of Psychiatry] will be administered through RFMH or Columbia University, respectively[,]" with the Executive Director of NYSPI — who is also Chair of the Columbia Medical School Department of Psychiatry and Psychiatrist-in Chief of Presbyterian/Columbia Hospital — making the final determination as to whether RFMH or Columbia University should be the grant applicant.

276.     The 2011 NYS OMH-Columbia MOU goes on to state that, "[f]or purposes of submitting proposals on grants, it is expected that salaries will be presented on grant budgets on a combined basis, including State, [Columbia Medical School Department of Psychiatry], and RFMH salaries."

277.     The 2011 NYS OMH-Columbia MOU notes that "*[i]t is expected that personnel of [NYSPI/Columbia/Presbyterian Psychiatry] will collaborate closely in proposing and carrying out intramural and externally sponsored research, training and, where appropriate, clinical care and that each institution will support the activities of the other with respect to such research, training and clinical care, regardless of which institution is nominally responsible*."  (Emphasis added.)

278.     The 2011 NYS OMH-Columbia MOU recommits the parties to the sharing of physical space and other resources:

> "[W]here appropriate to accomplish joint objectives, realize efficiencies in operation or otherwise be of mutual benefit, resources of [NYSPI/Columbia/ Presbyterian Psychiatry], including space, equipment  and staff, may be shared by mutual agreement and, where applicable, in keeping with the conditions set forth as covenants in the agreement between the New York State Hospital Commission and the Columbia University Joint Administrative Board, acting for Columbia University and the Presbyterian Hospital, dated November 12, 1924 and June 10, 1925, the deed transferring the land upon which NYSPI was built, dated May 14, 1926, and the deed transferring  the land upon which the Kolb Annex was built, dated November 8, 1974.  Unless otherwise agreed, the use of space and equipment and the conduct of activities to be conducted in such space shall be governed by the policies and procedures of the host institution."

### (9)     The 2015 Recruitment of a Vice Chair to the Columbia Medical School Department of Psychiatry

279.     In 2015, in connection with its efforts to recruit to the Columbia Medical School Department of Psychiatry a Vice Chair for Administration and Finance who would report to Dr. Lieberman, the Department worked with an executive recruiter to create an overview of the Department for candidates (the "*2015 Recruiting Overview*").

280.     The 2015 Recruiting Overview touted the Columbia Medical School Department of Psychiatry's intimate affiliation with the NYS OMH and NYSPI (and RFMH) through NYSPI/Columbia/Presbyterian Psychiatry, noting that "Columbia Psychiatry's faculty work across the partnering institutions (i.e., [the] Columbia [Medical School Department of Psychiatry], NYSPI and [Presbyterian/Columbia Hospital])[.]"

281.     The 2015 Recruiting Overview explained:  "For more than 80 years, Columbia University College of Physicians and Surgeons ('College', 'Columbia' and 'P&S'), together with its strategic partners, the New York State Psychiatric Institute ('NYSPI' and 'PI') and NewYork-Presbyterian Hospital ('NYP' and 'NewYork-Presbyterian') have led the nation in discovery and innovation related to the causes, treatment and prevention of mental illness.  With faculty and staff numbering more than 2,000, an operating budget greater than $200 million dollars and more grant revenue from the National Institutes of Health than any other mental health research program in the U.S., Columbia Psychiatry stands out among the elite programs in the nation.  In the most recent ranking of Best Hospitals by *U.S. News and World Report*, the psychiatry service at NYP was ranked #2 in the nation."

282.     The 2015 Recruiting Overview also explained:  "Columbia Psychiatry is among the largest departments at Columbia University Medical Center ('CUMC') and is, no doubt, the most complex  .  .  .  [w]ith an unequalled number of specialized clinical programs sponsored both by NYSPI and NYP, research activities of exceptional breadth and depth sponsored both by Columbia and the Research Foundation for Mental Hygiene, Inc. ('RFMH' and 'Foundation'), and internationally-recognized education and training programs[.]"

96

283.     The 2015 Recruiting Overview noted further:  "The relationship between [the Columbia Medical School Department of Psychiatry] and the NYSPI has been an enduring, committed relationship that has resulted in extraordinary advances in our understanding of the biological basis of behavior health disorders and their effective treatment.  Pioneering research has been performed by Columbia faculty investigators in laboratories and clinics operated under the sponsorship of [the Columbia Medical School Department of Psychiatry], NYSPI and RFMH with continued success."

284.     The 2015 Recruiting Overview elaborated upon the intertwined relationships that the Columbia Medical School Department of Psychiatry maintains with the State of New York and Presbyterian/Columbia Hospital:

> "***The Clinical Enterprise at Columbia Psychiatry is comprised of comprehensive psychiatric services at 3 intersecting institutions: NYSPI, NYP [Presbyterian/Columbia Hospital] and Columbia University***.  Many of these clinical services are also teaching sites for medical students, residents, psychology interns, and trainees from other disciplines.  The inpatient program at NYSPI operates 55 licensed beds through three inpatient units, two of which primarily admit patients participating in research protocols, accounting for approximately 600 adult annual admissions.  NYP/CUMC operates two adult inpatient units, with an aggregate of 54 beds that account for approximately 875 admissions each year.  Both NYSPI and NYP/CUMC provide adult and child outpatient services that account for approximately 28,000 and 60,000 visits per year, respectively. The Department also runs a comprehensive psychiatric emergency program providing over 6,500 annual visits at NYP."  (Emphasis added.)

285.     The 2015 Recruiting Overview also noted the tremendous success that NYSPI/Columbia/Presbyterian Psychiatry had enjoyed under Dr. Lieberman's stewardship in attracting federal research grants:  "***As one of the largest university departments of psychiatry in the country, Columbia Psychiatry works in close collaboration with the New York State***

97

*Psychiatric Institute, Research Foundation for Mental Hygiene, and New York-Presbyterian Hospital, creating a unique public/private/academic partnership*. . . . *A testimony to its world-class stature, Columbia Psychiatry has been awarded more federal research dollars than any other psychiatry research program in the nation for eight consecutive years*.  Columbia Psychiatry has been the site of many of the major discoveries in psychiatry, including much of the pioneering work leading to today's understanding of mental health and mental illness."  (Emphasis added.)

       286.    The 2015 Recruiting Overview touted the NYSPI facilities that are interwoven into NYSPI/Columbia/Presbyterian Psychiatry:

> "NYSPI was further modernized in 1998 by the opening of a new hospital building to replace the original one.  Overlooking the Hudson River and George Washington Bridge, the new Psychiatric Institute provides a state-of-the art environment for patient care, education, and research.  The approximately 320,000 square feet offer space for 60 inpatient beds, 23 specialized outpatient research clinics, educational facilities, and research laboratories.  *Walkway bridges to and from the Kolb Annex and New-York-Presbyterian Hospital provide comfortable and efficient all-weather avenues for patient and staff travel within the Columbia University Medical Center*.
>
>      \*  \*  \*
>
> "Through the years, distinguished figures in American psychiatry have served as directors of the Psychiatric Institute, including Drs. Ira Van Gieson, Adolph Meyer, August Hoch, Lawrence Kolb, Edward Sachar and Herbert Pardes.  It is now led by a noted academic psychiatrist, Dr. Jeffrey A. Lieberman.  *The Institute is the flagship for the Columbia University Department of Psychiatry, for which it is the primary location of research and educational activities*."  (Emphasis added.)

       287.    The 2015 Recruiting Overview noted the important role played by RFMH in the research activities engaged in by NYSPI/Columbia/Presbyterian Psychiatry:

4890-9158-2565, v. 1

"The Research Foundation for Mental Hygiene, Inc. is a private, not-for-profit membership corporation organized in 1952, for the purpose of assisting and enhancing the research and training objectives of the New York State Department of Mental Hygiene and its component agencies: the Office of Mental Health (OMH), the Office for People with Developmental Disabilities (OPWDD) and the Office of Alcoholism and Substance Abuse Services (OASAS).

"Through an agreement with New York State, RFMH has been designated as the organization responsible for administering and directing the conduct of all sponsored research programs carried out by scientists at New York State institutes or facilities.  Sponsored research activities are carried out at the central offices of RFMH, as well as the three research institutes, one of which is NYSPI.

"RFMH provides an organizational bridge between the scientist and those wishing to support his or her work, be it the Federal Government, State Government, Individuals, Foundations or, as is frequently the case, a combination of multiple sponsors."

288.    The 2015 Recruiting Overview also explained the close physical proximity of the structures used interchangeably by the members of NYSPI/Columbia/ Presbyterian Psychiatry: "[Columbia] [M]edical [S]chool is considered to be among the finest in America, and has traditionally been one of the nation's primary sources of academicians, investigators and clinical teachers.  NYSPI is located on the western aspect of the [Columbia Medical School] campus and is connected by a covered bridge to the buildings forming the core of the campus.  The most prominent NewYork-Presbyterian Hospital structure, adjacent to [Columbia Medical School], is the 745-bed Milstein Hospital building, which has expanded the Hospital's advanced medical procedures and its critical care capability."

289.    The 2015 Recruiting Overview explained that the new Vice Chair of Administration and Finance would have to coordinate and collaborate with all of the members of NYSPI/Columbia/Presbyterian Psychiatry, as well as with RFMH:

99

"***Working closely with the Chair of Psychiatry and Columbia Psychiatry's leadership team, the Vice Chair sets annual departmental goals and objectives for administrative and financial matters.  He/She actively collaborates with the leadership of the College, NYPSI, NYP, RFMH and other affiliated organizations in attaining these established goals and objectives***.  The Vice Chair directs Columbia Psychiatry's financial planning and accounting practices, maintains financial management reporting and control systems, monitors departmental expenditures, oversees compliance with the policies, procedures and regulations of the College/affiliated organizations/external agencies and assures an efficient, high-functioning infrastructure to support the Columbia Psychiatry's clinical, educational and research missions.

"In the performance of her/his specific duties, the Vice Chair will be guided by awareness of her/his key responsibilities including:

- Overall management and strategic planning related to the administrative and financial operations and resources of Columbia Psychiatry; advise, consult, and/or direct the development of programs consistent with the needs of the combined and individual entities in collaboration with senior faculty leadership;

- ***Oversight of financial and accounting practices of the Columbia University Department of Psychiatry, the Research Foundation for Mental Hygiene, Inc., and the psychiatry services of the NewYork-Presbyterian Hospital; management of revenue/expense reporting and control systems, budget allocation, development of business plans, faculty recruitment, retention and compensation structures, implementation of marketing plans, and submission of timely budgets***;

- Development, refinement and implementation of policies, procedures, systems and organization structures responsive to and in compliance with College, Foundation and Hospital initiatives, mandates, and rules; fulfill reporting obligations the RFMH and Columbia;

- Oversight of sponsored project administration, human resources, information systems, outside contracts, negotiations and purchasing; management of the resources and business operations for Columbia Psychiatry's clinical and revenue generating clinical operations, practice plan financing and staffing[.]" (Emphasis added.)

**(10)**   **The 2016 Business Associate Agreement**

290.     In or about September 2016, Columbia University and NYS OMH entered into a Business Associate Agreement (the "*2016 Business Associate Agreement*") addressing compliance with the protected health information requirements of the Health Insurance Portability and Accountability Act of 1996 and related statutes defined therein collectively as "HIPAA."

291.     The 2016 Business Associate Agreement acknowledges that "the Parties have had a long-standing academic affiliation at New York State Psychiatric Institute (NYSPI) involving collaborative programs of interdisciplinary research and training in fields relevant to mental health as set forth in and governed by the [2011 MOU][.]"

292.     The 2016 Business Associate Agreement also acknowledged that the "significant collaborative linkages between the Parties include shared infrastructure support and services provided by each and available to the other[.]"

293.     The 2016 Business Associate Agreement further acknowledged that, "*as a result of such linkages and as a function of the historical roots of the affiliation dating back to the 1920's, the same person has typically served as the Executive Director of NYSPI and the Chair of Columbia Psychiatry; the majority of NYSPI researchers have held faculty appointments in Columbia Psychiatry; and the primary location of Columbia Psychiatry has been in space owned or leased by NYSPI*[.]"  (Emphasis added.)

**(11)   The 2018 Peer Review of the Columbia
Medical School Department of Psychiatry**

294.     In or about 2018, a peer review of the Columbia Medical School
Department of Psychiatry was performed at the Department's request by professors of psychiatry
at three other institutions.  To facilitate this review, the Department prepared a comprehensive
overview of its history, clinical research efforts, academic activities, patient-care resources and
other endeavors, dated July 17, 2018 (the "***2018 Department of Psychiatry Overview***").

295.     The 2018 Department of Psychiatry Overview provides an extensive
overview of NYSPI/Columbia/Presbyterian Psychiatry, which is referred to in the Overview as
simply "Columbia Psychiatry."  The Overview explains:  "Columbia Psychiatry has a storied past
and a bright future.  It is comprised of the [Columbia Medical School] Department of Psychiatry
. . ., NYSPI, and the [Hospital Department of] Psychiatry[.]  It . . . provides an array of clinical
services deployed in the New York State Office of Mental Health, New York Presbyterian
Hospital and the Columbia University Medical Center faculty practice organization.  . . .
Located within Columbia University and its extensive intellectual resources, and as an integral
part of the New York State Mental Health System with a commitment to public mental health
care, Columbia Psychiatry is well qualified to contribute to the knowledgebase and workforce of
the field of psychiatric medicine and mental health care."

296.    The 2018 Department of Psychiatry Overview also explains:  "Columbia Psychiatry is the product of a public/academic partnership established between Columbia University's College of Physicians and Surgeons, the New York State Government, and Columbia Presbyterian Hospital[.]"

297.    The following summary of the deep, historical relationships among and between NYS OMH/NYSPI, the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry was included in the 2018 Department of Psychiatry Overview:

"Columbia University, originally named King's College, was founded in 1767 and was the first institution of the newly formed nation to grant medical degrees.  In 1868, The Presbyterian Hospital was founded and affiliated with Columbia College of Physicians and Surgeons (an affiliation which has continued through the merger with the New York Hospital in 2000).  In 1895, the Pathological Institute of the New York State Hospitals for the Insane was founded to serve as a central pathology laboratory.  Its first director, Ira Van Gieson, a psychiatrist and pathologist, convinced the New York State Commission on Lunacy to allow him to expand the Pathological Institute into a multidisciplinary research facility to study the causes of mental illness.  This enabled him to recruit top scientists to pursue research in genetics, epidemiology, and neuropathology.  At the same time, the name was changed to the New York State Psychiatric Institute.

"Van Gieson's successor, Adolph Meyer, expanded the research enterprise further and reconfigured the state hospital system so that NYSPI could train almost all of the senior academic psychiatrists of that day for the State of New York.

"In 1910, August Hoch succeeded Meyer and introduced Freudian psychoanalytic theory and practice, which had just come to the U.S., to NYSPI and also established serological, histological, and neuropsychology laboratories.

"George Kirby headed the Institute from 1917 to 1931 and emphasized interdisciplinary research and prioritized admissions to NYSPI, making patients eligible to participate in clinical research.  Kirby expanded education to other disciplines in addition to physicians, such as nurses, social workers, and psychologists.

103

"In 1925, a covenant was struck between Columbia University and the New York State Hospital Commission that documented an agreement in which Columbia deeded a plot of land on the Medical Campus to the State for 'as long as psychiatric research continued to be performed there.' New York State, in turn, promised to make the facilities of the new twenty-story building that was to house NYSPI available to 'Columbia in perpetuity.' The State Board of Estimate and Control allotted $1.6 million for the construction of a 246,000 square foot building with laboratories, teaching areas, and clinical services, including pediatrics. The new facility was completed in 1929 and with the State and University's support, attracted researchers, clinicians, and trainees. Ever since, NYSPI has been an integral component of Columbia University and Presbyterian Hospital.

"The events surrounding World War II led to new additions to the Columbia Psychiatry faculty, including Franz Kallman who, in 1936, started the first program in psychiatric genetics in the U.S. and Lothar Kalinowsky, who studied with Cerletti and Bini in Italy and then came to the U.S. and NYSPI in 1937 where he introduced ECT. In 1945, Sandor Rado, who had studied with Freud and immigrated to the U.S., approached Nolan Lewis, then head of NYSPI, about starting the Columbia University Center for Psychoanalytic Training and Research, which was the first academically-affiliated analytic institute in the U.S.

"In 1952, New York State created the Research Foundation of Mental Hygiene as a 501(c)(3) nonprofit corporation to administer the grants that supported research at the then numerous state research institutes, including NYSPI, more efficiently. Through this mechanism, the indirect costs from grants and contracts are captured by NY State and used to support sponsored institutions. At the same time, NYSPI and Columbia University formally joined educational programs, and in doing so bestowed faculty appointments to NYSPI faculty and presented trainees with Columbia diplomas. In this context, the positions of Director of the New York State Psychiatric Institute, Chair of the Department of Psychiatry of Columbia University, and Chief of Psychiatric Services at Presbyterian Hospital were formally consolidated.

\* \* \*

"Columbia Psychiatry's growth in research and training programs led to a space shortage. To allow for expansion, in 1983, New York State completed construction of a fourteen-story Annex, adjacent to the original NYSPI building, to provide 140,000 square feet of largely wet laboratory and animal care space. . . .

"In 1998, NYSPI moved from its original building to a newly-constructed 320,000 square foot building across Riverside Drive on a site overlooking the Hudson River. The new NYSPI building includes 60 inpatient beds, specialized outpatient research clinics, educational facilities, research laboratories, and

104

administrative offices.  Walkway bridges connect NYSPI to the Kolb Annex and New York Presbyterian Hospital and provide avenues for patient and staff travel within the Columbia University Irving Medical Center."

298.    Under the heading, "Columbia Psychiatry Space and Facilities," the 2018 Department of Psychiatry Overview explained:  ***The Columbia University Department of Psychiatry is located on the Columbia University Health Sciences campus in northern Manhattan, part of an urban neighborhood that is ethnically, racially and economically diverse.  The Department's research and education programs are primarily housed in buildings owned and maintained by New York State under the auspices of the Office of Mental Health (OMH)***.  Clinical space for faculty practice, as well as some research space, is housed in buildings owned and operated by the Columbia University Irving Medical Center (CUIMC)." (Emphasis added.)

299.    The 2018 Department of Psychiatry Overview further explained the physical layout of NYSPI/Columbia/Presbyterian Psychiatry:

**"Research Space**

"Kolb Building – a 14-story, 118,856 square foot building owned by New York State, named for former Director and Commissioner Lawrence E. Kolb, dedicated to wet laboratory space and vivarium.

"Pardes Building – a 9-story, 321,446 square foot building owned by New York State, named for former Director and Columbia Dean Herbert Pardes includes:

- 65 inpatient research beds
- specialized outpatient research clinics
- educational facilities
- wet and dry research laboratories.

"Mailman School of Public Health – Columbia Psychiatry leases 25,000 square feet of

105

space on two floors of this building, the original site of the Psychiatric Institute before New York State sold the building to Columbia.

"CUIMC, 622 W 168th St – 3,000 square feet of research space for behavioral and psychosomatic medicine.

"Walkway bridges connect NYSPI to the Kolb Annex and New York Presbyterian Hospital and provide comfortable and efficient all-weather avenues for patient and staff travel within the Columbia University Medical Center."

300.     The 2018 Department of Psychiatry Overview further outlined the

physical layout of NYSPI/Columbia/Presbyterian Psychiatry:

**"Clinical Space – [Presbyterian/Columbia Hospital]**

"[Presbyterian/Columbia] Hospital – NYSPI is located on the western edge of the CUIMC campus and is connected by a covered bridge to the buildings forming the core of the campus. . . .   Psychiatric services at the Columbia campus of [the Hospital] include 54 inpatient beds (24 in Milstein and 30 in Allen), an outpatient department with 100,000 visits/year, a comprehensive emergency service with 3,500 visits/year, a child psychiatric clinic, and a consultation-liaison service."

301.     The 2018 Department of Psychiatry Overview included a labeled

photograph depicting the physical layout of the interchangeably used buildings comprising

NYSPI/Columbia/Presbyterian Psychiatry, as the Association existed in 2018 (and as its exists

today) on the campus of Columbia University.  In the photograph, which is reproduced

immediately below, the facilities of NYS OMH/NYSPI are labeled "NYS-OMH-NYSPI"; the

Presbyterian/Columbia Hospital is labeled "NYP Hospital"; the Columbia Medical School is

labeled "CUMC P&S"; and the Columbia University Mailman School of Public Health is labeled

"Mailman SPH":

106



302.    The 2018 Department of Psychiatry Overview also contains a section

titled "Budget and Finance" that explains the complex, intertwined funding for NYSPI/

Columbia/Presbyterian Psychiatry.  The Overview states:

> "***Columbia Psychiatry receives funding streams from its four institutional sources: Columbia University, [Presbyterian/Columbia] Hospital . . ., the New York State Office for Mental Health (NYS-OMH) and the Research Foundation for Mental Hygiene (RFMH)***.  The budget for each funding source is negotiated annually and comes to Columbia Psychiatry separately with the exception of [the Hospital] in which funds for the [H]ospital budget are passed through the University.  The components of the total annual Columbia Psychiatry budget of $250.8 million, derive from different sources, have different fiscal years, come in different forms and may be used for different purposes.  In addition, they have different salary structures and benefits packages.

107

"For example, NYS-OMH funds come to NYSPI in the form of 'state lines' with designated titles, functions and salary levels, while RFMH funds are wholly derived from sponsored research and the proportion of the associated 'facilities and administration' funds returned by the Central Office of the Research Foundation to NYSPI, to be used in accordance with ICR [indirect cost recovery] policy.  CU funds derive from multiple sources[,] including sponsored research, clinical revenues, tuition fees, medical service agreements, [Hospital] 'pass through' funds, and gift and endowment funds.  Each funding source is subject to the fees and taxes of the source institution, and and [*sic*] must be managed in accordance with the policies and procedures of each organization.

"***In addition to the usual expenses and itemized expenditures of an academic medical department (e.g. salaries, supplies, equipment, capital costs, administrative charges), funds must support the costs of maintenance of our two NYSPI buildings and over 420,000 sq ft***.  This includes housekeeping, facilities maintenance, security, nursing and paraprofessional staff, administrative staff and nutrition and food services.

"***Financial management for Columbia Psychiatry is centralized***.  The Vice Chair for Administration and Finance is responsible for managing our budget under the auspices and with the approval of the Chair.  Each Vice Chair oversees the budget for their divisions, and in doing so may delegate responsibilities for salary adjustments and NPS [Non-Personnel Services] costs and expenditures to the Area, Center, Institute, Service and Program directors and their respective administrators to manage for their units.  The Directors report to their respective Vice Chair and their associated administrat[ors'] report to the respective Vice Chair.

"***To manage such a complex system administratively and financially, [i]t is essential that we have central management of the department finances and the abilities to align and integrate funding streams as best possible and feasible in a way that is compliant with the policies and procedures of the sponsor organizations, to efficiently and effectively utilize our considerable resources***."
(Emphasis added.)

108

303.    The 2018 Department of Psychiatry Overview contains a pie chart that illustrates the intertwined funding sources for NYSPI/Columbia/Presbyterian Psychiatry.  The pie chart, which reflects the same basic funding structure that has continued to date, is reproduced immediately below:



109

**(12)    The 2021 Overview of NYSPI/Columbia
Presbyterian Psychiatry**

304.    In or about the spring of 2021, NYSPI/Columbia/Presbyterian Psychiatry

prepared a PowerPoint overview of its activities in connection with the Columbia Medical

School Department of Psychiatry's Annual State of the Department meeting (the "*2021*

*NYSPI/Columbia/Presbyterian Psychiatry Overview*").

305.    The 2021 NYSPI/Columbia/Presbyterian Psychiatry Overview opens with

a slide summarizing the historically intertwined relationships among the members of

NYSPI/Columbia/Presbyterian Psychiatry:



306.    The 2021 NYSPI/Columbia/Presbyterian Psychiatry Overview also

included the following labeled photograph depicting the various buildings owned and operated

110

by NYSPI/Columbia/Presbyterian Psychiatry (the typo in the word "Physicians" appears in the

original):



307.     The 2021 NYSPI/Columbia/Presbyterian Psychiatry Overview included

the following organizational chart, reflecting the thoroughly integrated role of NYSPI in the

functioning of NYSPI/Columbia/Presbyterian Psychiatry:

4890-9158-2565, v. 1



**Table of Organization**

Columbia University Department of Psychiatry, New York State Psychiatric Institute, NewYork-Presbyterian/Columbia University Irving Medical Center

4890-9158-2565, v. 1

308.    The 2021 NYSPI/Columbia/Presbyterian Psychiatry Overview included the following slide titled "Complexity of Columbia Psychiatry," which summarized the overlapping funding and personnel functions among NYSPI (referenced in the slide as "PI" and "NYSPI"), the Columbia Medical School Department of Psychiatry (referenced in the slide as "CU"), Presbyterian/Columbia Hospital (referenced in the slide as "NYP") and RFMH:



309.    The 2021 NYSPI/Columbia/Presbyterian Psychiatry Overview included the following pie chart reflecting the funding sources for NYSPI/Columbia/Presbyterian Psychiatry during the 2020-2021 time period (which updated the 2017-2018 pie chart included in the 2018 Department of Psychiatry Overview):



310.    The 2021 NYSPI/Columbia/Presbyterian Psychiatry Overview also provided a pie chart summarizing the building space allocation among the members of NYSPI/Columbia/Presbyterian Psychiatry.  The chart, which is reproduced immediately below, reflects that three quarters — 74% — of the building space in which NYSPI/Columbia/ Presbyterian Psychiatry operates (the combined NYSPI Pardes Building space and the NYSPI Kolb Building space shown below) is owned or managed by New York State:



311.    The 2021 NYSPI/Columbia/Presbyterian Psychiatry Overview noted the collective efforts of the Columbia Medical School Department of Psychiatry, NYS OMH and NYSPI in attracting grants and funding for clinical research and related activities.  The success yielded by such efforts is captured in a slide addressing NIH awards, which is reproduced immediately below:

115

## Progress and Accomplishments: Rankings by NIH Awards

### NYSPI/Columbia Psychiatry NIH Awards

| 2020 Rank | Institution | $ Awarded | Change from 2019 | Number of Grants | 2019 Rank | 2018 Rank | 2017 Rank | 2016 Rank | 2015 Rank | 2014 Rank |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Yale University | $110,357,177 | $34,852,459 | 161 (+20) | 2 | 3 | 1 | 2 | 1 | 3 |
| 2 | University of Pittsburgh | $97,545,751 | $22,088,508 | 149 (-6) | 3 | 2 | 3 | 1 | 3 | 2 |
| 3 | NYSPI/Columbia University | $90,530,774 | $8,322,612 | 189 (+30) | 1 | 1 | 2 | 3 | 2 | 1 |
| 4 | University of Pennsylvania | $38,808,305 | -$15,656,687 | | 4 | 5 | 11 | 5 | 5 | 5 |

 COLUMBIA
COLUMBIA UNIVERSITY
DEPARTMENT OF PSYCHIATRY

 New York State Psychiatric Institute

NewYork-Presbyterian

312.    Finally, in the closing slide that is reproduced immediately below, the 2021 NYSPI/Columbia/Presbyterian Psychiatry Overview acknowledged the honors earned by NYSPI/Columbia/Presbyterian Psychiatry, including its high *U.S. News & World Report* ranking:



**(13)    The March 2022 NYSPI/Columbia/
Presbyterian Psychiatry Meeting**

313.    At a meeting held on or about March 7, 2022 (the "***March 7, 2022
NYSPI/Columbia/Presbyterian Psychiatry Meeting***"), Dr. Sullivan, the Commissioner of NYS

OMH; Dr. Smith, the Chief Medical Officer of NYS OMH; Dr. Simpson, then the Interim

Executor Director of NYSPI, Interim Chair of the Columbia Medical School Department of

Psychiatry and Interim Psychiatrist-in-Chief of Presbyterian/Columbia Hospital; and Dr.

Armstrong, who had just recently become the Dean of the Columbia Medical School, discussed,

among other things, the deep historical connections between and among New York State and the

other members of NYSPI/Columbia/Presbyterian Psychiatry.

117

314.     During the March 7, 2022 NYSPI/Columbia/Presbyterian Psychiatry Meeting, Dr. Smith was introduced as the Chief Medical Officer of the NYS OMH and a Special Lecturer in the Columbia Medical School Department of Psychiatry.

315.     During the March 7, 2022 NYSPI/Columbia/Presbyterian Psychiatry Meeting, Dr. Smith noted that the "affiliation agreement between the State and Columbia" had been signed in the 1920s.

**(14)     NYSPI/Columbia/Presbyterian Psychiatry Has Historically Held Itself Out, and Continues Presently To Hold Itself Out, To the Public As a <u>Thoroughly Integrated State-Infused Association</u>**

316.     NYSPI/Columbia/Presbyterian Psychiatry is a fully-integrated, New York State-controlled and influenced Association engaged in Psychiatric Activities, which, for the past century or so, has held itself out as such to the public.

317.     Upon information and belief, certain personnel of NYSPI/Columbia/ Presbyterian Psychiatry use an e-mail address whose suffix reads as follows: "*@nyspi.columbia.edu*."

318.     During his tenure as Executive Director of NYSPI, Chair of the Columbia Medical School Department of Psychiatry and Psychiatrist-in-Chief of the Hospital, Dr. Lieberman used an e-mail address whose suffix reads as follows:  "*@nyspi.columbia.edu*."

319.     During the time in which she served as a Vice Chair of the Columbia Medical School Department of Psychiatry, and during the period since late February 2022 during which she has served as Interim Executive Director of NYSPI, Interim Chair of the Columbia Medical School Department of Psychiatry and Interim Psychiatrist-in-Chief of Presbyterian/ Columbia Hospital, Dr. Simpson has used an e-mail address whose suffix reads as follows: "*@nyspi.columbia.edu*."

320.     During the time in which he has served as the Chief Medical Officer of NYS OMH and Special Lecturer with the Columbia Medical School Department of Psychiatry, Dr. Smith has used an e-mail address whose suffix reads as follows:  "*@nyspi.columbia.edu*."

321.     As noted, the Columbia Medical School Department of Psychiatry is headquartered predominantly at 1051 Riverside Drive, New York, New York, which is the same building in which NYSPI is headquartered and to which Presbyterian/Columbia Hospital has connecting walkways from its Manhattan headquarters.

322.     The members of NYSPI/Columbia/Presbyterian Psychiatry have included materials on their publicly-accessible websites and in other public announcements underscoring the deeply intertwined relationships among and between the State of New York, the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry.  Often, those website announcements contain the logos of two or all three of said members of NYSPI/Columbia/Presbyterian Psychiatry.

4890-9158-2565, v. 1

323.    At the bottom of the NYSPI Website (*see https://nyspi.org/*) appear the following logos of the other members of NYSPI/Columbia/Presbyterian Psychiatry:

  

324.    Among other postings on the NYSPI Website concerning NYSPI/ Columbia/Presbyterian Psychiatry are the following:

(a)    "The New York State Psychiatric Institute (NYSPI), established in 1895, was one of the first institutions in the United States to integrate teaching, research, and therapeutic approaches to the care of patients with mental illnesses.  In 1925, NYSPI affiliated with Presbyterian Hospital, adding general hospital facilities to the Institute's psychiatric services and research laboratories."  *See* NYSPI Website, *https://nyspi.org/nyspi/about-us*.

(b)    "These treatment, training, and research facilities were supplemented in 1983 by a 14-floor Psychiatric Research Building, the Kolb Annex.  . . . Walkway bridges to and from the Kolb Annex and NewYork-Presbyterian Hospital (NYPH) provide comfortable and efficient all-weather avenues for patient and staff travel within the Columbia University Irving Medical Center[.]  . . .  Through the years, distinguished figures in American psychiatry have served as directors of the Psychiatric Institute.  . . .  The Institute is the flagship for the Columbia University Department of Psychiatry, for which it is the primary location of research and educational activities."  *See* NYSPI Website, *https://nyspi.org/nyspi/about-us*.

325.    At the bottom of the Columbia Medical School Department of Psychiatry Website (*see https://www.columbiapsychiatry.org/*) appear the following logos of the members of NYSPI/Columbia/Presbyterian Psychiatry:



120

326.     Among other postings on the Columbia Medical School Department of

Psychiatry Website concerning NYSPI/Columbia/Presbyterian Psychiatry are the following:

(a)      "[Columbia Medical School partnered] with Presbyterian Hospital in
developing the Columbia-Presbyterian Medical Center in 1928, putting
patient care, research and education on the same campus.  The hospital,
since renamed NewYork-Presbyterian Hospital, is the primary teaching
hospital [for Columbia Medical School]."  *See* Columbia Medical School
Website, *https://www.vagelos.columbia.edu/about-us/history-vagelos-
college-physicians-and-surgeons*.

(b)      "From its origins as the New York State Pathological Institute in 1896, its
more than 90-year-old affiliation with Columbia University, and its
partnership with New York-Presbyterian Hospital, Columbia Psychiatry
has become an international leader in understanding mental health and
mental illness.  Currently, Columbia Psychiatry ranks #3 in research
funding from the National Institutes of Health and has been in the top 3 for
the past decade."  *See* Columbia Medical School Department of Psychiatry
Website, *https://www.columbiapsychiatry.org/sites/default/files/media/
documents/2022-03/columbia_psychiatry_at_a_glance_2021-
2022_052121_1.pdf.*

(c)      "Columbia Psychiatry is supported in its vital mission by appropriations
from the state of New York, public and private research grants, clinical
services, and philanthropic gifts.  In the current fiscal year, our annual
budget totals $281 million, comprising $82 million in New York State
support and $126.4 million in sponsored research funds (CU: $33.7;
RFMH [Research Foundation for Mental Hygiene, Inc.]: $92.7), of which
$119 million came from federal sources. . . .  It is through this support
that we are expanding our understanding of mental health and better
understanding how to provide support and treatment to those who need it
most."  *See* Columbia Medical School Department of Psychiatry Website,
*https://www. columbiapsychiatry.org/sites/default/files/media/documents
/2022-03/columbia_psychiatry_at _a_glance_2021-2022_052121_1.pdf.*

(d)      "Columbia Psychiatry provides exemplary care in a variety of settings in
New York City and its surrounding communities, [including] the many in-
and out-patient programs and studies offered at the New York State
Psychiatric Institute and NewYork-Presbyterian Hospital at Columbia
University Irving Medical Center."  *See* Columbia Medical School
Department of Psychiatry Website, *https://www.columbiapsychiatry.*

121

*org/sites//files/media/documents /2022-03/columbia_psychiatry_at_a_ glance_2021-2022_052121_1.pdf.*

(e)     Columbia University "is also home to the New York Psychiatric Institute[.]"  *See* Columbia University Website, *https://www.columbia. edu/content/history-columbia-university.*

327.     Upon information and belief, during the Relevant Time Period, the State of New York, through NYS OMH, NYSPI and/or another State entity, has contributed 50% of the compensation of the Residents in the Presbyterian/Columbia Hospital Department of Psychiatry.

328.     For all the reasons demonstrated herein, the State of New York, through NYS OMH and NYSPI, has exercised and continues to exercise coercive power over NYSPI/Columbia/Presbyterian Psychiatry for purposes of the Section 1983 Claims alleged herein.

329.     For all the reasons demonstrated herein, the State of New York, through NYS OMH and NYSPI, has provided and continues to provide such significant encouragement to NYSPI/Columbia/Presbyterian Psychiatry, overtly and/or covertly, including, but not limited to, through its management of, political and other influence over and funding of NYSPI/ Columbia/Presbyterian Psychiatry, that the choices and decisions made by NYSPI/Columbia/ Presbyterian Psychiatry and the Entity Defendants with respect to Dr. Lieberman, as detailed herein, have been the choices and decisions of the State of New York for purposes of the Section 1983 Claims alleged herein.

4890-9158-2565, v. 1

330.    For all the reasons demonstrated herein, the State of New York, through NYS OMH and NYSPI, has created and continues to maintain such a close nexus with the other members of NYSPI/Columbia/Presbyterian Psychiatry, including, but not limited to, through its management of, political and other influence over and funding of NYSPI/Columbia/Presbyterian Psychiatry, that the actions of NYSPI/Columbia/Presbyterian Psychiatry and the Entity Defendants with respect to Dr. Lieberman, as detailed herein, have been the actions of the State of New York for purposes of the Section 1983 Claims alleged herein.

## XIII.

## NYAKIM GATWECH: AN INTERNATIONALLY-RECOGNIZED FASHION MODEL CELEBRITY

331.    Upon information and belief, Nyakim Gatwech is an internationally recognized fashion model who was born in Ethiopia to South Sudanese parents.

332.    It has been reported that, at age 14, after spending some time in a Kenyan refugee camp, Ms. Gatwech emigrated to the United States.  Upon information and belief, although born in Ethiopia, Ms. Gatwech identifies as South Sudanese.  *See* Annette Ejiofor, "How Nyakim Gatwech Went From Living In Refugee Camps to Modelling For Calvin Klein," *HuffPost* (Dec. 14, 2017) (hereinafter, "***Ejiofor/HuffPost***"), accessible at *https://www.huffpost. com/archive/ca/entry/nyakim-gatwech_ca_5cd5214 ae4b07bc729751310.*

333.    It has also been reported that, "[i]n March [2017], Nyakim Gatwech, a Minnesota-based Sudanese model, was sitting in an Uber on her way to a job interview in St. Paul when her driver, who she describes as a 'light-skinned black man,' asked if she'd ever consider bleaching her much-darker-toned skin for $10,000.  'He said, "Wow, you're dark,"' Gatwech says. 'I'm like, "Yeah, I know."  [Laughs] . . .  I can tell when somebody has never seen a Sudanese person before, somebody as dark as me.'  When this happened, Gatwech, now 24, recently had gotten attention for her part in a photo series called 'Different Melanin,' which depicted herself with three other models of varying shades of brown skin.  She posted another picture with other Sudanese friends a few days later and shared her Uber story in the caption. She was surprised to see that image gain even more traction and supportive comments than the first viral snap."  Rachel Torgerson, "I Was Bullied for Being 'Too Black.'  Now I'm a Model," *Cosmopolitan* (Dec. 11, 2017) (hereinafter, "***Cosmopolitan***") (bracketed notation in original), accessible at *https://www.cosmopolitan.com/style-beauty/fashion/a13443263/nyakim-gatwech-model-interview/*.

334.    Upon information and belief, following her social media posts about her March 2017 exchange with the Uber driver, Ms. Gatwech's notoriety, and thus her modeling career, reached new heights, as she affirmed publicly and proudly the beauty of her exquisitely dark skin and embraced the nickname "Queen of the Dark."

335.    It has been reported that Ms. Gatwech responded to the "Queen of the Dark" nickname as follows:  "'I actually like the name[;] there is nothing wrong with darkness and [being called a] queen is just Cherry on the top[.]  . . .  So I am the queen of the dark who

124

bring[s] light and love to those around me.'"  *See* Isabella Khoo, "Sudanese Model Nyakim Gatwech Is The Self-Love Queen You Need To Know," *HuffPost* (July 6, 2017) (hereinafter, "***Khoo/HuffPost***"), accessible at *https://www.huffpost.com/archive/ca/entry/sudanese-model-nyakim-gatwech_ca_5cd4e 393e4b07bc72972ece2.*

336.    It has been further reported that "[Ms.] Gatwech is also using her platform to preach self-love and self-acceptance and redefine conventional beauty ideals with her dark skin.  Thanks to her stunning modelling shots, the Sudanese model is proving that black is beautiful, too."  *See* Khoo/*HuffPost*, accessible at *https://www.huffpost.com/archive/ca/entry/ sudanese-model-nyakim-gatwech_ca_5cd4e393e4b07bc72972ece2.*

337.    It has been reported that, in a social media post, Ms. Gatwech explained: "'My hope is that this post can remind you every day of why you should be proud of your melanin.  Why you should be proud of your heritage regardless of how light or dark your skin is.  Stop comparing your skin [to] anyone.  Change can only happen once you can truthfully look in the mirror and love that Deep Chocolate, Cinnamon, Mocha, or Caramel complexion.'"  *See* Khoo/*HuffPost*, accessible at *https://www.huffpost.com/archive/ca/entry/sudanese-model-nyakim-gatwech_ca_5cd4e393e4b07bc72972ece2.*

338.    Ms. Gatwech has attained celebrity status as a fashion model, including on Instagram and other social media platforms.

339.     In a July 2017 article published in *Teen Vogue*, the following was reported:  "Nyakim [Gatwech] has been nicknamed the 'Queen of the Dark' by her fans and has proven her royalty in her fierce photos and motivational captions.  Nyakim has become a woman that little girls look up to when, they too, are in search of self-love.  'When I put a picture up I'm telling people that no matter what you say, I love who I am.  I love my skin tone.  I'm telling people that I am beautiful even though I look different than the majority of people in this world I live in[.]'"  Mirabella Roberts, "Model Nyakim Gatwech Challenges Beauty Standards on Instagram," *Teen Vogue* (July 19, 2017) (hereinafter, "***Teen Vogue***"), accessible at *https://www.teenvogue.com/story/model-nyakim-gatwech-challenges-beauty-standards-instagram*.

340.     The *Teen Vogue* article reported:  "It wasn't until her Junior year of high school when Nyakim [Gatwech] felt she could really pursue modeling.  The career clicked with Nyakim when she strutted down the runway in her friend's designs at a school event, she said.  It was then the dark skinned beauty started to build her portfolio, taking two years in New York and countless weekends during college to have photo shoots.  Today, not only has Nyakim taken the internet by storm with her modeling, but she has started a movement of self-love and female empowerment."  *Teen Vogue*, accessible at *https://www.teenvogue.com/story/model-nyakim-gatwech-challenges-beauty-standards-instagram*.

341.     The *Teen Vogue* article also noted that, as of 2017, Ms. Gatwech had "260K+ followers on Instagram[.]"  *Teen Vogue*, accessible at *https://www.teenvogue.com/story/model-nyakim-gatwech-challenges-beauty-standards-instagram*.

126

342.     In July 2017, Ms. Gatwech also found herself the subject of another flattering article, this one published by *Harper's Bazaar*, which noted that her social media posts "serve as a reminder that black women are beautiful.  Often using the hashtag #melaninmonday, she calls herself 'Queen of the Dark' — a nickname first given by her fans."  *See* Ella Alexander, "Sudanese Model Who Was Told to Bleach Her Skin is Now Celebrating Being 'Queen of the Dark,'" *Harper's Bazaar* (July 15, 2017), accessible at *https://www.harpersbazaar.com/uk/ fashion/fashion-news/news/a42492/black-model-nyakim-gatwech-profile/*.

343.     Upon information and belief, on or about July 29, 2017, Ms. Gatwech was interviewed by BuzzFeed's YouTube Channel, *As/Is*.  The video notes, among other things, that "[Ms. Gatwech's] deeply pigmented skin is having an impact on the modeling industry." *See* "This 'Queen of the Dark' Got Bullied And Is Now a Model" (July 29, 2017), accessible at *https://www.youtube.com/watch?v=1QlsK3m-zSw*.  Upon information and belief, the July 2017 YouTube video garnered more than 18 million views.  *See id*.

344.     Ms. Gatwech's 2017 publicity Blitzkrieg continued into the late summer, as yet another flattering article was published about her on August 30, 2017 by *Popsugar*.  The article observed:  "There are a lot of stunning models in the fashion industry, but Nyakim Gatwech stands out as the 'Queen of Dark' — and the Sudanese beauty wouldn't dream of changing herself to fit in.  The 24-year-old has taken the modeling world by storm[.]"  Lisa Fogarty, "Get to Know Sudanese Model Nyakim Gatwech, 'The Queen of Dark,'" *Popsugar* (Aug. 30, 2017) (hereinafter, "***Popsugar***"), accessible at *https://www.popsugar.com/fashion /Who-Nyakim-Gatwech-43830903*.

127

345.     The August 2017 *Popsugar* article also reported:  "[Ms.] Gatwech has since built up an impressive portfolio, walked for designers, and posed for some of the most stunning photos, but her reach extends far beyond her modeling work.  Her Snapchat and Instagram, where she has 286,000 followers and counting, are beacons of self-love and self-acceptance.  She uses hashtags like #melaninpoppin, #myblackisbeautiful, and #melaningoddess to make it crystal clear that she isn't apologizing for her gorgeous skin and will continue to promote her beauty and the beauty of others like her."  *Popsugar*, accessible at *https://www. popsugar.com/fashion/Who-Nyakim-Gatwech-43830903*.

346.     In or about September 2017, Ms. Gatwech was interviewed by Harry Connick, Jr.  During the interview, Ms. Gatwech, referring to her nickname, "Queen of the Dark," embraced it as a "'very catchy name, I love it.'"  *See* Harry Connick, Jr., accessible at *https://www.youtube.com/watch?v=vCYcu_UC5UQ*.

347.     As noted, on or about December 11, 2017, *Cosmopolitan* published a flattering article about Ms. Gatwech, which reported, among other things, that Ms. Gatwech had "grown her Instagram page from 20,000 followers to more than 300,000" and "booked professional gigs ranging from local magazine covers to national campaigns for brands like Aldo."  *See Cosmopolitan*, accessible at *https://www.cosmopolitan.com/style-beauty/fashion/ a13443263/nyakim-gatwech-model-interview/*.

4890-9158-2565, v. 1

348.    Also in December 2017, *Cosmopolitan* included Ms. Gatwech in its list of the most fascinating persons on Instagram, a list that linked to the *Cosmopolitan* article referenced in the immediately preceding paragraph, above.  *See* "Meet the 17 Most Fascinating People on Instagram:  These are the style stars, beauty icons, and Other Influencers Who Wowed us in 2017," *Cosmopolitan* (Dec. 11, 2017), accessible at *https://www.cosmopolitan.com/ lifestyle/a14392875/instagrams-most-fascinating-people/*.

349.    In its December 2017 article about Ms. Gatwech, the *Huffington Post* reported:  "Nyakim Gatwech left behind a life of living in refugee camps when she was 14 years old.  Today, ten years later, Gatwech has modelled for Calvin Klein, Fashion Nova, Aldo, and Cosmopolitan, and she's ready to bring positivity and black girl magic to the runway.  The 24-year-old model first developed her passion for the world of lights, camera, and action while living in a refugee camp in Kenya, spending her time looking through fashion magazines and watching 'America's Next Top Model.'"  *See* Ejiofor/*HuffPost*, accessible at *https://www. huffpost.com/archive/ca/entry/nyakim-gatwech_ca_ 5cd5214ae4b07bc729751310*.

350.    Upon information and belief, in September 2018, Ms. Gatwech attended the 70th Emmy Awards show, which was held in Los Angeles, and attracted substantial flattering publicity.

351.    For example, one publication wrote:

"When you're dripping in melanin like South Sudanese model Nyakim Gatwech, people can't help but stare.  And that's exactly what happened at the 2018 Emmy Awards.  Just 10 years ago, Nyakim Gatwech was living in a refugee camp in Kenya dreaming of becoming a model while watching *America's Next Top Model*

129

and browsing fondly through fashion publications.  Now, the 24-year old Minnesota-based model has been part of major campaigns and partnerships with the likes of Calvin Klein, Fashion Nova, Aldo, L'Oreal and BET for our Black Like Me series.  She even attended the Emmys this year looking like literal chocolate gold."  *See* Gina Conteh, "Meet The South Sudanese Model Who Had Everyone's Jaws On The Floor At This Year's Emmy Awards:  She is the Definition of Black Girl Magic!" *Black Entertainment Television* (Sept. 25, 2018) (hereinafter, "***BET***"), accessible at *https://www.bet.com/article/xr5lvp/see-the-south-sudanese-model-who-dropped-jaws-at-the-emmys*.

352.    The September 2018 *BET* article featured the following photograph of Ms.

Gatwech below the statement, "See how Nyakim stunned at the Emmys below[:]"



353.    In a piece published on September 22, 2018 in *Lee Bailey's EurWeb.com*,

the author gushed about Ms. Gatwech, writing:

"Upon seeing Nyakim Gatwech for the first time, your initial impression may have been: Holy moly!  WHO is this?  And WHERE did she come from?

"Well, for those on the late-freight, she's a South Sudanese-born model currently based in Minnesota.

"The 24-year-old model first developed her passion for the world of lights, camera, and action while living in a refugee camp in Kenya, spending her time looking through fashion magazines and watching 'America's Next Top Model.'

130

"You also probably won't be surprised to learn that she's called 'The Queen of Dark' because of how she models in her unique skin color.  But let's talk about the move she made recently that blew minds on the red carpet at the Emmys.

* * *

"[Another article on Ms. Gatwech] also makes note that while a lot of dark skinned people are fleeing from their blackness with bleaching creams, potions, etc., this 24-year-old model is smartly embracing her dark complexion with pride."  *See* Fisher Jack, "Nyakim Gatwech: Stunning Sudanese-American Model Wows on the Emmy Red Carpet – LOOK!" *Lee Bailey's EurWeb.com* (Sept. 22, 2018), accessible at *https://eurweb.com/2018/nyakim-gatwech-stunning-sudanese-american-model-wows-on-the-emmy-red-carpet-look/*.

354.    In January 2019, Ms. Gatwech was featured in an article published by L'Oréal, the iconic French beauty company.  *See* "L'Oréal Lifestyle: How Nyakim Gatwech Embraced Her Skin and Found Success in the Beauty Industry" (Jan. 25, 2019) (hereinafter, the "***2019 L'Oréal Article***"), accessible at *https://www.lorealparisusa.com/beauty-magazine/beauty-tips/beauty-trends/nyakim-gatwech-interview*.

355.    The 2019 L'Oréal Article noted that Ms. Gatwech had been named to the 2019 L'Oréal League, described as an "influencer ambassador program," and reported, among other things:

"You can learn a lot about someone from scrolling through their social media feed, looking at snapshots of their lives and reading captions — but don't you ever want to know more about the people you follow?  Nyakim Gatwech is certainly someone we want to know more about.  A member of the 2019 L'Oréal League — L'Oréal Paris' influencer ambassador program — Nyakim is a South Sudanese model known for her gorgeous complexion and dark skin tone.  Here, she grants our (and your) wish of wanting to know more and talks about gaining confidence, reminding herself of her worth, her best beauty tips, and more.

* * *

"If you aren't one of Nyakim's more than 400,000 followers, you might not know the nickname she's been given: Queen of Dark.  The nickname, which is based on her stunningly deep skin tone, has become a point of pride — earning a spot in her Instagram bio and a hashtag on many of her posts.  Speaking on the name,

131

Nyakim says this, 'For most people, the name might be seen in a negative light, but I'm proud of the name and claim it with pride.'"

356.    The 2019 L'Oréal Article included the following Instagram photo of Ms. Gatwech:



357.    In December 2019, Ms. Gatwech attended the 14th Annual L'Oréal Paris Women of Worth Awards in New York City.  Ms. Gatwech was among the attendees who garnered media attention.  A published article reporting on the event included a photograph of Ms. Gatwech above a caption stating, in part:  "Model Nyakim Gatwech, 26, put on a show in a black and silver patterned mini dress[.]"  *See* Rachel McGrath, *Daily Mail* (updated Dec. 5, 2019), accessible at *https://www.dailymail.co.uk/tvshowbiz/article-7757877/Amber-Heard-Andie-MacDowell-Camila-Cabello-attend-LOreal-Paris-Women-Worth-Awards-NYC.html*.

132

358.    In March 2020, Ms. Gatwech was featured on the cover of *WOE (Women Own Excellence) Magazine*.  *See* Ayo Thomas, "Nyakim Gatwech: Breaking Barriers on Colorism While Thriving in Black Girl Excellence," *Women Own Excellence* (March 20, 2020) (hereinafter, "***WOE Magazine***"), accessible at *https://woemagazine.com/nyakim-gatwech-breaking-barriers-on-colorism-while-thriving-in-black-girl-excellence/*.  The magazine cover, included in the aforementioned article, is reproduced immediately below:



359.    The WOE Magazine article contained an interview of Ms. Gatwech, including the following exchange:

"South Sudanese model Nyakim Gatwech is a voice of empowerment who uses her social media platforms to address colorism and social ideologies amongst women of color.  Nyakim A.K.A **'Queen of The Dark'** is spreading black girl excellence around the world inspiring women to embrace their dark skin tones, break barriers of conventional beauty standards and love themselves unapologetically.

\*   \*   \*

133

"'I technically did not come up with the name.  I went viral for my complexion, speaking about self-love and self-acceptance, I always saw myself as a 'Queen[.]'  My Instagram handle first was named 'Queen Nyakim' but I would always use hash tags #queen #darkskincomplexion etc.  One of my followers posted on Twitter,  Nyakim Gatwech the '***Queen of Dark***[.]'  At first, I was like what, who named me Queen of Dark[?]  But then I realized it was a catchy name to use for my brand.  Some initially thought it was negative, but I explained to them, strong beautiful black women are queens.

\* \* \*

"'Aside from modeling, I am thinking about getting into acting.  I would like to explore more options to showcase my beauty and talent.'"  WOE Magazine (boldface emphasis in original), accessible at *https://woemagazine.com/nyakim-gatwech-breaking-barriers-on-colorism-while-thriving-in-black-girl-excellence/*.

360.     In connection with *Glamour Magazine*'s coverage of the launch of the spring 2021 clothing line of celebrity singer, actress and business owner Robyn Rihanna Fenty (known simply as Rihanna), the publication noted that Ms. Gatwech was among the models chosen to debut the new line:  "'We're taking you on a psychedelic garden trip with Rihanna and models Nyakim Gatwech, Denise Bidot, Tonoia and Bree Kish in our latest campaign[.]'"  *See* Bianca London, "Rihanna is out here championing *every* damn body with her ethereal new lingerie collection," *Glamour Magazine* (March 2, 2021), accessible at *https://www.glamourmagazine.co.uk/article/rihanna-fenty-savage-lingerie*.

361.     In August 2022, Ms. Gatwech was pictured in connection with the release of the new album of singer Fireboy DML.  *See* "Nyakim South Sudanese Model Plaiting Fireboy DML's Hair and Featured in the Playboy Album" (Aug. 8, 2022), accessible at *https://www.youtube.com/watch?v=n60oWHyChok*.

4890-9158-2565, v. 1

362.   In or about September 2022, Hunkemöller Lingerie announced its collaboration with Ms. Gatwech in connection with its new "Queen Nyakim Collection," stating: "International top model Nyakim Gatwech is the face and co-designer of our new collection." *See* Hunkemöller Facebook Page, accessible at *https://www.facebook.com/hunkemoller/videos/ international-top-model-nyakim-gatwech-is-the-face-and-co-designer-of-our-new- co/754310295652118/.  See also* Hunkemöller Website ("Hunkemöller & Queen Nyakim uncover everyone's queenly vibes with a collection designed to make women feel like royalty inside and out.  . . .  Nyakim is the queen of color."), accessible at *https://www.hunkemoller. com/new/nyakim.*

363.   Upon information and belief, as of May 1, 2023, Ms. Gatwech's Instagram profile, @queennyakimofficial, had approximately a million followers.

364.   Ms. Gatwech's Instagram profile reflects a "verified badge," which, upon information and belief, means that Instagram has confirmed that the account is the "authentic presence of the public figure, celebrity or brand it represents."  *See* Instagram Help Center Website, "Verified badges on Instagram," accessible at *https://help.instagram.com/ 733907830039577/?helpref=uf_share.*

135

**XIV.**

**DR. LIEBERMAN'S FEBRUARY 19, 2022 PERSONAL
TWEET IN RESPONSE TO A TWITTER POSTING ABOUT
CELEBRITY FASHION MODEL NYAKIM GATWECH**

365.     As demonstrated above, by the time of Dr. Lieberman's February 19, 2022 Personal Tweet, Ms. Gatwech, as the self-proclaimed Queen of the Dark, had made it an essential part of her personal and professional mission to proudly raise public awareness of, provide a keener appreciation for and generate increased societal commentary on the extraordinary beauty of darker-skinned fashion models, as well as darker-skinned individuals generally.

366.     NYSPI, the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry were closed on Monday, February 21, 2022, in observance of the federal holiday, Presidents' Day, and the New York State holiday, George Washington's Birthday.

367.     February 19, 2022 was therefore the Saturday of what for many was the three-day Presidents' Day Weekend.

368.     February 19, 2022 was a busy, but pleasant, routine Saturday for Dr. Lieberman and his wife, Rosemarie Fernandez-Larios.

136

369.     By the early evening of February 19, 2022, after Dr. Lieberman had played tennis earlier in the day, he and Rosemarie were relaxing together at their home, watching television and scrolling through their respective social media accounts before having dinner.

370.     On that early evening of Saturday, February 19, 2022, while perusing social media, Rosemarie stumbled upon a photograph of model Nyakim Gatwech, which was the same photograph that had been included in the Original Gatwech Tweet of February 17, 2022, attributed to "Mynameis. . . Miro @zg4ever."

371.     Upon information and belief, the "Mynameis…Miro" Twitter account that posted the Original Gatwech Tweet summarized its author's social/political philosophy in the account biography reproduced immediately below:



372.    The Original Gatwech Tweet contained a photograph of Ms. Gatwech

above which the "Mynameis. . .Miro" Twitter account user had written the following:

"It is not a work of art made of black stone or granite.  She is Sudanese model
Nyakim Gatwech.  The most beautiful among the black beauties.  She is in the
Guinness Book of World Records for having the darkest skin ever seen on earth.
She is also known as the QUEEN OF DARK."

373.    The Original Gatwech Tweet, which includes the photograph of Ms.

Gatwech that Rosemarie had earlier on the Saturday evening of February 19, 2022 brought to Dr.

Lieberman's attention, is reproduced immediately below on the next page:

138





374.    Upon information and belief, as reflected in the graphic reproduced in the

immediately preceding paragraph, above, the Original Gatwech Tweet had been retweeted 2,228

times and received 28,800 "likes."

139

375.    The Chilean-raised Rosemarie had worked for the Spanish-language television network, Telemundo and, for some time thereafter, managed a gallery in Manhattan specializing in Latin American art.

376.    Because she has an eye for art, the stunning photograph of Ms. Gatwech, caught the attention of Rosemarie on the evening of February 19, 2022, prompting her to bring it to the attention of her husband, Dr. Lieberman, who was seated nearby.

377.    Sometime shortly before 7:00 p.m. or so on February 19, 2022, the Original Gatwech Tweet — containing the same stunning photograph of Ms. Gatwech that his wife had so enthusiastically brought to his attention just a little while earlier that evening — appeared in Dr. Lieberman's Twitter feed.

378.    Upon reading the Original Gatwech Tweet, Dr. Lieberman posted reflexively from his personal Twitter account his 15-word February 19, 2022 Personal Tweet in response to the Original Gatwech Tweet's statements that Ms. Gatwech (a) "is not a work of art made of black stone or granite"; (b) is "[t]he most beautiful among the black beauties"; (c) "is in the Guinness Book of World Records for having the darkest skin ever seen on earth"; and (d) "is also known as the QUEEN OF DARK."

379.    Intending to underscore the exquisite beauty of the internationally-renowned fashion model known as the Queen of the Dark, Dr. Lieberman's spontaneous February 19, 2022 Personal Tweet stated in its entirety:  "Whether a work of art or freak of nature she's a beautiful sight to behold."

380.    Dr. Lieberman's February 19, 2022 Personal Tweet, along with the

Original Gatwech Tweet to which it responded, is reproduced immediately below:



381.    Like his wife, Rosemarie, Dr. Lieberman was struck by the beauty of Ms.

Gatwech, the proudly proclaimed Queen of the Dark, as depicted in the photograph circulated in

the Original Gatwech Tweet.  Dr. Lieberman therefore intended and believed his spontaneous

February 19, 2022 Personal Tweet in response to the Original Gatwech Tweet to be thoroughly

complimentary of Ms. Gatwech's exquisite dark-skinned beauty.

141

382.     In the context of the Original Gatwech Tweet to which the February 19,

2022 Personal Tweet responded, Dr. Lieberman's use of the phrase, "[w]hether a work of art or

freak of nature," was clearly intended to compliment the extraordinary, innate physical beauty of

Ms. Gatwech, the proclaimed Queen of the Dark, whom the Original Gatwech Tweet had

crowned "[t]he most beautiful among the black beauties" and likened to "a work of art made of

black stone or granite."

383.     The term "freak of nature" has long been used to compliment those who

are genetically gifted with unique beauty, strength, athletic ability, stamina, endurance, mental

focus and musical and other talents, skills and attributes not possessed by mere mortals.

According to *The Britannica Dictionary*, a "freak of nature" is "a person or thing that is very

unusual or abnormal[;] [for example,] [h]e's an amazing athlete — a real *freak of nature*." *The

Britannica Dictionary* (emphasis in original), accessible at *https://www.britannica.com/

dictionary/freak-of-nature*.

384.     The term "freak of nature" has been used in countless contexts to

compliment extraordinary physical, mental and other attributes, including, by way of example

only, the following:

    (a)    "***They say that beauty fades — but not if you're one of these freaks of
nature!*** Wonderwall.com rounded up our favorite supermodels of the '80s
and '90s to see how they've changed (or not!) over the years.  Keep
reading to catch up with Naomi Campbell, Linda Evangelista, Helena
Christensen and more of fashion's most famous faces of the past, starting
with Cindy Crawford[.]" *See* "Supermodels of the '80s and '90s:  Where
Are They Now?" *Wonderwall.com* (Feb. 20, 2021) (emphasis added),
accessible at *https://www.wonderwall.com /celebrity/supermodels-80s-*

*90s-where-are-they-now-cindy-crawford-naomi-campbell-more-35017.gallery*.

(b)   "***I've always wanted to be a freak of nature.  The good kind, where I'm so genetically gifted I can wake up and run a sub-2:45 marathon, or take the bike out for a 30-mph spin on my rest days, or call the International Olympic Committee and let them know which event I'll be entering in London.  That kind of freakiness would be pretty terrific***.  . . .  ***On Oct. 8, triathlete phenom Chrissie Wellington of Great Britain won her fourth Ironman World Championship in Hawaii.  Her friend and training partner, Leanda Cave, who placed third in Kona, lovingly referred to Wellington as a freak of nature.  It was hardly the first time the moniker had been attached to Wellington***."  *See* Kathryn Bertine, "Kona Champ Chrissie Wellington:  Freak of Nature?" ESPN (Oct. 13, 2011) (emphasis added), accessible at *https://www.espn.com/espnw/athletes-life/story/_/id/7098475/*.

(c)   "[T]he bodies of ultraendurance athletes are actually little different from those of other sports people.  The brain, he says, is the oft-overlooked organ that sets ultraracers apart.  ***These people are 'mental freaks,' he says, not physiological ones***."  *See* "Freaks of Nature," *Nature* (Vol. 444, Dec. 2006) (emphasis added), accessible at *https://www.nature.com/articles/4441000a.pdf*.

(d)   "We went through all the sports and examined those athletes who demonstrate the most freakish, athletic ability.  . . .  This is not a greatest athletes list, but simply looking at it from a genetic standpoint.  Most of these guys worked hard to get to where they were, but a maximal genetic envelope often plays the biggest role in this list.  We narrowed the list down to the top 25 biggest athletic freaks in history (in order) [listing, among others: Jim Thorpe (baseball/football/track); Dave Winfield (baseball); Mike Tyson (boxing); Gordie Howe (hockey); Brock Lesnar (wrestling); Serena Williams (tennis); Herschel Walker (football); Lebron James (basketball); Alexander Karelin (wrestling)].  ***The term 'athletic freak' can be defined as their raw talent in terms of physical giftedness and athletic ability in terms of strength, size, raw power, agility, and durability***.

"The biggest surprise you will notice is that Michael Jordan is not on this list.  Jordan became the world's greatest athlete but he possessed a combination of imperfections.  ***He was not necessarily a true athletic freak who was genetically blessed with innate abilities like raw speed or the quickest cutting ability***.  Jordan worked and worked to get to where he was, which helped make him the greatest of all time.  He was known as

143

the hardest worker on the court, which elevated him to where he was. . . . ***The people on this list were just born as pure, natural athletic freaks who could dominate in their sport, getting by on talent, and could probably play professional in numerous sports if they tried.***" *See* "Top 25 Most Athletic Freaks of All Time," *Muscle Prodigy* (emphasis added), accessible at *https://www.muscleprodigy.com/top-25-most-athletic-freaks-of-all-time/*.

(e)     "'It's amazing because when you're out there watching [Tom Brady] in practice, you're like, "This guy looks like he's 30, maybe 33 at most," Coach Bruce Arians said.  'It's just amazing watching him and the way he works so hard at taking care of himself.  That's not easy at 43, taking a few shots — hopefully not too many — and moving on. . . . ***He really is a freak of nature in that regard***.'" *See* "Old Hat For Brady Is New For Tampa," *Arkansas Democrat Gazette* (Jan. 7, 2021) (emphasis added), accessible at *https://www.arkansasonline.com/news/2021/jan/07/old-hat-for-brady-is-new-for-tampa/*.

(f)     "Coming to America from Greece as a teenager was not always the smoothest transition for Milwaukee Bucks superstar Giannis Antetokounmpo.  ***Before 'Giannis' became a household name, those who couldn't pronounce his last name often called the NBA's reigning MVP the 'Greek Freak,' because of his rare, freakish athletic ability and ballhandling skills for someone 6-foot-11***.

"But as popular as the nickname has become, Antetokounmpo can't recall the first person to use it.

"'***First of all, the nickname is really good. I like it,' Antetokounmpo said*** during his Thursday morning appearance on Capture Sports Marketing's Athletes Doing Good Radiothon with his teammate Pat Connaughton on ESPN Wisconsin.

"'I don't remember the first time I heard about it — it was probably my rookie year — but I really don't know who came up with it,' he said.  '***I just went on the court one day and I had like a crazy dunk or a crazy block and after that everyone started calling me the Greek Freak.  So it stuck by me, I love it and it's a cool nickname***.'" *See* Eric Woodyard, "Giannis Antetokounmpo loves 'Greek Freak' nickname, unsure of origin," *ESPN* (May 21, 2020) (emphasis added), accessible at *https://www. espn.com/nba/story/_/id/29206029/giannis-antetokounmpo-loves-greek-freak-nickname-unsure-origin*.

144

(g)     "*[Mike Trout is] a freak.  It's almost boring to write about him, because it's just, what else can you say that hasn't already been said? He's the best*.  .  .  .  Trout is the best player in baseball, and when it's all said and done, he'll be in the conversation for one of the greatest baseball players who ever played the game."  *See* "Mike Trout Has Homered in Four Straight Games, Is a Freak of Nature," *Barstool Sports* (May 16, 2017) (emphasis added), accessible at *https://www.barstoolsports.com /blog/778418/mike-trout-has-homered-in-four-straight-games-is-a-freak- of-nature*.

(h)     "'You know, I'm trying to think of some man in his sport who is as accomplished and this dominant over such a long period time as Serena Williams.  Listen, I've always contended that the greatest athlete of all time is Babe Zaharias [who excelled in, among other sports, baseball, basketball, track and field and golf, winning Olympic Gold Medals and the U.S. Women's Open on multiple occasions].  Just through my studies of athletes over all these years, nobody could compare to Babe when it comes to the ability to go from sport to sport, Olympic accomplishments, literally starting the LPGA [Ladies Professional Golf Association]; *[Serena Williams] is a woman like Babe, shot out of a cannon, a physical freak of nature, a phenom*.  *She is the greatest athlete in the country I believe, maybe in the world*."  *See* "Beasley Reece: Serena Williams Is 'The Greatest Athlete In The Country…Maybe The World,'" *CBS Philadelphia* (July 13, 2015) (emphasis added), accessible at *https://www.cbsnews.com/philadelphia/news/beasley-reece-serena- williams-is-the-greatest-athlete-in-the-countrymaybe-the-world/*.

(i)     "Speaking on Tennis.com, [Greg] Rusedski said '*he (Nadal) is a genetic freak of nature and also, his mental fortitude is second to none*.  If you wanted one guy playing for your life for one match, he is your man.  What he's done is sensational.'"  *See* "Rafael Nadal 'A Genetic Freak of Nature,' Claims Former British Number One," *Tennis Head* (Feb. 6, 2022), accessible at *https://tennishead.net/rafael-nadal-a-genetic-freak-of-nature-claims- former-british-no-1/*.

**XV.**

**FREE SPEECH AND VIEWPOINT DIVERSITY WITHIN THE ACADEMIC
ENVIRONMENT OF NYSPI/COLUMBIA/PRESBYTERIAN PSYCHIATRY,
COLUMBIA UNIVERSITY AND PRESBYTERIAN/COLUMBIA HOSPITAL**

**A.      First Amendment Free-Speech Protections: Generally**

385.    In or about 1788, shortly after the United States Constitution had been

drafted and circulated for robust debate within the young American nation, James Madison, the

principal draftsman of the First Amendment, advocated the need to protect diversity of

expression:  "In a free government the security for civil rights must be the same as that for

religious rights.  It consists in the one case in the multiplicity of interests, and in the other in the

multiplicity of sects.  The degree of security in both cases will depend on the number of interests

and sects[.]"  *Federalist No. 51.*

386.    In debating and drafting the United States Constitution, the Framers

sought through the First Amendment to protect, among other rights, the right to freedom of

speech and expression.

387.    The First Amendment provides:  "Congress shall make no law respecting

an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of

speech, or of the press; or the right of the people peaceably to assemble, and to petition the

government for a redress of grievances."

388.    The Supreme Court has held that the First Amendment on its face

prohibits the federal government from infringing upon the rights enumerated therein and, by

146

means of the Fourteenth Amendment to the United States Constitution, prohibits state and local

governments from infringing upon those rights, including the right to freedom of speech. *See,*

*e.g., Gitlow v. New York,* 268 U.S. 652, 666 (1925) ("we may and do assume that freedom of

speech and of the press — which are protected by the First Amendment from abridgment by

Congress — are among the fundamental personal rights and 'liberties' protected by the due

process clause of the Fourteenth Amendment from impairment by the States").

389.    The United States Supreme Court has long recognized the critical, First

Amendment-based right of Americans to express divergent views.  For example, 80 years ago,

the Supreme Court explained:

> "*[W]e apply the limitations of the Constitution with no fear that freedom to be intellectually and spiritually diverse or even contrary will disintegrate the social organization*.  . . .  But freedom to differ is not limited to things that do not matter much.  That would be a mere shadow of freedom.  The test of its substance is the right to differ as to things that touch the heart of the existing order.
>
> "*If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein*." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 641-42 (1943) (emphasis added).

390.    As the Supreme Court has explained:  "The vitality of civil and

political institutions in our society depends on free discussion. . . .  The right to speak

freely and to promote diversity of ideas and programs is therefore one of the chief

distinctions that sets us apart from totalitarian regimes." *See Terminiello v. Chicago*, 337

U.S. 1, 4 (1949).

147

391.    The Supreme Court also observed:

"'Believing in the power of reason as applied through public discussion, [the Framers] eschewed silence coerced by law — the argument of force in its worst form.  Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.'

"Thus, *we consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open*, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials."  *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (emphasis added).

### B.    Free-Speech Protections in Academic Environments

392.    The United States Supreme Court has acknowledged the particularly critical need to protect free speech within the context of academic research and teaching institutions.  For example, in 1957, the Supreme Court held:

"The essentiality of freedom in the community of American universities is almost self-evident.  No one should underestimate the vital role in a democracy that is played by those who guide and train our youth.  To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation.  No field of education is so thoroughly comprehended by man that new discoveries cannot yet be made.  Particularly is that true in the social sciences, where few, if any, principles are accepted as absolutes.  Scholarship cannot flourish in an atmosphere of suspicion and distrust.  *Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die*."  *Sweezy v. State of New Hampshire*, 354 U.S. 234, 250 (1957) (emphasis added).

393.    The Supreme Court has repeatedly underscored the views expressed in *Sweezy*, as quoted in the immediately preceding paragraph, above:

"*The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.  'By limiting the power of the States to interfere with freedom of speech and freedom of inquiry and freedom of association, the Fourteenth Amendment protects all persons, no matter what*

148

*their calling.  But, in view of the nature of the teacher's relation to the effective exercise of the rights which are safeguarded by the Bill of Rights and by the Fourteenth Amendment, inhibition of freedom of thought, and of action upon thought, in the case of teachers brings the safeguards of those amendments vividly into operation*.  Such unwarranted inhibition upon the free spirit of teachers . . . has an unmistakable tendency to chill that free play of the spirit which all teachers ought especially to cultivate and practice; it makes for caution and timidity in their associations by potential teachers.'"  *Shelton v. Tucker*, 364 U.S. 479, 487 (1960) (emphasis added).

394.    In 1967, the Supreme Court again held:

"Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned.  That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.  '*The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.' . . . The classroom is peculiarly the 'marketplace of ideas.'  The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers the truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection*.'"  *Keyishian v. Board of Regents of the University of the State of New York*, 385 U.S. 589, 603 (1967) (emphasis added).

395.    In 1972, the Supreme Court again underscored the need for First

Amendment protection of the robust exchange of ideas and opinions in academic environments:

"[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. . . .  The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,' and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom."  *Healy v. James*, 408 U.S. 169, 180-81 (1972).

396.    In 20 U.S.C. § 1011a, titled *Protection of Student Speech and Association*

*Rights*, the United States Congress declared:  "It is the sense of Congress that . . .  *an institution*

*of higher education should facilitate the free and open exchange of ideas*."  *See* 20 U.S.C.

§ 1011a(a)(2)(C) (emphasis added).

149

397.    In 1967, a committee commissioned by the President of the University of Chicago to explore the mission of the university, known as the Kalven Committee, concluded as follows:

"The mission of the university is the discovery, improvement, and dissemination of knowledge.  Its domain of inquiry and scrutiny includes all aspects and all values of society.  A university faithful to its mission will provide enduring challenges to social values, policies, practices, and institutions.  By design and by effect, it is the institution which creates discontent with the existing social arrangements and proposes new ones.  *In brief, a good university, like Socrates, will be upsetting*.

"The instrument of dissent and criticism is the individual faculty member or the individual student.  The university is the home and sponsor of critics; it is not itself the critic.  It is, to go back once again to the classic phrase, a community of scholars.  *To perform its mission in the society, a university must sustain an extraordinary environment of freedom of inquiry and maintain an independence from political fashions, passions, and pressures.  A university, if it is to be true to its faith in intellectual inquiry, must embrace, be hospitable to, and encourage the widest diversity of views within its own community*.  It is a community but only for the limited, albeit great, purposes of teaching and research.  It is not a club, it is not a trade association, it is not a lobby.

".  .  .  *There is no mechanism by which [the university] can reach a collective position without inhibiting that full freedom of dissent on which it thrives.  It cannot insist that all of its members favor a given view of social policy; if it takes collective action, therefore, it does so at the price of censuring any minority who do not agree with the view adopted*.  In brief, it is a community which cannot resort to majority vote to reach positions on public issues." Kalven Committee, "Report on the University's Role in Political and Social Action," University of Chicago (Nov. 11, 1967) (emphasis added), accessible at *https://provost.uchicago.edu/sites/default/files/documents/reports/KalvenRprt_0.pdf*.

398.    The American Civil Liberties Union (the "*ACLU*") has explained its views on campus speech as follows:

"The First Amendment to the Constitution protects speech no matter how offensive its content.  Restrictions on speech by public colleges and universities amount to government censorship, in violation of the Constitution.  Such restrictions deprive students of their right to invite speech they wish to hear, debate speech with which they disagree, and protest speech they find bigoted or offensive.  An open society depends on liberal education, and the whole enterprise of liberal education is founded on the principle of free speech.

"How much we value the right of free speech is put to its severest test when the speaker is someone we disagree with most.  Speech that deeply offends our morality or is hostile to our way of life warrants the same constitutional protection as other speech because the right of free speech is indivisible: When we grant the government the power to suppress controversial ideas, we are all subject to censorship by the state.  Since its founding in 1920, the ACLU has fought for the free expression of all ideas, popular or unpopular.  Where racist, misogynist, homophobic, and transphobic speech is concerned, the ACLU believes that more speech — not less — is the answer most consistent with our constitutional values.
* * *
".  .  . Restricting [offensive or bigoted] speech may be attractive to college administrators as a quick fix to address campus tensions.  But real social change comes from hard work to address the underlying causes of inequality and bigotry, not from purified discourse.
* * *
"*.  .  . [Campus administrators should] vigilantly defend the equal rights of all speakers and all ideas to be heard, and promote a climate of robust and uninhibited dialogue and debate open to all views, no matter how controversial*." *See* "Speech on Campus," ACLU Website (emphasis added), accessible at *https://www.aclu.org/other/speech-campus*.

399.    In 2016, Robert J. Zimmer, the President of the University of Chicago,

acknowledged the critical need for free speech within academic institutions.  Dr. Zimmer wrote:

"Free speech is at risk at the very institution where it should be assured: the university.  Invited speakers are disinvited because a segment of a university community deems them offensive, while other orators are shouted down for similar reasons.  Demands are made to eliminate readings that might make some students uncomfortable.  Individuals are forced to apologize for expressing views that conflict with prevailing perceptions.  In many cases, these efforts have been supported by university administrators.
* * *

151

"Over the years, universities have come under attack from a range of groups, both external and internal, that demand the silencing of speakers, faculty, students, and visitors.  The attack is sometimes driven by a desire of an individual or group not to have its authority questioned.  Other times it derives from a group's moral certainty that its particular values, beliefs, or approaches are the only correct ones and that others should adhere to the group's views.  Some assert that universities should be refuges from intellectual discomfort and that their own discomfort with conflicting and challenging views should override the value of free and open discourse.

*   *   *

"Universities should be clear about their core educational mission — to provide students with the most enriching education possible.  We cannot shortchange our students.  This means that questioning and challenge must flourish.

"***Universities cannot be viewed as a sanctuary for comfort but rather as a crucible for confronting ideas and thereby learning to make informed judgments in complex environments***.  ***Having one's assumptions challenged and experiencing the discomfort that sometimes accompanies this process are intrinsic parts of an excellent education***.  Only then will students develop the skills necessary to build their own futures and contribute to society."  *See* Robert J. Zimmer, "A Crucible For Confronting Ideas," *University of Chicago Magazine* (Fall 2016) (emphasis added), accessible at *https://mag.uchicago.edu/university-news/crucible-confronting-ideas*.  *See also* Robert J. Zimmer, "Free Speech Is the Basis of a True Education," *The Wall Street Journal* (Aug. 26, 2016), accessible at *https://www.wsj.com/articles/free-speech-is-the-basis-of-a-true-education-1472164801*.

400.     On August 29, 2017, more than 25 professors and lecturers from Princeton University, Yale University and Harvard University penned an open letter to incoming college freshmen.  The letter underscored the crucial need for freedom of expression and the clash of ideas within academia:

"We are scholars and teachers at Princeton, Harvard, and Yale who have some thoughts to share and advice to offer students who are headed off to colleges around the country.  Our advice can be distilled to three words:

"**Think for yourself**.

152

"Now, that might sound easy. But you will find—as you may have discovered already in high school—that thinking for yourself can be a challenge. It always demands self-discipline and these days can require courage.

"In today's climate, it's all-too-easy to allow your views and outlook to be shaped by dominant opinion on your campus or in the broader academic culture.  The danger any student — or faculty member — faces today is falling into the vice of conformism, yielding to groupthink.

"At many colleges and universities what John Stuart Mill called 'the tyranny of public opinion' does more than merely discourage students from dissenting from prevailing views on moral, political, and other types of questions.  It leads them to suppose that dominant views are so obviously correct that only a bigot or a crank could question them.

"Since no one wants to be, or be thought of as, a bigot or a crank, the easy, lazy way to proceed is simply by falling into line with campus orthodoxies.

"**Don't do that. Think for yourself**.

"Thinking for yourself means questioning dominant ideas even when others insist on their being treated as unquestionable.  It means deciding what one believes not by conforming to fashionable opinions, but by taking the trouble to learn and honestly consider the strongest arguments to be advanced on both or all sides of questions — including arguments for positions that others revile and want to stigmatize and against positions others seek to immunize from critical scrutiny.

"The love of truth and the desire to attain it should motivate you to think for yourself.  The central point of a college education is to seek truth and to learn the skills and acquire the virtues necessary to be a lifelong truth-seeker.  Open-mindedness, critical thinking, and debate are essential to discovering the truth.  Moreover, they are our best antidotes to bigotry.

"Merriam-Webster's first definition of the word 'bigot' is a person 'who is obstinately or intolerantly devoted to his or her own opinions and prejudices.'  The only people who need fear open-minded inquiry and robust debate are the actual bigots, including those on campuses or in the broader society who seek to protect the hegemony of their opinions by claiming that to question those opinions is itself bigotry.

"So don't be tyrannized by public opinion.  Don't get trapped in an echo chamber.  Whether you in the end reject or embrace a view, make sure you decide where you stand by critically assessing the arguments for the competing positions.

153

"**Think for yourself**.

"Good luck to you in college!" *See* "Some Thoughts and Advice for Our Students and All Students" (Aug. 29, 2017) (boldface emphasis in original).

401.    In a letter to the Stanford Law School community dated March 22, 2023, the Dean of the Law School, Jenny Martinez, reminded the community that, among other things, "our commitment to diversity and inclusion means that we *must* protect the expression of all views." *See* March 22, 2023 Letter of Dean Martinez (emphasis in original), accessible at *https://law.stanford.edu/wp-content/uploads/2023/03/Next-Steps-on-Protests-and-Free-Speech.pdf*.

**C.    Columbia University's Free-Expression Policies Govern the Activities of NYSPI/Columbia/Presbyterian Psychiatry, <u>Columbia University and Presbyterian/Columbia Hospital</u>**

402.    While Dr. Lieberman does not seek relief through this Complaint for Defendant's willful, intentional and malicious violation of the internal free-expression policies that governed the activities of NYSPI/Columbia/Presbyterian Psychiatry, Columbia University and Presbyterian/Columbia Hospital during the Relevant Time Period, those policies are critically important to understanding the free-expression academic environment in which Defendants knowingly perpetrated their Unlawful Scheme against Dr. Lieberman.

403.    Columbia University and its constituent departments, including the Columbia Medical School Department of Psychiatry, have long espoused policies underscoring the critical importance of freedom of expression and diversity of ideas and opinions among its community members.

404.     Section 440 of the Columbia University Rules of University Conduct (the

"*Columbia Rules of Conduct*") provides:

"*The Rules of University Conduct, found in Chapter XLIV of the Statutes of Columbia University, are intended to ensure that all members of our community may engage in our cherished traditions of free expression and open debate.  The University, as a forum for the pursuit and attainment of knowledge in every field of human endeavor, has a special role in fostering free inquiry.  A principal reason why universities have endured and flourished over centuries is that they provide a place for ideas to be tested, for values to be questioned, and for minds to be changed with as few constraints as possible.  Like society at large, but even more so, the University has a vital interest in fostering a climate in which nothing is immune from scrutiny.  And Columbia, in particular, has a long tradition of valuing dissent and controversy and in welcoming the clash of opinions onto the campus*.

"*To be true to these principles, the University cannot and will not rule any subject or form of expression out of order on the ground that it is objectionable, offensive, immoral, or untrue.  Viewpoints will inevitably conflict, and members of the University community will disagree with and may even take offense at both the opinions expressed by others and the manner in which they are expressed.  But the role of the University is not to shield individuals from positions that they find unwelcome.  Rather, the University is a place for received wisdom and firmly held views to be tested, and tested again, so that members of the University community can listen, challenge each other, and be challenged in return*.

"The University recognizes only two kinds of limitations on the right of freedom of expression, and both are to be narrowly construed.  First, the University reasonably regulates the time, place, and manner of certain forms of public expression.  *In keeping with the University's dedication to the principle of uninhibited discourse, these regulations do not turn on the content of any message that might be expressed*.  Rather, they are necessary not because they would prevent any opinion from being stated or heard, but, to the contrary, because they protect the rights of free speech, free press, and academic freedom.  *Just as all members of the University community have the right to speak, to study, research, to teach, and to express their own views, so must they allow others in the community to do the same*.  The right to demonstrate, for example, cannot come at the expense of the right of others to counter-demonstrate, to teach, or to engage in academic pursuits requiring uninterrupted attention.  *As is true of the larger community in which the University sits, the University must protect the rights of all to engage in their callings and express their own views*.

155

"Second, the University may restrict expression that constitutes a genuine threat of harassment, that unjustifiably invades an individual's privacy, or that falsely defames a specific individual.  These forms of expression stand apart because they do little if anything to advance the University's truth-seeking function and they impair the ability of individuals at the University to participate in that function.  The University has an obligation to assure members of its community that they can continue in their academic pursuits without fear for their personal security or other serious intrusions on their ability to teach and to study.

"***Because of the University's function as an incubator of ideas and viewpoints, the principle of free expression must be jealously guarded***.  As President Bollinger has noted, 'Our great institutions of higher education bear a special social responsibility for educating people to possess a nimble cast of mind, able to grasp multiple perspectives and the full complexity of a subject.  And for centuries, great societies of all types have understood that this kind of intellectual capacity is essential to progress.  But never have critical thinking and tolerance been more important for individual well-being and for our collective prosperity.'  ***Every member of our community therefore retains the right to demonstrate, to rally, to picket, to circulate petitions and distribute ideas, to partake in debates, to invite outsiders to participate, and to retain the freedom to express opinions on any subject whatsoever, even when such expression invites controversy and sharp scrutiny.  Although the University values the civil and courteous exchange of viewpoints, it does not limit discussion because the ideas expressed might be thought offensive, immoral, disrespectful, or even dangerous.  We expect that members of our community will engage in public discussions that may confront convention, and free expression would mean little if it did not include the right to express what others may reject or loathe***."  *See* Columbia University's Rules of University Conduct, Section 440 (emphasis added), accessible at *https://universitypolicies.columbia.edu/content/rules-university-conduct*.

405.    The Columbia Rules of Conduct, including Section 440 thereof, apply to "all members of the University community: administrators, administrative staff, research staff, library staff, supporting staff, faculty, and students."  *See* Columbia Rules of Conduct, Section 442 (Jurisdiction), accessible at *https://universitypolicies.columbia.edu/content/rules-university-conduct*.

156

406.     The Columbia Rules of Conduct define the term "University," as used

therein, to mean Columbia University.  *See* Columbia Rules of Conduct, Section 441

(Definitions), accessible at *https://universitypolicies.columbia.edu/content/rules-university-*

*conduct*.

407.     The Columbia Rules of Conduct, including Section 440 thereof, are

applicable to any "University facility," which is defined as a "place where a University function

occurs" (also referred to hereinafter individually as a "***Columbia University Facility***" and

collectively as "***Columbia University Facilities***").  *See* Columbia Rules of Conduct, Section 441

(Definitions), accessible at *https://universitypolicies.columbia.edu/content/rules-university-*

*conduct*.

408.     The Columbia Rules of Conduct, including Section 440 thereof, are

applicable to any "University function," which is defined as "any charter or statutory operation or

activity of the University, including instruction, research, study, administration, habitation, social

life, space allocation and control, food supply, and other functions directly related thereto.

Specifically included are both functions of fixed-time duration (*e.g.*, classes, examinations,

lectures, etc.) and functions of continuing duration (*e.g.*, the operation of libraries, research

laboratories, maintenance shops, computers, business offices, etc.).  Also included are functions

ancillary to directly educational purposes, such as meetings, disciplinary proceedings, and

athletic and social events sponsored by any University-approved organization" (also referred to

hereinafter individually as a "***Columbia University Function***" and collectively as "***Columbia***

157

*University Functions*").  *See* Columbia Rules of Conduct, Section 441 (Definitions), accessible at *https://universitypolicies.columbia.edu/content/rules-university-conduct*.

409.    As demonstrated in detail herein, NYSPI/Columbia/Presbyterian Psychiatry is a New York State-dominated, controlled and influenced academic, clinical, research and fundraising Association whose inextricably intertwined Psychiatric Activities include, but are not limited to, psychiatric research; the teaching of psychiatry; the publication of academic and medical papers, articles and books; the hospital-based and other training of psychiatric medical students; and the administration of the medical professionals, professors, adjunct professors, lecturers and other employees and staff who comprise NYSPI/Columbia/ Presbyterian Psychiatry.

410.    As demonstrated in detail herein, NYSPI/Columbia/Presbyterian Psychiatry is a fully-integrated, New York State-dominated, controlled and influenced academic, clinical, research and fundraising Association whose Psychiatric Activities are conducted predominantly from New York State-owned and managed buildings located on and adjacent to the Columbia University campus in New York City.

411.    As noted, in 1952, NYSPI and the Columbia Medical School Department of Psychiatry formally joined their educational programs to create the 1952 NYSPI-Columbia Psychiatry Educational Partnership.  As a result of 1952 NYSPI-Columbia Psychiatry Educational Partnership, Columbia Medical School Department of Psychiatry faculty

158

appointments were bestowed upon NYSPI faculty and NYSPI trainees received Columbia diplomas.

412.     In connection with the 1952 NYSPI-Columbia Psychiatry Educational Partnership, the positions of Executive Director of NYSPI, Chair of the Columbia Medical School Department of Psychiatry and Psychiatrist-in-Chief of the Presbyterian/Columbia Hospital were formally consolidated and held by a single person (who, until his wrongful removal therefrom by Defendants in late February 2022, was Dr. Lieberman).

413.     Each of the buildings from which NYSPI/Columbia/Presbyterian Psychiatry conducts its activities — including, but not limited to, 1051 Riverside Drive, New York, New York, the building in which NYSPI and the Columbia Medical School Department of Psychiatry are predominantly headquartered and to which the headquarters of Presbyterian/Columbia Hospital is connected via walkways — constitutes a Columbia University Facility, as defined in the Columbia Rules of Conduct.  Indeed, each such building constitutes a "place where a University function occurs."  *See* Columbia Rules of Conduct, Section 441 (Definitions), accessible at *https://universitypolicies.columbia.edu/content/rules-university-conduct*.

414.     The Columbia Rules of Conduct, including Section 440 thereof, apply to each Columbia University Facility from which NYSPI/Columbia/Presbyterian Psychiatry conducts its activities — including, but not limited to, 1051 Riverside Drive, New York, New York, the building in which NYSPI and the Columbia Medical School Department of Psychiatry are predominantly headquartered and to which building the headquarters of Presbyterian/

Columbia Hospital is connected via walkways — because each such building constitutes a "place where a University function occurs."  *See* Columbia Rules of Conduct, Section 441 (Definitions), accessible at *https://universitypolicies.columbia.edu/content/rules-university-conduct*.

415.    Because, as demonstrated in detail herein, NYSPI/Columbia/Presbyterian Psychiatry is a fully-integrated, New York State-controlled and influenced academic, clinical, research and fundraising Association whose Psychiatric Activities are conducted predominantly from New York State-owned and managed buildings located on and adjacent to the Columbia University campus in New York City, each of the Psychiatric Activities of NYSPI/Columbia/Presbyterian Psychiatry constitutes a Columbia University Function.  *See* Columbia Rules of Conduct, Section 441 (Definitions), accessible at *https://universitypolicies.columbia.edu/content/rules-university-conduct*.

416.    Accordingly, the Columbia Rules of Conduct, including Section 440 thereof, apply to all of the Psychiatric Activities engaged in by NYSPI/Columbia/Presbyterian Psychiatry because such Activities are conducted from Columbia University Facilities and constitute Columbia University Functions, as defined in said Rules.  *See* Columbia Rules of Conduct, Section 441 (Definitions), accessible at *https://universitypolicies.columbia.edu/content/rules-university-conduct*.

417.    In his commencement address to Columbia University's graduating class of 2017, Lee Bollinger, in his capacity as the President of Columbia University and a renowned

First Amendment scholar, emphasized the critical need for the free exchange of competing ideas,

viewpoints and opinions, especially within academia:

> "***All of this poses a very special obligation on those of us within universities. Not only must we make the case in every venue for the values that form the core of what we are and do, but we must also live up to our own principles of free inquiry and fearless engagement with all ideas***.  This is why recent incidents on a handful of college campuses disrupting and effectively censoring speakers is so alarming.  Such acts not only betray a basic principle, but also inflame a rising prejudice against the academic community, and feed efforts to delegitimize our work, at the very moment when it's most needed.  .  .  .  ***But now, in this environment especially, universities must be at the forefront of defending the rights of all students and faculty to listen to controversial voices, to engage disagreeable viewpoints, and to make every effort to demonstrate our commitment to the sort of fearless and spirited debate that we are simultaneously asking of the larger society***.  Anyone with a voice can shout over a speaker; but being able to listen to and then effectively rebut those with whom we disagree — particularly those who themselves peddle intolerance — is one of the greatest skills our education can bestow.  And it is something our democracy desperately needs more of.  That is why, I say to you now, if speakers who are being denied access to other campuses were to come here, I will personally volunteer to introduce them, and listen to them, however much I may disagree with them.  But I will also never hesitate to make clear why I disagree with them.
>
> \*  \*  \*
>
> "This much, though, should be clear as you take stock of this auspicious moment in your own life: the way you think, and speak, and engage those who will be your partners in charting the future will count for everything.  For our collective efforts to rehabilitate public discourse — a discourse that is being profoundly threatened by fear and intolerance — ultimately will have a tremendous impact in shaping the world we — and most importantly you — will live in."  Lee C. Bollinger, "2017 Commencement Address: Towards a Public Discourse Based on Tolerance, Not on Fear" (May 17, 2017) (emphasis added), accessible at *https://president.columbia.edu/content/2017-commencement-address*.

418.    In October 2017, President Bollinger reaffirmed the Columbia

community's commitment to the free exchange of competing ideas and viewpoints:

161

"We're just not going to be a place that allows speakers to be shut down or disrupted.  We're just not going to be that kind of place. . . .  The University, over many, many years, has embraced this idea that in public discussion of public issues on the campus, students invite speakers, faculty invite speakers, schools invite speakers, and so on.  *We're simply not going to let the people who are offended by the messages — even reasonably offended by the messages — to stop the speech from happening*.

\* \* \*

"Any time you're in a conversation and are like, 'Oh my God, I can't broach this, I can't take a position here,' that's where the education is.  That's what it means to be a creative, free-thinking academic.  That's why academic life is so exciting and engaging and productive.  It's because there are people who are brave enough and it puts us in a position where we have to ask ourselves, are we brave enough and how would we talk about this, how would we figure it out, and am I persuaded by this?  So I think it's a wonderful example where that is the reason for having free speech.  Very active arguing about free speech is, to me, the example — it justifies it.

\* \* \*

"It's hard to be civilized.  It's important to be civil, it's important to engage with other ideas that you don't like — that takes work.  And I think students today are no different from students 10 years ago, 20 years ago, and 30 years ago.  *I think most students, by far, understand intuitively or explicitly that they want to be challenged, that they come to a university because it's not going to be easy to think through ideas.  And then there are some, but I think a very small number who say, 'I think I've already figured out what's right and wrong, what's true and false, and my job is to advocate*.'  I don't think there are very many like that.  That's my view." *See* Aaron Holmes, "Bollinger Discusses White Nationalist Speakers, Free Speech on Campus," *Columbia Spectator* (Oct. 16, 2017) (emphasis added), accessible at *https://www.columbiaspectator.com/news /2017/10/16/transcript-bollinger-discusses-white-nationalist-speakers-free-speech-on-campus/*.

419.     John Coatsworth, the Provost of Columbia University, also championed the need for the free exchange of competing ideas and opinions in an October 17, 2017 statement addressed to "fellow members of the Columbia community."  Provost Coatsworth explained:

"*The University is committed to defend the right of all the members of our community to exercise their right to invite, listen to, and challenge speakers whose views may be offensive and even hurtful to many of us.  It is the duty of every member of the community to help preserve freedom of speech for all, including protesters*.

162

"This duty does not evaporate when the freedom we enjoy protects community members who invite speakers made famous by grotesquely unfounded and unethical attacks on people whose presence at Columbia, and in the surrounding Harlem community, contribute so much to the diversity that makes us great." *See* John H. Coatsworth, "Statement on Disrupting Speakers" (Oct. 17, 2017) (emphasis added), accessible at *https://provost.columbia.edu/news/statement-disrupting-speakers*.

420.     In a statement titled, "Our Commitment to Freedom of Expression," dated

October 29, 2021, Dennis A. Mitchell, Columbia University's Executive Vice President for

University Life, Senior Vice Provost for Faculty Advancement and Professor of Dental

Medicine, wrote:

> "***The robust exchange of ideas and viewpoints, even when uncomfortable, allow us to learn and further develop our own thinking.  The ability to hear ideas, engage with them and determine your own views is the purpose of an education.  Universities have long been the hallowed ground of new ideas and dissenting opinions, none of which would be possible without freedom of expression.  This value is at the heart of the mission of every University, and it must be protected***.

> "The University Rules of Conduct are part of the University Statutes, and were adopted by the Trustees.  The Rules maintain that '*the University is the place for received wisdom and firmly held views to be fully tested and then tested again, so that members of the University community can listen, challenge each other, and be challenged in return*.'
> *   *   *
> "I want to acknowledge what many of you may feel, this is a time of intense emotion on our campuses.  There are challenges to discuss and to overcome.  After more than 18 months away we have returned as a University community, and there is much that each of us needs to express — both in and outside of the classroom.  ***At Columbia, we expect nothing less than active participation, expression and engagement on any and every issue, especially on challenging topics***.  ***But that engagement must allow space for all opinions and never infringe on another Community member's opportunity to learn***."  *See* Dennis A. Mitchell, "Our Commitment to Freedom of Expression," Columbia University (Oct. 29, 2021) (non-boldfaced emphasis in original; boldface emphasis added), accessible at *https://universitylife.columbia.edu/news/our-commitment-freedom-expression*.

4890-9158-2565, v. 1

**D. The Individual State Actor Defendants (as Well as the Entity Defendants) Were Fully Aware That Their Punishment of Dr. Lieberman For Posting His February 19, 2022 Personal Tweet Violated His Clearly Established Right To Free Speech Under the First Amendment**

421.    For all the reasons demonstrated in detail herein, the State of New York, through NYSPI and NYS OMH, has exercised and continues to exercise coercive power over NYSPI/Columbia/Presbyterian Psychiatry for purposes of the Section 1983 Claims alleged herein.

422.    For all the reasons demonstrated in detail herein, the State of New York, through NYSPI and NYS OMH, (a) has provided and continues to provide such significant encouragement to NYSPI/Columbia/Presbyterian Psychiatry, overtly and/or covertly, including, but not limited to, through its management of, political and other influence over and funding of NYSPI/Columbia/Presbyterian Psychiatry, and (b) has created and continues to maintain such a close nexus with the other members of NYSPI/Columbia/Presbyterian Psychiatry, including, but not limited to, through its management of, political and other influence over and funding of NYSPI/Columbia/Presbyterian Psychiatry, that the choices and decisions made by NYSPI/Columbia/Presbyterian Psychiatry with respect to Dr. Lieberman, as detailed herein, have been the choices and decisions of the State of New York for purposes of the Section 1983 Claims alleged herein.

423.    For all the reasons demonstrated in detail herein, NYSPI/Columbia/Presbyterian Psychiatry is a New York State-dominated, controlled and influenced academic, clinical, research and fundraising Association whose Psychiatric Activities include, but are not

164

limited to, psychiatric research; the teaching of psychiatry; the publication of academic and medical papers, articles and books; the hospital-based and other training of psychiatric medical students; and the administration of the medical professionals, professors, adjunct professors, lecturers and other employees and staff who comprise NYSPI/Columbia/Presbyterian Psychiatry.

424.    Because NYSPI/Columbia/Presbyterian Psychiatry and each of its constituent members has been engaged at all times during the Relevant Time Period in the Psychiatric Activities, NYSPI/Columbia/Presbyterian Psychiatry and each of its constituent members has acted as a New York State-dominated, controlled and influenced academic institution to which the free-speech protections of the First Amendment apply with particular force.

425.    Because NYSPI/Columbia/Presbyterian Psychiatry is a fully-integrated, New York State-controlled and influenced academic, clinical, research and fundraising Association that conducts its Psychiatric Activities, which constitute Columbia University Functions, in Columbia University Facilities, all of the free-speech policies of Columbia University, including Section 440 of the Columbia Rules of Conduct, apply to the Psychiatric Activities of NYSPI/Columbia/Presbyterian Psychiatry.

426.    Because NYSPI/Columbia/Presbyterian Psychiatry and each of its constituent members has been engaged at all times during the Relevant Time Period in the Psychiatric Activities — including academic teaching and training of students and others, the clinical teaching and training of students and others, and the performance of clinical and other

4890-9158-2565, v. 1

research related to the mission of NYSPI/Columbia/Presbyterian Psychiatry — each of the Individual State Actor Defendants and the Entity Defendants certainly knew or should have reasonably known that NYSPI/Columbia/Presbyterian Psychiatry constitutes a New York State-dominated, controlled and influenced academic institution to which the clearly established free-speech protections of the First Amendment apply with particular force.

427.    Because NYSPI/Columbia/Presbyterian Psychiatry and each of its constituent members has been engaged at all times during the Relevant Time Period in the Psychiatric Activities that comprise Columbia University Functions — including academic teaching and training of students and others, the clinical teaching and training of students and others, and the performance of clinical and other research related to the mission of NYSPI/Columbia/Presbyterian Psychiatry — which Psychiatric Activities are conducted from Columbia University Facilities, each of the Individual State Actor Defendants and the Entity Defendants certainly knew or should have reasonably known that NYSPI/Columbia/ Presbyterian Psychiatry and each of its constituent members were and are subject to the clearly established free-speech protections adopted by Columbia University, including Section 440 of the Columbia Rules of Conduct.

428.    Because NYSPI/Columbia/Presbyterian Psychiatry and each of its constituent members has been engaged at all times during the Relevant Time Period in the Psychiatric Activities, including academic teaching and training of students and others, the clinical teaching and training of students and others, and the performance of clinical and other research related to the mission of NYSPI/Columbia/Presbyterian Psychiatry, each of the

166

Individual State Actor Defendants and the Entity Defendants certainly knew or should have reasonably known that Defendants' firing and other punishment of Dr. Lieberman in retaliation for the content of his February 19, 2022 Personal Tweet constituted an egregious violation of Dr. Lieberman's clearly established constitutional protections.

**XVI.**

**FEBRUARY 22, 2022 THROUGH FEBRUARY 28, 2022: THE
DRACONIAN PUNISHMENT IMPOSED UPON DR. LIEBERMAN
BY THE INDIVIDUAL STATE ACTOR DEFENDANTS AND
THE ENTITY DEFENDANTS IN RETALIATION FOR THE
CONTENT OF HIS FEBRUARY 19, 2022 PERSONAL TWEET**

429.    When he posted his February 19, 2022 Personal Tweet, Dr. Lieberman had no idea whatsoever that, in exercising his First Amendment rights to comment upon a public figure from his home in his personal capacity via his personal Twitter account during the evening of a holiday weekend, he was unleashing the cowardly, punitive instincts of the New York State-controlled and dominated leadership of NYSPI/Columbia/Presbyterian Psychiatry and of the Entity Defendants.

430.    As demonstrated in detail in Background Sections XVI through XXIV herein, within 72 hours or so following Dr. Lieberman's 15-word February 19, 2022 Personal Tweet (and continuing thereafter through the present), the Individual State Actor Defendants, in concert with the leadership of the Entity Defendants, launched their Unlawful Scheme against Dr. Lieberman in retaliation for the content of his Tweet for the purpose of destroying Dr. Lieberman personally and professionally, thereby advancing Defendants' overlapping political, social and academic agendas.

167

431. As demonstrated in detail in Background Sections XVI through XXIV herein, the punitive measures imposed by the Individual State Actor Defendants and the Entity Defendants through their carefully-coordinated Unlawful Scheme in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet included, but were not limited to, willfully, intentionally, wrongfully and maliciously (a) forcing Dr. Lieberman to resign as the Executive Director of NYSPI; (b) stripping Dr. Lieberman of his Chairmanship of the Columbia Medical School Department of Psychiatry; (c) removing Dr. Lieberman as Psychiatrist-in-Chief of Presbyterian/Columbia Hospital; (d) suspending Dr. Lieberman from engaging in various other academic, clinical and research activities; (e) denying Dr. Lieberman access to the buildings of NYSPI/Columbia/Presbyterian Psychiatry; (f) breaching the terms of the activities-resumption agreement that they had imposed upon Dr. Lieberman; (g) denying to Dr. Lieberman the use of grants and funds that he had been instrumental in obtaining for his clinical research on behalf of NYSPI/Columbia/Presbyterian Psychiatry; (h) humiliating Dr. Lieberman before his students, colleagues, patients and peers; and (i) ostracizing Dr. Lieberman from NYSPI/Columbia/ Presbyterian Psychiatry.

432. As demonstrated in detail in Background Sections XVI through XXIV herein, despite Dr. Lieberman's faithful and successful commitment year in and year out since 2005 to all aspects of NYSPI/Columbia/Presbyterian Psychiatry and the communities served thereby — a period during which the reputation and funding of NYSPI/Columbia/Presbyterian Psychiatry soared — the Individual State Actor Defendants, in concert with the Entity Defendants, implemented a willful, intentional and malicious Unlawful Scheme against Dr.

Lieberman in retaliation for his having exercised his rights under the First Amendment to comment upon a public figure from his home in his personal capacity via his personal Twitter account during the evening of a holiday weekend.

433.    As demonstrated in detail in Background Sections XVI through XXIV herein, through the continual perpetration of their carefully coordinated Unlawful Scheme since February 22, 2022, Defendants, in retaliation for the content of the February 19, 2022 Personal Tweet, have achieved their malicious, punitive objective of transforming Dr. Lieberman from a highly respected, world-renowned psychiatrist into a pariah.

A.    **February 22, 2022:  Dr. Lieberman Attempts**
       **To Appease Certain Misguided Twitter Users**

434.    Shortly after he posted his February 19, 2022 Personal Tweet, Dr. Lieberman became aware of certain Twitter users who appeared to misconstrue his Tweet. Given the benign content and complimentary intention of his February 19, 2022 Personal Tweet, Dr. Lieberman was stunned and deeply disappointed by this.

435.    Even though he knew that his February 19, 2022 Personal Tweet had been intended as and was indeed a spontaneous compliment to the extraordinary beauty of Ms. Gatwech, Dr. Lieberman had observed the fickle and punitive nature of contemporary Cancel Culture.

436.    Dr. Lieberman therefore resolved to delete his February 19, 2022 Personal Tweet and shut down his Twitter account, which he did on or about Monday, February 21, 2022.

Before doing so, Dr. Lieberman stated graciously: "TWEET DELETED.  My sincere apologies for any offense taken and indiscretion.  Living and learning."

437.    Little did Dr. Lieberman appreciate at this moment the egregious trauma and injustice that lay ahead for him as a result of the intended compliment of Ms. Gatwech's extraordinary beauty conveyed through his February 19, 2022 Personal Tweet.

438.    Dr. Lieberman had no inkling at this time that the Individual State Actor Defendants and the senior leadership of the Entity Defendants would conspire to extract from him increasingly self-flagellating apologies only to declare, once they had been proffered, that Dr. Lieberman must still be punished and humiliated for the content of his February 19, 2022 Personal Tweet.

439.    Dr. Lieberman's entire personal and professional life was shortly to be turned upside down.  Battered and confused, Dr. Lieberman struggled to keep afloat, as he complied robotically with the ever-changing and increasingly humiliating demands made by the Individual State Actor Defendants in concert with the senior leadership of the Entity Defendants.

B.    **By February 22, 2022, Dr. Lieberman Becomes Concerned That Defendants Might Seek To Wrongfully Reprimand or Otherwise Censure Him For Exercising His Constitutional Right To Post His February 19, 2022 Personal Tweet**

440.    By the morning of Tuesday, February 22, 2022, the first business day after the Presidents' Day Weekend, Dr. Lieberman had had time to reflect upon his February 19, 2022 Personal Tweet.  Although he believed that his Tweet had conveyed what he knew to be his

170

intended complimentary message in support of Ms. Gatwech, Dr. Lieberman was acutely aware of the proliferating news reports of persons who had been punished because their good-intentioned words had been distorted by a relatively small number of hyper-sensitive readers or listeners, who pounced upon and exploited those words for political, social and other gain.

441.    For example, *Harper's Magazine* published a piece on July 7, 2020, titled "A Letter on Justice and Open Debate" (the "***Harper's Free-Expression Letter***"), which was signed by approximately 150 writers, professors and others.  The signatories to the Harper's Free-Expression Letter included professors from the following 28 universities: Bard College; Barnard College; Brown University; Columbia University; City University of New York; Dartmouth College; Fordham University; Harvard University; Harvard Law School; Howard University; University of Illinois; Massachusetts Institute of Technology; Middlebury College; New York Law School; The New School; New York University; New York University-Stern; University of North Carolina at Chapel Hill; Northwestern University; Princeton University; Rutgers University; Smith College; University of South Alabama; Stanford Law School; Washington University in St. Louis; University of Wisconsin; Yale University; and Yeshiva University.

442.    The Harper's Free-Expression Letter observed, in part:

"[C]ensoriousness is also spreading more widely in our culture: an intolerance of opposing views, a vogue for public shaming and ostracism, and the tendency to dissolve complex policy issues in a blinding moral certainty.  *We uphold the value of robust and even caustic counter-speech from all quarters.  But it is now all too common to hear calls for swift and severe retribution in response to perceived transgressions of speech and thought.  More troubling still, institutional leaders, in a spirit of panicked damage control, are delivering hasty*

*and disproportionate punishments instead of considered reforms. Editors are fired for running controversial pieces; books are withdrawn for alleged inauthenticity; journalists are barred from writing on certain topics; professors are investigated for quoting works of literature in class; a researcher is fired for circulating a peer-reviewed academic study; and the heads of organizations are ousted for what are sometimes just clumsy mistakes. Whatever the arguments around each particular incident, the result has been to steadily narrow the boundaries of what can be said without the threat of reprisal.* We are already paying the price in greater risk aversion among writers, artists, and journalists who fear for their livelihoods if they depart from the consensus, or even lack sufficient zeal in agreement.

"This stifling atmosphere will ultimately harm the most vital causes of our time. *The restriction of debate, whether by a repressive government or an intolerant society, invariably hurts those who lack power and makes everyone less capable of democratic participation. The way to defeat bad ideas is by exposure, argument, and persuasion, not by trying to silence or wish them away. We refuse any false choice between justice and freedom, which cannot exist without each other. As writers we need a culture that leaves us room for experimentation, risk taking, and even mistakes. We need to preserve the possibility of good-faith disagreement without dire professional consequences.* If we won't defend the very thing on which our work depends, we shouldn't expect the public or the state to defend it for us." *See* "A Letter on Justice and Open Debate," *Harper's Magazine* (July 7, 2020) (emphasis added), accessible at *https://harpers.org/a-letter-on-justice-and-open-debate/.*

443.     Among those who signed the Harper's Free-Expression Letter quoted in the immediately preceding paragraph were the following persons affiliated with Columbia University and Barnard College (the latter of which, upon information and belief, is an independently incorporated educational institution and an official college of Columbia University):  Professor Sheri Berman of Barnard College; Professor John McWhorter of Columbia University; the late Professor Todd Gitlin of Columbia University; Professor Kian Tajbakhsh of Columbia University; and Andrew Solomon, Ph.D., a writer and lecturer on

172

politics, culture and psychology and Professor of Clinical Medical Psychology (in Psychiatry) at Columbia Medical School.

444.     In October 2021, *The Atlantic* published an article by Anne Applebaum addressing the toxicity of Cancel Culture.  *See* Anne Applebaum, "The New Puritans," *The Atlantic* (article dated Aug. 31, 2021; published in the Oct. 2021 Issue) ("***The Atlantic New Puritan Article***"), accessible at *https://www.theatlantic.com/magazine/archive/2021/10/new-puritans-mob-justice-canceled/619818/*.

445.     In The Atlantic New Puritan Article, the author explained:

"[T]he modern online public sphere, a place of rapid conclusions, rigid ideological prisms, and arguments of 280 characters, favors neither nuance nor ambiguity.  Yet ***the values of that online sphere have come to dominate many American cultural institutions: universities, newspapers, foundations, museums.  Heeding public demands for rapid retribution, they sometimes impose the equivalent of lifetime scarlet letters on people who have not been accused of anything remotely resembling a crime.  Instead of courts, they use secretive bureaucracies.  Instead of hearing evidence and witnesses, they make judgments behind closed doors***.

"I have been trying to understand these stories for a long time, both because I believe that the principle of due process underpins liberal democracy, and also because they remind me of other times and places.  A decade ago, I wrote a book about the Sovietization of Central Europe in the 1940s, and found that much of the political conformism of the early Communist period was the result not of violence or direct state coercion, but rather of intense peer pressure.  Even without a clear risk to their life, people felt obliged — not just for the sake of their career but for their children, their friends, their spouse — to repeat slogans that they didn't believe, or to perform acts of public obeisance to a political party they privately scorned. . . .

\* \* \*

". . . How many American manuscripts now remain in desk drawers — or unwritten altogether — because their authors fear a similarly arbitrary judgment? ***How much intellectual life is now stifled because of fear of what a poorly***

173

*worded comment would look like if taken out of context and spread on Twitter?*"  (Emphasis added.)

446.    The author of The Atlantic New Puritan Article proceeded to make the following observations:

"*Here is the first thing that happens once you have been accused of breaking a social code, when you find yourself at the center of a social-media storm because of something you said or purportedly said.  The phone stops ringing.  People stop talking to you.  You become toxic*. . . .
* * *
"*Here is the second thing that happens, closely related to the first:  Even if you have not been suspended, punished, or found guilty of anything, you cannot function in your profession*. . . .
* * *
"Sometimes advocates of the new mob justice claim that these are minor punishments, that the loss of a job is not serious, that people should be able to accept their situation and move on.  But *isolation plus public shaming plus loss of income are severe sanctions for adults, with long-term personal and psychological repercussions — especially because the 'sentences' in these cases are of indeterminate length.  [One person interviewed for the article] contemplated suicide, and has written that 'every first-hand account I've read of public shaming — and I've read more than my share — includes thoughts of suicide*.' . . .

"Others have changed their attitudes toward their professions. 'I wake up every morning afraid to teach,' one academic told me:  The university campus that he once loved has become a hazardous jungle, full of traps.  Nicholas Christakis, the Yale professor of medicine and sociology who was at the center of a campus and social-media storm in 2015, is also an expert on the functioning of human social groups.  He reminded me that *ostracism 'was considered an enormous sanction in ancient times — to be cast out of your group was deadly.'  It is unsurprising, he said, that people in these situations would consider suicide*."  (Emphasis added.)

447.    Another astute observer of society and language who has addressed the pernicious effects of Cancel Culture is John McWhorter, a Professor at Columbia University.

174

448.    According to Columbia University's website:  "Professor McWhorter has taught the seminar 'Language in America,' a study of American linguistic history that considers Native American languages, immigrant languages, creole languages, American Sign Language, Black English and other speech varieties — their development, interactions, and preservation. He has also taught the seminar 'Language Contact,' which focuses specifically on the mixture of language in North America, and studies the development of creoles, pidgins, koines, 'vehicular' languages, and nonstandard dialects.  Both seminar[s] consider perceived legitimacy of languages, and the standing of language mixtures in media and education.  Professor McWhorter also teaches various other courses for the Linguistics Program and Music Humanities for the Core Curriculum program."  *See https://americanstudies.columbia.edu/people/john-h-mcwhorter.*

449.    Columbia University's website also states:  "Professor McWhorter is an author of more than twenty books including *The Power of Babel: A Natural History of Language, Losing the Race: Self Sabotage in Black America* and *Our Magnificent Bastard Tongue: The Untold History of English.*  In 2016 he published *Words on the Move: Why English Won't - and Can't - Sit Still (Like, Literally),* while in 2021 he published *Nine Nasty Words* and *Woke Racism.*"  *See https://americanstudies.columbia.edu/people/john-h-mcwhorter.*

450.    In *Woke Racism: How a New Religion Has Betrayed Black America* (Penguin Random House 2021), Professor McWhorter addressed the toxicity of Cancel Culture. Among others examples, Professor McWhorter noted the unjust cancellation of Alison Roman, then a food writer for the *New York Times* (*see* Mackenzie Nichols, "Alison Roman's New York

175

Times Column on Hold Following Chrissy Teigen Controversy," *Variety* (May 20, 2020),

accessible at *https://variety.com/2020/biz/news/alison-roman-new-york-times-leave-chrissy-*

*teigen-controversy-1234611860/*), and Leslie Neal-Boylan, then Dean of Nursing at the

University of Massachusetts Lowell (*see* Madison Dibble, "Dean of Massachusetts Nursing

School Fired After Saying 'Everyone's Life Matters,'" *Washington Examiner* (July 2, 2020),

accessible at *https://www.washingtonexaminer.com/news/dean-of-massachusetts-nursing-school-*

*fired-after-saying-everyones-life-matters*).

451.    Professor McWhorter noted that Alison Roman was suspended by the

*Times*, punished and ostracized for the "sin" of having "passingly criticized two people for

commercialism, model and food writer Chrissy Teigen and lifestyle coach Marie Kondo.  Roman

was Twitter-mobbed for having the nerve, as a white woman, to criticize two women of color

[one of whom, Ms. Teigen "is half white and half Thai"; the other, Ms. Kondo "is a Japanese

citizen"].  . . .  Roman, now typical of such cases, ate crow with an apologetic statement[.]  . . .

Her Wikipedia entry will now forever include a notice that she was deemed a racist, billboard

style, despite that most Americans likely see that she did nothing that remotely deserved such

treatment[.]"

452.    Professor McWhorter observed that "Leslie Neal-Boylan lasted only a few

months as dean of nursing at the University of Massachusetts Lowell" after expressing her

concern over racism and noting that "Black Lives Matter, but also, everyone's life matters"

(upper-case lettering omitted).

176

453.     Dr. Lieberman therefore began to wonder whether the leadership of NYSPI/Columbia/Presbyterian Psychiatry (as well as of the Entity Defendants) might conceivably seize upon and misconstrue his February 19, 2022 Personal Tweet as a basis for some type of informal or formal reprimand.

454.     Dr. Lieberman's concern in this regard was heightened by his recognition that 2022 was an election year.  Upon information and belief, New York Governor Kathy Hochul, who had ascended from Lieutenant Governor to Governor in late August 2021 upon the resignation of Governor Andrew Cuomo, had at or about that time also announced her intention to seek election to her own full gubernatorial term in November 2022.

455.     Commentators and others had acknowledged the need for Governor Hochul to make a strong showing among Black voters in the upcoming Democrat primary and in the November 2022 general election.  A February 2022 Siena College Poll revealed that "[New York City Public Advocate and competing gubernatorial candidate Jumaane] Williams has a narrow 39-32% lead over [Governor Kathy] Hochul with Black voters[.]"  *See* Siena College Poll, Siena Research Institute (Feb. 22, 2022), accessible at *https://scri.siena.edu/wp-content/uploads/2022/03/SNY-February-2022-Poll-Release-2-22-22-FINAL.pdf*.

456.     Subsequently, a *New York Times* piece provided the following analysis of Governor Hochul's electoral prospects:

"From the moment she took office, Gov. Kathy Hochul set out to shore up her standing with an important constituency.

"She named Brian A. Benjamin, a Black Democratic state senator from Harlem, as her lieutenant governor, and held a celebratory news conference on 125th Street in Harlem to announce it.  She spoke from the pulpits of Black churches around the city, including Abyssinian Baptist Church.

"The strategy seemed to work:  Ms. Hochul, a white moderate from Buffalo, picked up early support from a wide range of Black leaders.

"Yet nearly seven months into her tenure, some New York Democrats are concerned that she has not been able to use those endorsements to generate much enthusiasm among Black voters, a key voting bloc.

"Ms. Hochul could win the primary even with a muted showing from Black voters, but if they don't turn out in November to support her, the race for governor could be tighter, and problems could emerge for other Democrats down the ballot.

"A Siena College poll released Monday found that if Ms. Hochul's predecessor, former Gov. Andrew M. Cuomo, entered the primary race, he would lead her among Black voters by 50 percent to 23 percent, although she leads him overall among registered Democrats by eight points, the poll found.

"But the poll found that if Mr. Cuomo stayed out, Ms. Hochul led a Black candidate, Jumaane Williams, the New York City public advocate, among Black voters by a margin of 39 percent to 17 percent — a reversal from a February Siena poll in which she trailed Mr. Williams."  *See* Jeffery C. Mays, "Will Black Democratic Voters Turn Out for Gov. Hochul?" *New York Times* (March 28, 2022), accessible at *https://www.nytimes.com/2022/03/28/nyregion/black-voters-kathy-hochul.html*.

457.    By the time he awoke on the morning of Tuesday, February 22, 2022, Dr. Lieberman was therefore concerned that, as utterly unfounded and wrongful as it would be, the leadership of NYS OMH and NYSPI, in conjunction with certain persons in the Governor's Office (Chambers) and the leadership of the Entity Defendants, might try to use the content of Dr. Lieberman's benign February 19, 2022 Personal Tweet for political purposes.

4890-9158-2565, v. 1

458.    More specifically, it crossed Dr. Lieberman's mind at this time that, as utterly unfounded and wrongful as it would be, the Individual State Actor Defendants might seek to reprimand or censure Dr. Lieberman for the content of his February 19, 2022 Personal Tweet as a form of virtue-signaling designed to curry favor with Black voters on behalf of Governor Hochul.

459.    It also crossed Dr. Lieberman's mind that, as utterly unfounded and wrongful as it would be, the leadership of the Entity Defendants, bowing to the State's influence and control of NYSPI and NYS OMH, might then similarly seek to reprimand or censure him for the content of his February 19, 2022 Personal Tweet.

460.    What Dr. Lieberman did not know when he awoke on the morning of Tuesday, February 22, 2022, was that, while his concern that the Individual State Actor Defendants and the Entity Defendants might seek to reprimand or censure him in some way for the content of his February 19, 2022 Personal Tweet was well-founded, he had dramatically underestimated the brutality and swiftness of the orchestrated punishment that awaited him at the hands of Defendants.

461.    When he awoke on the morning of Tuesday, February 22, 2022, Dr. Lieberman certainly did not anticipate that, by that evening, the Individual State Actor Defendants, in concert with the leadership of the Entity Defendants, would have destroyed his personal and professional reputations, forced him to resign from NYSPI and torpedoed his distinguished career at NYSPI/Columbia/Presbyterian Psychiatry (and elsewhere in his beloved

179

field of psychiatry) and that the Entity Defendants, in concert with and following the lead of the

Individual State Actor Defendants, would impose additional coordinated punishments

immediately thereafter.

**C.      Tuesday, February 22, 2022:  The Longest, Most Unjust and
Most Crushing Day of Dr. Lieberman's Professional Life**

462.    On Tuesday morning, February 22, 2022, reeling from the concerns

addressed in Background Section XVI(B), immediately above, Dr. Lieberman decided that the

best course of action would be to address those concerns head-on.  To this end, he decided to

immediately inform the leadership team of NYSPI/Columbia/Presbyterian Psychiatry of his

February 19, 2022 Personal Tweet to ensure that everyone would be on the same page with

respect to any follow-up steps that might be deemed appropriate.

463.    In his role as the head of NYSPI/Columbia/Presbyterian Psychiatry, it was

Dr. Lieberman's style to address potential issues directly and quickly before they metastasized

into larger issues.  Accordingly, on the morning of Tuesday, February 22, 2022, Dr. Lieberman

contacted the key leadership members of NYSPI/Columbia/Presbyterian Psychiatry to address

his February 19, 2022 Personal Tweet.

464.    The many meetings and other communications in which Dr. Lieberman

participated on Tuesday, February 22, 2022, in connection with the February 19, 2022 Personal

Tweet include those addressed below.

180

(i)    **Dr. Lieberman's February 22, 2022**
       **Morning Meeting With His Vice Chairs**

465.    In the early morning of Tuesday, February 22, 2022, Dr. Lieberman, using

his "nyspi.columbia.edu" e-mail address (the same e-mail address used by most, if not all, of the

members of NYSPI/Columbia/Presbyterian Psychiatry), sent an e-mail to, among others, his

Vice Chairs in the Columbia Medical School Department of Psychiatry, at their respective

"nyspi.columbia.edu" e-mail addresses, scheduling an urgent meeting for later that morning to

discuss the February 19, 2022 Personal Tweet (the "***February 22, 2022 Vice Chairs Meeting***").

466.    On Tuesday, February 22, 2022, at approximately 10:00 a.m., Dr.

Lieberman hosted his February 22, 2022 Vice Chairs Meeting.  After Dr. Lieberman discussed

with the attendees his February 19, 2022 Personal Tweet and explained that he wanted to address

and put to rest any issues relating thereto with respect to NYSPI/Columbia/Presbyterian

Psychiatry, certain attendees, including Dr. Simpson, urged Dr. Lieberman to circulate a

preemptive detailed apology to NYSPI/Columbia/Presbyterian Psychiatry.

467.    Initially, Dr. Lieberman was perplexed by this advice.  First, he knew that

his February 19, 2022 Personal Tweet was intended as and, fairly read, was indeed an

enthusiastic compliment to Ms. Gatwech's extraordinary beauty.  Second, he had already very

graciously shut down his Twitter account and expressed regret in response to certain Twitter

users who had misconstrued his words, declaring at the time he deleted the February 19, 2022

Personal Tweet:  "TWEET DELETED.  My sincere apologies for any offense taken and

indiscretion.  Living and learning."

181

468.     Despite his misgivings, Dr. Lieberman was pressured by certain of his Vice Chairs and staff, including Dr. Simpson, who insisted that they knew better than he how to deal with such a situation and that nothing less than a full-throated, self-abasing apology would suffice.  Indeed, in providing such advice, these Vice Chairs and staff members suggested adamantly that, if Dr. Lieberman did not immediately fall on his sword in the most groveling apology, he was likely to face withering condemnation and serious punishment from NYSPI/Columbia/Presbyterian Psychiatry.

469.     Upon listening to certain of his Vice Chairs and staff members during the February 22, 2022 Vice Chairs Meeting, including Dr. Simpson, it crossed Dr. Lieberman's mind for the first time that, rather than being subjected to some wholly unwarranted, but ultimately benign, reprimand for exercising his First Amendment right to post his February 19, 2022 Personal Tweet, he was facing the increasingly real possibility that the leadership of NYSPI/Columbia/Presbyterian Psychiatry might actually seize upon the content of his Tweet in an attempt to destroy Dr. Lieberman's well-earned reputation and stellar career — *i.e.*, to take away from him everything he had worked so hard to achieve on behalf of NYSPI/Columbia/ Presbyterian Psychiatry as its operational leader since 2005.  This realization sent a shiver up Dr. Lieberman's spine.

470.     Trapped in an accelerating, surreal nightmare, Dr. Lieberman was seized by a rising panic.  He contemplated the unthinkable and wholly unjustified potential destruction of his personal and professional reputation — all as a result of a 15-word Tweet that had been intended as an enthusiastic compliment to an internationally-renowned fashion model known as

4890-9158-2565, v. 1

Queen of the Dark, whose extraordinary beauty had been so casually called to Dr. Lieberman's attention by his wife during a period of relaxation and leisure at their home on a Saturday evening of a holiday weekend.

471.    Despite his initial out-of-body experience — the feeling that this could not actually be happening to him — it finally dawned on Dr. Lieberman with sobering clarity that his February 19, 2022 Personal Tweet could make him an attractive target for retribution.  It became clearer to him that he was now potentially at risk for some type of sanction at the hands of those whose *modus operandi* is to deliberately distort the words of others to manufacture an offensive meaning in response to which they and/or their allied groups and persons can claim to have been victimized and then use their purported victimization to justify the destruction of the speaker to advance their own political, social and other agendas (the "***Opportunistic Censors***").

472.    Accordingly, believing that there was no viable alternative, Dr. Lieberman capitulated reluctantly to the adamant recommendation of certain of his Vice Chairs and staff members, including Dr. Simpson, that he issue a much more dramatically obsequious apology to satisfy the Opportunistic Censors.

473.    It was decided at the February 22, 2022 Vice Chairs Meeting that certain Vice Chairs and staff members, including Dr. Simpson, would draft the language that they believed was required to be circulated to NYSPI/Columbia/Presbyterian Psychiatry by or on behalf of Dr. Lieberman later that day.

183

474.    At this tumultuous, panic-inducing moment, Dr. Lieberman failed to recall

or appreciate the sage observations set forth in The Atlantic New Puritan Article with respect to

futile attempts to apologize one's way out of the situation that was beginning to engulf him.  In

that October 2021 issue of the magazine, the author of The Atlantic New Puritan Article wrote:

> "The third thing that happens is that you try to apologize, whether or not you have
> done anything wrong.
>
>         \*    \*    \*
>
> "Not that everyone really wants an apology.  One former journalist told me that
> his ex-colleagues 'don't want to endorse the process of mistake/apology/
> understanding/forgiveness — they don't want to forgive.'  Instead, he said, they
> want 'to punish and purify.'  But the knowledge that whatever you say will never
> be enough is debilitating.  'If you make an apology and you know in advance that
> your apology will not be accepted — that it is going to be considered a move in a
> psychological or cultural or political game — then the integrity of your
> introspection is being mocked and you feel permanently marooned in a world of
> unforgivingness,' one person told me.  'And that is a truly unethical world.'"

475.    Dr. Simpson played a significant role in shaping the tone and content of

the apology that was to be circulated on Dr. Lieberman's behalf on the afternoon of Tuesday,

February 22, 2022.

476.    Upon information and belief, Dr. Simpson recognized and fully intended

that the apology that was being drafted would destroy Dr. Lieberman's career.  Indeed, soon after

the circulation of said apology, Dr. Simpson was tapped by the leadership of NYSPI/Columbia/

Presbyterian Psychiatry to fill (on an interim basis that continues to date) each of the three

leadership roles at NYSPI/Columbia/Presbyterian Psychiatry from which Dr. Lieberman was

summarily removed.

184

**(ii)     Interim Dean Rustgi Cancels a Scheduled Zoom
Meeting With Dr. Lieberman and Others on the
Morning of February 22, 2022**

477.     On the morning of Tuesday, February 22, 2022, Dr. Lieberman received a

Zoom calendar invitation from Dr. Anil Rustgi, Interim Dean of the Columbia Medical School,

to join a 10:30 a.m. meeting with Dr. Rustgi, Donna Lynne, the Chief Operating Officer of

Columbia University Medical Center, and Dr. Anne Taylor, Vice Dean of Academic Affairs at

Columbia University Medical Center.

478.     Upon information and belief, sometime prior to the commencement of the

10:30 a.m. Zoom meeting referenced in the immediately preceding paragraph, above, Interim

Dean Rustgi learned of the February 19, 2022 Personal Tweet from certain of the NYSPI/

Columbia/Presbyterian Psychiatry leadership members to whom Dr. Lieberman had already

communicated that morning.  Although Dr. Lieberman and the other intended participants had

accepted Dr. Rustgi's Zoom invitation, the meeting was cancelled without explanation by Dr.

Rustgi.

479.     Dr. Lieberman viewed Interim Dean Rustgi's cancellation of his scheduled

Zoom meeting as an ominous sign that the Entity Defendants had decided to sit on the sidelines

and not engage with Dr. Lieberman until NYSPI, NYS OMH and, ultimately, the Governor's

Office decided whether the apology that his team was drafting was sufficient to put an end to the

matter.

4890-9158-2565, v. 1

### (iii)   Dr. Lieberman's February 22, 2022 Morning
### Telephone Conversation With Dr. Smith

480.    Also in the early morning of February 22, 2022, Dr. Lieberman sent an

e-mail to Dr. Smith (at his "nyspi.columbia.edu" e-mail address), asking if he could telephone

Dr. Smith to discuss an "urgent matter[,]" which was a reference to the February 19, 2022

Personal Tweet.

481.    On February 22, 2022, at approximately 8:29 a.m., Dr. Smith responded

via e-mail to Dr. Lieberman, providing his cell number at which Dr. Lieberman could reach him.

482.    Sometime later in the morning of Tuesday, February 22, 2022, after

concluding the February 22, 2022 Vice Chairs Meeting, Dr. Lieberman spoke by telephone with

Dr. Smith, who then served in multiple roles, including Chief Medical Officer of NYS OMH (the

"*First February 22, 2022 Lieberman-OMH Telephone Conversation*").

483.    During the First February 22, 2022 Lieberman-OMH Telephone

Conversation, Dr. Lieberman addressed with Dr. Smith the February 19, 2022 Personal Tweet

(of which Dr. Smith had already been made aware, presumably by others with whom Dr.

Lieberman had communicated that morning), Dr. Lieberman's earlier February 22, 2022 Vice

Chairs Meeting and the apology that certain members of his team had set about to draft.

484.    During the First February 22, 2022 Lieberman-OMH Telephone

Conversation, Dr. Smith told Dr. Lieberman, in words or substance, that NYSPI and NYS OMH

were aware of his February 19, 2022 Personal Tweet and, provided Dr. Lieberman circulated the

apology that his team was drafting and committed to some type of "sensitivity" training, Dr. Smith and Dr. Sullivan were supportive of Dr. Lieberman's continuing in his current leadership role, unless the Governor's Office (Chambers) directed otherwise.

485.    Dr. Lieberman understood Dr. Smith to be telling him during the First February 22, 2022 Lieberman-OMH Telephone Conversation that he, Dr. Smith, did not feel that Dr. Lieberman's February 19, 2022 Personal Tweet warranted any punishment and, if NYSPI, NYS OMH and, ultimately, the Governor's Office were satisfied with the apology that was being prepared, that would be the end of the matter.

486.    Upon concluding the First February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Lieberman was deeply disappointed, upset and insulted that anyone would try to cast a negative gloss upon his complimentary February 19, 2022 Personal Tweet — and continued to believe that he had a protected constitutional right to post his well-intentioned Tweet.

487.    Upon concluding the First February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Lieberman struggled with ambivalent feelings.  On the one hand, Dr. Lieberman was pleased to hear that Dr. Smith and Dr. Sullivan supported his continued leadership of NYSPI/Columbia/Presbyterian Psychiatry.  On the other hand, Dr. Lieberman was distressed to hear that, as a result of the content of his February 19, 2022 Personal Tweet, his continued leadership of NYSPI/Columbia/Presbyterian Psychiatry was actually in doubt.

187

488.    Upon concluding the First February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Lieberman, still reeling from the fact that anyone would seek to twist his complimentary February 19, 2022 Personal Tweet into something negative, decided to bite his tongue and accept virtually any apology that his team drafted for him because, based upon his understanding of Dr. Smith's statements to him, such an apology would put an end to the matter.

489.    Accordingly, during the next few hours following the First February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Lieberman was of the belief that circulating the apology that his team was drafting would put this matter behind him and allow his Vice Chairs, staff and him to refocus on the mission of NYSPI/Columbia/Presbyterian Psychiatry.

490.    Unfortunately, Dr. Lieberman's cautiously optimistic belief that circulating the apology that his team was drafting would put this matter behind him was to be short-lived.

491.    Dr. Lieberman would learn the very painful, dispiriting lesson that, as a general matter, no amount of apologizing for well-intentioned comments will ever satisfy the Opportunistic Censors who have resolved to twist such words beyond recognition to serve their own political, social and other agendas.

**(iv)    Sometime in the Early Afternoon of February 22, 2022:
Dr. Lieberman's Team Provides Him With a Recommended
Apology To Be Circulated To NYSPI/Columbia/Presbyterian
Psychiatry**

492.    As noted, Dr. Simpson played a significant role in shaping the tone and content of the apology that was to be circulated on Dr. Lieberman's behalf on the afternoon of Tuesday, February 22, 2022.

188

493.     Sometime in the early afternoon of Tuesday, February 22, 2022, Dr.

Lieberman's team provided him with the proposed apology that they had drafted for him (the

"*February 22, 2022 Vice Chairs Apology*").

494.     When Dr. Lieberman read the February 22, 2022 Vice Chairs Apology, he

was flabbergasted by its tone and content.  It was more self-degrading than anything Dr.

Lieberman had ever imagined his team would draft.

495.     The February 22, 2022 Vice Chairs Apology that was presented to Dr.

Lieberman for circulation read as follows:

"Dear Friends and Colleagues:

"Yesterday, I tweeted from my personal account a message that was racist and
sexist.  Prejudices and stereotypical assumptions that I didn't know I harbored
have been exposed — to myself and to you — and I'm profoundly sorry and
deeply ashamed.

"I have participated in the many efforts of Columbia University, including by the
medical faculty, the New York State Office of Mental Health, and NewYork-
Presbyterian to root out discrimination at all levels.  And although tackling
unconscious bias is an ongoing part of these efforts, it starts internally.  An
apology from me to the Black community, to women, and to all of you is not
enough.  I've hurt many and failed to exemplify the values and behavior in which
I fervently believe and try to embody.  I am just beginning the soul-searching
process needed and to understand the work ahead needed to make the personal
changes necessary over time to regain your trust.

"In the meantime, I have temporarily shut down my social media accounts, while
I seek counsel from others.  I want to meet with as many of you in the days and
weeks ahead who would find that helpful, creating safe spaces for you to share
your thoughts and questions and to outline next steps."

496.     Dr. Lieberman believed that the opening sentence of the February 22,

2022 Vice Chairs Apology was inaccurate in all material respects.  Contrary to the statements

contained therein, Dr. Lieberman did not believe for one second that his February 19, 2022 Personal Tweet was in any way whatsoever "racist."  Indeed, Dr. Lieberman knew that his Tweet was intended to, and, fairly read, most certainly did, communicate his enthusiastic compliment of and support for an internationally-renowned fashion model whose extraordinarily dark complexion — which had prompted her to embrace proudly the nickname Queen of the Dark — had been the focus of the Original Gatwech Tweet to which Dr. Lieberman responded.

497.    Contrary to the statements contained in the February 22, 2022 Vice Chairs Apology, Dr. Lieberman also knew that his February 19, 2022 Personal Tweet was certainly not "sexist."  Prompted by his wife's having called to his attention the stunning photo of Ms. Gatwech that was included in the Original Gatwech Tweet, Dr. Lieberman's Tweet intended to, and, fairly read, most certainly did, communicate his enthusiastic compliment to and support for an internationally-renowned fashion model whose career is premised upon generating interest in and appreciation for, among her other attributes, her physical beauty.

498.    Contrary to the statements contained in the second sentence of the February 22, 2022 Vice Chairs Apology, Dr. Lieberman did not believe that his February 19, 2022 Personal Tweet reflected any "[p]rejudices and stereotypical assumptions" that he harbored and for which he should be "deeply ashamed."

499.    Nor did Dr. Lieberman believe that, as stated in the February 22, 2022 Vice Chairs Apology, his February 19, 2022 Personal Tweet had somehow "failed to exemplify the values and behavior in which" he "fervently believe[s] and tr[ies] to embody."

190

500.    Although Dr. Lieberman was extremely upset by the tone and content of the February 22, 2022 Vice Chairs Apology, he was acutely aware that he was running out of time and therefore the Apology, as utterly flawed as it was, would have to be circulated soon.

501.    By the early afternoon of Tuesday, February 22, 2022, Dr. Smith had contacted Dr. Lieberman by e-mail to schedule a follow-up telephone conversation with Dr. Lieberman and Dr. Sullivan, Dr. Smith and Ms. Tashjian for the late afternoon/early evening of February 22, 2022.

502.    Dr. Lieberman therefore recognized that the February 22, 2022 Vice Chairs Apology would have to be circulated to NYSPI/Columbia/Presbyterian Psychiatry as soon as possible that afternoon — certainly prior to the scheduled late afternoon/early evening call with Dr. Sullivan, Dr. Smith and Ms. Tashjian — to blunt any inclination among the Opportunistic Censors, including the Individual State Actor Defendants and the senior leadership of the Entity Defendants, to take punitive action against Dr. Lieberman.

503.    In the early afternoon of Tuesday, February 22, 2022, conscious that the clock was ticking with respect to circulating the February 22, 2022 Vice Chairs Apology to NYSPI/Columbia/Presbyterian Psychiatry, Dr. Lieberman sought the input of a few persons with respect to said Apology.

504.    For example, in the early afternoon of Tuesday, February 22, 2022, Dr. Lieberman arranged to provide the February 22, 2022 Vice Chairs Apology to Columbia Medical School Interim Dean Rustgi, asking for his comments.  Consistent with Dr. Rustgi's apparent

191

strategy to remain on the sideline until he could take his cue from NYSPI and NYS OMH, with which the leadership members of the Entity Defendants, including Dr. Rustgi, were working in concert, Dr. Rustgi ignored Dr. Lieberman's request for comments.

505.   In the early afternoon of Tuesday, February 22, 2022, Dr. Lieberman also sent the February 22, 2022 Vice Chairs Apology to Andrew Solomon, who, as noted, was then, among other things, a Professor of Clinical Psychology at Columbia Medical School.  In response, Professor Solomon provided certain proposed edits, suggesting that Dr. Lieberman "not exaggerate the self-abasement, which sounds a little mawkish to me."

506.   Among the marked revisions suggested by Professor Solomon to the February 22, 2022 Vice Chairs Apology were the following changes to the opening sentence: "Yesterday, I tweeted from my personal account a message that ~~was~~ has been construed as racist and sexist, though that was certainly not my intention."

507.   In the early afternoon of Tuesday, February 22, 2022, Dr. Lieberman also sought comments to the February 22, 2022 Vice Chairs Apology from Christopher DiFrancesco, the Chief Communications Officer for Columbia Medical School.  Mr. DiFrancesco, apparently having been instructed by Interim Dean Rustgi to remain on the sideline until the Entity Defendants received their marching orders from the Individual State Actor Defendants with whom they were working in concert, did not respond to Dr. Lieberman's request for comments.

508.    Given the frenetic, crisis mode in which he and his Department were operating on Tuesday, February 22, 2022, Dr. Lieberman had no time to consider, much less adopt, any of Professor Solomon's proposed changes to the February 22, 2022 Vice Chairs Apology.

509.    Indeed, because of the time pressure under which he was working, and given that he had decided reluctantly to circulate whatever apology his team prepared, Dr. Lieberman did not even notice that the first word of the February 22, 2022 Vice Chairs Apology suggested mistakenly that his February 19, 2022 Personal Tweet had been posted "[y]esterday" — February 21, 2022.

510.    By early afternoon of Tuesday, February 22, 2022, Dr. Lieberman had still not received any feedback from Interim Dean Rustgi to the proposed February 22, 2022 Vice Chairs Apology.  Moreover, Dr. Lieberman was scheduled to speak by telephone just a few hours later with certain of the Individual State Actor Defendants, Dr. Sullivan, Dr. Smith and Ms. Tashjian.

511.    Accordingly, Dr. Lieberman's staff arranged for the circulation of the February 22, 2022 Vice Chairs Apology at approximately 2:59 p.m. on Tuesday, February 22, 2022, via an e-mail from the "Director's Office" of NYSPI, with the following subject line: "A Message from Dr. Jeffrey Lieberman."

4890-9158-2565, v. 1

**(v)     The Close of Business on February 22, 2022:  Dr. Lieberman Decides To Take From His Home the Upcoming Telephonic Conference With Certain of the Individual State Actor Defendants**

512.     By the close of business on Tuesday, February 22, 2022, Dr. Lieberman was physically and emotionally drained.  The matters surrounding his February 19, 2022 Personal Tweet had consumed virtually every minute of his anxiety-ridden day.

513.     The February 22, 2022 Vice Chairs Apology having been circulated, Dr. Lieberman turned his attention to his upcoming telephone conference with Dr. Sullivan, Dr. Smith and Ms. Tashjian.

514.     Dr. Lieberman decided that he would take his upcoming call with Dr. Sullivan, Dr. Smith and Ms. Tashjian from his home.

515.     In light of the First February 22, 2022 Lieberman-OMH Telephone Conversation, during which Dr. Smith had assured Dr. Lieberman that a robust apology would likely suffice in putting this matter to rest, unless the Governor's Office directed otherwise, Dr. Lieberman wanted to ensure that, prior to their evening call, Dr. Sullivan, Dr. Smith and Ms. Tashjian had seen the February 22, 2022 Vice Chairs Apology.

516.     Therefore, before leaving his office on the evening of Tuesday, February 22, 2022, Dr. Lieberman e-mailed to Dr. Sullivan, Dr. Smith and Ms. Tashjian an apology that tracked materially the February 22, 2022 Vice Chairs Apology.

194

517.     Before e-mailing the February 22, 2022 Vice Chairs Apology to Dr. Sullivan, Dr. Smith and Ms. Tashjian at about 5:36 p.m. on Tuesday, February 22, 2022, Dr. Lieberman made a few corrections and clarifications, including, among other things, adding a new first paragraph noting "how seriously this incident has affected me" and clarifying that his February 19, 2022 Personal Tweet was posted "[s]everal days ago[.]"

518.     As he left his office to make his way home on that breezy winter evening of Tuesday, February 22, 2022, Dr. Lieberman, emotionally and physically exhausted, believed that the worst was now behind him.  He looked forward to his upcoming call with Dr. Sullivan, Dr. Smith and Ms. Tashjian later that evening as the final step in putting these traumatic events to rest and moving forward with the important work of NYSPI/Columbia/Presbyterian Psychiatry.

519.     What Dr. Lieberman did not know as he traveled back home on the evening of Tuesday, February 22, 2022, is that, tragically, his already long, exhausting day was about to get dramatically worse.

520.     As he traveled back home on the evening of Tuesday, February 22, 2022, Dr. Lieberman did not know that the Individual State Actor Defendants, in close coordination with the Governor's Office and the leadership of the Entity Defendants, had already decided that, in retaliation for the content of his February 19, 2022 Personal Tweet, Dr. Lieberman was to be sacrificed to advance their overlapping political, social and academic agendas.

521.    On that winter evening of Tuesday, February 22, 2022, as he headed home to participate in the telephone conference with Dr. Sullivan, Dr. Smith and Ms. Tashjian, which he believed would be the final step in putting this matter behind him, Dr. Lieberman was blithely unaware that, in retaliation for the content of his February 19, 2022 Personal Tweet, the Individual State Actor Defendants and the Entity Defendants had already conspired — and begun — to implement their willful, intentional and malicious Unlawful Scheme against him.

522.    As he traveled home on the evening of Tuesday, February 22, 2022, Dr. Lieberman was unaware that the Unlawful Scheme that Defendants had coordinated, choreographed and approved among themselves was designed to, among other things, (a) destroy Dr. Lieberman's personal and professional reputations; (b) eviscerate Dr. Lieberman's career at NYSPI/Columbia/Presbyterian Psychiatry; (c) scapegoat and further humiliate Dr. Lieberman before his patients, colleagues, students, Hospital residents, peers and donors; (d) promote Dr. Simpson, one of the chief proponents and architects of the February 22, 2022 Vice Chairs Apology, by naming her to fill (on an interim basis that continues to date) the NYSPI/ Columbia/Presbyterian Psychiatry leadership roles that Defendants would force Dr. Lieberman to vacate; and (e) take affirmative steps to manufacture a sense of aggrievement among the community members of NYSPI/Columbia/Presbyterian Psychiatry and the Entity Defendants in an effort to justify Defendants' punitive retaliatory measures against Dr. Lieberman for the purpose of currying favor with the Targeted Constituencies to advance Defendants' overlapping political, social and academic agendas.

**(vi)    4:44 p.m. on February 22, 2022:  Unbeknownst To Dr. Lieberman, Defendants Launch a Negative Public Relations Campaign in Furtherance of Their Unlawful Scheme**

523.    Because the day had been so frenetic, Dr. Lieberman was not aware at the time he traveled home on the evening of Tuesday, February 22, 2022, that the Individual State Actor Defendants, in close coordination with the leadership of the Entity Defendants, had already begun the process of manufacturing a sense of aggrievement among the Targeted Constituencies to justify Defendants' punishment of Dr. Lieberman, thereby advancing Defendants' overlapping political, social and academic agendas.

524.    It would certainly have been reasonable for the leadership of NYSPI/ Columbia/Presbyterian Psychiatry and the Entity Defendants to have allowed the February 22, 2022 Vice Chairs Apology circulated on behalf of Dr. Lieberman to stand on its own, without further comment, as the leadership thereof moved on with the work of NYSPI/Columbia/ Presbyterian Psychiatry and the Entity Defendants.  However, such a rational, tempered approach would not have served the objectives of Defendants' Unlawful Scheme.

525.    Instead, Defendants endeavored affirmatively to manufacture a sense of aggrievement and victimization among the Targeted Constituencies to justify Defendants' willful, intentional and malicious treatment of Dr. Lieberman and advance Defendants' overlapping political, social and academic agendas.

526.    Defendants had no intention of allowing the February 22, 2022 Vice Chairs Apology that had been circulated on behalf of Dr. Lieberman to put an end to the matter.

The content of the February 19, 2022 Personal Tweet was to be shamelessly distorted and exploited by Defendants for the next 15 months as a way to advance the overlapping political, social and academic agendas of Defendants.

527.    While, as noted, it would have been quite reasonable for the leadership of NYSPI/Columbia/Presbyterian Psychiatry and the Entity Defendants to have allowed the February 22, 2022 Vice Chairs Apology circulated on behalf of Dr. Lieberman to stand on its own, without further comment, the Individual State Actor Defendants and the Entity Defendants proceeded to deliberately inflame the situation against Dr. Lieberman through the implementation of their Unlawful Scheme, including their Negative PR Campaign.

528.    To this end, at approximately 4:44 p.m. on February 22, 2022, fewer than two hours after the February 22, 2022 Vice Chairs Apology had been circulated on behalf of Dr. Lieberman, the leadership team of the Columbia Medical School Department of Psychiatry's Faculty Practice Organization ("**FPO**") — consisting of Lourival ("Lou") Baptista, Vice Chair for Clinical Services in the Columbia Medical School Department of Psychiatry; Adrian Jacques Ambrose, Medical Director of FPO; Patrice Malone, Assistant Professor in the Columbia Medical School Department of Psychiatry; Amy Friedman, Administrator and Chief Operating Office in the Columbia Medical School Department of Psychiatry; Colleen Cullen, Associate Professor of Medical Psychology at Columbia Medical School and the Executive Director and Chief Quality Officer for FPO; and Hannah Reed, Instructor in the Columbia Medical School Department of Psychiatry — sent an e-mail to "Columbia Faculty, Staff, and Community" (the "**February 22, 2022 Columbia FPO E-Mail**").

198

529.     The February 22, 2022 Columbia FPO E-Mail, whose subject line stated "Message On Behalf of FPO Leadership — Lou Baptista, Jacques Ambrose, Patrice Malone, Amy Friedman, Colleen Cullen, Hannah Reed," quite deliberately sought to foment indignation, anger and upset in response to the very February 22, 2022 Vice Chairs Apology that Dr. Lieberman had been urged by the leadership of NYSPI/Columbia/Presbyterian Psychiatry to circulate to mollify those who had misconstrued or might misconstrue his February 19, 2022 Personal Tweet.

530.     As Dr. Lieberman would not come to learn until later that evening, the February 22, 2022 Columbia FPO E-Mail that the authors circulated in close coordination with the Individual State Actor Defendants (who themselves were consulting with the Governor's Office) launched the initial stage of Defendants' Unlawful Scheme — including Defendants' carefully planned and coordinated Negative PR Campaign that was designed to justify the destruction of Dr. Lieberman's reputation and career for the purpose of currying favor with and gaining the support of the Targeted Constituencies in an effort to advance Defendants' overlapping political, social and academic agendas.

531.     Defendants' Unlawful Scheme, as launched via the February 22, 2022 Columbia FPO E-Mail, quite willfully, intentionally and maliciously cast Dr. Lieberman's February 19, 2022 Personal Tweet in the most absurdly negative light.

532.     The February 22, 2022 Columbia FPO E-Mail willfully, intentionally, falsely and maliciously portrayed Dr. Lieberman — who, among other things, had devoted his

199

career to expanding the reach of psychiatric services to minority and other marginalized communities (*see* Background Section IX, above); who had supported diversity initiatives at NYSPI/Columbia/Presbyterian Hospital (*see* Background Section X, above); and whose own Hispanic wife had called to his attention the stunning photo of the self-proclaimed Queen of the Dark that appeared soon thereafter in the Original Gatwech Tweet to which Dr. Lieberman responded with the spontaneous, complimentary endorsement of Ms. Gatwech's extraordinary beauty that was embodied in his February 19, 2022 Personal Tweet (*see* Background Section XIV, above) — as some racist, sexist monster.

533.    Intending to manufacture some degree of campus/community upset that Defendants might then use to justify the destruction of Dr. Lieberman's hard-earned personal and professional reputations, Defendants, by mean of the Unlawful Scheme that was implemented initially via the February 22, 2022 Columbia FPO E-Mail, set about to utterly distort the February 19, 2022 Personal Tweet, demonize Dr. Lieberman and convince the Targeted Constituencies that they had been traumatized by the Tweet and therefore required the guidance, counseling and grief-support of the Individual State Actor Defendants and the leadership of the Entity Defendants.

534.    The authors of the February 22, 2022 Columbia FPO E-Mail, along with the Individual State Actor Defendants and the other leaders of the Entity Defendants, recognized that it was imperative that their coordinated Unlawful Scheme convey immediately to the Targeted Constituencies Defendants' moral indignation over the content of the February 19, 2022 Personal Tweet (even if feigned), as well as Defendants' self-serving, theatrical contempt for Dr.

4890-9158-2565, v. 1

Lieberman himself.  Such preening and virtue-signaling before the Targeted Constituencies,

Defendants believed, would enhance their own status and advance their overlapping political,

social and academic agendas.

535.    The authors of the February 22, 2022 Columbia FPO E-Mail, along with

the Individual State Actor Defendants and the leadership of the Entity Defendants, recognized

that, to achieve maximum effectiveness, Defendants' Unlawful Scheme would have to be

implemented not only swiftly, but in a way that would keep the issue alive over a sustained

period of time.

536.    Accordingly, Defendants choreographed a series of so-called "town hall"

meetings during which they urged, prodded and otherwise enthusiastically encouraged attendees

to view themselves as vulnerable victims of some heinous act committed by Dr. Lieberman —

his posting of the 15-word February 19, 2022 Personal Tweet through which he quite obviously

sought to compliment the extraordinary beauty of an internationally-renowned fashion model

who had proudly embraced the moniker "Queen of the Dark."

537.    Defendants made it clear in their communications with faculty, students

and others that Defendants wanted them to view themselves as vulnerable victims of the

February 19, 2022 Personal Tweet — *i.e.*, to adopt the "approved" view that Defendants were

pushing to advance their own political, social and academic agendas — notwithstanding that, as

noted, the United States Supreme Court has emphasized the critical need for the clash of

conflicting ideas and opinions, especially in academic environments: "Our Nation is deeply

201

committed to safeguarding academic freedom, which is of transcendent value to all of us and not

merely to the teachers concerned.  That freedom is therefore a special concern of the First

Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom.  'The

vigilant protection of constitutional freedoms is nowhere more vital than in the community of

American schools.' . . .  The classroom is peculiarly the 'marketplace of ideas.'" *Keyishian v.*

*Board of Regents of the University of the State of New York*, 385 U.S. 589, 603 (1967).

538.    Defendants made it clear in their communications with faculty, students

and others that Defendants wanted them to view themselves as vulnerable victims of the

February 19, 2022 Personal Tweet notwithstanding that, as noted, the Columbia Rules of

Conduct state unequivocally that members of the academic community are not to be shielded

from or otherwise coddled in response to their exposure to varying points of view:  "***Because of***

***the University's function as an incubator of ideas and viewpoints, the principle of free***

***expression must be jealously guarded***.  . . .  ***Although the University values the civil and***

***courteous exchange of viewpoints, it does not limit discussion because the ideas expressed***

***might be thought offensive, immoral, disrespectful, or even dangerous***.  ***We expect that***

***members of our community will engage in public discussions that may confront convention,***

***and free expression would mean little if it did not include the right to express what others may***

***reject or loathe***."  *See* Columbia Rules of Conduct, Section 440 (emphasis added), accessible at

*https://universitypolicies.columbia.edu/content/rules-university-conduct*.

539.    Defendants made it clear in their communications with faculty, students

and others that Defendants wanted them to view themselves as vulnerable victims of the

February 19, 2022 Personal Tweet — *i.e.*, to adopt the "approved" view that Defendants were

pushing to advance their overlapping political, social and academic agendas — notwithstanding

that, as noted, the President of Columbia University, Lee Bollinger, has announced:  "***We're***

***simply not going to let the people who are offended by the messages — even reasonably***

***offended by the messages — to stop the speech from happening****.  .  .  .  **Any time you're in a***

***conversation and are like, 'Oh my God, I can't broach this, I can't take a position here,' that's***

***where the education is.  That's what it means to be a creative, free-thinking academic*.**  That's

why academic life is so exciting and engaging and productive."  *See* Aaron Holmes, "Bollinger

Discusses White Nationalist Speakers, Free Speech on Campus," *Columbia Spectator* (Oct. 16,

2017) (emphasis added), accessible at *https://www.columbiaspectator.com/news/*

*2017/10/16/transcript-bollinger-discusses-white-nationalist-speakers-free-speech-on-campus/*.

540.   Notwithstanding that it was wholly antithetical to the academic

environment in which NYSPI/Columbia/Presbyterian Psychiatry operates, a key objective of

Defendants' Unlawful Scheme was to ensure that members of the intended audience, fearful of

subjecting themselves to the ridicule of the moral arbiters who had launched said Scheme, would

be too intimidated to step forward publicly and, paraphrasing the famous words of Hans

Christian Andersen, declare simply that the Emperors have no clothes — *i.e.*, that Defendants

had concocted a nonexistent, preposterous and wholly disingenuous and malicious narrative

surrounding the February 19, 2022 Personal Tweet and Dr. Lieberman.

541.   The deliberately incendiary February 22, 2022 Columbia FPO E-Mail,

addressed to Columbia Faculty, Staff and Community, therefore declared as follows:

203

"As a follow-up to Dr. Lieberman's message, we stand with you, championing our values and priorities for diversity, equity, inclusion, and justice.  We want to emphasize our unequivocal support of our minoritized colleagues and firm commitment against any form of discrimination or oppression, such as, racism, sexism, homophobia/transphobia, ableism, ageism, and others.  We want to acknowledge and validate the re-traumatization, hurt, and many disquieting emotions — sadness, anger, frustration, confusion, shame, that Dr. Lieberman's actions have caused.

"As a result, in the spirit of creating an open and safe space for any interested faculties to be heard, we are hosting a town-hall this Friday, February 25 (Finalized calendar invites to be sent).

"In addition, we will be partnering with clinical leaders to listen and learn in order to better create a diverse and inclusive community.  We will meet with CLC members this evening February 22.

"Turning the mirror inward, we hope to take this occasion to reexamine our own individual and system-level practices and policies to prevent these hurtful actions in the future.  We recognize this is not a onetime check-the-box but a deliberate and genuine commitment for progress and unity.

"To strengthen each of us and all of us, it is not sufficient to be not racist; we must strive toward an anti-racist community."

542.    In a cynical, heavy-handed and self-serving attempt to foment a sense of victimhood among the Targeted Constituencies — an attempt to declare preemptively that such Targeted Constituencies had been victimized by Dr. Lieberman's exercise of his constitutional right to express, by means of his February 19, 2022 Personal Tweet, what he clearly intended (and what reasonable persons understood to be) his appreciation for the extraordinary beauty of an internationally-renowned fashion model known as Queen of the Dark in response to the Original Gatwech Tweet whose breathtaking photo of Ms. Gatwech Dr. Lieberman's wife had earlier brought to his attention — the authors of the February 22, 2022 Columbia FPO E-Mail wrote hyperbolically:  "***We want to acknowledge and validate the re-traumatization, hurt, and***

***many disquieting emotions — sadness, anger, frustration, confusion, shame, that Dr.***

***Lieberman's actions have caused***" (emphasis added).

543.     In manufacturing the desired "crisis" that Defendants intended to use to justify their destruction of Dr. Lieberman's reputation and career and to pander to the Targeted Constituencies for the purpose of advancing their political, social and academic agendas, the last thing that Defendants, as well as the authors of the February 22, 2022 Columbia FPO E-Mail, wished to provide their audience was an opportunity to meet and discuss cordially and professionally with Dr. Lieberman the context in which his February 19, 2022 Personal Tweet had been posted.

544.     Accordingly, rather than offer to facilitate a candid, open discussion with Dr. Lieberman (although it is likely that most of the audience members harbored no desire for any further discussion whatsoever of this benign matter), the authors of the February 22, 2022 Columbia FPO E-mail, in concert with the Individual State Actor Defendants and other leaders of the Entity Defendants, announced that they would host a series of one-sided, "safe space" town hall meetings during which attendees would be insulated from any competing viewpoints.

545.     During these town hall meetings, the Individual State Actor Defendants and the leadership of the Entity Defendants, acting as therapist-facilitators, would guide the attendees, without any input from Dr. Lieberman himself, toward Defendants' predetermined desired conclusion that the Targeted Constituencies had been victimized by Dr. Lieberman's

205

exercise of his constitutional right to convey an intended compliment to a public figure by means of his 15-word February 19, 2022 Personal Tweet.

546.    The authors of the February 22, 2022 Columbia FPO E-Mail therefore stated:  "[I]n the spirit of creating an open and safe space for any interested faculties to be heard, we are hosting a town-hall this Friday, February 25[.]"

547.    The authors of the February 22, 2022 Columbia FPO E-Mail, in concert with the Individual State Actor Defendants and other leaders of the Entity Defendants, orchestrated the so-called "safe space" town hall meetings with the communities of NYSPI/Columbia/Presbyterian Psychiatry and of the Entity Defendants for the express purpose of denying the attendees an opportunity to engage in a civil dialogue with Dr. Lieberman — in shameful contravention of the core free-expression principles that govern these communities.

548.    As noted, the President of Columbia University articulated these governing free-expression principles as follows:  "***Not only must we make the case in every venue for the values that form the core of what we are and do, but we must also live up to our own principles of free inquiry and fearless engagement with all ideas***.  .  .  .  ***[I]n this environment especially, universities must be at the forefront of defending the rights of all students and faculty to listen to controversial voices, to engage disagreeable viewpoints, and to make every effort to demonstrate our commitment to the sort of fearless and spirited debate that we are simultaneously asking of the larger society***."  *See* Lee C. Bollinger, "2017 Commencement Address: Towards a Public Discourse Based on Tolerance, Not on Fear" (May

206

17, 2017) (emphasis added), accessible at *https://president.columbia.edu/content/2017-commencement-address*.

549.    At the time they sent their February 22, 2022 Columbia FPO E-Mail in furtherance of Defendants' Unlawful Scheme against Dr. Lieberman, the authors of the February 22, 2022 Columbia FPO E-Mail, along with the Individual State Actor Defendants and the other leaders of the Entity Defendants, were acutely aware, or, at a minimum, should reasonably have been aware, that their conduct violated Dr. Lieberman's constitutionally protected free-speech rights (and also contravened the institutional free-speech principles that govern Defendants).

> **(vii)    The Evening of February 22, 2022:  Dr. Lieberman**
> **Is Blindsided by the Individual State Actor Defendants**
> **During Multiple Telephone Conferences**

550.    As noted, on Tuesday, February 22, 2022, after e-mailing to Dr. Sullivan, Dr. Smith and Ms. Tashjian at about 5:36 p.m. the slightly modified February 22, 2022 Vice Chairs Apology, Dr. Lieberman left his office to make his way home.

551.    As he traveled home, Dr. Lieberman, emotionally and physically drained — and still unaware of the February 22, 2022 Columbia FPO E-Mail — believed that, upon completing his upcoming call with Dr. Sullivan, Dr. Smith and Ms. Tashjian that evening, the matters relating to his February 19, 2022 Personal Tweet would finally be put to rest and he and his team would be able to refocus their efforts on the invaluable work of NYSPI/Columbia/ Presbyterian Psychiatry.

4890-9158-2565, v. 1

552.     Sometime around 6:00 p.m. or so on the evening of Tuesday, February 22, 2022, Dr. Lieberman reached his Manhattan apartment building.  As he entered the lobby of the building, his cell phone rang.  On the line were Dr. Sullivan, Dr. Smith and Ms. Tashjian, each of whom was an employee of at least NYS OMH (the "***Second February 22, 2022 Lieberman-OMH Telephone Conversation***").

553.     At the time of the Second February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Sullivan was the Commissioner of NYS OMH, Dr. Smith was the Chief Medical Officer of NYS OMH and Ms. Tashjian was the Deputy Commissioner of NYS OMH.

554.     From the outset of the Second February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Lieberman was taken aback by the formal, abrupt and officious tone of Dr. Sullivan, Dr. Smith and Ms. Tashjian.  As noted, as of February 22, 2022, Dr. Lieberman had known and worked closely and collegiately with Dr. Sullivan and Dr. Smith for many years and had worked constructively with Ms. Tashjian since she assumed her position in or about October 2021.

555.     The tone of the Second February 22, 2022 Lieberman-OMH Telephone Conversation was dramatically different from the constructive tone that Dr. Smith had employed during the First February 22, 2022 Lieberman-OMH Telephone Conversation, when he indicated to Dr. Lieberman that circulation of the February 22, 2022 Vice Chairs Apology on Dr. Lieberman's behalf would allow NYS OMH and NYSPI to continue to support Dr. Lieberman in his leadership roles within NYSPI/Columbia/Presbyterian Psychiatry.

208

556.     During the Second February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Lieberman was absolutely stunned to hear Dr. Sullivan, Dr. Smith and Ms. Tashjian say, in words or substance, that, in consultation with the Governor's Office (Chambers), they were calling to inform Dr. Lieberman that, in light of the content of his February 19, 2022 Personal Tweet, he had to resign his position as Executive Director of NYSPI immediately or be fired ("**Dr. Lieberman's Forced Resignation**" or the "**Forced Resignation**").

557.     During the Second February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Sullivan, Dr. Smith and Ms. Tashjian made clear to Dr. Lieberman that his Forced Resignation from NYSPI was based entirely on the content of his February 19, 2022 Personal Tweet.

558.     Upon hearing the ultimatum that had just been delivered by the Individual State Actor Defendants at the beginning of the Second February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Lieberman was in shock.  The words that he had just heard hung in the air; his mind could scarcely process them.

559.     A torrent of thoughts, questions and emotions colliding in his mind, the thoroughly exhausted Dr. Lieberman struggled to breathe.  He grappled with the brutally unjust (and unconstitutional) reality with which he had just been presented.

560.     Despite having devoted his entire professional (and a good deal of his personal) life over the past 17 years as the head of NYSPI/Columbia/Presbyterian Psychiatry to increasing the Association's capabilities (including its outreach to minority groups, prisoners and

4890-9158-2565, v. 1

other underserved communities) and enhancing the Association's reputation as a preeminent public-academic psychiatric partnership, and despite, at the urging of the Individual State Actor Defendants, having allowed the humiliating, self-abasing February 22, 2022 Vice Chairs Apology to be circulated on his behalf earlier in the day, Dr. Lieberman was now being summarily terminated in retaliation for the content of his February 19, 2022 Personal Tweet.

561.    Despite having devoted himself for 17 years to the demonstrable success of the vital mental health mission of NYSPI/Columbia/Presbyterian Psychiatry, Dr. Lieberman was now being summarily discharged for having exercised his constitutionally-protected right to express — by means of the 15-word February 19, 2022 Personal Tweet that he sent from his home via his personal Twitter account over a holiday weekend — his well-intentioned compliment of the extraordinary beauty of an internationally-renowned fashion model known as Queen of the Dark.

562.    Stunned and struggling mightily to compose himself in the lobby of his apartment building during the Second February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Lieberman finally managed to speak.  After seeking, but not receiving, clarification as to, among other things, the status of his NYSPI pension, Dr. Lieberman asked Dr. Sullivan, Dr. Smith and Ms. Tashjian if he could have until the next morning to think through the ramifications of their ultimatum.  Dr. Lieberman's request was summarily denied; he was told by Dr. Sullivan, Dr. Smith and Ms. Tashjian that he needed to respond immediately.

210

563.    Reeling from the speed with which this nightmare was unfolding, Dr. Lieberman then asked for a five-minute hiatus to allow him to collect his thoughts before resuming the Second February 22, 2022 Lieberman-OMH Telephone Conversation.  Reluctantly, Dr. Sullivan, Dr. Smith and Ms. Tashjian granted his modest request.

564.    Dr. Lieberman then proceeded from the lobby of the building to his apartment.  Within a few minutes of entering his apartment, Dr. Lieberman telephoned Ms. Tashjian, who patched in Dr. Sullivan and Dr. Smith (the "***Third February 22, 2022 Lieberman-OMH Telephone Conversation***").

565.    During the Third February 22, 2022 Lieberman-OMH Telephone Conversation, it was again made clear to Dr. Lieberman that his career with NYSPI was over. His Forced Resignation was not negotiable.  Dr. Lieberman would resign or he would be terminated; either way, Dr. Lieberman would no longer be the Executive Director of NYSPI by the end of that very long day.

566.    Dr. Lieberman fought valiantly to maintain his composure during the Third February 22, 2022 Lieberman-OMH Telephone Conversation.  During that Telephone Conversation, Dr. Sullivan, Dr. Smith and Ms. Tashjian told Dr. Lieberman, in words or substance, that they believed that Dr. Lieberman's Forced Resignation would not affect his New York State pension, but that they would check with the Governor's Office (Chambers).

567.    During the Third February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Lieberman asked how the State intended to communicate to others his Forced

211

Resignation.  In response, Dr. Sullivan, Dr. Smith and Ms. Tashjian told Dr. Lieberman, in words or substance, that they would check with the Governor's Office (Chambers) and get back to him later that evening.

568.    Sometime later on the evening of Tuesday, February 22, 2022, Ms. Tashjian telephoned Dr. Lieberman and patched in Dr. Smith (the "***Fourth February 22, 2022 Lieberman-OMH Telephone Conversation***").  Ms. Tashjian said that she and Dr. Smith would proceed without Dr. Sullivan, who, she explained, would not be joining the call.

569.    During the Fourth February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Smith and Ms. Tashjian relayed to Dr. Lieberman that they had confirmed with the Governor's Office (Chambers) that Dr. Lieberman's Forced Resignation would not impact his New York State pension.

570.    During the Fourth February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Smith and Ms. Tashjian told Dr. Lieberman, in words or substance, that the State, at this time, was not planning to announce Dr. Lieberman's Forced Resignation.

571.    What neither Dr. Sullivan, Dr. Smith nor Ms. Tashjian told Dr. Lieberman during their telephone conversations on the evening of Tuesday, February 22, 2022, was that the opening salvo in Defendants' Unlawful Scheme (including the Negative PR Campaign) against Dr. Lieberman — which was quite obviously designed to seep into the public domain — had already been fired by means of the 4:44 p.m. February 22, 2022 Columbia FPO E-Mail, which,

upon information and belief, was prepared and circulated in close coordination with the Individual State Actor Defendants and other leaders of the Entity Defendants.

572.     In fact, as the Individual State Actor Defendants and the Entity Defendants had fully intended and orchestrated, the very next day — Wednesday, February 23, 2022 — the *New York Times* reported Dr. Lieberman's Forced Resignation from NYSPI, as well as the coordinated punitive retaliatory measures that had been imposed that day upon Dr. Lieberman by the Entity Defendants.  *See* Lola Fadulu, "Columbia Psychiatry Chair Suspended After Tweet About Dark-Skinned Model," *New York Times* (Feb. 23, 2022) (the "***February 23, 2022 New York Times Lieberman Article***"), accessible at *https://www.nytimes.com/2022/02/23/nyregion/ columbia-jeffrey-lieberman.html*.

573.     Nor did Dr. Sullivan, Dr. Smith or Ms. Tashjian advise Dr. Lieberman during their telephone conversations on the evening of Tuesday, February 22, 2022, that, as a follow-up to the February 22, 2022 Columbia FPO E-Mail, the Individual State Actor Defendants and the Entity Defendants — pandering shamelessly to the Targeted Constituencies for the purpose of advancing Defendants' overlapping political, social and academic agendas — were coordinating the issuance of ever more disingenuous, unctuous apologies and the holding of additional one-sided, "safe space" town hall meetings through which Dr. Lieberman's reputation, dignity and career would be further publicly shredded.

574.     During the Fourth February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Smith and Ms. Tashjian advised Dr. Lieberman, in words or substance, that, after consultation with the Governor's Office (Chambers), it had been decided that — in utter disregard of the fact that Dr. Lieberman had spent the past 17 years as the Executive Director of NYSPI and had naturally accumulated a substantial volume of materials during that period — Dr. Lieberman would be required to vacate his NYSPI/Columbia/Presbyterian Psychiatry office the very next day, Wednesday, February 23, 2022.

575.     Moreover, during the Fourth February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Smith and Ms. Tashjian advised Dr. Lieberman, in words or substance, that, after consultation with the Governor's Office (Chambers), it had been decided that Dr. Lieberman was also to be denied the courtesy of assembling and addressing his Vice Chairs and staff collectively the next day, February 23, 2022.

576.     By denying Dr. Lieberman the courtesy of assembling and addressing his Vice Chairs and staff collectively the next day, February 23, 2022, the Individual State Actor Defendants and the leadership of the Entity Defendants betrayed their deep fear of allowing the members of the NYSPI/Columbia/Presbyterian Psychiatry community an opportunity to meet and discuss cordially and professionally with Dr. Lieberman the context in which he had posted his February 19, 2022 Personal Tweet.

577.     Trampling arrogantly on the free-expression, pro-engagement principles that govern NYSPI/Columbia/Presbyterian Psychiatry (*see* Background Section XV, above), the

Individual State Actor Defendants and the Entity Defendants were desperate to deny Dr. Lieberman any forum in which members of the NYSPI/Columbia/Presbyterian Psychiatry community might collectively discuss these matters with him.

578.    The Individual State Actor Defendants and the leadership of the Entity Defendants were quite desperate to prevent any discourse between Dr. Lieberman and his team (or with any other members of the NYSPI/Columbia/Presbyterian Psychiatry community) because Defendants feared that many of the those community members would reach the independent conclusion that Dr. Lieberman had been treated shamefully for having exercised his constitutional right to express, through his February 19, 2022 Personal Tweet, what he clearly intended (and what reasonable persons understood to be) his appreciation for the extraordinary beauty of an internationally-renowned fashion model known as Queen of the Dark.

579.    Treating Dr. Lieberman with gratuitous disrespect, the Individual State Actor Defendants, in concert with the leadership of the Entity Defendants, therefore resolved that under no circumstances could Dr. Lieberman be permitted to address by himself any group of persons affiliated with NYSPI/Columbia/Presbyterian Psychiatry.

580.    The only collective discourse concerning the February 19, 2022 Personal Tweet that would be permitted — indeed, affirmatively encouraged — by the Individual State Actor Defendants and the leadership of the Entity Defendants would be Defendants' carefully-controlled, "safe space" town hall meetings during which the attendees would be insulated from alternative narratives.

581.     As noted, during these town hall meetings, the Individual State Actor

Defendants and the leadership of the Entity Defendants, without any countervailing input from

Dr. Lieberman, intended to and did in fact encourage certain of the Targeted Constituencies to

reach the desired conclusion that they had been victimized by Dr. Lieberman's exercise of his

constitutional right to convey an intended compliment to a public figure by means of his

February 19, 2022 Personal Tweet.

582.     Accordingly, during the Fourth February 22, 2022 Lieberman-OMH

Telephone Conversation, Dr. Smith and Ms. Tashjian explained, in words or substance, that, in

consultation with the Governor's Office (Chambers), it had been decided that Dr. Smith, playing

the role of Big Brother Monitor, would meet Dr. Lieberman at Dr. Lieberman's NYSPI/

Columbia/Presbyterian Psychiatry office at 1051 Riverside Drive in Manhattan on the morning

of Wednesday, February 23, 2022, and then ***Dr. Smith — not Dr. Lieberman —*** would convene

Dr. Lieberman's Vice Chairs and staff to advise them of Dr. Lieberman's Forced Resignation.

583.     During the Fourth February 22, 2022 Lieberman-OMH Telephone

Conversation, Dr. Smith advised Dr. Lieberman that he intended to monitor, or shadow, Dr.

Lieberman on Wednesday, February 23, 2022, for as long as necessary for Dr. Lieberman to

vacate his office and complete his transition out of the NYSPI/Columbia/Presbyterian Psychiatry

building at 1051 Riverside Drive in Manhattan.  Dr. Smith told Dr. Lieberman that he would

meet Dr. Lieberman at his office at or a bit after 8:00 a.m. on February 23, 2022.

4890-9158-2565, v. 1

584.     During the Fourth February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Smith and Ms. Tashjian said that, in close consultation with the Governor's Office (Chambers), Dr. Sullivan, Dr. Smith and Ms. Tashjian had decided that, in connection with his Forced Resignation, Dr. Lieberman would have to submit an e-mail or letter of resignation to Dr. Smith that night.  When Dr. Lieberman said that he would provide the letter once he understood what the State intended to say publicly about his Forced Resignation, Ms. Tashjian responded testily, in words or substance, as follows:  "Well, then, you're going to be terminated.  That's your choice.  You either will be terminated or you're going to resign."

585.     During the Fourth February 22, 2022 Lieberman-OMH Telephone Conversation, Dr. Lieberman could still not wrap his exhausted mind around the utter injustice of his Forced Resignation from NYSPI, the evisceration of his cherished reputation and the instantaneous destruction of his hard-earned professional career.

586.     Ever the gentleman, Dr. Lieberman expressed his upset and frustration politely during the Fourth February 22, 2022 Lieberman-OMH Telephone Conversation.  In words or substance, Dr. Lieberman observed that the New York State governmental process is harsh and political.  He lamented the fact that, sadly, although he had known and worked closely with Dr. Sullivan and Dr. Smith for many years, they were now treating him like a pariah and a criminal.  Dr. Smith replied, "Yeah.  It stinks."  Ms. Tashjian then agreed, saying "Yeah."

587.     Sometime around 7:15 p.m. or so on the evening of Tuesday, February 22, 2022, Dr. Lieberman received a communication from Dr. Smith and/or Ms. Tashjian, as a

217

follow-up to the Fourth February 22, 2022 Lieberman-OMH Telephone Conversation, prodding him to send the Forced Resignation e-mail or letter that had been demanded.

588.    Shortly thereafter on the evening of Tuesday, February 22, 2022, Dr. Lieberman, mustering remarkable restraint and decorum, sent the following required Forced Resignation e-mail to Dr. Sullivan, Dr. Smith and Ms. Tashjian (the "***February 22, 2022 Forced-Resignation E-Mail***"):

"Dear Ann, Tom and Moira:

"I am sorry for the problems caused by what was perceived to be an inappropriate tweet and appreciate your support and efforts on my behalf.  However, given Governor Hochul's ultimatum to resign or face termination, I hereby submit this letter of resignation of my position as Executive Director of NYSPI and WHCS [Washington Heights Community Services] effective immediately.

"I must say that given my record of accomplishment for the citizens and state of NY during my 17 year tenure, the numerous talented scientists that I have recruited and serve the state's interest, and the $120 million in sponsored research that we receive annually which provides jobs and tax dollars for NYS and my pristine record of never having any personnel or HR related issues, the Governor's actions in response to a single social media communication without any prior such incidents among the tens of thousands of similar social media communications that I have made and without the opportunity to offer any explanation or the benefit of due process seems excessive and unwarranted.

"Nevertheless, I will be fully compliant with this directive and work with the HR office and Dr. Tom Smith to complete the process tomorrow morning.  However, based on your understanding and agreement with my request as to how the Governor's office will describe the reason for my resignation for internal OMH and public media communications, I propose the following:

'Dr. Jeffrey Lieberman, after 17 years of public service as Executive Director of the New York State Psychiatric Institute, has requested to leave this position to devote more time to his academic interests in psychiatric medicine and pursue entrepreneurial initiatives in the private sector.  NYS government is grateful for his numerous contributions furthering our understanding of mental illness and improving the quality of mental health care.'

218

"I will appreciate the favor of your reply and confirmation of your efforts to gain approval for adoption of the aforementioned request on the announcement of my departure."

589.     Dr. Lieberman did not receive a response to his February 22, 2022 Forced-Resignation E-Mail.

590.     As noted, on the morning of Tuesday, February 22, 2022, Dr. Rustgi, then the Interim Dean of Columbia Medical School, had abruptly cancelled his scheduled 10:30 a.m. Zoom meeting with Dr. Lieberman, Donna Lynne and Dr. Anne Taylor.

591.     As also noted, Dr. Rustgi declined to provide Dr. Lieberman with the courtesy of a response to Dr. Lieberman's e-mail containing the February 22, 2022 Vice Chairs Apology that Dr. Lieberman had sent to him by midday or so on February 22, 2022.

592.     As further noted, upon information and belief, Dr. Rustgi, in close coordination with the Individual State Actor Defendants and other leaders of the Entity Defendants, deliberately avoided all substantive interaction with Dr. Lieberman during normal business hours on Tuesday, February 22, 2022.  Dr. Rustgi waited stealthily on the sideline until the February 22, 2022 Columbia FPO E-Mail had been circulated and he had received word that Dr. Sullivan, Dr. Smith and Ms. Tashjian, in consultation with the Governor's Office (Chambers), had effected Dr. Lieberman's termination from NYSPI.

593.     Once they received confirmation that Dr. Lieberman had been forced to resign from NYSPI, Dr. Rustgi (on behalf of Columbia University and Columbia Medical School) and Dr. Corwin (on behalf of Presbyterian/Columbia Hospital), in close coordination

219

with the Individual State Actor Defendants and other leaders of the Entity Defendants, swooped in to further punish Dr. Lieberman for having exercised his constitutionally and otherwise protected right to post his well-intentioned February 19, 2022 Personal Tweet.

594.    Accordingly, at approximately 10:00 p.m. on Tuesday, February 22, 2022, Dr. Rustgi communicated with Dr. Lieberman to direct him to attend a Zoom meeting at 7:30 a.m. the following morning (Wednesday, February 23, 2022) with Dr. Rustgi, Dr. Corwin and Jane Booth, then Columbia University's General Counsel.

595.    Upon information and belief, during the day, evening and night of Tuesday, February 22, 2022, prior to communicating with Dr. Lieberman sometime around 10:00 p.m. that night, Dr. Rustgi had been in close communication with Dr. Sullivan, Dr. Smith and/or Ms. Tashjian, as well as Dr. Corwin and other senior leadership members of the Entity Defendants.  The objective of such coordination was to implement the next stages of the Unlawful Scheme against Dr. Lieberman.

596.    During his communication with Dr. Lieberman on the night of February 22, 2022, Dr. Rustgi also canceled the plan for Dr. Lieberman to meet Dr. Smith at 8:00 a.m. the next morning, February 23, 2022, at what was to become Dr. Lieberman's former office at NYSPI/Columbia/Presbyterian Psychiatry.  Dr. Rustgi advised Dr. Lieberman to instead stay home on February 23, 2022; he was advised that under no circumstances was he to appear on site.

597.     After devoting 17 years of his life to leading and elevating NYSPI/
Columbia/Presbyterian Psychiatry, Dr. Lieberman was thus denied even the courtesy of being
permitted to clean out his office.

598.     Tuesday, February 22, 2022, was by far the longest, most devastating,
most anxiety-producing, most exhausting, most humiliating and most physically and emotionally
painful day of Dr. Lieberman's professional life.

599.     Thoroughly drained and dispirited from the tumultuous events of the day,
feeling emotionally and physically ill, and dreading the Zoom meeting that Dr. Rustgi had
scheduled for 7:30 a.m. on Wednesday, February 23, 2022, Dr. Lieberman barely slept at all on
the night of February 22, 2022.

**D.     February 23, 2022:  The Entity Defendants, in Concert
         With the Individual State Actor Defendants, Impose
         Additional Punishment Upon and Further Humiliate
         Dr. Lieberman For Having Exercised His Constitutional
         Right To Post His February 19, 2022 Personal Tweet**

**(i)     February 23, 2022: The 7:30 a.m.
          Rustgi-Initiated Lieberman Zoom Meeting**

600.     At or about 7:30 a.m. on Wednesday morning, February 23, 2022, Interim
Dean Rustgi, Dr. Corwin and General Counsel Jane Booth held their Zoom meeting with Dr.
Lieberman (the "***February 23, 2022 Rustgi-Initiated Lieberman Zoom Meeting***").

221

601.     At the commencement of the February 23, 2022 Rustgi-Initiated Lieberman Zoom Meeting, Dr. Rustgi declared, in words or substance, that, in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman had been suspended, effective immediately, from his position as the Chair of the Columbia Medical School Department of Psychiatry.

602.     Following up on Dr. Rustgi's opening statement at the commencement of the February 23, 2022 Rustgi-Initiated Lieberman Zoom Meeting, Dr. Corwin announced, in words or substance, that, in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman had been suspended, effective immediately, from his position as Psychiatrist-in-Chief of Presbyterian/Columbia Hospital.  Moreover, Dr. Corwin declared that Dr. Lieberman was barred, effective immediately, from engaging in any clinical activities at the Hospital.

603.     During the February 23, 2022 Rustgi-Initiated Lieberman Zoom Meeting, Dr. Rustgi, Dr. Corwin and Ms. Booth made clear to Dr. Lieberman that the punitive actions that the Entity Defendants were taking against Dr. Lieberman were based exclusively on the content of his February 19, 2022 Personal Tweet.

604.     Already mortally wounded from the willful, intentional and malicious decisions made and conduct perpetrated by Defendants on Tuesday, February 22, 2022 — which culminated in Dr. Lieberman's Forced Resignation from NYSPI — Dr. Lieberman listened

222

numbly to the respective declarations made by Dr. Rustgi and Dr. Corwin at the beginning of the February 23, 2022 Rustgi-Initiated Lieberman Zoom Meeting.

605.    As he listened to the respective declarations made by Dr. Rustgi and Dr. Corwin at the beginning of the February 23, 2022 Rustgi-Initiated Lieberman Zoom Meeting, Dr. Lieberman was deeply disappointed — but, by now, hardly shocked — to learn that Dr. Rustgi, Dr. Corwin and other leaders of the Entity Defendants, in coordination with and taking their cue from the decisions that had already been made by the Individual State Actor Defendants in consultation with the Governor's Office (Chambers), had decided to pile on in retaliation for the content of Dr. Lieberman's constitutionally and otherwise protected February 19, 2022 Personal Tweet.

606.    Shortly after the commencement of the February 23, 2022 Rustgi-Initiated Lieberman Zoom Meeting, General Counsel Jane Booth advised Dr. Lieberman that his position as Chair of the Columbia Medical School Department of Psychiatry and his position as Psychiatrist-in-Chief of Presbyterian/Columbia Hospital would be filled by an Interim Chair and an Interim Psychiatrist-in-Chief, respectively.

607.    After listening to the respective declarations made by Dr. Rustgi, Dr. Corwin and Ms. Booth at the beginning of the February 23, 2022 Rustgi-Initiated Lieberman Zoom Meeting, the weary Dr. Lieberman asked Ms. Booth whether he would be eligible for reinstatement as Chair of the Columbia Medical School Department of Psychiatry and

223

Psychiatrist-in-Chief of Presbyterian/Columbia Hospital once his suspension period had ended. Ms. Booth pointedly declined to respond to Dr. Lieberman's question.

608.    After Dr. Lieberman had asked a few more questions to which Dr. Rustgi, Dr. Corwin and Ms. Booth declined to respond substantively, he was advised dismissively, in words or substance, that the purpose of the February 23, 2022 Rustgi-Initiated Lieberman Zoom Meeting was simply to inform Dr. Lieberman of the actions that had been taken against him and to provide related directives.  The purpose was not, Dr. Rustgi, Dr. Corwin and Ms. Booth explained, to engage Dr. Lieberman in any substantive discussion of the matters at issue.

609.    When Dr. Lieberman asked to be permitted to at least share with them certain observations and comments, Dr. Rustgi, Dr. Corwin and Ms. Booth agreed reluctantly to allow him to speak toward the end of the February 23, 2022 Rustgi-Initiated Lieberman Zoom Meeting.

610.    When he finally had the opportunity to address Dr. Rustgi, Dr. Corwin and Ms. Booth toward the end of the February 23, 2022 Rustgi-Initiated Lieberman Zoom Meeting, Dr. Lieberman shared the following thoughts, in words or substance:

    (a)    Dr. Lieberman respectfully disagreed with the punishment imposed against him by NYSPI and the Entity Defendants in retaliation for the content of his February 19, 2022 Personal Tweet because he had done nothing wrong;

    (b)    Defendants were imposing punishment against him as a form of censorship for having expressed himself in his well-intentioned February 19, 2022 Personal Tweet;

224

(c)    The punishment imposed upon Dr. Lieberman appeared quite clearly to be politically motivated and shamefully consistent with Cancel Culture, as opposed to free-expression, principles; and

(d)    Dr. Lieberman believed that he had done as much or more to elevate NYSPI/Columbia/Presbyterian Psychiatry than anyone else who had led the Association.

611.    As Dr. Lieberman made the comments set forth in the immediately preceding paragraph, above, during the February 23, 2022 Rustgi-Initiated Lieberman Zoom Meeting, Dr. Rustgi, Dr. Corwin and Ms. Booth sat silent and stone-faced.  They were incapable of even attempting to defend the coordinated and outrageous retaliatory actions taken by the Individual State Actor Defendants and the Entity Defendants against Dr. Lieberman.

### (ii)    February 23, 2022: Dr. Rustgi and Dr. Corwin Expand the Negative PR Campaign Against Dr. Lieberman

612.    Having begun on Tuesday, February 22, 2022 to implement what would turn out to be a 15-month series of willful, intentional and malicious acts against Dr. Lieberman in retaliation for the content of his February 19, 2022 Personal Tweet, Defendants were not content to move forward in an understated, professional manner.  Instead, they elected to make a dramatic splash in perpetrating their Unlawful Scheme.

613.    As noted, in close coordination with the Individual State Actor Defendants (one of whom, in turn, admitted that said Individual State Actor Defendants had been consulting with the Governor's Office), the Entity Defendants sent the February 22, 2022 Columbia FPO E-Mail to Columbia faculty, staff and community as the opening salvo in Defendants' Unlawful Scheme.

225

614.    As also noted, through their Unlawful Scheme, including their Negative PR Campaign, against Dr. Lieberman, Defendants solicited, in the most sycophantic manner, the support of the Targeted Constituencies that Defendants believed was so necessary to advancing Defendants' overlapping political, social and academic agendas.

615.    On the morning of Wednesday, February 23, 2022 — after they had informed Dr. Lieberman during the February 23, 2022 Rustgi-Initiated Lieberman Zoom Meeting that, in retaliation for the content of his February 19, 2022 Personal Tweet, Dr. Lieberman had been suspended, effective immediately, from his respective positions as the Chair of the Columbia Medical School Department of Psychiatry and Psychiatrist-in-Chief of Presbyterian/Columbia Hospital (and had been barred, effective immediately, from engaging in any clinical activities at the Hospital) — Dr. Rustgi and Dr. Corwin continued their close coordination with the Individual State Actor Defendants and other leadership personnel of the Entity Defendants for the purpose of furthering the Unlawful Scheme that was designed to advance Defendants' overlapping political, social and academic agendas.

616.    Upon information and belief, Dr. Simpson was among the Individual State Actor Defendants (and members of the Entity Defendants' leadership team) who continued to coordinate and conspire closely with Dr. Rustgi and Dr. Corwin after February 22, 2022 for the purpose of furthering the Unlawful Scheme that was designed to advance Defendants' overlapping political, social and academic agendas.

226

617.    As noted, Dr. Simpson had contributed substantially to the tone and content, and lobbied vigorously for the dissemination, of the February 22, 2022 Vice Chairs Apology.

618.    Dr. Simpson benefited personally from her substantial contributions to the short-term and long-term destruction of Dr. Lieberman's reputation and career.  As noted, in late February 2022, Dr. Simpson stepped nimbly (on an interim basis that continues to date) into each of the three leadership roles at NYSPI/Columbia/Presbyterian Psychiatry from which Dr. Lieberman had been removed.

619.    On Wednesday, February 23, 2022, Dr. Rustgi and Dr. Corwin pounced quickly in an effort to build upon the Unlawful Scheme that Defendants had launched the preceding day by means of the February 22, 2022 Columbia FPO E-Mail.

620.    Working in close coordination with the Individual State Actor Defendants and other leadership personnel of the Entity Defendants, Dr. Rustgi and Dr. Corwin announced via an e-mail sent with "High" importance sometime around 10:40 a.m. on the morning of Wednesday, February 23, 2022, that they would hold at 12:30 p.m. that day a departmental meeting (the "***First February 23, 2022 Rustgi/Corwin E-Mail Announcement***").

621.    The First February 23, 2022 Rustgi/Corwin E-Mail Announcement, which was sent from the e-mail address "*director@nyspi.columbia.edu*," stated:  "There will be a departmental meeting today at 12:30pm via zoom where Drs. Corwin and Rustgi will address the

227

department regarding recent events that have affected us all [the "***February 23, 2022 Rustgi/Corwin Zoom Meeting***"].  Please join us."

622.    Despite the efforts of the Individual State Actor Defendants and the Entity Defendants — which had begun with the February 22, 2022 Columbia FPO E-Mail — to ***manufacture*** a state of upset among the NYSPI/Columbia/Presbyterian Psychiatry community and the public at large in an attempt to justify their outrageous mistreatment of Dr. Lieberman and curry favor with the Targeted Constituencies for the purpose of advancing Defendants' political, social and academic agendas, the fact is that, at the time the First February 23, 2022 Rustgi/Corwin E-Mail Announcement was circulated at 10:40 a.m., it was sheer nonsense for Dr. Rustgi and Dr. Corwin to suggest that Dr. Lieberman's February 19, 2022 Personal Tweet had "affected us all."  Upon information and belief, at this time, much of the community did not yet even know about said Tweet.

623.    Upon information and belief, many recipients of the First February 23, 2022 Rustgi/Corwin E-Mail Announcement had no clue what was to be discussed at the February 23, 2022 Rustgi/Corwin Zoom Meeting, but merely understood that two senior persons, Dr. Rustgi and Dr. Corwin, had sent a high-priority e-mail advising of a scheduled meeting to address "recent events that have affected us all."

624.    By means of the First February 23, 2022 Rustgi/Corwin E-Mail Announcement, Dr. Rustgi and Dr. Corwin hoped to lure a large number of the recipients of the Announcement to join the February 23, 2022 Rustgi/Corwin Zoom Meeting and, once assembled

in the desired controlled environment in which participants would be shielded from any real-time dialogue with their colleague, Dr. Lieberman, to stoke the fire of Defendants' self-serving false narrative.

625.     In reality, what had begun to seep into the consciousness of the NYSPI/Columbia/Presbyterian Psychiatry community (and beyond) by the morning of Wednesday, February 23, 2022 — and cause confusion and upset — was the egregious, coordinated mistreatment and humiliation of Dr. Lieberman by the Individual State Actor Defendants and the leadership of the Entity Defendants.

626.     Of course, reality meant nothing to the Individual State Actor Defendants and the Entity Defendants.  All that mattered to them was shaping perceptions and creating a narrative to justify their outrageous mistreatment of Dr. Lieberman and thereby curry favor with the Targeted Constituencies for the purpose of advancing Defendants' political, social and academic agendas.

627.     At or about 11:03 a.m. on the morning of Wednesday, February 23, 2022 — just 23 minutes after they had circulated the First February 23, 2022 Rustgi/Corwin E-Mail Announcement at 10:40 a.m. that morning — Dr. Rustgi and Dr. Corwin sent a second e-mail announcement, this one bearing the subject line "Announcement regarding Jeffrey Lieberman, MD" (the "*Second February 23, 2022 Rustgi/Corwin E-Mail Announcement*").

628.     The Second February 23, 2022 Rustgi/Corwin E-Mail Announcement, which was addressed to "*all-cumc@lists.columbia.edu*," stated:

"Dear Colleagues,

"We are writing to inform you that Dr. Jeffrey Lieberman has been suspended from his role as chair of the Department of Psychiatry at Vagelos College of Physicians and Surgeons and removed as Psychiatrist-in-Chief at [Presbyterian/Columbia] Hospital, effective immediately.

"Later today, we will be meeting with Department of Psychiatry faculty, staff and trainees, and will soon announce an interim chair of Psychiatry."

629.     At approximately 1:01 p.m. on Wednesday, February 23, 2022 (half an hour or so later than the originally scheduled 12:30 time), the "Directors Office," using the e-mail address "*director@nyspi.columbia.edu*," circulated a new Zoom link for the February 23, 2022 Rustgi/Corwin Zoom Meeting.

630.     Upon information and belief, the new Zoom link for the February 23, 2022 Rustgi/Corwin Zoom Meeting was circulated so that a larger number of attendees could be accommodated.

631.     On Wednesday, February 23, 2022, shortly after 1:00 p.m., the February 23, 2022 Rustgi/Corwin Zoom Meeting commenced.

632.     Upon information and belief, the organizers of the February 23, 2022 Rustgi/Corwin Zoom Meeting did not permit attendees, who constituted a captive audience, to engage in a free-flowing, interactive discussion.  Instead, for the most part, the attendees were forced to listen to Dr. Rustgi and Dr. Corwin pontificate.

633.    Dr. Lieberman was not invited to join Dr. Rustgi and Dr. Corwin in addressing the attendees of the February 23, 2022 Rustgi/Corwin Zoom Meeting because Defendants were determined to prevent Dr. Lieberman from engaging the attendees in any dialogue whatsoever.

634.    As noted, the last thing the Individual State Actor Defendants and the senior leadership team of the Entity Defendants wanted during the February 23, 2022 Rustgi/Corwin Zoom Meeting was to afford Dr. Lieberman and the attendees (many of whom were Dr. Lieberman's colleagues) an opportunity to converse directly in accordance with the robust free-expression policies that govern the Psychiatric Activities of NYSPI/Columbia/ Presbyterian Psychiatry (*see* Background Sections XV(C) and XV(D), above).

635.    Defendants recognized that, had Dr. Lieberman and the February 23, 2022 Rustgi/Corwin Zoom Meeting attendees been permitted to converse directly, Defendants might have lost control of the pernicious narrative that they had so malevolently woven for the purpose of advancing their own overlapping political, social and academic agendas.  Defendants understood that, unless they succeeded in convincing the attendees that Dr. Lieberman was some racist, sexist demon, they would be unable to justify having so shamefully destroyed him and thereby be deprived of the credit for such destruction that they craved from the Targeted Constituencies.

636.    At the February 23, 2022 Rustgi/Corwin Zoom Meeting, Dr. Rustgi and Dr. Corwin urged, if not commanded, the meeting participants to adopt the brazenly distorted

view that (a) Dr. Lieberman's well-intentioned February 19, 2022 Personal Tweet was somehow animated by racism, sexism and other intolerant "isms"; (b) the 15 words comprising the Tweet therefore posed some existential threat to the victimized meeting participants; (c) Defendants were thereby justified in summarily removing Dr. Lieberman from his NYSPI/Columbia/ Presbyterian Psychiatry leadership positions and otherwise maliciously punishing him in retaliation for the content of his Tweet; and (d) having thoroughly and justifiably destroyed Dr. Lieberman's reputation, career and well-being, Defendants should be hailed as heroic Thought Police who were worthy of the adulation and support of the victimized Targeted Constituencies.

637.    Upon information and belief, during the February 23, 2022 Rustgi/Corwin Zoom Meeting, Dr. Rustgi and Dr. Corwin almost tripped over themselves trying to paint Dr. Lieberman as a monster whom they had slain so heroically.

638.    Upon information and belief, during the February 23, 2022 Rustgi/Corwin Zoom Meeting, Dr. Corwin boasted, in words or substance:  "Let me just reiterate.  [Dr. Lieberman] has no administrative responsibilities, will not be signing off on anything.  He has no clinical responsibilities within the hospital, has been indefinitely suspended as the chair, and there will be an interim chair who will make those decisions."

639.    Upon information and belief, during the February 23, 2022 Rustgi/Corwin Zoom Meeting, Dr. Rustgi piled on, assuring the attendees, in words or substance, that Dr. Lieberman was being stripped of any involvement in the exceptionally successful research-grant/fundraising efforts that he had spearheaded to the benefit of NYSPI/Columbia/Presbyterian

Psychiatry.  Upon information and belief, Dr. Rustgi stated, in words or substance:  "I'll reiterate that we've already done an inventory of Dr. Lieberman's grants and we have initiated following up with the appropriate organizations and authorities.  So, one, the research will not suffer, and two, his role in that research will be adjudicated, so I want to provide reassurance about that."

640.    Hardly satisfied with their itemization of the egregious punitive measures that the Individual State Actor Defendants and the Entity Defendants had taken and were planning to take against Dr. Lieberman in unlawful retaliation for the content of his February 19, 2022 Personal Tweet, Dr. Rustgi and Dr. Corwin used the February 23, 2022 Rustgi/Corwin Zoom Meeting as another opportunity to try to convince the attendees (and the public at large) that they had been victimized by the February 19, 2022 Personal Tweet and should therefore be outraged.

641.    Accordingly, during the February 23, 2022 Rustgi/Corwin Zoom Meeting, Dr. Corwin engaged in shameful demagoguery in an effort to whip the attendees (and the public at large) into a frenzy against Dr. Lieberman, so that they would view the Individual State Actor Defendants and the leadership of the Entity Defendants as protectors deserving of political, social and academic support.  Dr. Corwin began, in words or substance, as follows:  "After getting over the initial astonishment at the tweet, both Dr. Rustgi and I were quite hurt by it, [we] understand the hurt that it caused and [we] understand the pain that it did cause.  And that's something that as a community we have to get over.  We have to move beyond it."

642.     Of course, contrary to Dr. Corwin's rhetoric, the very purpose of the February 23, 2022 Rustgi/Corwin Zoom Meeting, as well as the additional town hall meetings held by Defendants thereafter, was to ensure that the attendees did not simply "move beyond" the February 19, 2022 Personal Tweet that Defendants had so completely mischaracterized.

643.     As noted, the actual purpose of the February 23, 2022 Rustgi/Corwin Zoom Meeting was quite the opposite.  That Zoom Meeting was a carefully orchestrated vehicle through which Dr. Corwin, Dr. Rustgi and the other senior leaders of the Entity Defendants, in concert with the Individual State Actor Defendants, sought to stir up a sense of victimization and aggrievement among the Targeted Constituencies to justify Defendants' egregious mistreatment of Dr. Lieberman for the purpose of advancing Defendants' overlapping political, social and academic agendas.

644.     It was for the purpose of fomenting that sense of victimization and aggrievement among the February 23, 2022 Rustgi/Corwin Zoom Meeting attendees that Dr. Corwin opened said Zoom Meeting with his dramatic reference to the purported shock, hurt and pain that he and Dr. Rustgi had suffered when they read Dr. Lieberman's 15-word February 19, 2022 Personal Tweet.

645.     As of February 23, 2022, Dr. Corwin was a veteran medical professional who had weathered, among other things, the crack cocaine epidemic, the devastating spike in HIV/AIDS cases, the carnage caused by the September 11, 2001 terrorist attacks on the World Trade Center, the destruction and death caused in New York City and surrounding areas by

Hurricane Sandy in 2012, and the horror of the COVID-19 pandemic.  *See, e.g.,* Jonathan

Lamantia, "Dr. Steven Corwin," *Crain's New York Business* (2020), accessible at

*https://www.crainsnewyork.com/awards/hall-fame-2020-dr-steven-corwin*.

646.   Yet, incredibly, Dr. Corwin told the attendees of the February 23, 2022

Rustgi/Corwin Zoom Meeting that Dr. Lieberman's intended compliment to an internationally-

renowned fashion model by means of his February 19, 2022 Personal Tweet had somehow

"astonish[ed]" Dr. Corwin and caused him unspeakable "hurt" and "pain" — and that said Tweet

should therefore also shock and pain the meeting attendees (and the public at large).

647.   During the February 23, 2022 Rustgi/Corwin Zoom Meeting, Dr. Corwin,

continued to inflame the situation in the hopes of manufacturing a sense of victimhood among

the attendees (and the public at large) and generating anger toward Dr. Lieberman.  Dr. Corwin

declared shamefully and recklessly, in words or substance:  "Your outrage at this is an example

of our culture and I'm proud of the outrage that you showed because it was outrageous, and we

will do whatever we can to make sure that, as leaders, as leaders that choose leaders, that the

value system that we hold so dear is upheld and that your confidence and faith in the leadership

of the department will be justified."

648.   Of course, as of the time the February 23, 2022 Rustgi/Corwin Zoom

Meeting was held, the only "outrageous" conduct was that which had been undertaken in concert

by Defendants to perpetrate their Unlawful Scheme against Dr. Lieberman.

649.     At the conclusion of the February 23, 2022 Rustgi/Corwin Zoom Meeting,

Dr. Rustgi, not to be outdone by Dr. Corwin's hyperbolic speech, framed in almost apocalyptic

terms Defendants' punitive response to the content of Dr. Lieberman's February 19, 2022

Personal Tweet.

650.     Addressing the attendees of the February 23, 2022 Rustgi/Corwin Zoom

Meeting, as well as the broader public community, Dr. Rustgi declared, in words or substance:

"It's going to take time and we have to start the healing process through this announcement.  We

appreciate what all of you are going through and beyond the department, those — there are

thousands not connected with the department that are grieved, injured, hurt, and we have to heal

and at the same time, we have to restate our principles," including "equity, diversity and

inclusion.  This is part of our fabric.  It's our philosophy and this is an unwelcome deviation from

that, but we will win out."

**(iii)    The Afternoon of February 23, 2022: Dr. Sullivan Expands
          Upon the Negative PR Campaign Against Dr. Lieberman**

651.     Having played a pivotal role in the willful, intentional and malicious

Forced Resignation of Dr. Lieberman from NYSPI in retaliation for the content of his February

19, 2022 Personal Tweet, Dr. Sullivan announced via e-mail at approximately 2:15 p.m. on

Wednesday, February 23, 2022, that Dr. Smith, with whom she had worked closely in effecting

Dr. Lieberman's termination (*see* Background Section XVI(C), above), had been named Interim

Director of NYSPI (the "***February 23, 2022 Sullivan Announcement***").

652.    Unable to resist advancing the false narrative embodied in Defendants' Unlawful Scheme against Dr. Lieberman, Dr. Sullivan included the following self-serving remarks in the February 23, 2022 Sullivan Announcement:  "We are writing to inform you that the Office of Mental Health took immediate action after learning of Dr. Jeffery Lieberman's offensive and inappropriate comments on social media.  He has resigned from his position.  As of February 22, he is no longer affiliated with OMH or the State of New York.  Dr. Thomas Smith will serve as the interim director of the New York Psychiatric Institute effective immediately."

### (iv)    The Evening of February 23, 2022: Dr. Smith Expands Upon the Negative PR Campaign Against Dr. Lieberman

653.    As demonstrated in detail herein (*see* Background Section XVI(C), above), Dr. Smith, along with the other Individual State Actor Defendants and the leadership of the Entity Defendants, was a key participant in the events of Tuesday, February 22, 2022, that culminated in the willful, intentional and knowingly unconstitutional Forced Resignation of Dr. Lieberman from NYSPI in retaliation for the content of his February 19, 2022 Personal Tweet and put in motion the additional punitive measures that were implemented in accordance with Defendants' Unlawful Scheme.

654.    As noted, by Wednesday, February 23, 2022, Dr. Smith had been named the Interim Director of NYSPI, a position that he held briefly until Dr. Simpson was shortly thereafter tapped to fill that role.

655.    For all the reasons addressed in detail herein, having stripped Dr.

Lieberman of his leadership positions within NYSPI/Columbia/Presbyterian Psychiatry in

retaliation for the content of his February 19, 2022 Personal Tweet, Defendants were not content

to simply move forward in a low-key, professional manner.  Instead, they elected to double down

on their Unlawful Scheme for the purpose of further advancing Defendants' overlapping

political, social and academic agendas.

656.    At approximately 5:21 p.m. on Wednesday, February 23, 2022, Dr. Smith,

in his new role as Interim Director of NYSPI, along with Dr. Simpson, Melissa Arbuckle (who

had served as Dr. Lieberman's Vice Chair for Education in the Columbia Medical School

Department of Psychiatry and, like Dr. Simpson, was involved in drafting the February 22, 2022

Vice Chairs Apology) and other members of the NYSPI/Columbia/Presbyterian Psychiatry

leadership team, circulated an e-mail announcement from the Director's Office (using the e-mail

address "*director@nyspi.columbia.edu*") bearing the salutation "Dear Colleagues" (the

"***February 23, 2022 Smith/Simpson Announcement***").

657.    In the February 23, 2022 Smith/Simpson Announcement, which, upon

information and belief, was drafted in close consultation and coordination with the other

Individual State Actor Defendants and the leadership personnel of the Entity Defendants, Dr.

Smith and Dr. Simpson continued to implement Defendants' Unlawful Scheme.  They did so in a

relentless attempt to manufacture a sense of victimhood and upset among the recipients that

could be harnessed to curry favor with the Targeted Constituencies for the purpose of advancing

Defendants' overlapping political, social and academic agendas.

658.     Piggybacking on the inflammatory, obsequious statements made by Dr. Rustgi and Dr. Corwin during the February 23, 2022 Rustgi/Corwin Zoom Meeting, Dr. Smith and Dr. Simpson continued to besmirch Dr. Lieberman for the purpose of advancing Defendants' overlapping political, social and academic agendas.  In the February 23, 2022 Smith/Simpson Announcement, Dr. Smith and Dr. Simpson declared:

> "Dr. Jeffrey Lieberman's social media message over the weekend caused pain and outrage to our NYSPI/Columbia Psychiatry family.  Dr. Lieberman resigned as Executive Director of the New York State Psychiatric Institute yesterday evening and this morning was suspended as Chair of the Columbia Department of Psychiatry.  Dr. Thomas Smith will serve as acting director of the New York Psychiatric Institute effective immediately.
>
> "We condemn the racism and sexism reflected in Dr. Lieberman's tweet and acknowledge and share the hurt, sadness, confusion, and distressing emotions you may be feeling.  Moving forward, the NYSPI and Columbia Psychiatry leadership commit to face racism and inequality and strive toward equity and inclusion in our actions.  We commit to supporting our new leadership and continuing our efforts to champion diversity, equity, inclusion, and justice."

659.     Upon information and belief, Defendants calculated that it was in their collective interests to prolong their Unlawful Scheme against Dr. Lieberman, as well as to continue to impose ever more punitive measures against him, because it would allow them to continue to milk the situation and thereby ingratiate themselves with the Targeted Constituencies for the purpose of advancing Defendants' overlapping political, social and academic agendas.

660.     Accordingly, the February 23, 2022 Smith/Simpson Announcement went on to seek to persuade the recipients thereof that they required "support" in the form of, among other things, ever more town hall meetings and "anonymous messaging" — from which, of course, Dr. Lieberman would be excluded.  As set forth in said Announcement, Defendants

239

intended to hold additional town hall meetings on four consecutive business days (Thursday,

February 24, 2022; Friday, February 25, 2022; Monday, February 28, 2022; and Tuesday, March

1, 2022):

> "We offer our support to all and invite you to communicate with us directly with questions or concerns.
>
> "Moving forward will require that we have necessary but difficult conversations. NYSPI and Columbia Psychiatry area leaders, directors and supervisors are encouraged to discuss experiences and reactions with their staff as needed.  As noted earlier, the Columbia Psychiatry Office of Equity, Diversity and Inclusion offers immediate support via email: columbiapsychiatry.edi@nyspi.columbia.edu (or click here for virtual anonymous messaging directly to the office).
>
> "Dr. Smith and the NYSPI/Columbia Psychiatry leadership team will host town hall meetings open to all NYSPI/Columbia faculty and staff to provide further updates and offer opportunities for discussion.  These calls will take place from 11:00 – noon on each of the next four days (Thursday 2/24, Friday 2/25, Monday 2/28, and Tuesday 3/1).  Calls will require registration and be capped at 150 attendees to allow for discussion[.]"

661.    The 600 aggregate persons whom Defendants hoped to attract through the

February 24, 2022 – March 1, 2022 town hall meetings (150 attendees for each of the four

meetings) was not a sufficient number for Defendants.  To feed their insatiable appetite for safe-

space sessions in which to advance their overlapping political, social and academic agendas by

defaming Dr. Lieberman in retaliation for the content of his February 19, 2022 Personal Tweet,

Defendants were prepared to hold ever more town hall meetings.

662.    The February 23, 2022 Smith/Simpson Announcement therefore stated:

"We will schedule additional town hall meetings as necessary moving forward.  We look forward

to you joining us in these conversations as we work toward helping our colleagues heal."

663.     As noted, almost six months after Dr. Lieberman's Forced Resignation from NYSPI, ***Dr. Smith, in a rare burst of candor, admitted to Dr. Lieberman that, just as Dr. Lieberman had suspected, Defendants' Unlawful Scheme was indeed driven by Defendants' overlapping political, social and academic agendas***.

664.     During the August 3, 2022 Smith-Lieberman Telephone Conversation, Dr. Smith explained to Dr. Lieberman, in words or substance, that ***consideration of Dr. Lieberman's February 19, 2022 Personal Tweet "went to the Governor, or at least it went to her chief of staff," who was "adamant" that the State make "a complete and full break" with Dr. Lieberman, who would not be allowed "to be onsite moving forward***."

665.     During the August 3, 2022 Smith-Lieberman Telephone Conversation, Dr. Smith explained to Dr. Lieberman, in words or substance, that, in compelling Dr. Lieberman's Forced Resignation as Executive Director of NYSPI, the Individual State Actor Defendants were made aware of the "optics" of the situation, as perceived by "the Governor's Office." ***Dr. Smith further confirmed, in words or substance, that the Individual State Actors Defendants' decision to retaliate against Dr. Lieberman for the content of his February 19, 2022 Personal Tweet by terminating his employment with NYSPI was one that was very much influenced by gubernatorial "politics" and "optics" — given that the "new Governor" wanted "to be reelected" and was therefore quite conscious of the optics of "ethno-racial disparities, equity, etc***."

241

666.    While the Individual State Actor Defendants were undoubtedly influenced by the perceived climate in the Governor's Office (Chambers), each of the Individual State Actor Defendants made a knowing, conscious and independent decision, in concert with the leadership of the Entity Defendants, to trample Dr. Lieberman's constitutionally protected freedom of expression in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet.

667.    By Wednesday, February 23, 2022, Dr. Lieberman had been advised by Defendants that his NYSPI e-mail account had been shut down, his contacts list had been deleted and he was to stay at home indefinitely and not enter the premises of NYSPI/Columbia/ Presbyterian Psychiatry.  Dr. Lieberman was also advised that, until further notice, he was prohibited from speaking with staff, faculty, patients and donors.  (When he asked who would care for his patients, Dr. Lieberman was advised curtly to send Defendants a list of his patients.)

668.    Upon information and belief, within a few days of Dr. Lieberman's Forced Resignation from NYSPI, Dr. Simpson engaged in yet another gratuitous, malicious and carefully considered act of retaliation against Dr. Lieberman for the content of his February 19, 2022 Personal Tweet.  Intended by Dr. Simpson as a deliberate slap in the face to Dr. Lieberman for all to see at the headquarters of NYSPI/Columbia/Presbyterian Psychiatry, this petty act was designed to further punish, ostracize, humiliate and intentionally harm Dr. Lieberman.

669.    As noted, as of February 22, 2022, certain walls of the NYSPI/Columbia/ Presbyterian Psychiatry headquarters at 1051 Riverside Drive in Manhattan had been covered with painted murals of historical and current NYSPI/Columbia/Presbyterian Psychiatry

242

personnel, enlarged photographs depicting uplifting scenes and inspirational messages.  One

such wall mural depicted Dr. Lieberman standing with a few colleagues at a Department social

event (the "***Lieberman and Colleagues Wall Mural***").

670.    Upon information and belief, to advance her and the other Defendants'

political, social and academic agendas by boasting to the Targeted Constituencies that

Defendants had destroyed Dr. Lieberman's reputation and career in response to the content of his

February 19, 2022 Personal Tweet — *i.e.*, that Defendants had literally "erased" him —  Dr.

Simpson, just a few days after Dr. Lieberman's Forced Resignation from NYSPI and removal

from his other leadership positions within NYSPI/Columbia/Presbyterian Psychiatry, directed

that the image of Dr. Lieberman in the Lieberman and Colleagues Wall Mural be painted over.

671.    Dr. Lieberman was also advised on Wednesday, February 23, 2022, that

he had been placed on "Administrative Time-Out" by Presbyterian/Columbia Hospital.

672.    Upon information and belief, as a direct result of Defendants' Unlawful

Scheme against Dr. Lieberman, including Defendants' Negative PR Campaign, the February 23,

2022 New York Times Lieberman Article reported Defendants' punishment of Dr. Lieberman.

*See* February 23, 2022 New York Times Lieberman Article, accessible at *https://www.nytimes.*

*com/2022/02/23/nyregion/columbia-jeffrey-lieberman.html*.

673.    Upon information and belief, the February 23, 2022 New York Times

Lieberman Article was based upon information provided to the *New York Times* by one or more

of the Defendants (including, according to the article, at least one spokesperson for Columbia University) and by others with the express or tacit approval of one or more of the Defendants.

674.     The author of the February 23, 2022 New York Times Lieberman Article — who, again, upon information and belief, was fed the information for the article by one or more of the Defendants and others acting with Defendants' express or tacit approval — (a) cherry-picked the "freak of nature" phrase out of context from the rest of the February 19, 2022 Personal Tweet; (b) reported that "the tone [at the February 23, 2022 Rustgi/Corwin Zoom Meeting] was serious and grave"; and (c) noted that "[t]he head of the [Presbyterian/Columbia] [H]ospital [Dr. Corwin] described [Dr. Lieberman's Tweet] as 'outrageous.'"   *See* February 23, 2022 New York Times Lieberman Article, accessible at *https://www.nytimes.com/2022/02/23/ nyregion/columbia-jeffrey-lieberman.html*.

675.     The February 23, 2022 New York Times Lieberman Article stated, in part, as follows:

> "The chair of the Columbia University department of psychiatry was suspended on Wednesday, 'effective immediately,' after referring to a dark-skinned model as possibly a 'freak of nature' on Twitter.

> "Dr. Lieberman, who specializes in schizophrenia and is considered one of the leading psychiatrists in the nation, was also removed from his position as psychiatrist-in-chief at Columbia University Irving Medical Center/NewYork Presbyterian Hospital. That decision is final, according to a spokesman for Columbia University.

> "Dr. Lieberman also resigned from his role as executive director of the New York State Psychiatric Institute on Tuesday evening.

"Department leaders at Columbia called a meeting for faculty and staff on Wednesday afternoon to discuss the situation, and to announce that an interim chair would be named. Several hundred people attended the Zoom meeting, according to a person who attended, and the tone was serious and grave.  The head of the hospital described the tweet as outrageous."  *See* February 23, 2022 New York Times Lieberman Article, accessible at *https://www.nytimes.com/ 2022/02/23/nyregion/columbia-jeffrey-lieberman.html*.

**E.**      **February 24, 2022: Courageous Persons Begin To Reject Defendants' Unlawful Scheme Against Dr. Lieberman**

   **(i)**      **Courageous Voices Within the NYSPI/Columbia/ Presbyterian Psychiatry Community and Columbia University Generally**

676.    The destructive power of Defendants' Unlawful Scheme against Dr. Lieberman that was launched by means of the February 22, 2022 Columbia FPO E-Mail and then implemented in successive, carefully-coordinated stages by the Individual State Actor Defendants and the senior leadership of the Entity Defendants and NYSPI/Columbia/ Presbyterian Psychiatry over the next 15 months cannot be overstated.

677.    As noted, Defendants' Unlawful Scheme against Dr. Lieberman included the carefully planned and coordinated Negative PR Campaign that was and is designed (a) to justify Defendants' egregious destruction of Dr. Lieberman in knowing, malicious violation of his constitutionally and otherwise protected free-expression rights (and in contravention of the oft-repeated free-expression policies of Columbia University that govern the activities of NYSPI/ Columbia/Presbyterian Psychiatry); (b) to bully the NYSPI/Columbia/Presbyterian Psychiatry community (and the public at large) into embracing Defendants' knowingly false narrative that Dr. Lieberman was a racist, sexist villain at whose hands, via his well-intentioned February 19,

245

2022 Personal Tweet, the community had been traumatized and victimized; and (c) to convince the Targeted Constituencies that, because Defendants had destroyed said villain, Defendants were deserving of those Constituencies' political, social and academic support.

678.    However, upon information and belief, many of those who comprised the audience targeted by Defendants' Unlawful Scheme actually rejected Defendants' false narrative about Dr. Lieberman and recoiled at Defendants' imposition of punitive sanctions against him in retaliation for his well-intentioned February 19, 2022 Personal Tweet (collectively, the "***Dissenting Community Members***"; individually, a "***Dissenting Community Member***").

679.    However, upon information and belief, few of the Dissenting Community Members who witnessed Defendants' merciless destruction of Dr. Lieberman believed that they themselves could risk dissenting openly from the false narrative that was being pushed so aggressively by means of Defendants' Unlawful Scheme.

680.    Upon information and belief, most of the Dissenting Community Members were cowed into silence by the recognition of Defendants' terrifying power to subject to withering ridicule, humiliation and, ultimately, annihilation anyone who dissented from Defendants' false narrative about Dr. Lieberman and/or who saw through Defendants' shameful political motives.

681.    This paralyzing fear that has prevented so many Dissenting Community Members from dissenting publicly was (and continues to be) quite tragic in light of, among other things, the vigorous free-expression policies and ideals of Columbia University that govern

Defendants and NYSPI/Columbia/Presbyterian Psychiatry (*see* Background Sections XV(C) and XV(D), above).

682.    Professor McWhorter, himself a Dissenting Community Member, had in 2021 examined the debilitating fear wrought by Cancel Culture:

> "Graduate students and professors write me . . . in droves, frightened that this new ideology will ruin their careers, departments, or fields, as they also do to other organizations, often on private email accounts to avoid being smoked out by anyone at the institutions they work for." *See Woke Racism: How a New Religion Has Betrayed Black America* at 6 (Penguin Random House 2021).

683.    Notwithstanding the intended atmosphere of intimidation created by Defendants' Unlawful Scheme against Dr. Lieberman, certain Dissenting Community Members — of diverse racial, ethnic and cultural backgrounds — did step up to voice their disagreement with Defendants' shameful treatment of Dr. Lieberman.

684.    One such Dissenting Community Member who spoke up bravely was Professor McWhorter himself.  On or about Thursday, February 24, 2022, Professor McWhorter relayed to Dr. Lieberman his belief that, in posting his February 19, 2022 Personal Tweet, Dr. Lieberman "did nothing wrong" and that Defendants had treated Dr. Lieberman unjustly.

685.    On March 1, 2022, Professor McWhorter penned an opinion piece for the *New York Times* in which he addressed certain aspects of Defendants' Unlawful Scheme against Dr. Lieberman.  *See* John McWhorter, "One Graceless Tweet Doesn't Warrant Cancellation," *New York Times* (March 1, 2022) (the "***March 1, 2022 McWhorter Opinion Piece***"), accessible at *https://www.nytimes.com/2022/03/01/opinion/psychiatry-professor-tweet.html*.

4890-9158-2565, v. 1

686.     The March 1, 2022 McWhorter Opinion Piece did not purport to address the crucial threshold facts that (a) Dr. Lieberman's February 19, 2022 Personal Tweet constituted personal speech about a public figure that is constitutionally protected and (b) such protections would apply even if said Tweet somehow had been intended to criticize or insult Ms. Gatwech (which, as demonstrated in detail herein, was not even remotely the case).

687.     Nor did the March 1, 2022 McWhorter Opinion Piece address specifically the bitter irony that Defendants' willful, intentional and malicious destruction of Dr. Lieberman in retaliation for the content of his February 19, 2022 Personal Tweet for the purpose of advancing Defendants' political, social and academic agendas was all the more hypocritical because it was undertaken in the academic environment in which NYSPI/Columbia/Presbyterian Psychiatry, the Individual State Actor Defendants and the Entity Defendants operate — an environment governed by the time-honored free-expression policies and ideals articulated by the United States Supreme Court, the United States Congress and Columbia University (*see* Background Section XV, above).

688.     It was within this traditional bastion of academic free expression that Defendants engaged in their willful, intentional and malicious efforts to prevent any direct, constructive dialogue between Dr. Lieberman and the audience targeted by Defendants' Unlawful Scheme because such an open, free-flowing discussion would have undermined said Scheme, including Defendants' Negative PR Campaign.

689.     It was within this traditional bastion of academic free expression that Defendants engaged in their willful, intentional and malicious efforts to bully the Dissenting Community Members into remaining silent, for fear of ridicule, ostracism and punishment.

690.     However, within the limited scope of the March 1, 2022 McWhorter Opinion Piece, Professor McWhorter did reject decisively the fabricated basis for Defendants' Unlawful Scheme.

691.     The March 1, 2022 McWhorter Opinion Piece debunked Defendants' self-serving myth that, in the context of his February 19, 2022 Personal Tweet, Dr. Lieberman's use of the phrase "freak of nature" was intended to be offensive:

> "Dr. Jeffrey Lieberman, a professor of psychiatry at Columbia University and one of the most accomplished and respected psychiatrists in the world, recently tweeted about Nyakim Gatwech, the celebrated American model of South Sudanese descent who is known for her dark skin, writing, 'Whether a work of art or freak of nature she's a beautiful sight to behold.'  A number of people on social media and within and outside Lieberman's profession found his words offensive, particularly his use of the phrase 'freak of nature' and specifically the term 'freak' in a tweet about a Black woman, and the sequence of events that followed was, sadly, all too predictable.
> * * *
> *"[Dr. Lieberman's] swift sanctioning — accompanied by a Zoom faculty meeting that was attended by hundreds and, according to The Times's reporting, included the head of the hospital describing the tweet as 'outrageous' — appears to have been conducted according to a fantastical notion that Lieberman had called a Black woman a 'freak.'  But he did no such thing.  He used that word in the expression 'freak of nature,' and that expression — regardless of what 'freak' means by itself — was intended as a compliment.  If you doubt it, consider that the supposedly offending phrase was bookended by the phrases 'work of art' and 'beautiful sight to behold.'  Lieberman thought of himself as admiring Gatwech's beauty, and I assume that most people*

249

*understand that, even if they won't admit it*."  March 1, 2022 McWhorter Opinion Piece (emphasis added), accessible at *https://www.nytimes.com/ 2022/03/01/opinion/psychiatry-professor-tweet.html*.

692.    The March 1, 2022 McWhorter Opinion Piece also acknowledged that, as demonstrated herein, Defendants' Unlawful Scheme, including their Negative PR Campaign, intimidated many who disagreed with Defendants' mistreatment of Dr. Lieberman, forcing them to self-censor instead of speaking up publicly in support of Dr. Lieberman.  Professor McWhorter proffered an alternative scenario:

"So, versed as we are now in the etiquette of the virtual meeting, consider a hypothetical scenario:  At the Zoom session where Lieberman was dutifully condemned, one person puts the hand-up sign in her window, and when called on by the moderator, takes a deep breath and says, 'Dr. Lieberman's comment was inappropriate, and I see why a lot of people took exception to it.  But I think this treatment of him is excessive.  I don't think he should be suspended or lose his job.'  After an awkward pause, the applauding-hands icon appears in a different window, followed quickly by another, until the applauding hands decorate a substantial number of the windows, and many of them are from people of color.  The chat section gradually fills up with people chiming in, echoing the meeting's original Spartacus.  The meeting ends in confusion. *The next day, those who were brave enough to stand up to this new cancel-first fashion, who together are too numerous to feasibly face punishment for their unwillingness to acquiesce, gather and write a letter outlining their opposition to mauling someone over a minor tort and calling it social justice*.

"*If only.  Too often, in reality, we stand by and say nothing as we watch expulsions that we know to be unfair, out of fear that we'll be next.  I am unaware of any precedent that encourages us to think of this as moving society in the right direction*."  March 1, 2022 McWhorter Opinion Piece (emphasis added), accessible at *https://www.nytimes.com/2022/03/01/opinion/ psychiatry-professor-tweet.html*.

693.    Another courageous Dissenting Community Member was Spiro Pantazatos, an Assistant Professor of Clinical Neurobiology in Psychiatry at Columbia Medical School.  Professor Pantazatos objected to Defendants' Unlawful Scheme against Dr. Lieberman.

250

694.     Responding directly to the February 23, 2022 Sullivan Announcement, Professor Pantazatos sent an e-mail, from his "nyspi.columbia.edu" e-mail address, at approximately 3:10 a.m. on Thursday, February 24, 2022, addressed to Dr. Sullivan, Dr. Rustgi and others, including Dr. Lieberman, in which he expressed his view that Defendants' Unlawful Scheme against Dr. Lieberman was unjust (the "***February 24, 2022 Pantazatos E-Mail Objection***").

695.     Opening the February 24, 2022 Pantazatos E-Mail Objection with the salutation, "Dear Commissioner Sullivan et al.," Professor Pantazatos, like Professor McWhorter, observed that "***the context of Dr. Lieberman's [February 19, 2022 Personal] [T]weet made it clear that he intended for [the phrase "freak of nature"] to come across as a compliment***."  (Emphasis added.)

696.     Professor Pantazatos cited the recipients of the February 24, 2022 Pantazatos E-Mail Objection to the following *Britannica Dictionary* link, *https://www. britannica.com/dictionary/freak-of-nature*, which provides the following example of the complimentary usage of the "freak of nature" term:  "He's an amazing athlete — a real *freak of nature*" (emphasis in original).  *See also* Background Section XIV, above.

697.     The February 24, 2022 Pantazatos E-Mail Objection went on to explain insightfully that ***the recent disruption to, and the angst within, the NYSPI/Columbia/ Presbyterian Psychiatry community had been caused not by Dr. Lieberman's February 19,***

251

*2022 Personal Tweet, but by the deliberate, shameful and unjust mistreatment of Dr.*

*Lieberman that had been perpetrated through Defendants' Unlawful Scheme.*

698.    In the February 24, 2022 Pantazatos E-Mail Objection, Professor

Pantazatos wrote:

> "*I find it incredibly unjust for [Dr. Lieberman] to lose his livelihood over a momentary lapse in tact and judgment for which he has already apologized for [sic]. I believe people in the department will be much more shaken up and upset by this fact alone, rather than the actual contents of the tweet. His world has turned on a dime, and it seems he (and those who depend on him) are the ones who need the most support right now.*"  (Emphasis added.)

699.    In the February 24, 2022 Pantazatos E-Mail Objection, Professor

Pantazatos observed that the best way for Defendants to calm the storm created by Defendants'

Unlawful Scheme would be to quickly reinstate Dr. Lieberman and terminate the Scheme.

Professor Pantazatos wrote:

> "I urge you to consider being compassionate and giving our fellow humans the benefit of the doubt as being the overarching lessons of the day.  *I believe it will help uplift and bless everyone.*"  (Emphasis added.)

700.    Unwilling to discontinue Defendants' Unlawful Scheme, which was being

used masterfully to stoke the fires required to advance Defendants' overlapping political, social

and academic agendas, Dr. Sullivan declined to send a reply to Professor Pantazatos, Dr.

Lieberman and all of the other persons to whom Professor Pantazatos had sent the February 24,

2022 Pantazatos E-Mail Objection.

701.    It is not known to Dr. Lieberman whether Dr. Sullivan replied to the

February 24, 2022 Pantazatos E-Mail Objection by communicating with Professor Pantazatos

and others separately, while excluding Dr. Lieberman.  In any event, notwithstanding receipt of the February 24, 2022 Pantazatos E-mail Objection, Dr. Sullivan and the other Defendants thereafter pressed ahead aggressively with Defendants' Unlawful Scheme.

702.    On Friday, February 25, 2022, the day after sending the February 24, 2022 Pantazatos E-Mail Objection, Professor Pantazatos elaborated on his belief that most members of the Columbia Medical School Department of Psychiatry, of which Professor Pantazatos himself was a member, consisted of Dissenting Community Members who had been intimidated into silence by fear that their expression of those dissenting views would subject them to punishment at the hands of Defendants.

703.    As noted, such intimidation by Defendants was particularly shameful in light of, among other things, the vigorous free-expression policies and ideals that govern Defendants and NYSPI/Columbia/Presbyterian Psychiatry (*see* Background Sections XV(C) and XV(D), above).

704.    By means of an e-mail sent to Dr. Lieberman at approximately 6:12 a.m. on Friday, February 25, 2022, Professor Pantazatos shared the following thoughts:

> "***I think most of the department [the Columbia Medical School Department of Psychiatry] disapproves of how you [Dr. Lieberman] were treated by higher ups, even if they do not feel comfortable expressing it outright***.
>
> "***The decision to replace you was not made with the best interest of the department in mind, but rather a combination of herd mentality/PR maneuvering to acquiesce to a small vocal minority backed by a twitter mob. Their opinions should not be determining the direction and leadership of the department.  It is clear to most observers that your intentions with the tweet were not malevolent.  I cannot say the same for people who sought your termination***."  (Emphasis added.)

253

**(ii)     Courageous Voices Outside the NYSPI/Columbia/
Presbyterian Psychiatry Community and Columbia
University Generally**

705.    On February 23, 2022, *Medscape Medical News* published a story about

Dr. Lieberman's Forced Resignation from NYSPI and the other sanctions imposed against him in

response to his February 19, 2022 Personal Tweet.  *See* Alicia Ault, "Former APA President

Suspended by Columbia for 'Racist' Tweet," *Medscape Medical News* (Feb. 23, 2022) (the

"***February 23, 2022 Medscape Article***"), accessible at *https://www.medscape.com/viewarticle
/969031*.

706.    Defendants' Unlawful Scheme was designed to disseminate Defendants'

false narrative about Dr. Lieberman, including the punitive measures that had been imposed

upon him, to not only the respective communities of NYSPI/Columbia/Presbyterian Psychiatry

and the Entity Defendants, but also to the general public.  Accordingly, after reporting that Dr.

Lieberman had been suspended from his position as Chair of the Columbia Medical School

Department of Psychiatry, the February 23, 2022 Medscape Article asserted that "a letter from

the school's leadership notifying staff of the suspension [had been] posted on Twitter

this morning by addiction psychiatrist Jeremy Kidd, MD, who is a colleague of Lieberman's [*sic*]

at Columbia."

707.    Among the comments posted in response to the February 23, 2022

Medscape Article by Dissenting Community Members within the medical profession were the

following:

254

(a) **<u>Tudor</u>:** "What horrible aggressiveness [by Defendants]. An incomprehensible reaction to a compliment regarding an exceptionally attractive person. This evermore pervasive behavior, if condoned, will lead to [the] dissolution of American society."

(b) **<u>BK</u>:** "Should have defended his comment instead of turtling."

(c) **<u>Robert</u>:** "I guess that I am missing something, or I am way dumber than previously imagined. I read the tweet as a compliment to a woman of color."

(d) **<u>Sarah</u>:** "Where exactly is the racism in his comment, not the fact of the model's race, the fact of his actual words?"

(e) **<u>Erik</u>:** "[By apologizing,] [h]e tried to appease the woke cultural terrorists. Big mistake."

(f) **<u>Bruce</u>:** "Appeared to be a simple freedom of speech expressing A COMPLIMENT in an unusual way . . [*sic*] We have become an over-reactive society. Sad."

(g) **<u>Constance</u>:** "What if the model had been white or Caucasian . . .? Would he still have been demoted? Some folks don't recognize a compliment when they see it. That's all I can say."

(h) **<u>David</u>:** "100% correct. Sue Columbia for $100 million in exemplary damages. To deter."

(i) **<u>Jeffery R.</u>:** "I am lost & un woke. If he would have said 'gift' instead of 'freak', is that ok? I thought it was meant as a compliment...as in 'Tom Brady is a freak'. No apologies or explanations accepted. Everything is a microaggression, and they want a pound of flesh in retaliation. . . . Why so upset[?] I think one man's/woman's lingo, what it invokes, is not another[']s. My daughter is a petite pretty dentist. She was a dancer and has hypermobility. She has been called a 'freak . . . it is complementary [*sic*] since, in our circles (especially athletic, aerobic) the term 'freak' is meant to be 'outside the norm' or 'exceptional[.]'"

(j) **<u>Joshua</u>:** "This is interesting. Models are highly paid to sell products based on their perceived attractiveness. There is a v[a]st commercial and cultural enterprise built around this practice that touches almost every aspect of everyday life. But if someone comments explicitly on a model's perceived attractiveness, they are condemned for violating some of

255

society's most sacred taboos.  What would a visitor from another planet make of this?"

(k)    **Mark:**  "Much ado about nothing.  The wokescolds do not really care about one's apologies for ostensibly offensive remarks  . . . They operate in bad faith.  NEVER APOLOGIZE . . . It's like chumming the water to attract hungry sharks."

708.    On February 28, 2022, *Medscape Medical News* published a follow-up story about Dr. Lieberman's Forced Resignation from NYSPI and the other sanctions imposed against him in response to his February 19, 2022 Personal Tweet.  *See* Kelli Whitlock Burton, "Interim Psych Chair Named After 'Racist' Twitter Controversy," *Medscape Medical News* (Feb. 28, 2022) (the "*February 28, 2022 Medscape Article*"), accessible at *https://www.medscape. com/viewarticle/969351*.

709.    The February 28, 2022 Medscape Article revealed that the author had been provided a copy of a February 28, 2022 internal NYSPI/Columbia/Presbyterian Psychiatry e-mail authored by, among others, Dr. Armstrong, the then incoming Dean of Columbia Medical School; Dr. Sullivan; Dr. Rustgi; and Dr. Corwin, which announced that Dr. Simpson had been named Interim Chair of the Columbia Medical School Department of Psychiatry, Interim Director of NYSPI and Interim Psychiatrist-in-Chief of Presbyterian/Columbia Hospital (the "*February 28, 2022 NYSPI/Columbia/Presbyterian Psychiatry Announcement*").

710.    The February 28, 2022 Medscape Article reported:  "Columbia University has appointed an interim chair of psychiatry in the wake of a controversial tweet sent out last week, according to an email obtained by *Medscape Medical News* that was sent by university leadership to faculty and staff this afternoon.  Helen Blair Simpson, MD, PhD, will take over for

256

Jeffrey Lieberman, MD, who was suspended last week over a tweet he sent February 21 that was widely condemned as both racist and sexist."  *See* February 28, 2022 Medscape Article, accessible at *https://www.medscape.com/viewarticle/969351*.

711.    Among the comments posted by Dissenting Community Members within the medical profession in response to the February 28, 2022 Medscape Article were the following:

(a)    **Felicia:**  "And here I was expecting to find a tweet that was offensive"

(b)    **Nayade:**  "Why is [it] that this country is all about black and white?  I come from a Caribbean country where we were able to call a black person 'black' and no one would be offended[.]"

(c)    **Karla**  "This seems like a gross overreaction, and unfair to him. I read his comment to be an innocent observation on an unusual beauty. There ARE humans and creatures who are striking and lovely because of distinct features.  PC overreach in canning him; terrible."

(d)    **Jeff:**  "Forced confession, that's the problem.  And you can see what good it did him.  There is no forgiveness in the world of woke.  No penance will ever be sufficient."

(e)    **JoAnn:**  "Sorry but that does not seem like something to go so wild about.  Politically correct at its craziest.  Pretty soon we won't have anyone working as we all say things occasionally that could offend someone somewhere."

(f)    **John:**  "These administrators and directors should be, and possibly are, ashamed of their cowardly response to the demands of a woke mob[.] It is like the Inquisition, the French Revolution, the Salem witch trials, the Red Guard.  An accusation is enough to require confession and a re-education camp."

(g)    **Elene:**  "I'm female and pretty damed [*sic*] woke, but I don't think his comment deserved such extreme consequences.  BTW I posted a picture of this exceptionally beautiful woman on Facebook a few months ago, with the simple idea that my friends would enjoy seeing it."

257

(h)   **Patrick:**  "I am so tired of the the [*sic*] rampant purity police.  Please, grow up and get a life!  Dr. Lieberman's comment was innocuous and, ultimately, a compliment.   She is a model, after all: her job, which she chose, is to BE beautiful.  It's disturbing to see Dr. Lieberman beaten into submission with his confession."

(i)   **Ben:**  "I wonder if this kind of sensitivity would be shown if his [Dr. Lieberman's] replacement had made the comment instead.  Of course not, because the whole point is to demographically cleanse all positions of prominence based entirely on identity.  That is transparently the case here."

(j)   **Peter:**  "Shaq O'Neal, Michael Phelps are freaks of nature in their own way.  No sports commentator was ever erased for saying such.  Please tell me there was more to this story."

(k)   **Teresa.**  "I don't know what the tweet was about.  One wonders if a full career devoted to medicine should be wiped off by one inappropriate comment.  Or is the objective that nobody speaks, just in case?  Really, Medscape is dedicating a lot of energy to publicize the public scorn of this or that physician, as judged by the social media mob.  There may be unfortunate comments, or titles for papers, but everybody can make a mistake.  I certainly did not sign on Medscape for this kind of finger pointing, censorship and punishment.  Scientific news and controversies are more interesting."

(l)   **Elizabeth:**  "Just googled her [Ms. Gatwech].  This doc's response was mild compared to what her fans say and the [*sic*] what the reporters write about her, and what the photographers show of her.  You'll be the judge."

(m)   **Anibal:**  "This is terrible.  Woke[']s everywhere.  So sorry."

(n)   **Alan:**  "What an injustice.  This comes right out of Kafka or the Mao Cultural Revolution.  A lifetime of work destroyed by a rabble of social justice vigilantes, That there is no justice to social justice is the lesson.  What is especially awful is these holier than thou students will be doctors and medical professionals.  We all should be very worried."

(o)   **Pieter:**  "To my non awakened mind it sou[n]ds like a compliment he gave her.  Beautiful."

(p)   **Joanne:**  "We are all perfectly imperfect human beings.  As a psychiatrist, the basis of the therapeutic relationship is repair of

258

empathic failures.  We get second and third and fourth chances.  The woke mob has eliminated this.  You get zero chances.  Say something they don't like - you're out!  Even if you take responsibility and apologize - you're out!  I read this article [the February 28, 2022 Medscape Article] with a sinking sensation of dread.  An entire career cancelled by one impulsive comment.  The witch hunt is never over."

(q)     **Graham.**  "The man was commenting on the appearance of a woman whose job is based completely on appearance.  Explain why this is a problem, please."

(r)     **Garrick:**  "I grew up in a communist country where expressing unapproved views was frowned upon.  You lost your job and, sometimes, freedom.  Nuff said."

(s)     **Dean:**  "Sad, but not surprising.  We've experienced a couple of pogom attempts at my medical school, and the targets and rhetoric of the woke mob here were pretty blatantly anti Semitic.  This is a cultural witch hunt, and anyone with non-sanctioned opinions is at risk.  All the more reason to stay clear of any form of social media, since those who live by the tweet often die by the tweet."

(t)     **Terryann:**  "This country has totally lost its bearings."

(u)     **Ian:**  "I'm still trying to understand what's wrong with his tweet.  He complimented a woman for being attractive.  Has the United States gone stark staring mad?  Why did he apologise?  Never apologise to the baying mob[.]"

(v)     **DeWayne:**  "Another victim of the woke witch-hunt."

F.     **Thursday, February 24, 2022: Defendants' Negative PR
Campaign Against Dr. Lieberman Roars Into Overdrive**

712.    As noted, it was in Defendants' collective interests to prolong their

Unlawful Scheme against Dr. Lieberman, so that they could continue to pander to their Targeted

Constituencies for the purpose of advancing Defendants' overlapping political, social and

academic agendas.

713.    The first town hall meeting at which Dr. Lieberman was to be further

demonized by the Individual State Actor Defendants and the leadership of the Entity Defendants

was to be held on the morning of Thursday, February 24, 2022 (the "***February 24, 2022 Town

Hall Meeting***").

714.    At approximately 11:00 a.m. on Thursday, February 24, 2022, Dr. Smith,

Dr. Simpson, Dr. Arbuckle and other members of the NYSPI/Columbia/Presbyterian Psychiatry

leadership team circulated an e-mail announcement from the Director's Office (using the e-mail

address "*director@nyspi.columbia.edu*") advising of a slight delay in the starting time for the

February 24, 2022 Town Hall Meeting (the "***February 24, 2022 Smith/Simpson

Announcement***").

715.    The February 24, 2022 Smith/Simpson Announcement pushed forward

with Defendants' Unlawful Scheme, continuing to fuel the false narrative that Defendants'

destruction of Dr. Lieberman was necessary to heal what Defendants sought persistently to

convince the NYSPI/Columbia/Presbyterian Psychiatry community (and the public at large) were

emotional scars caused by the content of the February 19, 2022 Personal Tweet.

4890-9158-2565, v. 1

716.     The February 24, 2022 Smith/Simpson Announcement provided information for attending the February 24, 2022 Town Hall Meeting, as well as the other three town hall meetings that were scheduled through March 1, 2022.  The Announcement also promised that Defendants would "schedule additional town hall meetings as necessary moving forward."

717.     The February 24, 2022 Smith/Simpson Announcement closed by again advancing the core objectives of Defendants' Unlawful Scheme — convincing the attendees that (a) the destruction of Dr. Lieberman was righteous, (b) only through the therapeutic town hall meetings could the community begin to recover from the trauma caused by the February 19, 2022 Personal Tweet and (c) Defendants should be credited for protecting the community.

718.     Using words and phrases more commonly and properly associated with mass shootings and other palpable tragedies, the February 24, 2022 Smith/Simpson Announcement expressed the authors' hope that the Announcement recipients would join them "in these conversations as we work toward helping our colleagues heal."

719.     At approximately 1:53 p.m. on Thursday, February 24, 2022, fewer than three hours after the commencement of the February 24, 2022 Town Hall Meeting, certain members of the NYSPI/Columbia/Presbyterian Psychiatry leadership (including Dr. Jacques Ambrose and Dr. Baptista) recirculated the February 23, 2022 Smith/Simpson Announcement along with their updated message (the "***February 24, 2022 Ambrose/Baptista Announcement***").

720.     The February 24, 2022 Ambrose/Baptista Announcement was addressed to "Columbia Faculty, Staff, and Community" and included the following subject line: "Follow-up message on behalf of Columbia Psychiatry outpatient clinical leadership[.]"

721.     In the February 24, 2022 Ambrose/Baptista Announcement, the NYSPI/Columbia/Presbyterian Psychiatry leadership team members redoubled their efforts to exploit Dr. Lieberman's February 19, 2022 Personal Tweet to advance Defendants' overlapping political, social and academic agendas through their Unlawful Scheme.

722.     To advance their overlapping agendas, Defendants pursued vigorously their concerted, overarching objective of convincing the community members that they had somehow been victimized by Dr. Lieberman's February 19, 2022 Personal Tweet.  Upon information and belief, Defendants recognized that a sustained effort was necessary because most reasonable persons understood instinctively that the Tweet was intended by Dr. Lieberman as an enthusiastic compliment of the extraordinary beauty of an internationally-renowned fashion model who had quite proudly embraced her exquisite pigmentation and the nickname, "Queen of the Dark," as her brand.  *See, e.g.,* WOE Magazine (quoting Ms. Gatwech as saying, "I realized ['Queen of Dark'] was a catchy name to use for my brand"), accessible at *https://woemagazine. com/nyakim-gatwech-breaking-barriers-on-colorism-while-thriving-in-black-girl-excellence/.*

723.     Accordingly, the Individual State Actor Defendants, in concert with the leadership of the Entity Defendants, continued to boast of Defendants' willful, intentional and malicious public destruction of Dr. Lieberman in retaliation for the content of his February 19,

2022 Personal Tweet as a means of pandering to the Targeted Constituencies whose support

Defendants sought so desperately.

724.    The authors of the February 24, 2022 Ambrose/Baptista Announcement

therefore opened their e-mail with the following declaration:

> "We wanted to follow up on our message from Tuesday.  Members of our clinical
> leadership stand very much in support of the decision and necessary action to
> suspend Dr. Lieberman from his roles within the department and the medical
> center.  Of course, that action does not begin to heal the pain and re-
> traumatization caused by this event and as we noted it is essential that we take this
> opportunity to look critically at ourselves and our systems and policies in support
> of further progress in striving towards an anti-racist community."

725.    Recognizing that Defendants' respective efforts to foment the desired

feeding frenzy through Defendants' Unlawful Scheme had created overlapping and duplicative

grievance fora, the authors of the February 24, 2022 Ambrose/Baptista Announcement also

noted:

> "While we communicated an intent to hold a town hall on Friday, a number of
> other forums have since arisen with a goal of giving faculty and staff an
> opportunity to be heard, which is an important first step.  These forums include
> multiple departmental-wide town halls which are noted in the forwarded email
> below [the February 23, 2022 Smith/Simpson Announcement].  .  .  .  Given
> these newly available forums, we will plan to postpone the intended clinical
> services town hall for tomorrow so as not to duplicate efforts."

726.    Consistent with the full-court press required by Defendants' Unlawful

Scheme, the authors of the February 24, 2022 Ambrose/Baptista Announcement nevertheless

made clear that, "[i]n addition to the departmental-wide supports, we know that our clinical

leaders have or will have smaller program conversations to process the recent events within

263

teams."  Moreover, the authors touted the fact that they would "create a safe space specifically for individuals of minoritized communities to share their experiences and thoughts[.]"

727.    Defendants' playbook for their Unlawful Scheme was as simple as it was malicious:  To pander to the Targeted Constituencies whose support Defendants deemed crucial to advancing Defendants' political, social and academic agendas, Defendants manufactured an environment designed to encourage a feeding frenzy of outrage against Dr. Lieberman (and thus support for Defendants' destruction of him) by telling the community members over and over again relentlessly that (a) the content of the February 19, 2022 Personal Tweet was offensive, (b) the community members were egregiously harmed by the Tweet and (c) to recover from such harm, the community members had to avail themselves of the safe, healing spaces that only Defendants could provide — in which spaces of course, Defendants would continue to espouse the false narrative of their Negative PR Campaign, while intimidating Dissenting Community Members into silence.

728.    On the very day the *New York Times*, referring to Russia's invasion of Ukraine, announced on its front page, "RUSSIA ATTACKS AS PUTIN WARNS WORLD" (*see New York Times* (Feb. 24, 2022), accessible at *https://static01.nyt.com/images/2022/02/24/ nytfrontpage/scan.pdf*), Defendants were hard at work trying to convince the NYSPI/ Columbia/Presbyterian Psychiatry community, as well as Defendants' broader internal and external audiences, that the most consequential event in their lives was Dr. Lieberman's 15-word February 19, 2022 Personal Tweet.

729.     Absurdly, fewer than two weeks later, on March 7, 2022, Dr. Smith would actually tell an audience comprised of NYSPI/Columbia/Presbyterian Psychiatry community members and others that Dr. Lieberman's February 19, 2022 Personal Tweet had caused trauma analogous to that suffered by Ukrainians at the hands of their Russian invaders.  *See* Background Section XVII(C), below.

730.     The February 24, 2022 Ambrose/Baptista Announcement closed with the dramatic observation that "[t]his is an incredibly challenging and emotionally draining time for so many in our community."

G.     **Friday, February 25, 2022: Defendants Continue To Punish and Humiliate Dr. Lieberman in Response To the Content of His February 19, 2022 Personal Tweet**

731.     By Friday morning, February 25, 2022, the bullied, humiliated and decimated Dr. Lieberman was limping to the end of the most excruciating, disillusioning week of his professional career.  To the extent that he harbored the belief that the horrific nightmare might finally be behind him, he was wrong.

732.     At approximately 9:55 a.m. on Friday, February 25, 2022, Dr. Lieberman received an e-mail from Rudina Odeh-Ramadan, Dean for Finance and Administration at Columbia Medical School, advising that she wished him to join her in a Zoom meeting that morning with Dr. Rustgi; Dr. Corwin; General Counsel Jane Booth; and Dr. Anne Taylor to review with Dr. Lieberman the terms of the punishment that had been levied against him in

retaliation for the content of his February 19, 2022 Personal Tweet (the "***February 25, 2022 Rustgi/Corwin/Booth-Lieberman Zoom Meeting***").

733.     During the brief February 25, 2022 Rustgi/Corwin/Booth-Lieberman Zoom Meeting, the leadership of the Entity Defendants advised Dr. Lieberman of the terms of the punishment that had been levied against him in response to his February 19, 2022 Personal Tweet, which terms had been memorialized in a memorandum that Defendants summarized during the meeting and then e-mailed to Dr. Lieberman that afternoon (the "***Entity Defendants' February 25, 2022 Punishment Memorandum***").

734.     The Entity Defendants' February 25, 2022 Punishment Memorandum declared:

> "As you are aware, you have been suspended from your role as Chair of the Department of Psychiatry at Vagelos College of Physicians & Surgeons, effective February 24, 2022 until further notice.  Additionally, you have been removed as Psychiatrist-in-Chief at Columbia University Irving Medical Center/New York-Presbyterian Hospital (NYP), effective February 24, 2022."

735.     The Entity Defendants' February 25, 2022 Punishment Memorandum went on to detail the Draconian terms with which Dr. Lieberman — a renowned psychiatrist who had dedicated decades of his life to serving the mental health needs of communities of all types and who had for 17 years led NYSPI/Columbia/Presbyterian Psychiatry to new heights — would be forced to comply.

736.     Having been designated *persona non grata* by Defendants, Dr. Lieberman was advised in the Punishment Memorandum that, as a result of the content of his February 19, 2022 Personal Tweet, he had been stripped, in a deliberately unceremonious manner, of virtually all of his normal duties and privileges:

"Consistent with the suspension of your role as Chair for the Department of Psychiatry, effective immediately, the following measures must be adhered to:

1. ***You are not permitted to use the Chair's Office located at 1051 Riverside Drive***.  We will locate a faculty office for your use.

2. ***We expect you to work from home until further notice*** and until a Columbia University (CU) faculty office is assigned to you.

3. ***You are not permitted to supervise any personnel***.

4. During suspension, you will remain a CU tenured faculty member at your current CU salary, eligible or all employee benefits in accordance with terms of the University's benefits programs.

5. Your swipe access to all University facilities will remain active.  You will retain access to your university email account.  Your access to university systems is subject to all University policies and terms of use.  Any misuse of university systems will result in immediate suspension of your systems access.

6. ***You are not permitted to contact donors or engage in fundraising during your suspension***.

7. ***You do not have Institutional signatory authority and cannot sign-off on behalf of the Department or Institution***.

8. ***In accordance with the Administrative Time Out (ATO) you received from NYP, you cannot access patients or any clinical care systems***.  This applies to all NYP systems, including at Lawrence and Allen Hospitals and CU patient care and clinical research systems.  ***Additionally, you cannot participate in any clinical research activities, including in your role as Area Lead of Psychosis***."  (Emphasis added.)

737.     Upon information and belief, commencing at approximately 11:00 a.m. on Friday, February 25, 2022, the leadership of the Entity Defendants, in close coordination with the Individual State Actor Defendants, held another town hall meeting, this one hosted by Dr. Rustgi, Dr. Corwin and Dr. Laura Forese, the Chief Operating Officer of Presbyterian/Columbia Hospital ("**Defendants' February 25, 2022 Town Hall Meeting**").

738.     As one more prong of Defendants' Unlawful Scheme, Defendants' February 25, 2022 Town Hall Meeting was designed to further Defendants' overlapping political, social and academic agendas by attacking, scapegoating and humiliating Dr. Lieberman in front of his colleagues and the broader community in response to the exercise by Dr. Lieberman of his constitutionally protected free-speech rights to compliment the extraordinary beauty of an internationally-renowned fashion model by means of his February 19, 2022 Personal Tweet.

739.     Consistent with their Stalinist show-trial mentality, Defendants denied Dr. Lieberman the opportunity to engage the audience and rebut Defendants' false narrative during Defendants' February 25, 2022 Town Hall Meeting.

740.     At approximately 2:29 p.m. on Friday, February 25, 2022, Dr. Smith sent Dr. Lieberman an e-mail (from Dr. Smith's "*nyspi.columbia.edu*" e-mail address) attaching a letter of that date from NYS OMH, bearing the names of Governor Hochul, Dr. Sullivan and Ms. Tashjian in the letterhead and copied to Columbia University, Ms. Tashjian and Dr. Smith (the "**February 25, 2022 NYS OMH Letter**").

741.    The February 25, 2022 NYS OMH Letter, treating Dr. Lieberman as if he

were a common criminal, advised him curtly as follows:

> "This is to confirm that you were informed on February 22, 2022 that *you were
> no longer permitted to enter New York State Psychiatric Institute (NYSPI)
> premises unescorted*.  *You must vacate your office at NYSPI effective
> immediately*.  Arrangements will be made to remove your personal belongings
> and return them to you.  Please coordinate logistics with Dr. Thomas Smith."
> (Emphasis added)

742.    Of course, since, as noted, the Individual State Actor Defendants, in

concert with the leadership of the Entity Defendants, denied Dr. Lieberman the courtesy of

visiting his office on the morning of February 23, 2022 for the purpose of addressing his staff

and packing his office belongings, Dr. Lieberman — as Dr. Sullivan, Ms. Tashjian and Dr. Smith

knew full well by the time Dr. Smith e-mailed to him the February 25, 2022 NYS OMH Letter

— had been forced to vacate his office as of the evening of February 22, 2022.

**H.    Monday, February 28, 2022: The Town Hall Meetings
          Continue and Defendants' Unlawful Scheme
          Continues To Bear Fruit**

743.    Upon information and belief, commencing at approximately 11:00 a.m. on

Monday, February 28, 2022, six days after Dr. Lieberman's Forced Resignation from NYSPI, the

leadership of the Entity Defendants, in close coordination with the Individual State Actor

Defendants, held another town hall meeting, hosted again by Dr. Rustgi, Dr. Corwin and Dr.

Forese ("***Defendants' February 28, 2022 Town Hall Meeting***").

744.    Like Defendants' other town hall meetings, the threefold purpose of

Defendants' February 28, 2022 Town Hall Meeting was to provide a forum through which

269

Defendants could continue to (a) take credit for having destroyed Dr. Lieberman in response to his exercising his constitutionally protected free-expression rights; (b) manufacture their unrelenting false narrative that the community had been victimized by, and therefore required the creation of Defendants' safe spaces in which to heal from, the February 19, 2022 Personal Tweet; and (c) advance Defendants' political, social and academic agendas by pandering to the Targeted Constituencies whom Defendants believed would celebrate the destruction of Dr. Lieberman.

745.    On or about February 28, 2022, Dr. Lieberman was advised by the NIMH that his role as the Principal Investigator (also referred to as a "***PI***") in connection with a research study had been terminated.  Upon information and belief, the termination of Dr. Lieberman's role in the NIMH research study was prompted by NIMH's learning that Dr. Lieberman had been summarily stripped of his roles as Executive Director of NYSPI, Chair of the Columbia Medical School Department of Psychiatry and Psychiatrist-in-Chief of Presbyterian/Columbia Hospital.

746.    At approximately 4:32 p.m. on Monday, February 28, 2022, Defendants circulated the February 28, 2022 NYSPI/Columbia/Presbyterian Psychiatry Announcement, which, as noted, disclosed Dr. Simpson's elevation, on an interim basis, to Dr. Lieberman's leadership roles at NYSPI/Columbia/Presbyterian Psychiatry.  The February 28, 2022 NYSPI/Columbia/Presbyterian Psychiatry Announcement stated, in part:

> "We are pleased to announce that Blair Simpson, MD, PhD, has agreed to serve as the interim chair of the Department of Psychiatry at Columbia University Vagelos College of Physicians and Surgeons and interim director of the New York State Psychiatric Institute (NYSPI).  She will also serve as interim Psychiatrist-in-Chief at NewYork-Presbyterian/Columbia University Irving Medical Center.  The appointments are effective today."

270

## XVII.

## MARCH 2022: DEFENDANTS' PERSECUTION
## AND EXPLOITATION OF DR. LIEBERMAN CONTINUES

A.     **March 1, 2022: Defendants Hold Yet Another Town
Hall Meeting To Advance Their Political, Social and
Academic Agendas By Again Condemning Dr. Lieberman**

747.     Although, by March 1, 2022, it had been 10 days since the February 19,

2022 Personal Tweet and a week since Dr. Lieberman's Forced Resignation from NYSPI,

Defendants were not even close to ending Defendants' Unlawful Scheme against Dr. Lieberman.

748.     Defendants' shameful, coordinated objective was to keep the manufactured

controversy alive for as long as possible because they believed there was still so much more

political, social and academic benefit to be exploited from the situation.  Defendants were

determined to wring out every drop of such benefit until the sponge containing Dr. Lieberman's

reputation, honor and career had been squeezed completely dry.

749.     Accordingly, commencing at approximately 11:00 a.m. on Tuesday,

March 1, 2022, the leadership of the Entity Defendants, in close coordination with the Individual

State Actor Defendants, held yet another town hall meeting, this one also hosted by Dr. Rustgi,

Dr. Corwin and Dr. Forese ("***Defendants' March 1, 2022 Town Hall Meeting***").

750.     Like Defendants' other town hall meetings, Defendants' March 1, 2022

Town Hall Meeting constituted yet one more carefully orchestrated phase of Defendants'

Unlawful Scheme against Dr. Lieberman for the purpose of advancing in a one-sided forum their

overlapping political, social and academic agendas.

271

**B.      Early March 2022: Dr. Armstrong Meets
         With Dr. Lieberman**

751.      Sometime in or about the first week of March 2022, Dr. Armstrong, the

then new Dean of Columbia Medical School, met with Dr. Lieberman (the "***Early March 2022***

***Armstrong-Lieberman Meeting***").

752.      During the Early March 2022 Armstrong-Lieberman Meeting, Dr.

Armstrong admitted to Dr. Lieberman, in words or substance, that she did not feel that his

Forced Resignation from NYSPI and related punishment by Defendants was "right."

753.      During the Early March 2022 Armstrong-Lieberman Meeting, Dr.

Armstrong also told Dr. Lieberman, in words or substance, that she believed that he would be

"fine" because he is "really talented."

754.      During the Early March 2022 Armstrong-Lieberman Meeting, Dr.

Armstrong told Dr. Lieberman, in words or substance, that, "down the road," the Columbia

Medical School Department of Psychiatry should have an event to recognize Dr. Lieberman's

"accomplishments."  Dr. Lieberman declined politely and told Dr. Armstrong, in words or

substance, that he simply wanted to resume his academic, clinical and research activities.

755.      During the Early March 2022 Armstrong-Lieberman Meeting, Dr.

Armstrong told Dr. Lieberman, in words or substance, that Dr. Lieberman would soon be

permitted to resume his academic, clinical and research activities on behalf of the Entity

Defendants.

756.    While Dr. Lieberman believed that he been egregiously and unconstitutionally mistreated by Defendants' Unlawful Scheme against him in retaliation for the content of his February 19, 2022 Personal Tweet, Dr. Lieberman, in reasonable reliance upon Dr. Armstrong's assurance that he would soon be able to resume his academic, clinical and research activities on behalf of the Entity Defendants, elected to forgo exploring employment opportunities with academic/medical institutions other than Columbia University and Presbyterian/Columbia Hospital.

757.    Instead of pursuing opportunities with other academic/medical institutions, Dr. Lieberman continued to endeavor to work with Dr. Armstrong and the other members of the Entity Defendants' leadership team to resume his academic, clinical and research activities on behalf of the Entity Defendants.

### C.    The March 7, 2022 NYSPI/Columbia/Presbyterian Psychiatry Meeting

758.    On March 7, 2022, 16 days after Dr. Lieberman posted his February 19, 2022 Personal Tweet and 13 days after his Forced Resignation from NYSPI, Dr. Simpson — who, after contributing significantly to the tone and content of the self-abasing February 22, 2022 Vice Chairs Apology that was circulated on behalf of Dr. Lieberman, benefited personally from his removal from the NYSPI/Columbia/Presbyterian Psychiatry leadership positions to which Dr. Simpson had been almost immediately appointed to fill on an interim basis — appeared at the March 7, 2022 NYSPI/Columbia/Presbyterian Psychiatry Meeting to share with the in-person and remote attendees her goals for NYSPI/Columbia/Presbyterian Psychiatry.

4890-9158-2565, v. 1

759.     Dr. Simpson was joined on stage during the March 7, 2022 NYSPI/ Columbia/Presbyterian Psychiatry Meeting by, among others, Dr. Armstrong, Dr. Sullivan and Dr. Smith.

760.     During the March 7, 2022 NYSPI/Columbia/Presbyterian Psychiatry Meeting, Dr. Simpson, Dr. Sullivan and Dr. Smith, continuing to perpetrate Defendants' Unlawful Scheme, boasted implicitly, but unmistakably, of the immediate, dramatic punishment to which Dr. Lieberman had been (and is still being) subjected at the hands of Defendants for having exercised his constitutionally protected right to post his well-intentioned February 19, 2022 Personal Tweet.

761.     It was apparent that those leading the March 7, 2022 NYSPI/ Columbia/Presbyterian Psychiatry Meeting had agreed to avoid mentioning Dr. Lieberman by name during the Meeting, since, as noted he had been rendered *persona non grata*.

762.     As the first introduced speaker at the March 7, 2022 NYSPI/Columbia/ Presbyterian Psychiatry Meeting, Dr. Smith — like the other Individual State Actor Defendants and the leadership of the Entity Defendants with whom he was coordinating closely — was ever mindful of the need to capitalize on every opportunity to implement Defendants' Unlawful Scheme for the purpose of advancing Defendants' overlapping political, social and academic agendas.  For Dr. Smith and the other Defendants, the March 7, 2022 NYSPI/Columbia/ Presbyterian Psychiatry Meeting presented just such an opportunity.

763.    On Saturday, March 5, 2022, just a couple of days before the March 7,

2022 NYSPI/Columbia/Presbyterian Psychiatry Meeting, the *New York Times* summarized the

status of the Russian invasion of Ukraine as follows:

> "Ten days into the Russian invasion, the shelling around the corridors made clear
> that Mr. Putin had settled on a plan to hammer civilian infrastructure and
> pulverize basic services and neighborhoods.  ***The sustained assault has set off
> what the United Nations calls the fastest-moving exodus of European refugees
> since World War II***.
>
> *   *   *
>
> "***The Russian assault has also deepened the desperation in Mariupol, a major
> city of nearly half a million people in southern Ukraine where residents
> described children trapped in bomb shelters without food, water or warmth***.  It
> has been largely impossible to bring in medical supplies and other relief to the
> city, where the local government has refused to surrender, despite daily bombing
> by Russian forces, which have surrounded the city.
>
> "'***The shelling is constant and at random,' Diana Berg, a Mariupol resident,
> said in an interview on Thursday.  'Everything I ever thought to be a nightmare
> is nothing compared to what I am witnessing***.'
>
> "***Mariupol was cut off from telecommunications, she said, meaning there was
> no internet, cellphone service, electricity or hot water.  Residents, she said, were
> building fires in the streets to stay warm.  'And when you're on the street, at any
> moment, a rocket can land next to you,' Ms. Berg said***."  *See* Michael
> Schwirtz, Andrew E. Kramer and Michael Levenson, "Russian Forces Pound
> Civilians, as Putin Likens Sanctions to a 'Declaration of War,'" *New York Times*
> (March 5, 2022) (the "***March 5, 2022 New York Times Article on the Russian
> Invasion of Ukraine***") (emphasis added), accessible at *https://www.nytimes.com/
> 2022/03/05/world/europe/ukraine-russia-putin.html*.

764.    At the March 7, 2022 NYSPI/Columbia/Presbyterian Psychiatry Meeting,

Dr. Smith launched into an utterly surreal, hyperbolic and, ultimately, absurd comparison

between the brutal military onslaught that the Ukrainian people were desperately attempting to

survive at the hands of their Russian invaders, on the one hand, and the manufactured trauma that

Defendants, in an effort to promote their overlapping political, social and academic agendas,

275

continued to insist the NYSPI/Columbia/Presbyterian Psychiatry community should feel as a

result of a 15-word compliment to the extraordinary beauty of an international fashion model that

Dr. Lieberman posted via his February 19, 2022 Personal Tweet, on the other hand.

765.     In his opening remarks at the March 7, 2022 NYSPI/Columbia/

Presbyterian Psychiatry Meeting, Dr. Smith, in a colossal insult to the war-pummeled citizens of

Ukraine, announced dramatically to the NYSPI/Columbia/Presbyterian Psychiatry community, in

words or substance, as follows:

> "*I was reading over the weekend, you know, reading the news about what's
> going on in Ukraine, the horrible, horrible situation there*, and there was a quote
> that struck me.  Somebody quoted, it was actually Vladimir Lenin who said, there
> are weeks where decades happen.  And I think that that certainly is applicable to
> what's going on in Ukraine and this horrible war.

> "*It struck me also that in our, you know, much smaller part of the world over
> here in New York that it applies to us.  We've had a couple of weeks where
> we've sort of been ricocheting around decades, haven't we?  We had four town
> halls where we spent a lot of time thinking about our accomplishments over the
> past 10, 20 years and what kind of climate, what kind of environment we do
> have here in our department, and what we want.  So, we started that work.  And
> that work will continue.  I want to thank everybody for being part of those town
> halls*.  We pledge, the leadership pledges to continue those efforts, those
> processes, and we'll roll out some activities and initiatives accordingly."

766.     The only passage in the March 5, 2022 New York Times Article on the

Russian Invasion of Ukraine that might have any application to Defendants' Unlawful Scheme

against Dr. Lieberman is the quoted statement of Ihor Kolykhaev, the mayor of the southern

Ukrainian city of Kherson:

> "Mr. Kolykhaev said it was ludicrous for Russian forces to destroy city services
> and supply lines for medicines and other essential goods and then present
> themselves as 'kind liberators.'  Russian troops seized Kherson on Wednesday
> after a vicious battle that killed 300 people, including dozens of civilians, he said.

276

"'***First they create a critical situation,' Mr. Kolykhaev said in a text message,
'then heroically they save us***.'"  *See* March 5, 2022 New York Times Article on
the Russian Invasion of Ukraine (emphasis added), accessible at
*https://www.nytimes.com/2022/03/05/world/europe/ukraine-russia-putin.html*.

767.    As noted, after terminating, demoting and destroying Dr. Lieberman in
response to the content of his February 19, 2022 Personal Tweet — thereby deliberately creating
a "critical situation" by upending the successful functioning of NYSPI/Columbia/Presbyterian
Psychiatry — Defendants, as a key component of their Unlawful Scheme, engaged in sustained
efforts to convince the Targeted Constituencies to view Defendants as having "heroically" saved
them by destroying Dr. Lieberman and then hosting town hall meetings and the like to enable the
Targeted Constituencies to heal.

768.    At the March 7, 2022 NYSPI/Columbia/Presbyterian Psychiatry Meeting,
Dr. Sullivan reaffirmed the close, intertwined relationships among the members of NYSPI/
Columbia/Presbyterian Psychiatry.  In words or substance, Dr. Sullivan touted the partnership
"between the state and between NYSPI and with Columbia."  Dr. Sullivan also emphasized that
the State of New York has supported NYSPI/Columbia/Presbyterian Psychiatry, noting, in words
or substance, that the State "brings the dollars forward."  Dr. Sullivan also declared, in words or
substance, "I'm proud of my Governor."

769.    At the March 7, 2022 NYSPI/Columbia/Presbyterian Psychiatry Meeting,
Dr. Armstrong echoed Dr. Sullivan's praise of the intertwined relationships among the members
of NYSPI/Columbia/Presbyterian Psychiatry.  Dr. Armstrong noted, in words or substance, that

277

she had just become "part of a medical center that has this extraordinary Department of

Psychiatry, that has the partnership with the New York State Psychiatric Institute."

770.    When her turn to address the audience at the March 7, 2022 NYSPI/

Columbia/Presbyterian Psychiatry Meeting arrived, Dr. Simpson —in her new roles as Dr.

Lieberman's interim replacement as Executive Director of NYSPI, Chair of the Columbia

Medical School Department of Psychiatry and Psychiatrist-in-Chief of Presbyterian/Columbia

Hospital — criticized implicitly Dr. Lieberman's February 19, 2022 Personal Tweet.

771.    At the March 7, 2022 NYSPI/Columbia/Presbyterian Psychiatry Meeting,

which was held two full weeks after the February 19, 2022 Personal Tweet, Dr. Simpson sang

from Defendants' prescribed hymnal for the purpose of advancing Defendants' overlapping

political, social and academic agendas.  Dr. Simpson repeated Defendants' false narrative that the

Tweet was somehow racist and sexist and continued Defendants' efforts to promote a sense of

victimhood among the Targeted Constituencies that only the Individual State Actor Defendants

and the newly-constituted leadership of the Entity Defendants could heal.

772.    As noted, Dr. Simpson, in coordination with the other Individual State

Actor Defendants and the leadership of the Entity Defendants, played a pivotal role in shaping

the tone and content of the self-degrading February 22, 2022 Vice Chairs Apology that was

circulated on behalf of Dr. Lieberman.

773.    Upon information and belief, beginning on February 22, 2022, Dr.

Simpson — who had been mentored and promoted by Dr. Lieberman — held multiple

discussions with the other Individual State Actor Defendants and the leadership of the Entity

Defendants for the purpose of plotting not only the removal of Dr. Lieberman from his positions

as Executive Director of NYSPI, Chair of the Columbia Medical School Department of

Psychiatry and Psychiatrist-in-Chief of Presbyterian/Columbia Hospital (which Dr. Simpson then

positioned herself to fill and hold on an interim basis ever since), but also a series of longer term

punishments designed to deny to Dr. Lieberman the funding, grants, office facilities and other

resources, as well as the access to colleagues, residents and students, required for him to fully

discharge his academic, clinical and research activities on behalf of the Entity Defendants.

774.    It was no surprise, then, that, during the March 7, 2022 NYSPI/Columbia/

Presbyterian Psychiatry Meeting, Dr. Simpson embraced an Orwellian approach to the reporting

of acts and statements deemed politically unacceptable to Dr. Simpson and her cadre of new

leaders at NYSPI/Columbia/Presbyterian Psychiatry.  The objective of this Big Brother

approach, as she explained proudly in words or substance, is "to provide clear pathways for

reporting."

775.    During the March 7, 2022 NYSPI/Columbia/Presbyterian Psychiatry

Meeting, Dr. Simpson also applauded Defendants' holding of the town hall meetings, which had

been used masterfully by Defendants to justify their destruction of Dr. Lieberman in response to

his February 19, 2022 Personal Tweet, thereby securing the support of the Targeted

Constituencies that was so critical to advancing Defendants' overlapping political, social and

academic agendas.

4890-9158-2565, v. 1

776.     In championing the town hall meetings during the March 7, 2022 NYSPI/Columbia/Presbyterian Psychiatry Meeting, Dr. Simpson observed, in words or substance, that "we've had four town halls" and thanked Dr. Smith "for moderating those." ***Dr. Simpson then declared, in words or substance, that the town hall meetings "gave voice to a lot of very serious concerns, but I appreciate there are more voices to be heard.  Those were capped at 150, and only heard the people who were willing to speak up***."

777.     Through the comments referenced in the immediately preceding paragraph, above, Dr. Simpson was clearly urging Defendants to disseminate their false narrative about Dr. Lieberman and his February 19, 2022 Personal Tweet to an even larger audience (including the public at large) in a continuing effort to gain the support of the Targeted Constituencies that was needed to advance Defendants' overlapping political, social and academic agendas.

778.     However, the ironic nature of Dr. Simpson's words apparently escaped her.  In noting at the March 7, 2022 NYSPI/Columbia/Presbyterian Psychiatry Meeting that each of the four town hall meetings that Defendants held on February 24, 25 and 28, 2022 and March 1, 2022 provided a forum in which, of course, the voices of those who were not "***willing to speak up***" were not heard, Dr. Simpson quite inadvertently described most of the Dissenting Community Members, who objected to Defendants' outrageous mistreatment of Dr. Lieberman.

779.     As noted, unlike the vocal members of the Targeted Constituencies, whose politically acceptable views had been actively solicited and encouraged by Defendants, most of

the Dissenting Community Members remained silent at the town hall meetings and otherwise

because they recognized that their views clashed with those that Defendants were pushing so

aggressively.  Indeed, most of the Dissenting Community Members feared that, if they spoke up,

they would be subjected to the same personal and professional destruction suffered by Dr.

Lieberman.

### D.      March 18, 2022: The *New York Times* Editorial Board Speaks Out Generally Against Cancel Culture

780.    On March 18, 2022, the *New York Times* published a piece titled,

"America Has a Free Speech Problem," *New York Times* Editorial Board (March 18, 2022) (the

"***March 18, 2022 New York Times Editorial***"), accessible at *https://www.nytimes.com/*

*2022/03/18/opinion/cancel-culture-free-speech-poll.html*.

781.    The March 18, 2022 New York Times Editorial made a number of

observations, including the following:

"For all the tolerance and enlightenment that modern society claims, Americans
are losing hold of a fundamental right as citizens of a free country: the right to
speak their minds and voice their opinions in public without fear of being shamed
or shunned.

"This social silencing, this depluralizing of America, has been evident for years,
but dealing with it stirs yet more fear.  It feels like a third rail, dangerous. For a
strong nation and open society, that *is* dangerous.
                              *  *  *
"Many Americans are understandably confused, then, about what they can say
and where they can say it.  ***People should be able to put forward viewpoints, ask
questions and make mistakes and take unpopular but good-faith positions on
issues that society is still working through — all without fearing cancellation***.
                              *  *  *
"[A Times Opinion/Siena College] poll and other recent surveys from the Pew
Research Center and the Knight Foundation reveal a crisis of confidence around

281

one of America's most basic values.  Freedom of speech and expression is vital to human beings' search for truth and knowledge about our world.  ***A society that values freedom of speech can benefit from the full diversity of its people and their ideas. At the individual level, human beings cannot flourish without the confidence to take risks, pursue ideas and express thoughts that others might reject***.

\* \* \*

"***[T]he old lesson of 'think before you speak' has given way to the new lesson of 'speak at your peril.'  You can't consider yourself a supporter of free speech and be policing and punishing speech more than protecting it.  Free speech demands a greater willingness to engage with ideas we dislike and greater self-restraint in the face of words that challenge and even unsettle us***."  (Boldfaced emphasis added; non-boldfaced emphasis in original.)

782.    To the extent they read the March 18, 2022 New York Times Editorial, Defendants were unmoved.  They plunged forward blithely with Defendants' Unlawful Scheme against Dr. Lieberman to ensure that he was thoroughly demeaned, ostracized and humiliated, thereby reaping their carefully calculated political, social and academic benefits.

E.    **The Second Half of March 2022: Defendants Continue To Punish Dr. Lieberman For His February 19, 2022 Personal Tweet**

783.    Upon information and belief, Dr. Armstrong and Dr. Simpson made it clear within NYSPI/Columbia/Presbyterian Psychiatry that, as a result of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman was to be stripped of most of the funding that he had raised through NIH grants and other sources and removed from pending research projects. *See* Background Section XXIII, below.

784.    Upon information and belief, on or about March 9, 2022, Dr. Lawrence Kegeles of NYSPI/Columbia/Presbyterian Psychiatry, using his "*@nyspi.columbia.edu*" e-mail address, inquired of Dr. Simpson and Amy Friedman, the Administrator/COO for the Columbia

282

Medical School Department of Psychiatry, about "a grant on which Jeff Lieberman has been co-investigator.  It is an NIH grant to another site, NYU, with Larry Yang PI, and subaward to CU [Columbia University] to Ezra Susser as PI on which Jeff is co-investigator [the "***NIH Columbia/China Grant***"].  Larry is asking if he needs to remove Jeff from the subaward.  I would assume the Dean's guidance would require removal, but I wanted to get word from you before I respond."

      785.    Upon information and belief, on or about March 10, 2022, Dr. Kegeles further explained to Dr. Simpson (in her roles as Interim Executive Director of NYSPI, Interim Chair of the Columbia Medical School Department of Psychiatry and Interim Psychiatrist-in-Chief of Presbyterian/Columbia Hospital), Amy Friedman (in her roles as Administrator and Chief Operating Officer of the Department of Psychiatry) and others that the NIH Columbia/China Grant related to "clinical work done in China on the main grant, but no clinical work [was] done on the sub[award] at CU [Columbia University]."

      786.    On or about March 15, 2022, Ms. Friedman, who, upon information and belief, was acting at the direction of Dr. Simpson and in coordination with the Individual State Actor Defendants, nevertheless declared that Dr. Lieberman would have to be removed from the NIH Columbia/China Grant.

      787.    In late March 2022, Dr. Lieberman met briefly with Dean Armstrong.  Dr. Lieberman opined that the punitive measures imposed upon him by Defendants were terribly

unjust and that he wished to resume his academic, clinical and research activities.  Dr. Armstrong

expressed sympathy, but offered no concrete timeline for his resumption of such activities.

## XVIII.

## APRIL-JUNE 2022: DEFENDANTS IMPOSE ADDITIONAL PUNITIVE MEASURES AS CONDITIONS TO DR. LIEBERMAN'S RESUMPTION OF HIS ACADEMIC, CLINICAL AND RESEARCH ACTIVITIES

788.     As the calendar turned to April 2022 — many weeks after the February

19, 2022 Personal Tweet — Dr. Lieberman continued to be badly mistreated by Defendants in

retaliation for the content of his February 19, 2022 Personal Tweet.  In accordance with their

Unlawful Scheme, Defendants continued to punish, humiliate and ostracize Dr. Lieberman.

789.     Since February 22, 2022, Defendants' Unlawful Scheme — including, but

not limited to, Dr. Lieberman's Forced Resignation from NYSPI; Dr. Lieberman's removal as the

Chair of the Columbia Medical School Department of Psychiatry; Dr. Lieberman's removal as

Psychiatrist-in-Chief of Presbyterian/Columbia Hospital; Defendants' Negative PR Campaign

against Dr. Lieberman; and Defendants' commission of many other wrongful acts against Dr.

Lieberman — had the intended effect of rendering Dr. Lieberman radioactive to many third

parties with which he had maintained relationships prior to February 22, 2022.

790.     Through their Unlawful Scheme, Defendants succeeded in deliberately

destroying Dr. Lieberman's professional relationships with a number of medical publications,

psychiatry organizations, business ventures and the like with which he had been affiliated prior

to the February 19, 2022 Personal Tweet.  *See* Background Section XXIV, below.

284

A.     **April 2022: Defendants Continue
To Punish Dr. Lieberman For His
February 19, 2022 Personal Tweet**

791.    The perpetration of Defendants' Unlawful Scheme — the willful, intentional and malicious acts in which Defendants engaged deliberately for the purpose of demeaning, humiliating, defaming, ostracizing and harming Dr. Lieberman — caused Dr. Lieberman a tremendous amount of emotional stress, anxiety and other health problems.

792.    Because of the stress and anxiety that he suffered as a direct result of Defendants' Unlawful Scheme, Dr. Lieberman was forced to seek the care of a psychiatrist under whose care he has been since early March 2022.  *See* Background Section XXV, below.

793.    By early April 2022, due to the stress and anxiety that he was suffering as a direct result of Defendants' Unlawful Scheme, Dr. Lieberman also began to experience atrial flutter, which is a type of cardiac arrhythmia, for which he received cardiac care.  *See* Background Section XXV, below.

794.    On or about April 4, 2022, Dr. Lieberman was advised that Dr. Simpson had directed that Dr. Lieberman's name be removed from another major grant application that he had been working on with a colleague.

795.    On April 12, 2022, the *New York Times* reported that Brian Benjamin, Governor Hochul's then Lieutenant Governor, had resigned in light of his indictment in connection with a campaign-finance scandal.  *See* William K. Rashbaum, Nicholas Fandos and Jeffery C. Mays, "Lt. Gov. Benjamin Resigns Following Campaign Finance Indictment," *New*

285

*York Times* (April 12, 2022) (the "***April 12, 2022 New York Times Indictment Article***"),

accessible at *https://www.nytimes.com/2022/04/12/nyregion/brian-benjamin-resigns-*

*indicted.html.*

796.    The April 12, 2022 New York Times Indictment Article observed:

"Ms. Hochul selected Mr. Benjamin to be her lieutenant governor last August,
shortly after she became governor following Mr. Cuomo's resignation amid
numerous allegations of sexual misconduct.  The choice of Mr. Benjamin, who is
Black, was widely seen as an attempt by Ms. Hochul, a white moderate from
Buffalo, to expand her appeal to nonwhite voters in New York City in this year's
elections."

797.    Upon information and belief, after the publication of the April 12, 2022

New York Times Indictment Article, the Individual State Actor Defendants and certain members

of the leadership of the Entity Defendants redoubled their efforts, through Defendants' Unlawful

Scheme, to punish Dr. Lieberman for the content of his February 19, 2022 Personal Tweet.

Defendants imposed additional sanctions upon and further humiliated and ostracized Dr.

Lieberman for the purpose of advancing Defendants' overlapping political, social and academic

agendas.

798.    In April 2022, the Columbia Medical School Department of Psychiatry

announced that *U.S. News & World Report* had published its college and graduate school

rankings on March 29, 2022.  *See* Columbia Medical School Department of Psychiatry Website,

accessible at *https://www.columbiapsychiatry.org/news/columbia-psychiatry-medical-education-*

*program-jumps-no-2-nation-u-s-news-and-world-report.*  In a bittersweet tribute to the

outstanding work of the Columbia Medical School Department of Psychiatry under the

286

leadership of Dr. Lieberman, *U.S. News & World Report* ranked the Department of Psychiatry number two in the nation, which, upon information and belief, was the highest ranking earned by any Columbia Medical School department. *See U.S. News & World Report,* "Best Psychiatry Programs" (March 29, 2022), accessible at *https://www.usnews.com/best-graduate-schools/top-medical-schools/psychiatry-rankings*.

799.    On April 20, 2022, just a few weeks after the *U.S. News & World Report* rankings referenced in the immediately preceding paragraph, above, were published, Dr. Lieberman met with Dr. Armstrong (the "***April 20, 2022 Armstrong-Lieberman Meeting***"). During the Meeting, Dr. Armstrong was again complimentary of Dr. Lieberman.

800.    During the April 20, 2022 Armstrong-Lieberman Meeting, Dr. Armstrong explained, in words or substance, that, while Dr. Lieberman, of course, had been summarily removed from his role as Chair of the Columbia Medical School Department of Psychiatry two months earlier in retaliation for the content of his February 19, 2022 Personal Tweet, she, as Dean, had to memorialize his permanent removal as Chair of the Department before he could resume his academic, clinical and research activities on behalf of the Entity Defendants. To that end, Dr. Armstrong explained, she would provide Dr. Lieberman with a letter to that effect after the conclusion of their meeting.

801.    During the April 20, 2022 Armstrong-Lieberman Meeting, Dr. Armstrong, represented to Dr. Lieberman, in words or substance, that she had consulted with Dr. Corwin, the Chief Executive Officer of Presbyterian/Columbia Hospital, and was therefore speaking on his

behalf with respect to the resumption of Dr. Lieberman's academic, clinical and research activities for the Hospital.

802.     During the April 20, 2022 Armstrong-Lieberman Meeting,  Dr. Armstrong made a clear and unambiguous promise to Dr. Lieberman that, upon his satisfaction of certain conditions that she outlined, Dr. Lieberman would be able to promptly and fully resume his academic, clinical and research activities on behalf of the Entity Defendants.

803.     Although he believed that his constitutional and other rights had been violated willfully, intentionally and maliciously by Defendants' implementation of their Unlawful Scheme, Dr. Lieberman was desperate to resume his academic, clinical and research activities on behalf of the Entity Defendants.  Accordingly, believing that he had no choice, Dr. Lieberman indicated to Dr. Armstrong his willingness to satisfy the sensitivity training and other activities-resumption requirements that she had outlined.

804.     In the brief period during which Dr. Armstrong had served as Dean of the Columbia Medical School, Dr. Lieberman had had only positive interactions with her.  Dr. Lieberman also understood and believed that, as Dean of said Medical School, Dr. Armstrong did indeed have the authority and power that she represented that she possessed to promise him that, upon his satisfaction of the parties' agreed-upon conditions, Dr. Lieberman would be able to promptly and fully resume his academic, clinical and research activities on behalf of the Entity Defendants.

288

805.     Because Dr. Armstrong held the position of Dean of Columbia Medical School and because she represented to Dr. Lieberman that she had held discussions concerning the matter with Dr. Corwin, the Chief Executive Officer of Presbyterian/Columbia Hospital, Dr. Lieberman believed reasonably that Dr. Armstrong had the authority and power, on behalf of Columbia University, Columbia Medical School and Presbyterian/Columbia Hospital to restore promptly Dr. Lieberman's ability to engage fully in his academic, clinical and research activities on behalf of the Entity Defendants.

806.     Moreover, as of April 20, 2022, Dr. Lieberman had no reason to suspect that Dr. Armstrong had played a role in Defendants' Unlawful Scheme.

807.     As Dr. Armstrong fully intended, Dr. Lieberman quite reasonably relied upon Dr. Armstrong's April 20, 2022 promise that, upon his satisfaction of the parties' agreed-upon conditions, Dr. Lieberman would be able to promptly resume his academic, clinical and research activities on behalf of the Entity Defendants, including the exercise of his medical privileges at Presbyterian/Columbia Hospital.

808.     During the April 20, 2022 Armstrong-Lieberman Meeting, Dr. Lieberman asked Dr. Armstrong, in words or substance, whether the grants and other funding that he had been instrumental in securing for his research projects on behalf of the Entity Defendants would be restored to him.  Dr. Armstrong directed him to speak with Rudina Odeh-Ramadan, the Dean for Administration and Finance.

809.     Shortly after the conclusion of the April 20, 2022 Armstrong-Lieberman Meeting, Dr. Armstrong provided Dr. Lieberman with her signed letter of that date, on which she copied Dr. Corwin, Dr. Taylor and Ms. Odeh-Ramadan (the "*April 20, 2022 Armstrong Letter*"). In the April 20, 2022 Armstrong Letter, Dr. Armstrong stated, among other things:  "I do not feel that you can effectively act in your leadership role.  Therefore, I recognize that it is best that you step-down as Chair of the Department of Psychiatry at Vagelos College of Physicians & Surgeons, effective April 20, 2022."

810.     In the April 20, 2022 Armstrong Letter, Dr. Armstrong advised Dr. Lieberman that his then current compensation arrangements would be phased out as of April 2024 (the "*Compensation Phase-Out Period*") after which date he will be responsible for "generating external funding to support [his] salary above the endowment income from [his] professorship."

811.     By reiterating through the April 20, 2022 Armstrong Letter that Dr. Lieberman would never again Chair the Columbia Medical School Department of Psychiatry, Defendants succeeded in perpetuating their Negative PR Campaign, as they now had an excuse to circulate yet another communication to the NYSPI/Columbia/Presbyterian Psychiatry community members to remind them of the continuing punitive measures to which they were subjecting Dr. Lieberman in retaliation for the content of his February 19, 2022 Personal Tweet.

812.    On April 20, 2022, Dr. Armstrong disseminated an e-mail broadly to

"*ALL-CUMC@LISTS.COLUMBIA.EDU*" (the "***April 20, 2022 Armstrong All-Columbia***

***E-Mail***"), stating, in part:

> "***I am writing to update you on the status of Jeffrey Lieberman, MD, who was
> suspended from his role as chair of the Department of Psychiatry in late
> February***.
>
> "***Dr. Lieberman will not return to his role as department chair, but will remain
> on the faculty as professor of psychiatry.  Blair Simpson, MD, PhD, will
> continue to serve as interim chair until a permanent successor is appointed***.
>
> "I have asked Olajide Williams, MD, MS, professor and chief of staff in the
> Department of Neurology, to chair a search committee to identify candidates for
> this key leadership role.  The full membership of the committee will be
> announced shortly."  (Emphasis added.)

813.    Sometime around 7:39 p.m. on April 20, 2022, Dr. Lieberman sent an

e-mail to Dr. Armstrong, asking politely that she clarify for, among others, Dr. Simpson and Dr.

Smith, that the April 20, 2022 Armstrong All-Columbia E-Mail intended to communicate that

Dr. Lieberman would be resuming his academic, clinical and research activities.  Dr. Lieberman

wrote, in part:

> "Thank you for taking the time to meet today and promptly sending out this
> announcement.  Given the uncertainty as to my status among the members of my
> dept.[,] I would appreciate it if you could inform Blair Simpson, Tom Smith, Amy
> Friedman and Lou Baptista that I am able to resume my Columbia related
> academic and subsequently clinical activities as I am not sure that they will
> understand this to be the implication of your message."

814.    On April 22, 2022 — two full months after his Forced Resignation from

NYSPI and subsequent removal from his other leadership positions within NYSPI/Columbia/

Presbyterian Psychiatry — Dr. Lieberman communicated with Ms. Odeh-Ramadan, as suggested

by Dr. Armstrong, to inquire about the activities-resumption process.

291

815.     In an e-mail to Ms. Odeh-Ramadan on April 22, 2022, Dr. Lieberman summarized his understanding of what had been explained to him by that point: "As I understand it, the next step is the Term Sheet [listing the agreed conditions pursuant to which Dr. Lieberman would be able to resume his academic, clinical and research activities,] as you have defined it, then the [sensitivity] training that I must undergo, then the lifting of the ATO [Administrative Time Out] so I can resume seeing patients.  After these have been completed we can plan how, when and with whom to review the other issues (e.g.[,] sponsored research, gift funds, ongoing initiative[,] etc.)."

816.     By the early morning of April 27, 2022, in response to a communication that he received from a colleague in the Columbia Medical School Department of Psychiatry, Dr. Lieberman expressed frustration that he remained in limbo, unable to resume his academic, clinical and research activities.  Dr. Lieberman wrote:

> "Despite the announcement of my reinstatement to the faculty, I am still in limbo awaiting further information on where to go and what I can and can't do.  It's bizarre and surreal.  Moreover, thru the grapevine I hear that the dept's attitude towards me is hostile and I am being vilified for largely fabricated reasons.  Thus, I do not know what the future holds but would hope that I will be able to resume some if not most of my former activities.  Please stay in touch and will keep you posted on further developments.  Finally, give my regards to anyone who wants to receive them."

817.     On the afternoon of April 27, 2022, Amy Friedman communicated by e-mail with Dr. Lieberman, copying Dr. Smith, to inquire about certain personal items of Dr. Lieberman located in his former NYSPI/Columbia/Presbyterian Psychiatry office at 1051 Riverside Drive in Manhattan, which Dr. Lieberman was forced by Defendants to so abruptly vacate as of the evening of February 22, 2022.

818.    In his reply e-mail to Ms. Friedman, Dr. Lieberman identified certain personal items and then suggested quite reasonably:  "Actually the best thing would be for me to come to the office and see what else may be fragile or of value and take home with me." Defendants denied even this modest courtesy to Dr. Lieberman, whom they continued to treat shamefully as if he were some dangerous suspect on a government terrorist watch list.

819.    As demonstrated in detail herein, to advance their overlapping political, social and academic agendas, Defendants had by late April 2022 devoted more than two months to demonizing Dr. Lieberman to their Targeted Constituencies, attempting to justify Defendants' destruction of Dr. Lieberman and trying to convince those Constituencies that they had been traumatized by the February 19, 2022 Personal Tweet and therefore required Defendants' safe spaces and other assistance to heal.

820.    As such, the Individual State Actor Defendants and the leadership of the Entity Defendants decided in concert that Dr. Lieberman would not even be permitted to stop by his longtime office to collect his personal items.  Dr. Smith, who had demonstrated since February 22, 2022 a disturbing propensity for trying to avoid responsibility for his own wrongful actions by pointing to others, responded by e-mail, in part, on April 28, 2022, as follows:

> "I don't think we can have you come in Jeff.  We've already had PEF [the Public Employees Federation] complain to the governor[']s office that you were on site — someone mistook someone else for you.  They're very unreasonable right now."

821.    Upon information and belief, certain of the leaders and members of the Public Employees Federation referenced in the immediately preceding paragraph, above,

comprise the Targeted Constituencies whose support Defendants sought (and continue to seek)

so desperately to secure by means of their Unlawful Scheme against Dr. Lieberman.

822.     On April 28, 2022, Dr. Lieberman followed up with Dr. Armstrong to let

her know that he had still not received the term sheet or letter agreement to which she had

referred during the April 20, 2022 Armstrong-Lieberman Meeting nor had he received any

follow-up communication from Presbyterian/Columbia Hospital concerning the restoration of his

medical privileges.  In a reply e-mail that evening, Dr. Armstrong said, "I appreciate your

patience with this" and promised to "check with Steve [Corwin]."

823.     On April 29, 2022, Dr. Lieberman sent an e-mail to Dr. Smith, Ms.

Friedman and others, again asking that they complete all of the remaining steps necessary to

allow him to finally resume his academic, clinical and research activities.  Dr. Lieberman

explained, among other things:

> "It has been 10 weeks that I have been without restoration of my contact list so
> that I may be able to communicate with colleagues and carry on some degree of
> scholarly activities.  In addition, I have been waiting for a laptop and iphone so
> that my data, manuscripts, protocols, correspondence, communications, slides and
> fund accts can be migrated to secure storage devices.  This has placed me at great
> hardship.  [Notwithstanding] [t]he social media incident on Feb [19] that triggered
> my suspension as chair, chief of serv[ice] and Director, I was still a tenured
> faculty member and presumably entitled to the rights and privileges as such.
> Dean Armstrong's memo communicating my reinstatement [the April 20, 2022
> Armstrong All-Columbia E-Mail] affirms this.  Therefore I would ask that you
> give me an idea of when my contact list will be restored, files migrated and new
> devices received and activated.  I realize that you are busy with many demands on
> your time but ***feel that the length of time this situation has persisted has been [a]
> cruel and excessive denial of reasonable expectations***."  (Emphasis added.)

4890-9158-2565, v. 1

**B.    May 2022: Defendants Continue To Impose Additional Roadblocks To the Resumption of Dr. Lieberman's Academic, Clinical and Research Activities**

824.    After Defendants' unconstitutional removal of Dr. Lieberman from his leadership positions in NYSPI/Columbia/Presbyterian Psychiatry in February 2022, Dr. Lieberman did not (and does not through this lawsuit) seek reinstatement as Executive Director of NYSPI, Chair of the Columbia Medical School Department of Psychiatry or Psychiatrist-in-Chief of Presbyterian/Columbia Hospital.

825.    Instead, after suffering those wrongful removals at the hands of Defendants, all that Dr. Lieberman sought (and continues to seek) is the ability to resume the basic academic, clinical and research activities in which he, as a continuously-tenured Columbia University Professor and a physician with medical privileges at Presbyterian/Columbia Hospital, was and is entitled (and expected) to engage.

826.    By the second week of May 2022, Dr. Lieberman had still not been permitted to fully resume his academic, clinical and research activities.  Dr. Lieberman therefore continued to twist in the wind — having been stripped of his leadership roles, ostracized as a pariah by Defendants, unable to teach his academic courses, unable to see patients, unable to apply for grants, unable to solicit gifts or otherwise engage in substantive fundraising and unable to engage in research projects.

827.    Almost three months after Defendants launched their coordinated Unlawful Scheme against Dr. Lieberman in retaliation for the content of his February 19, 2022

295

Personal Tweet, Defendants intended to continue to thwart his ability to fully resume his academic, clinical and research activities.

828.    On May 9, 2022, Dr. Lieberman e-mailed Dr. Armstrong, copying Ms. Odeh-Ramadan, explaining politely, in part, as follows:

"[I]t has been 90 days since my suspension and ATO were imposed on February 22.  While I appreciate that my faculty status has officially been reactivated, I am still awaiting the 'term sheet' and restoration of my medical privileges.  In addition, while reinstated I have not been able to resume my scholarly activities or research due to the lack of engagement with the psychiatry department and access to any resources.  (This is not a complaint, just a statement[.])

"Therefore, I thought it would be useful to describe what I perceive to be the rate limiting factors to my resumption of faculty activities.  I am doing so to ensure that you and Rudi [Odeh-Ramadan] are aware of these and also that my identified needs for the reinstatement process are consistent with your wishes and priorities.

"Activities and goals that I would hope to resume as feasible. (Superscripts indicate detailed back-up information available upon request[.])

1.  Restoration of medical privileges so that I can continue to see patients.[1]

2.  Resumption of research on the neurobiology and psychopharmacology of schizophrenia and related psychotic disorders.

    a.  Restoration as PI and Co-Investigator on

        i.    NIMH grants[2]

        ii.   Pharmaceutical company studies[2]

        iii.  Foundation studies[2]

3.  Resumption of Department role as Director of the Psychotic Disorders Division[3]

4.   Access to my funds and support staff[4]

    Without an administrative assistant, research coordinator, research assistant[,] it will be difficult for me to function effectively.

296

4890-9158-2565, v. 1

> 5.      Resume leadership role in dept initiatives
>
> > a.   Collaboration with the Miami Justice Center for Mental Health and Recovery[5]
> >
> > b.   Proposal for Legal Processes to Support Clinical Intervention for Persons with Serious Mental Illness[6]
> >
> > c.   Columbia University Center for Psychedelic Research and Treatment[7]"

829.    Later on May 10, 2022, Dr. Armstrong sent a reply e-mail to Dr. Lieberman, telling him, among other things, that her "understanding is that we should have the [activities-resumption] memo completed very soon."

830.    In the early morning of May 11, 2022, Dr. Lieberman sent an e-mail to Dr. Smith advising that, as required by NYSPI, Dr. Lieberman had returned his NYSPI-issued electronic devices.  Dr. Lieberman also asked Dr. Smith to provide assurance that the folders on his NYSPI-issued electronic devices containing Dr. Lieberman's "personal information re my finances, tax returns and medical and family histories" would be returned to him and not be examined by NYSPI.  In his reply later that morning, Dr. Smith represented that he and an attorney with NYS OMH had reviewed certain files on Dr. Lieberman's devices, but "didn't look at directories/files that were obviously personal."

831.    On the morning of May 13, 2022, Dr. Lieberman met via Zoom with Ms. Odeh-Ramadan, who walked Dr. Lieberman through an activities-resumption memorandum, dated May 9, 2022, which set forth the conditions for resuming his academic, clinical and research activities (the "*May 9, 2022 Lieberman Activities-Resumption Agreement*").  That

afternoon, Ms. Odeh-Ramadan e-mailed to Dr. Lieberman a copy of the May 9, 2022 Lieberman Activities-Resumption Agreement.

832.    The May 9, 2022 Lieberman Activities-Resumption Agreement, which was addressed to Dr. Lieberman from Dr. Armstrong and Dr. Corwin, was copied to Dr. Taylor, Ms. Odeh-Ramadan, Dr. Deepa Kumaraiah and Dr. Kaplan.

833.    The May 9, 2022 Lieberman Activities-Resumption Agreement that was sent to Dr. Lieberman advanced the objectives of Defendants' Unlawful Scheme by requiring Dr. Lieberman to (a) again apologize for the content of his February 19, 2022 Personal Tweet; (b) submit to Soviet-style reeducation programs through which he would be forced to acknowledge the horror of his Tweet and confess the presumed latent racism and sexism that undergird it; and (c) be subjected to ongoing behavioral observation by colleagues, students and other members of the NYSPI/Columbia/Presbyterian Psychiatry community (referred to in the Agreement as "stakeholders") and then meet quarterly with Dr. Simpson, as the Interim Chair of the Department, to review the feedback of such stakeholders.

834.    The May 9, 2022 Lieberman Activities-Resumption Agreement set forth the following terms for Dr. Lieberman's resumption of his academic, clinical and research activities:

4890-9158-2565, v. 1

► "Going forward, *the Chair of the Department of Psychiatry [currently, Dr. Simpson] (or designee) will solicit formal feedback from key stakeholders quarterly on your observed behaviors. The Chair (or designee) will review feedback with you one-on-one and course correct where necessary. You will meet with the Chair (or designee) 60 minutes quarterly to review feedback and drive accountability*." (Emphasis added.)

► "[Y]our successful completion of training which . . . must be completed within ten (10) days of your receipt of this letter and in advance of your return:

- Invisible Influencers Online Training Program on *Unconscious Bias* (30 minutes)
- Press PAUSE Video Series (30 minutes)
- *Micro-Aggressions e-Learning Course* (10 Minutes)
- *Macro Behaviors e-Learning Course* (30 minutes)
- Review the Hospital's Social Media Policy online on Workday and sign an attestation (10 minutes)[.]  (Emphasis added.)

► "[Y]our successful completion, within ten (10) days of your receipt of this letter and in advance of your return, of *the Intercultural Development Inventory (IOI) Assessment* online with debrief of results (20 minutes for assessment; 60 minutes for debrief), a link to which will be sent to you by, and *which debrief will be conducted by, leadership coach Bart Bailey* (and/or designee)[.]"  (Emphasis added.)

► "[L]eading up to and immediately following your return, *your active participation in 1:1 individual leadership coaching with Bart Bailey (and/or or [sic] designee) for a continuous three months of intensive coaching/follow-up/check-ins, for which you will be contacted directly by Bart Bailey* (and/or designee)."  (Emphasis added.)

► "Finally, *you must prepare a formal letter of apology to the Department of Psychiatry, the content of which shall be reviewed and approved, in advance, by Columbia and the Hospital.  This letter must then be signed and sent by you prior to your return from Administrative Time Out*." (Emphasis added.)

835.    Because his reputation and professional career had been decimated by the

Unlawful Scheme that Defendants had been pursuing since February 22, 2022, Dr. Lieberman

4890-9158-2565, v. 1

believed that, if he were to salvage his academic, clinical and research activities within the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry — institutions that he had come to love and respect during the 17 years he led them — he had no choice but to comply, as he had told Dr. Armstrong he would, with the insulting demands set forth in the May 9, 2022 Lieberman Activities-Resumption Agreement.

836.    Given the significant amount of time that had already elapsed since his Forced Resignation from NYSPI on February 22, 2022, Dr. Lieberman believed that every additional day that passed without his being able to resume the academic, clinical and research activities that he loved so passionately threatened to destroy his career permanently.  He therefore felt tremendous pressure to comply with the petty, humiliating and burdensome additional demands that Defendants had decided to impose upon him by means of the May 9, 2022 Lieberman Activities-Resumption Agreement.

837.    Accordingly, over the week or so following his receipt of the May 9, 2022 Lieberman Activities-Resumption Agreement, Dr. Lieberman decided to bite his tongue and craft an apology to be approved by the leadership of the Entity Defendants.

838.    By letter dated May 13, 2022, Dr. Smith advised Dr. Lieberman that NYSPI's IT Department would return to Dr. Lieberman some, but not all, of the files that he had requested be sent to him from the computer that he had returned to NYSPI on or about May 10, 2022.  Dr. Smith advised that "NYSPI IT will load the allowable files onto an encrypted hard drive and hand deliver it to you."  These files were not delivered.

300

839.    On May 17, 2022, Dr. Lieberman e-mailed to Ms. Odeh-Ramadan certain questions and a modest suggested modification to the May 9, 2022 Lieberman Activities-Resumption Agreement, along with a draft apology for Defendants' review and approval ("***Dr. Lieberman's May 17, 2022 Draft Apology***").

840.    After providing yet another forced apology for his February 19, 2022 Personal Tweet, Dr. Lieberman's May 17, 2022 Draft Apology went on to say, among other things:  "I am proud of the accomplishments of the psychiatry department and NYSPI in the 17 years of my membership in which we have been ranked at or near the top on every academic metric, the many people our clinical services and research advances have helped, trained many talented students and the healthy financial status of the department" and that, "[g]oing forward, I hope to continue my scholarly, research and clinical activities as a tenured faculty member of the psychiatry department and university under the leadership of Dean Armstrong and the new Chair of Psychiatry, and in doing so continue to serve our university and society."

841.    On May 20, 2022, Dr. Lieberman e-mailed Ms. Odeh-Ramadan and noted that, "as I have complied with all requested [requirements set forth in the May 9, 2022 Lieberman Activities-Resumption Agreement, including the micro aggressions course, macro behaviors course and other so-called sensitivity-training courses] re the ATO [Administrative Time Out,] I would hope that my medical privileges would be restored promptly and without extensive delay."

842.     On Sunday, May 22, 2022, Dr. Lieberman sent an e-mail to Dr. Kaplan,

the Vice President and Chief Medical Officer of Presbyterian/Columbia Hospital, copied to Ms.

Odeh-Ramadan and Dr. Lieberman's assigned sensitivity coach, Bart Bailey, advising:

> "I have been working with Rudi [Odeh-Ramadan] to fulfill all things requested
> from Columbia pertaining to my reinstatement.  In addition, I have completed the
> online training on the Workday site, met with Bart Bailey and completed and
> submitted the survey that he requested.  Consequently, I would hope that this will
> enable the ATO to be lifted and my medical privileges restored.  Please let me
> know when this will be done or if there is anything that must be completed
> beforehand."

843.     On May 22, 2022, Dr. Kaplan responded to Dr. Lieberman's e-mail of that

date, advising that he would "review with the NYP [Presbyterian/Columbia Hospital] team and

let you know ASAP."

844.     On Sunday night, May 22, 2022, Ms. Odeh-Ramadan e-mailed Dr.

Lieberman to advise that Dr. Lieberman's May 17, 2022 Draft Apology was being reviewed by

Columbia University's "Communications [Department] and OGC [Office of General Counsel]."

845.     On May 23, 2022, Dr. Smith responded by e-mail to Dr. Lieberman's

concern, expressed in an e-mail to Dr. Smith dated May 15, 2022, that NYSPI intended to

withhold from Dr. Lieberman "all of my email folders in the NYSPI tree" many of which

"contain non-state related information pertaining to my research, scholarly and clinical

activities."  In his May 23, 2022 e-mail response, Dr. Smith advised:  "[W]e reviewed this with

[NYS] OMH counsel.  Departing State employees are not allowed to retain access to old emails

in State directories.  It's expected that employees doing non-State business should have those

emails in a non-State directory; hopefully many of your research-related emails are in [*sic*]

302

archived in your Columbia email account.  We cannot provide you access to old emails in NYSPI directories."

846.    NYSPI's refusal, as referenced in the immediately preceding paragraph, above, to return to Dr. Lieberman the non-New York State related information pertaining to Dr. Lieberman's research, scholarly and clinical activities created another substantial obstacle to Dr. Lieberman's ability to resume his academic, clinical and research activities on behalf of the Entity Defendants.

847.    At the end of May 2022, while Dr. Lieberman was jumping through the myriad hoops that Defendants had erected as barriers to the resumption of his academic, clinical and research activities, the Individual State Actor Defendants and the leadership of the Entity Defendants were still very much engaged in their Negative PR Campaign against him.

848.    In furtherance of the overlapping political, social and academic agendas that they sought to advance through their Unlawful Scheme, Defendants were determined to ensure that (a) Dr. Lieberman remained exiled from the day-to-day activities of NYSPI/ Columbia/Presbyterian Psychiatry and (b) his ability to engage in academic, clinical and research activities would continue to be severely circumscribed.

849.    As noted, Defendants prohibited Dr. Lieberman from even accessing the NYSPI/Columbia/Presbyterian Psychiatry headquarters at 1051 Riverside Drive in Manhattan, knowing full well the negative impact that such a prohibition would have on Dr. Lieberman's

ability to see patients, prepare for his academic courses and engage in research.  *See*

Background Section XXI, below.

850.     In late May 2022, there arose yet another example of Defendants' petty

and wholly unreasonable prohibition against Dr. Lieberman's accessing the NYSPI/

Columbia/Presbyterian Psychiatry headquarters and the Columbia University campus in

general.

851.     On or about May 27, 2022, Dr. Lieberman became aware that a retirement

party had recently been held for Marlene Carlson, a Clinical Coordinator in the Columbia

Medical School Department of Psychiatry with whom Dr. Lieberman was close.  Because Dr.

Lieberman had hired Ms. Carlson and worked with her for 16 years or so, he was

understandably perplexed as to why he had not been invited to her party.  He therefore inquired

of those involved in planning the party.

852.     On or about May 28, 2022, Dr. Lieberman received a response from one

of the members of the Columbia Medical School Department of Psychiatry who had been

involved in planning Ms. Carlson's retirement party.  His response to Dr. Lieberman revealed

the deep fear of Defendants in which so many members of the NYSPI/Columbia/Presbyterian

Psychiatry community were living under Dr. Simpson's leadership:

> "*I am sorry about this.  We initially had you first on the [party-invitation] list, but felt that we could not invite you because we were told you were not allowed on campus under any circumstances.  We did not push it because the current atmosphere at PI [NYSPI] makes it uncomfortable bringing up your name in conversation outside a select group of people.  It is very surreal and I do not understand*.

4890-9158-2565, v. 1

* * *

"*We in the Area [research group] have been repeatedly told you are not allowed in the [NYSPI/Columbia/Presbyterian Psychiatry] building.  No one specifically told us not to invite you, but it was implicitly clear*.  We also wanted to keep the focus on Marlene.

"*While [I] do not fully understand the situation and do not agree, I did not feel comfortable pushing back because of the atmosphere in the department.  I don't know if this was the correct decision and am sorry.  In a just world, you should have been there*.  You have always been supportive of me and I await details on your next steps."  (Emphasis added.)

**C.    June 2022: The June 1, 2022 Lieberman
Activities-Resumption Agreement Is Executed**

853.    On June 7, 2022 — almost four months after Dr. Lieberman's February 19, 2022 Personal Tweet — Ms. Odeh-Ramadan forwarded to Dr. Lieberman for his review and execution a revised activities-resumption agreement dated June 1, 2022 (the "*June 1, 2022 Lieberman Activities-Resumption Agreement*") and advised, without explanation, that an apology letter was no longer required.

854.    Upon information and belief, because Defendants were not enamored of Dr. Lieberman's May 17, 2022 Draft Apology, which, in their view, was not sufficiently self-abasing, Defendants decided to simply rely upon the obsequious February 22, 2022 Vice Chairs Apology.

855.    The June 1, 2022 Lieberman Activities-Resumption Agreement, which had been initialed by the authors, Dr. Armstrong and Dr. Corwin, tracked the May 9, 2022 Lieberman Activities-Resumption Agreement in material respects, except for the deletion of the requirement of another apology.

305

856.     Although Dr. Lieberman had been grievously wronged by the Unlawful

Scheme that Defendants had perpetrated since February 22, 2022 in willful, intentional and

malicious retaliation for the content of his February 19, 2022 Personal Tweet, Dr. Lieberman

believed that, in order to finally resume his cherished academic, clinical and research activities

on behalf of the Entity Defendants, he had no choice but to accept the conditions in the June 1,

2022 Lieberman Activities-Resumption Agreement, as he had advised Dr. Armstrong since the

April 20, 2022 Armstrong-Lieberman Meeting that he would.

857.     Accordingly, Dr. Lieberman signed the June 1, 2022 Lieberman

Activities-Resumption Agreement, dated it June 8, 2022 and returned it to Ms. Odeh-Ramadan,

Dr. Armstrong, Dr. Corwin and others via an e-mail dated June 9, 2022.

858.     In his June 9, 2022 e-mail attaching the fully-executed version of the June

1, 2022 Lieberman Activities-Resumption Agreement, the ever gracious Dr. Lieberman thanked

Ms. Odeh-Ramadan for all her assistance, as his designated contact person, "in navigating what

have been painful and at times humiliating procedures" and said that he looked "forward to

resuming my professional activities, role in the university, medical center and hospital, and

devoting myself to its scientific, clinical and academic missions and contributing to society."

859.     As acknowledged by the Entity Defendants, Dr. Lieberman has discharged

his obligations under the June 1, 2022 Lieberman Activities-Resumption Agreement.

860.     On June 16, 2022, Dr. Kaplan, e-mailed Dr. Lieberman to advise:  "[Y]our

ATO has been removed.  Your [Hospital] privileges have been reinstated and your systems

access has been restored.  From an NYP [Presbyterian/Columbia Hospital] perspective you may

resume your clinical activities.  Please be reminded that you must continue and complete your

work with Bart Bailey [the sensitivity coach]."

861.    What Dr. Lieberman did not know on June 16, 2022 is that, at the time the

Entity Defendants entered into the June 1, 2022 Lieberman Activities-Resumption Agreement,

the leadership of the Entity Defendants had no intention whatsoever of facilitating the

resumption of Dr. Lieberman's academic, clinical and research activities.

862.    Instead, the leadership of the Entity Defendants, in concert with the

Individual State Actor Defendants, intended to and did continue to perpetrate Defendants'

Unlawful Scheme against Dr. Lieberman by, among other things, employing the Negative PR

Campaign and denying to Dr. Lieberman the resources, funding, support and opportunities

necessary to fully resume his academic, clinical and research activities on behalf of the Entity

Defendants.

## XIX.

### ALMOST IMMEDIATELY AFTER THE EXECUTION OF THE JUNE 1, 2022 LIEBERMAN ACTIVITIES-RESUMPTION AGREEMENT, DEFENDANTS BREACH THE AGREEMENT IN FURTHERANCE OF THEIR UNLAWFUL SCHEME

863.    As noted, in his June 9, 2022 e-mail to Defendants attaching the fully-

executed version of the June 1, 2022 Lieberman Activities-Resumption Agreement, Dr.

Lieberman said that he looked "forward to resuming my professional activities, role in the

307

university, medical center and hospital, and devoting myself to its scientific, clinical and academic missions and contributing to society."

864.    Unfortunately, to the extent Dr. Lieberman believed that his execution of the June 1, 2022 Lieberman Activities-Resumption Agreement had finally put an end to Defendants' Unlawful Scheme — that the nightmare that had enveloped him since February 22, 2022 was now over — he would learn almost immediately that he was sadly mistaken.

865.    Dr. Lieberman would learn that the Individual State Actor Defendants and members of the Entity Defendants' senior leadership team had no intention of honoring all of their obligations under the June 1, 2022 Lieberman Activities-Resumption Agreement and, instead, were determined to undermine Dr. Lieberman's ability to fully resume his beloved academic, clinical and research activities on behalf of the Entity Defendants.

866.    Dr. Lieberman never relinquished his status as a tenured Columbia University Professor.  Indeed, the June 1, 2022 Lieberman Activities-Resumption Agreement made this clear, stating:  "[Y]ou remain a tenured faculty member at Columbia University[.]"

867.    Notwithstanding that Dr. Lieberman's resumption of his academic, clinical and research activities was confirmed in the June 1, 2022 Lieberman Activities-Resumption Agreement, it soon became clear to Dr. Lieberman that Defendants had no intention of allowing him to resume his academic activities, including teaching his courses.

4890-9158-2565, v. 1

868.     On June 17, 2022 — four months after the February 19, 2022 Personal Tweet and only nine days after Dr. Lieberman had executed the June 1, 2022 Lieberman Activities-Resumption Agreement — Dr. Smith e-mailed Dr. Lieberman from his "*@nyspi.columbia.edu*" e-mail account to advise Dr. Lieberman that he would not be permitted to teach his "PGY 2 Schizophrenia" course during the summer 2022 term (the "***June 17, 2022 Smith Teaching-Prohibition E-Mail***").

869.     In the June 17, 2022 Smith Teaching-Prohibition E-Mail, Dr. Smith not only advised Dr. Lieberman that he would not be able to teach the course, but requested brazenly that Dr. Lieberman provide his course materials to the professor who would be replacing him. Dr. Smith wrote: "***I'm preparing for our PGY 2 schizophrenia course this summer.  I don't think we can ask you to teach this summer given the circumstances***.  Sorry about that, hoping that can change in the future.  Joe Villarin will try to step in and offer a discussion on Neurobiology of Schizophrenia.  I wanted to ask if any chance he might use some of your slides? Ok if you prefer not, I understand."  (Emphasis added.)

870.     Confused as to why he was being barred from teaching his summer 2022 course, Dr. Lieberman responded by e-mail to Dr. Smith on June 17, 2022, and, although Dr. Lieberman graciously agreed to provide his course slides to the replacement professor, advised Dr. Smith that he "would like to talk to [Dr. Smith] first about the situation and my reengagement [o]r lack there of [*sic*].  LMK [let me know] when convenient."

871.     Five days elapsed before Dr. Smith responded to Dr. Lieberman's June 17, 2022 e-mail.  Upon information and belief, during that period, Dr. Smith conferred with Dr. Simpson (and perhaps with other Individual State Actor Defendants and other leadership members of the Entity Defendants and NYSPI/Columbia/Presbyterian Psychiatry) to coordinate a response to Dr. Lieberman's question as to why he was being barred from teaching his courses.

872.     By e-mail dated June 22, 2022, Dr. Smith acknowledged his tardy response and said that he would be joining Dr. Lieberman's telephone conversation with Dr. Simpson and others that was scheduled to take place on June 23, 2022.  Dr. Smith apparently did not wish to attempt to explain to Dr. Lieberman why he was being wrongfully denied the opportunity to resume his teaching activities until Dr. Smith could do so in the presence of three other leadership team members, Dr. Simpson, Dr. Baptista and Ms. Friedman.

873.     The Entity Defendants' prohibition against Dr. Lieberman's resumption of his teaching activities was a blatant violation of the June 1, 2022 Lieberman Activities-Resumption Agreement.  The deliberate continuation of the teaching prohibition was designed to prolong Defendants' punishment of Dr. Lieberman for the content of his February 19, 2022 Personal Tweet, thereby allowing Defendants to continue to curry favor with the Targeted Constituencies to advance Defendants' overlapping political, social and academic agendas.

4890-9158-2565, v. 1

**XX.**

**THE JUNE 23, 2022 ZOOM MEETING AMONG**
**DR. SIMPSON, DR. LIEBERMAN AND OTHERS**

874.    On the morning of June 23, 2022, Dr. Lieberman participated in a Zoom

meeting with Dr. Simpson, Dr. Smith, Dr. Baptista and Ms. Friedman (the "*June 23, 2022*

*Simpson Zoom Meeting*").

875.    The June 23, 2022 Simpson Zoom Meeting marked the first time that Dr.

Simpson had deigned to speak with Dr. Lieberman since February 22, 2022, when she had

attended the morning meeting with Dr. Lieberman, his other Vice Chairs and staff and then taken

a leading role in constructing the February 22, 2022 Vice Chairs Apology.

876.    The only reason that Dr. Simpson spoke with Dr. Lieberman on June 23,

2022 — 121 days after she had taken the lead in preparing the February 22, 2022 Vice Chairs

Apology and coordinated closely with the other Individual State Actor Defendants and senior

leaders of the Entity Defendants to implement Defendants' Unlawful Scheme — was because,

during a June 22, 2022 discussion that Dr. Lieberman had with Dr. Baptista and Ms. Friedman,

there were certain questions concerning Dr. Lieberman's resumption of his academic, clinical and

research activities pursuant to the June 1, 2022 Lieberman Activities-Resumption Agreement

that neither Dr. Baptista nor Ms. Friedman could answer.

877.    Upon information and belief, prior to the commencement of the June 23,

2022 Simpson Zoom Meeting, Dr. Simpson conferred with Dr. Smith, Dr. Baptista, Ms.

Friedman and perhaps other Individual State Actor Defendants and members of the Entity

311

Defendants' leadership team for the purpose of rehearsing and coordinating their responses to the questions that they anticipated Dr. Lieberman would raise during that Zoom Meeting.

878.    As Dr. Lieberman noted in a follow-up e-mail to Dr. Simpson on Saturday, June 25, 2022, at the time the June 23, 2022 Simpson Zoom Meeting commenced, he had hoped that, given his formerly close relationship with Dr. Simpson and his "mentorship and promotion of [her] into a leadership position," she would have engaged in a friendly discussion befitting "close colleagues" who were endeavoring to "manage an unfortunate situation as graciously and respectfully as possible."

879.    Unfortunately, as also noted in his June 25, 2022 e-mail to Dr. Simpson and others, Dr. Lieberman observed that Dr. Simpson conducted the June 23, 2022 Simpson Zoom Meeting "in an impersonal and officious manner."

880.    During the June 23, 2022 Simpson Zoom Meeting, Dr. Simpson, in a rather imperious, frosty tone, denied Dr. Lieberman's request to resume his leadership of certain clinical research programs, including the Psychotic Disorders Division, within the Columbia Medical School Department of Psychiatry.  Dr. Simpson stated, in words or substance, that Dr. Lieberman's resumption of leadership roles with respect to those programs was not in the Department's best interests because "the events of 12 weeks ago" — Dr. Lieberman's February 19, 2022 Personal Tweet — had been "very destabilizing to the Department."

881.    Of course, Dr. Simpson's comments at the June 23, 2022 Simpson Zoom Meeting referenced in the immediately preceding paragraph, above, constituted revisionist

312

history.  To the extent the Columbia Medical School Department of Psychiatry had been "destabilized" as a result of the "events of 12 weeks ago," *such destabilization was caused directly by the summary removal of Dr. Lieberman from his leadership roles at NYSPI/Columbia/Presbyterian Psychiatry and the many other willful, intentional and malicious acts perpetrated against him pursuant to the well-coordinated Unlawful Scheme that Defendants had launched to advance their political, social and academic agendas*.

882.    As noted, in the February 24, 2022 Pantazatos E-mail Objection that was sent to Dr. Sullivan, Dr. Rustgi and others, Professor Pantazatos wrote:

"I find it incredibly unjust for [Dr. Lieberman] to lose his livelihood over a momentary lapse in tact and judgment for which he has already apologized for [*sic*]. *I believe people in the department will be much more shaken up and upset by this fact alone, rather than the actual contents of the tweet.  His world has turned on a dime, and it seems he (and those who depend on him) are the ones who need the most support right now*."  (Emphasis added.)

883.    Dr. Lieberman responded to Dr. Simpson's "destabilization" comments at the June 23, 2022 Simpson Zoom Meeting by explaining politely, in words or substance, that the disruption to the Department had been a result of the Draconian actions that had been taken by Defendants in response to his February 19, 2022 Personal Tweet.  Dr. Lieberman noted, in words or substance, that "it was the [removal] actions taken by the State and then the University and Hospital following suit abruptly, within 24 hours" that caused the destabilization.

884.    During the June 23, 2022 Simpson Zoom Meeting, Dr. Lieberman went on to explain, in words or substance, that the disruption to the Department had been caused by, among other aspects of Defendants' Unlawful Scheme, the Draconian terms of his abrupt (and

313

unconstitutional and otherwise unlawful) suspension, including the prohibition against his

interaction with colleagues at NYSPI and the Entity Defendants.  These wrongful acts, he noted

politely in measured tones, sent the unmistakable message to the NYSPI/Columbia/Presbyterian

Psychiatry community and the public at large that he was a pariah or criminal to be shunned and

exiled.

885.    During the June 23, 2022 Simpson Zoom Meeting, Dr. Smith admitted, in

words or substance, that, in light of the hypersensitive environment that Defendants had

deliberately created among certain members of the Targeted Constituencies in response to the

February 19, 2022 Personal Tweet for the purpose of advancing Defendants' political, social and

academic agendas, the leadership of NYSPI and the Entity Defendants had concluded that there

was no place at NYSPI/Columbia/Presbyterian Psychiatry for Dr. Lieberman's merit-based

leadership style in connection with academic, clinical, fundraising, research or other activities.

886.    Incredibly, Dr. Smith criticized Dr. Lieberman for having established a

***meritocracy*** in the Columbia Medical School Department of Psychiatry.  Dr. Smith characterized

Dr. Lieberman's leadership approach, in words or substance, as "the typical sort of academic,

especially Ivy League, medical approach.  ***It was a meritocracy, right?  People got what they***

***merited in terms of their performance, grants***" and the like.

887.    Completely contrary to the knowingly false narrative about Dr. Lieberman

that Defendants, through the Negative PR Campaign component of their Unlawful Scheme, had

disseminated to the NYSPI/Columbia/Presbyterian Psychiatry community and the public at large

4890-9158-2565, v. 1

to advance their overlapping political, social and academic agendas, the Individual State Actor Defendants and the leadership of the Entity Defendants knew full well that the only sin of which Dr. Lieberman was guilty was having operated NYSPI/Columbia/Presbyterian Psychiatry as a meritocracy based not upon immutable personal characteristics such as race, gender and the like, but upon the merits of each person's achievements — of having fostered an environment to which, as one speaker at the dinner honoring Dr. Lieberman's first 10 years of service as the Chair of the Columbia Medical School Department of Psychiatry observed with pride, the "best, most accomplished and most ambitious students, scientists and clinicians" gravitated "because they know that they will have every opportunity to succeed."

888.     Tellingly, given Defendants' efforts to advance their overlapping political, social and academic agendas by exploiting disingenuously the content of the February 19, 2022 Personal Tweet to garner the support of the Targeted Constituencies, Dr. Lieberman's merit-based approach to managing the Columbia Medical School Department of Psychiatry was anathema to Defendants.

889.     Accordingly, to further pander to the Targeted Constituencies, Defendants intended to continue to shamefully distort the content of Dr. Lieberman's February 19, 2022 Personal Tweet, while contrasting Dr. Lieberman's now denigrated merit-based leadership approach with Defendants' assertedly more enlightened approach, which elevates immutable personal characteristics over one's qualifications and achievements.

890.    In light of the sense of victimhood that Defendants had worked so hard to create among certain members of the Targeted Constituencies for the purpose of advancing Defendants' political, social and academic agendas, the Individual State Actor Defendants and the leadership of the Entity Defendants fully intended to continue to work in concert for the foreseeable future to make an example of Dr. Lieberman for the content of his February 19, 2022 Personal Tweet.

891.    Dr. Smith explained to Dr. Lieberman during the June 23, 2022 Simpson Zoom Meeting, in words or substance, that, in light of the February 19, 2022 Personal Tweet and Defendants' efforts to solicit the political, social and academic support of the Targeted Constituencies through the Unlawful Scheme, Dr. Lieberman's merit-based management approach rendered him unsuitable to play any visible role with the Entity Defendants.

892.    During the June 23, 2022 Simpson Zoom Meeting, Dr. Smith admitted, in words or substance, that Defendants' Unlawful Scheme had in fact succeeded in creating a "mob mentality" among certain of the Target Constituencies.

893.    In response to the above-referenced comments of Dr. Smith during the June 23, 2022 Simpson Zoom Meeting, Dr. Lieberman agreed proudly that he had led NYSPI/ Columbia/Presbyterian Psychiatry based upon meritocratic principles.

894.    Dr. Lieberman then reminded Dr. Smith, Dr. Simpson and Dr. Baptista that each had been named to the professional position that he or she held as of February 22, 2022 because Dr. Lieberman had promoted and supported each in the merit-based environment that he had fostered.

895.    During the June 23, 2022 Simpson Zoom Meeting, Dr. Simpson acknowledged, in words or substance, that she and "everyone" admires Dr. Lieberman's "brilliance" and his "scholarship."  Nevertheless, Dr. Simpson made clear that Defendants intended to continue to retaliate against Dr. Lieberman for the content of his February 19, 2022 Personal Tweet.

896.    Occupying the leadership positions to which she had ascended almost immediately after conspiring with the other Individual State Actor Defendants and the leadership of the Entity Defendants to oust Dr. Lieberman from those positions, Dr. Simpson made clear, in words or substance, during the June 23, 2022 Simpson Zoom Meeting that she intended to deny Dr. Lieberman any "visible leadership role" in the Columbia Medical School Department of Psychiatry.

897.    Dr. Lieberman told Dr. Simpson, Dr. Smith and the other participants in the June 23, 2022 Simpson Zoom Meeting that he was devastated by the fact that Defendants had woven a "narrative" concerning the February 19, 2022 Personal Tweet that, in a word, is "untrue."

898.    Although the willful, intentional and malicious denial to Dr. Lieberman of any leadership role in the Department as punishment for having complimented, through his February 19, 2022 Personal Tweet, the extraordinary beauty of a world-renowned fashion model known as the Queen of the Dark was blatantly unconstitutional and otherwise unlawful, Dr. Lieberman did not press the issue.  Instead, during the June 23, 2022 Simpson Zoom Meeting, he very humbly and graciously assured Dr. Simpson that he would "keep a low profile" within the Department without any "leadership role."

899.    Ultimately, Dr. Lieberman's modest wish was to simply resume the academic, clinical and research activities in which he was entitled (and expected) to engage as a tenured Columbia University Professor and a signatory to the June 1, 2022 Lieberman Activities-Resumption Agreement.  As noted, however, even most of these activities were to be denied to Dr. Lieberman.

900.    When, during the June 23, 2022 Simpson Zoom Meeting, Dr. Lieberman expressed a desire to resume his involvement in the prisoner-focused Miami Center for Mental Health and Recovery program that he had been personally spearheading as of February 22, 2022 with the Honorable Steve Leifman, a Miami-Dade County, Florida, Associate Administrative Judge, Dr. Simpson advised Dr. Lieberman that, under her leadership, the project had been modified, two other Columbia Medical School Department of Psychiatry professors had been assigned to it and there would be no role for Dr. Lieberman.

901.    During the June 23, 2022 Simpson Zoom Meeting, Dr. Lieberman also expressed interest in resuming his role with the Department's Psychedelic Research and Treatment Program.  In response, Dr. Simpson dissembled, suggesting vaguely that the program had been placed on hold and that she would have to get back to Dr. Lieberman in July 2022. During the 11 months that have elapsed since the June 23, 2022 Simpson Zoom Meeting, Dr. Simpson has not once updated Dr. Lieberman on the Psychedelic Research and Treatment Program and Dr. Lieberman has been denied any involvement in resurrecting or running the Program.

902.    During the June 23, 2022 Simpson Zoom Meeting, Dr. Lieberman inquired as to how he could access the substantial amount of funding that he had been responsible for raising for the Columbia Medical School Department of Psychiatry for various research programs with which he was involved, including, but not limited to, gift funds that were solicited by Dr. Lieberman and designated by him for certain of his research projects.  Without access to these funds, Dr. Lieberman explained, he would not be able to hire support staff and fund his academic, clinical and research activities.

903.    Dr. Lieberman also noted that, during his tenure as Chair of the Columbia Medical School Department of Psychiatry, the Department's reserve fund in connection with its endowment almost tripled, making the Department one of, if not the, richest of the Medical School's departments.

4890-9158-2565, v. 1

904.    In response, Dr. Simpson once again dissembled, suggesting that funds that Dr. Lieberman had raised would be restored to him.  However, since the June 23, 2022 Simpson Zoom Meeting, Defendants, under the leadership of Dr. Simpson, the other Individual State Actor Defendants and certain other leadership members of the Entity Defendants, have refused to return to Dr. Lieberman's use much of the funding that he had been so instrumental in raising and which is critically important to support his academic and research activities.  *See* Background Section XXIII, below.

905.    Because Dr. Simpson has been so determined to completely erase Dr. Lieberman from the Columbia Medical School Department of Psychiatry, she has declined to meet or speak with him since the June 23, 2022 Simpson Zoom Meeting.

906.    On June 29, 2022, Dr. Lieberman met with Dr. Armstrong as a follow-up to the June 23, 2022 Simpson Zoom Meeting (the "***June 29, 2022 Armstrong-Lieberman Meeting***").

907.    During the June 29, 2022 Armstrong-Lieberman Meeting, Dr. Armstrong again promised Dr. Lieberman, in words or substance, that, as a faculty member of Columbia Medical School, Dr. Lieberman would be permitted to resume all of his academic, clinical and research activities on behalf of the Entity Defendants.

908.    During the June 29, 2022 Armstrong-Lieberman Meeting, Dr. Armstrong, on behalf of the Entity Defendants, made a clear and unambiguous promise to Dr. Lieberman that he would be permitted to immediately resume fully his academic, clinical and research

320

activities as a tenured Professor in the Columbia Medical School Department of Psychiatry and as a member of the Presbyterian/Columbia Hospital Department of Psychiatry.

909.    During the June 29, 2022 Armstrong-Lieberman Meeting, Dr. Armstrong represented to Dr. Lieberman, in words or substance, that she had consulted with Dr. Corwin, the Chief Executive Officer of Presbyterian/Columbia Hospital, and she was therefore speaking on his behalf with respect to the resumption of Dr. Lieberman's academic, clinical and research activities for the Hospital.

910.    In the period during which Dr. Armstrong had served as Dean of the Columbia Medical School, Dr. Lieberman had had only positive interactions with her.  Dr. Lieberman also understood and believed that, as Dean of said Medical School, Dr. Armstrong had the authority and power that she represented that she possessed in promising him during the June 29, 2022 Armstrong-Lieberman Meeting that Dr. Lieberman would be able to promptly and fully resume his academic, clinical and research activities on behalf of the Entity Defendants.

911.    Because Dr. Armstrong held the position of Dean of Columbia Medical School and because she represented to Dr. Lieberman that she had held discussions concerning the matter with Dr. Corwin, the Chief Executive Officer of Presbyterian/Columbia Hospital, Dr. Lieberman believed reasonably that Dr. Armstrong had the authority and power, on behalf of Columbia University, Columbia Medical School and Presbyterian/Columbia Hospital to restore promptly Dr. Lieberman's ability to engage fully in his academic, clinical and research activities on behalf of the Entity Defendants.

321

912.    Moreover, as of June 29, 2022, Dr. Lieberman had no reason to suspect that Dr. Armstrong had played a role in Defendants' Unlawful Scheme.

913.    Accordingly, as Dr. Armstrong fully intended, Dr. Lieberman quite reasonably relied upon Dr. Armstrong's June 29, 2022 promise that he would be able to promptly resume his academic, clinical and research activities on behalf of the Entity Defendants.

914.    During the June 29, 2022 Armstrong-Lieberman Meeting, Dr. Armstrong promised Dr. Lieberman, in words or substance, that his resumption of academic, clinical and research activities would include all projects and initiatives that fall within the customary role of a faculty member.

915.    At approximately 9:58 p.m. on June 29, 2022, Dr. Armstrong sent an e-mail to Dr. Lieberman summarizing her understanding of certain of the matters that she and Dr. Lieberman had discussed earlier that day.  Among other things, Dr. Armstrong's June 29, 2022 e-mail confirmed that, "as a faculty member, you [Dr. Lieberman] can engage in projects and initiatives that fall within the customary roles of a faculty member."

916.    Despite the very clear promises made by Dr. Armstrong during the June 29, 2022 Armstrong-Lieberman Meeting, Dr. Simpson, the other Individual State Actor Defendants and certain members of the Entity Defendants' leadership — with or without Dr. Armstrong's knowledge and blessing — have continued to erect roadblocks to Dr. Lieberman's resumption of his academic, clinical and research activities.

322

917.     A couple of hours later, at approximately 12:01 a.m. on June 30, 2022, Dr. Lieberman responded to Dr. Armstrong's June 29, 2022 e-mail, focusing upon the severe burdens and hardships that Defendants continued to place upon him.  Among other things, Dr. Lieberman noted, "with all due respect, there is a large discrepancy between your understanding and the reality of my situation and the process of my reinstatement.  I have no office, no staff, and no resources.  Indeed, most psychiatry faculty and staff do not know that I have been reinstated and believe that I remain suspended or have disappeared altogether."

918.     Although deeply disappointed by these developments, Dr. Lieberman continued to rely reasonably upon the promises made to him by Dean Armstrong and therefore continued to believe that she would overrule Dr. Simpson and other subordinates who continued to undermine the resumption of Dr. Lieberman's academic, clinical and research activities on behalf of the Entity Defendants.

## XXI.

## THE BUILDINGS-ACCESS PROHIBITION IMPOSED BY DEFENDANTS AGAINST DR. LIEBERMAN AS FURTHER PUNISHMENT FOR THE CONTENT OF HIS FEBRUARY 19, 2022 PERSONAL TWEET

919.     Dr. Simpson had to terminate her participation in the June 23, 2022 Simpson Zoom Meeting abruptly before the Meeting had ended due, she said, to an unrelated 10:00 a.m. commitment that morning.  At that time, Dr. Lieberman had not yet had an opportunity to raise the final topic that he wished to address at the Meeting, which was Defendants' absurdly punitive and unlawful prohibition against Dr. Lieberman's accessing New York State-owned buildings used by NYSPI/Columbia/Presbyterian Psychiatry, including its

323

headquarters located at 1051 Riverside Drive in Manhattan, for the purpose of conducting his academic, clinical and research activities (the "***Defendants' Buildings-Access Prohibition***").

920.    Defendants' Buildings-Access Prohibition was imposed to advance Defendants' political, social and academic agendas by continuing to curry favor with the Targeted Constituencies.  By maintaining Defendants' Buildings-Access Prohibition, Defendants were able to continue their maliciously false portrayal of Dr. Lieberman, the author of the February 19, 2022 Personal Tweet, as some type of dangerous criminal whose mere presence in or near a NYSPI/Columbia/Presbyterian Psychiatry building or parking garage posed a risk to the well-being of personnel.

### A.    Defendants Cannot Lawfully Bar Dr. Lieberman From the State-Owned Buildings in Which NYSPI/ Columbia/Presbyterian Psychiatry Operates

921.    As noted in Background Section XII(B)(ii)(6), above, in accordance with the 1985 NYS OMH-Columbia Revocable Permit, NYS OMH agreed to permit Columbia University to occupy and use "for the purpose of conducting psychiatric and related research" four floors of NYS OMH's Lawrence Kolb Building in Manhattan.

922.    As noted in Background Section XII(B)(ii)(7), above, annexed to the 2011 NYSPI Audit Report is the NYSPI Audit Response.  The NYSPI Audit Response explained as follows with respect to the space-sharing protocols among the members of NYSPI/Columbia/ Presbyterian Psychiatry:

4890-9158-2565, v. 1

"*In 1924 NYS resolved to locate the NYSPI on the health sciences campus of CU and established a covenant with CU setting forth the principles of this affiliation.  In the ensuing 86 years the New York State OMH/Columbia affiliation has become an historic and uniquely successful public-private partnership in academic medicine.  The decision to locate NYSPI on the campus of a major university and medical center ushered in a new era for care for the mentally ill and for the field of psychiatric medicine*.  Columbia's intellectual resources, technologies and facilities made available to NYSPI by the University and Medical School, then, as now, enrich and complement the State's own resources and further its mission.

"*Today, the vast majority of NYSPI researchers and many clinicians at NYSPI maintain faculty appointments at Columbia University because a Columbia title provides access to university collaboration (e.g., genetics, brain imaging, laboratory facilities, and clinical populations)*.  It enables NYSPI to compete for grants and awards in an increasingly competitive funding environment. It enables multi-disciplinary collaborations (e.g., with neurology, neuroscience, psychology, maternal-fetal medicine) so that we may contribute to a broader understanding of brain and behavior.  *In simplest terms, Columbia enables NYSPI to recruit and retain world-class scientists and clinicians to perform cutting edge scientific research and provide state of the art health care*.

"*A highly integrated NYSPI-Columbia Department of Psychiatry is now widely viewed as one of the foremost academic and research centers in psychiatry in the world*."  2011 NYSPI Audit Report at 23, accessible at *https://web.osc.state. ny.us/audits/allaudits/093011/08s145.pdf* (emphasis added).

923.    The NYSPI Audit Response expanded upon the benefits of the space-sharing arrangements among the members of NYSPI/Columbia/Presbyterian Psychiatry:

"*OMH/NYSPI considers sharing space at the Institute with Columbia to be a vital part of their public-private partnership.  Indeed, the principle of sharing space and facilities was integral to the original covenant between CU and NYS in 1926.  Space sharing serves OMH and the NYSPI's interests by providing for the integration and exchange of research and academic resources, contributing significantly to the Institute's success in realizing its mission.  It also promotes efficiency for researchers who have roles in supervising both NYSPI and Department-funded research projects, taking care of NYSPI patients, managing NYSPI programs and teaching future mental health professionals*.

4890-9158-2565, v. 1

"*For more than eighty years, Columbia professional staff working in the Department of Psychiatry have occupied space alongside NYSPI staff while NYSPI staff have had access to the resources of a world class academic medical center.  The result has been a uniquely rich collaboration in research, training and clinical care, which has substantially enhanced NYSPI's ability to attract grants to support its mission*.  .  .  .  *This infusion of grant income  .  .  .  is a product of the partnership between NYSPI/OMH and Columbia*.

".  .  .  *The co-location of Columbia and Institute staff is an important part of the architecture of the agreement Columbia and OMH conceived of in 1924*.  At that time, OMH agreed to accept the donation of land for NYSPI subject to the condition that 'the Student bodies and professional staffs of the University and the Hospital and associated institutions shall have [such facilities] available [to them] during the continuance and existence of the said Psychiatric Institute and Hospital, subject to the rules and regulations of the State Hospital Commission.' That land donation was the land upon which the former Building 1 of NYSPI was built.  *The condition for the use of NYSPI by the students and professional staffs of the University and the Hospital was incorporated into the deed for the property and a second agreement between the parties*.

"In 1974, Columbia donated a second parcel of land to the State for NYSPI's Kolb Annex, providing in the deed a covenant that 'the student bodies and professional staffs of [Columbia]  and The Presbyterian Hospital in the City of New York and associate institutions shall have available during the continuance and existence of the said extension to the Psychiatric Institute and Hospital, the facilities of said extension to the Psychiatric Institute and Hospital in the same manner as they have available the facilities of the main Psychiatric Institute and Hospital pursuant to the Agreement between [Columbia and NYSPI], dated December 16, 1925.'  *Like the earlier covenant, this covenant was intended to support the affiliation between NYSPI and the Department by providing for the sharing of resources and efficiencies in operation which were considered integral to achieving their common objectives*."  2011 NYSPI Audit Report at 25-26, accessible at *https://web.osc.state.ny.us/audits/allaudits/093011/08s145.pdf* (emphasis added).

924.    In light of the fact that the State-owned buildings in which NYSPI/ Columbia/Presbyterian Psychiatry operates, including its headquarters located at 1051 Riverside Drive in Manhattan, are subject to deeds and other legal agreements that require the State to make said buildings available for use "*by the students and professional staffs of [Columbia]*

*University and [Presbyterian/Columbia] Hospital*" (emphasis added), the Individual State Actor Defendants may ***not*** properly bar Dr. Lieberman, as a member of the Columbia Medical School Department of Psychiatry and of the Presbyterian/Columbia Hospital Department of Psychiatry, from accessing the New York State-owned NYSPI/Columbia/Presbyterian Psychiatry facilities to conduct academic, clinical and research activities on behalf of the Entity Defendants.

925.    Similarly, in light of the fact that the New York State-owned buildings in which NYSPI/Columbia/Presbyterian Psychiatry operates, including its headquarters located at 1051 Riverside Drive in Manhattan, are subject to deeds and other legal agreements that require the State to make said buildings available for use "by the students and professional staffs of [Columbia] University and [Presbyterian/Columbia] Hospital," the Entity Defendants may ***not*** properly bar Dr. Lieberman, as a member of the Columbia Medical School Department of Psychiatry and of the Presbyterian/Columbia Department of Psychiatry, from accessing the New York State-owned NYSPI/Columbia/Presbyterian Psychiatry facilities to conduct academic, clinical and research activities on behalf of the Entity Defendants.

**B.    Defendants' Buildings-Access Prohibition Has Severely Hampered Dr. Lieberman's Ability To <u>Resume His Academic, Clinical and Research Activities</u>**

926.    As Defendants fully intended, Defendants' Buildings-Access Prohibition, which was imposed as part of Defendants' retaliation against Dr. Lieberman for the content of his February 19, 2022 Personal Tweet, has negatively impacted the ability of Dr. Lieberman, as a member of the Columbia Medical School Department of Psychiatry and of the Presbyterian/

327

Columbia Department of Psychiatry, to resume his academic, clinical and research activities on behalf of the Entity Defendants.

927.     Even if, as a general matter, Defendants' Buildings-Access Prohibition could be properly imposed by the Individual State Actor Defendants and the Entity Defendants (which is not the case), the imposition of said Prohibition in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet deprives Dr. Lieberman of his constitutionally and statutorily protected free-expression rights.

928.     For the past 15 months, Defendants' Buildings-Access Prohibition has barred Dr. Lieberman from setting foot in NYSPI's headquarters at 1051 Riverside Drive in Manhattan (and other New York State-owned buildings), where the vast majority of the NYSPI/Columbia/Presbyterian Psychiatry offices, clinical services, patient care and laboratories are located.

929.     Dr. Lieberman's research focuses on schizophrenia.  The research clinics in which schizophrenia patients are seen are located in the NYSPI headquarters building at 1051 Riverside Drive in Manhattan.

930.     In addition, the neuroimaging facilities that are essential to Dr. Lieberman's research activities are located in the NYSPI headquarters building at 1051 Riverside Drive in Manhattan, as are the electroencephalogram, neurobiology, genetics and pharmacology labs.

328

931.    As a result of Defendants' Buildings-Access Prohibition, Dr. Lieberman has been forced to try to collaborate with other investigators at non-NYSPI/Columbia/ Presbyterian Psychiatry institutions, where the actual research will take place (the "***Non-NYSPI/Columbia/Presbyterian Psychiatry Research Efforts***").

932.    However, Dr. Lieberman's ability to proceed with Non-NYSPI/Columbia/ Presbyterian Psychiatry Research Efforts is dependent upon the financial and other support of the Columbia Medical School Department of Psychiatry in connection with research-grant submission, approval and management, which support has been withheld by Defendants.  Indeed, to date, Defendants have denied Dr. Lieberman access to certain NIMH grants that he was instrumental in obtaining prior to his Forced Resignation from NYSPI on February 22, 2022.

933.    During the past 15 months — having been stripped of his NYSPI/Columbia/Presbyterian Psychiatry leadership positions; having been denied any substantive role in his research projects that were pending as of February 22, 2022; having been denied the opportunity to teach; having been denied the necessary support to more easily see patients; and having been denied access to the resources required to conduct meaningful research — Dr. Lieberman has been limited essentially to writing papers and books.

934.    After Dr. Simpson had departed the June 23, 2022 Simpson Zoom Meeting, Dr. Lieberman explained to Dr. Smith, Dr. Baptista and Ms. Friedman how Defendants' Buildings-Access Prohibition has negatively impacted Dr. Lieberman's ability to engage in academic, clinical and research activities.

935.     In so explaining, Dr. Lieberman shared his understanding that Defendants'

Buildings-Access Prohibition, an integral part of their Unlawful Scheme, was driven by

Defendants' desire to advance their overlapping political, social and academic agendas.  Dr.

Lieberman explained, in words or substance, that his February 19, 2022 Personal Tweet had

given certain persons in the Office of the New York State Governor (Chambers) something to

exploit for the purpose of "currying favor" with "downstate minority voters."  Defendants'

Draconian, instantaneous destruction of Dr. Lieberman, which Defendants then arranged to share

with the public through their Negative PR Campaign, was implemented, Dr. Lieberman observed

in words or substance, to garner "a headline and a perp walk."

936.     During the June 23, 2022 Simpson Zoom Meeting, Dr. Lieberman also

lamented the fact that his egregious mistreatment by Defendants in retaliation for the content of

his February 19, 2022 Personal Tweet had been driven by "naked political interests."

937.     Defendants' unconstitutional, otherwise unlawful and shamefully petty

Buildings-Access Prohibition is designed intentionally to advance Defendants' political, social

and academic agendas by making a continuing example of Dr. Lieberman in retaliation for the

content of his February 19, 2022 Personal Tweet, further humiliating him and thwarting his

ability to conduct his academic, clinical and research activities.

938.     Dr. Lieberman noted, in words or substance, during the June 23, 2022

Simpson Zoom Meeting that, given the tripartite composition of NYSPI/Columbia/Presbyterian

Psychiatry and the fact that "so much of the Department's activities" are "based in State

4890-9158-2565, v. 1

facilities," Defendants' Buildings-Access Prohibition "poses a significant impediment" to Dr. Lieberman's ability to engage in his academic, clinical and research activities as a tenured member of the Columbia Medical School Department of Psychiatry.  Dr. Lieberman further noted that, to conduct his academic, clinical and research activities, he has to be able to "enter NYSPI" and work on site with Department faculty, staff and patients.

939.    Dr. Smith responded to the comments of Dr. Lieberman that are referenced in the immediately preceding paragraph, above, by stating:  "Right.  Right.  Okay."

940.    Subsequently, on or about July 1, 2022, Dr. Lieberman learned that, in May 2022, Dr. Simpson had announced to the Psychotic Disorders Division of the Columbia Medical School Department of Psychiatry that Dr. Lieberman was "not allowed to enter the building."

941.    In or about May 2023, the head of the Psychotic Disorders Division of the Columbia Medical School Department of Psychiatry explained to Dr. Lieberman that, as the former longtime administrative head and research leader of the Division, Dr. Lieberman will continue to be barred from Division meetings that are attended by trainees, students and research assistants.  Thus, the Department intends to continue to ostracize, isolate, punish and humiliate Dr. Lieberman in retaliation for the content of his February 19, 2022 Personal Tweet.

942.    It was explained to Dr. Lieberman, in words or substance, that the Department must continue to "protect" the trainees, students and research assistants by shielding them from the inherent danger and discomfort of interacting with Dr. Lieberman — whom

Defendants have conspired to demonize and destroy for the past 15 consecutive months by means of their willful, intentional and malicious Unlawful Scheme, including their Negative PR Campaign.

943.    Upon information and belief, the directive barring Dr. Lieberman from attending Psychotic Disorders Division meetings at which trainees, students and research assistants are present was issued by Dr. Simpson, in her role as the Interim Chair of the Department and in concert with the Individual State Actor Defendants, as part of Defendants' continuing, concerted and malicious efforts to make an example out of Dr. Lieberman to curry favor with the Targeted Constituencies whose continued support Defendants deem necessary to advancing Defendant's overlapping political, social and academic agendas.

944.    Because, in accordance with the directive issued by Dr. Simpson in concert with the other Individual State Actor Defendants, Dr. Lieberman is barred from entering the research buildings in which the Psychotic Disorders Division meetings are held (and in which other research activities take place), he is not permitted to attend in person even those Psychotic Disorders Division meetings at which no trainees, students or research assistants are present. Instead, Dr. Lieberman is limited to joining those relatively few meetings via Zoom or other remote video platform.

945.    Sometime in late June 2022, Julissa Reynoso — an alumna of Columbia Law School, a former member of the respective Boards of Trustees of Columbia University and NewYork Presbyterian Hospital and the then and current United States Ambassador to Spain —

332

had telephoned Edgar Santana, the Deputy Secretary to Governor Hochul, to suggest that New

York State permit Dr. Lieberman to access the NYSPI/Columbia/Presbyterian Psychiatry

buildings to conduct his academic, clinical and research activities in his capacity as a member of

the Columbia Medical School Department of Psychiatry and of the Presbyterian/Columbia

Department of Psychiatry.

      946.    In a follow-up e-mail to Deputy Secretary Santana, dated June 27, 2022,

Ambassador Reynoso wrote:

> "Thanks again for taking my call the other day.  As discussed with Congressman Espaillat and the Congressman's Chief of Staff Aneiry Batista, I want to see about the possibility of having a conversation with Secretary Kathryn Garcia concerning Doctor Jeffrey Lieberman, former head of psychiatry at Columbia Medical School and former head of New York State Psychiatric Institute.

> "Dr. Lieberman was abruptly terminated from practising at the beginning of the year due to a tweet.

> "Dr. Lieberman has been reinstated to practice in the medical school and the hospital but remains prohibited from entering NYSPI.  All of Dr. Lieberman's work materials remain in the NYSPI facility.

> "I am a life-long New Yorker.  I also am an alumna of Columbia Law School, former senior advisor to President Biden and currently serve as U.S. Ambassador to Spain.  Before joining the Biden Administration, I was a member of the Board of Trustees of Columbia University and New York Presbyterian Hospital.  I also, as do so many people in our society, have family members affected by mental illness.  Dr. Lieberman's help to members of my family has been life-saving.  He has also been [e]specially helpful to members of the Upper Manhattan community seeking basic mental health services.  In fact[,] during the pandemic, Dr. Lieberman and his team championed investing and creating innovative projects to address the extreme health disparities impacting communities of color — [e]specially those in Upper Manhattan and the Bronx.

> "I would like to respectfully urge the State to consider allowing Dr. Lieberman access to NYSPI in order for him to continue his significant work to advance psychiatry for the benefit of us all.  Please let me know when Secretary Garcia

333

might have a moment to further discuss.  I live in Madrid but can be reached [by telephone]."

947.    The requested telephone conversation between Ambassador Reynoso and Kathryn Garcia, the Director of State Operations for the State of New York, did not take place.

948.    On or about October 26, 2022, in response to Dr. Lieberman's request for permission to park for a brief period of time in the NYSPI parking garage while he made a single visit to a potential alternative office site, Ms. Friedman advised Dr. Lieberman curtly that, in accordance with Defendants' Buildings-Access Prohibition, Dr. Lieberman was not even allowed to park temporarily in the NYSPI parking garage.

## XXII.

### LATE SUMMER OF 2022: DEFENDANTS CONCEDE THE POLITICAL MOTIVES FOR THEIR UNLAWFUL SCHEME, AS THEY CONTINUE TO PUNISH DR. LIEBERMAN FOR HIS FEBRUARY 19, 2022 PERSONAL TWEET, INCLUDING PROHIBITING HIM FROM ENGAGING IN TEACHING ACTIVITIES AT PRESBYTERIAN/COLUMBIA HOSPITAL

**A.**    **The August 3, 2022 Smith-Lieberman Telephone Conversation**

949.    During the August 3, 2022 Smith-Lieberman Telephone Conversation, Dr. Lieberman observed, in words or substance, that Defendants' false narrative about the February 19, 2022 Personal Tweet had transformed Dr. Lieberman "overnight" from someone who had led NYSPI/Columbia/Presbyterian Psychiatry successfully for 17 years into a "pariah."  Dr. Smith agreed, responding with a single word, "Yeah."

334

950.    During the August 3, 2022 Smith-Lieberman Telephone Conversation, Dr. Lieberman noted how severely he had been impacted by Defendants' Buildings-Access Prohibition.  Dr. Lieberman explained, in words or substance, that, since his research had been "largely based in NYSPI," Defendants' Buildings-Access Prohibition had rendered such research infeasible, forcing Dr. Lieberman to try to conduct such research cumbersomely "from afar or using proxies."

951.    During the August 3, 2022 Smith-Lieberman Telephone Conversation, Dr. Smith attempted to explain his understanding of Defendants' Buildings-Access Prohibition, noting that it seems to apply when someone leaves NYSPI or another New York State agency "under acrimonious conditions," although Dr. Smith admitted that he did not know whether there was actually a "formal" policy.

952.    However, a little later in the August 3, 2022 Smith-Lieberman Telephone Conversation, Dr. Smith acknowledged the raw political and other agendas that gave rise to Defendants' Buildings-Access Prohibition (and, indeed, to Defendants' entire Unlawful Scheme). As noted above, Dr. Smith admitted to Dr. Lieberman, in words or substance, as follows:

(a)    ***Dr. Lieberman's February 19, 2022 Personal Tweet generated discussions involving*** "***the Governor, or at least her chief of staff,***" ***who was*** "***adamant***" ***that the State make*** "***a complete and full break***" ***with Dr. Lieberman, who would not be allowed*** "***to be onsite moving forward***."

(b)    ***The Individual State Actors Defendants' decision to retaliate against Dr. Lieberman for the content of his February 19, 2022 Personal Tweet by terminating his employment with NYSPI was one that was deeply influenced by gubernatorial*** "***politics***" ***and*** "***optics***" ***— given that the*** "***new Governor***" ***wanted*** "***to be reelected***" ***and was concerned about the optics of*** "***ethono-racial disparities, equity, etc.***"

335

953.    Although it was extremely disappointing to hear, Dr. Lieberman agreed

with the assessment of Dr. Smith that is referenced in the immediately preceding paragraph,

above.  Dr. Lieberman replied during the August 3, 2022 Smith-Lieberman Telephone

Conversation, in words or substance, that, although the advisors in Governor Hochul's office

(Chambers) did not know Dr. Lieberman "from Adam," the Individual State Actor Defendants'

instantaneous demand for Dr. Lieberman's Forced Resignation from NYSPI was deemed to be

"politically advantageous" for the Governor's electoral campaign.

954.    During the August 3, 2022 Smith-Lieberman Telephone Conversation, Dr.

Lieberman reminded Dr. Smith that Dr. Lieberman was still being denied many of the other

normal activities of a tenured Professor, noting, for example, that he was still not even permitted

to teach his courses.

**B.      By Means of Defendants' August 22, 2022**
**Hospital Teaching Prohibition and Other Actions,**
**Defendants Continue To Punish Dr. Lieberman**
**For His February 19, 2022 Personal Tweet**

955.    On August 5, 2022, Dr. Lieberman sent an e-mail to Dr. Baptista, Ms.

Friedman and others in which he explained his limbo status:

> "*164 days have passed since my suspension and termination.  In that time I
> have had no office, phone number, staff support, access to patient records and
> funds and that continues to this day.  All of my work related materials were
> packed up and placed in storage*.

> "On April 20th[, 2022,] I was reinstated to my tenured faculty position with
> endowed chair by the Dean.  On June 10th[, 2022,] the ATO [Administrative
> Time Out] was lifted by NYP [Presbyterian/Columbia Hospital] and my medical
> privileges restored.

336

"*At these junctures I requested that research and gift funds under my auspices be returned to me.  It has been three months since this request outlined in a memo and spreadsheet was submitted to Fran Caracappa and Rudi [Odeh-Ramadan] and I have received no response.*

"*In my mtg with Blair [Dr. Simpson] et al 6/23 [June 23, 2022] I was informed that I could not assume any of the leadership roles I previously had in my research, clinical or academic initiatives, and was not allowed on the NYSPI premises.*"  (Emphasis added.)

956.    Incredibly, on or about August 22, 2022, just a few weeks after Dr. Lieberman sent his August 5, 2022 e-mail to Dr. Baptista and six full months after Dr. Lieberman's February 19, 2022 Personal Tweet, Presbyterian/Columbia Hospital decided to impose yet additional punitive measures against Dr. Lieberman in retaliation for the content of said Tweet.

957.    Upon information and belief, as another component of the Unlawful Scheme implemented by Defendants in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, the leadership of Presbyterian/Columbia Hospital, including Dr. Simpson in her tripartite roles as Interim Executive Director of NYSPI, Interim Chair of the Columbia Medical School Department of Psychiatry and Interim Psychiatrist-in-Chief of the Hospital, in coordination with other Individual State Actor Defendants and certain members of the leadership of Columbia University, resolved to bar Dr. Lieberman — a world-renowned psychiatrist who led NYSPI/Columbia/Presbyterian Psychiatry for 17 years — from engaging in teaching activities in connection with the Hospital (the "***Defendants' Hospital Teaching Prohibition***" or the "***Hospital Teaching Prohibition***").

337

958.     Upon information and belief, Defendants' Hospital Teaching Prohibition was orchestrated by Defendants, by means of, among other things, Defendants' Negative PR Campaign, which was used to persuade certain Targeted Constituencies that the resumption of Dr. Lieberman's teaching and related activities at Presbyterian/Columbia Hospital would somehow pose a threat to those Constituencies' well-being.

959.     Upon information and belief, Defendants' Hospital Teaching Prohibition was adopted as a way to continue to exploit Dr. Lieberman's February 19, 2022 Personal Tweet to further advance Defendants' overlapping political, social and academic agendas.

960.     Astonishingly, the opportunity to advance Defendants' political, social and academic agendas by further humiliating, ostracizing and exiling Dr. Lieberman was deemed by Defendants to outweigh the denial to the Hospital's Medical Residents and Fellows of the vast professional knowledge and experience that Dr. Lieberman is able to impart to them as a teacher.

961.     By means of a curt, demeaning letter dated August 22, 2022, Dr. Wasson of Presbyterian/Columbia Hospital notified Dr. Lieberman officiously as follows:

"*The purpose of this letter is to advise you that the Hospital's Graduate Medical Education Council ('GMEC') has recently recommended that you no longer engage in teaching responsibilities*.  Having considered this recommendation, the Residency and Fellowship Programs now wish to clarify your role in the Graduate Medical Education learning environment.

"*In line with the recommendation of the GMEC, the leaders of each program have determined that you should not participate in Residency and Fellowship Program education.  That includes refraining from assuming any supervisory role over residents or fellows ('Graduate Staff'), initiating any professional contact with Graduate Staff (whether in person, in writing, by phone, or by electronic means), evaluating Graduate Staff, giving any classes or other didactics to Graduate Staff, and/or participating in grand rounds.  Going*

338

*forward, any and all communications regarding one of your patients must go through an attending physician, not Graduate Staff*."  (Emphasis added.)

962.    Upon information and belief, prior to sending her August 22, 2022 letter to Dr. Lieberman, Dr. Wasson consulted closely about the content of her letter with at least Dr. Corwin, the Chief Executive Officer of Presbyterian/Columbia Hospital, and Dr. Simpson, in her role, among others, as Psychiatrist-in-Chief of the Hospital.

963.    Upon information and belief, prior to Dr. Wasson's sending her August 22, 2022 letter to Dr. Lieberman, Defendants, through their Unlawful Scheme, including their Negative PR Campaign, conspired to affirmatively destroy Dr. Lieberman's reputation among Residents, Fellows and others at Presbyterian/Columbia Hospital in further retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet as a way to curry favor with Defendants' Targeted Constituencies.

964.    Upon information and belief, members of the leadership team at Presbyterian/Columbia Hospital, in coordination with certain of the Individual State Actor Defendants and other leadership personnel of the Entity Defendants, strongly guided, encouraged and intimidated many of the Hospital Residents, Fellows and others into accepting Defendants' assertion that, to preserve the safety of the Residents, Fellows and other Hospital personnel, Dr. Lieberman had to be barred from interacting with them because the content of Dr. Lieberman's February 19, 2022 Personal Tweet posed an existential threat to their well-being.

965.     As Defendants fully intended, their Hospital Teaching Prohibition created substantial additional obstacles to Dr. Lieberman's ability to resume his academic, clinical and research activities on behalf of the Entity Defendants.

966.     As Defendants know full well, the prohibition against Dr. Lieberman's conferring and otherwise consulting with the Presbyterian/Columbia Hospital Residents, who provide the day-to-day care for patients admitted to the Hospital, makes it very difficult, if not practicably impossible, for Dr. Lieberman to admit and care for his patients who require hospitalization.

967.     Sometime in or about the fall of 2022, Dr. Lieberman participated in a training session to learn the EPIC medical billing software system that is used in connection with the admission of patients to Presbyterian/Columbia Hospital.

968.     However, the EPIC software system requires Dr. Lieberman to input certain information, which requires him to interact with Hospital Residents, which he is not permitted to do in light of Defendants' Hospital Teaching Prohibition. This, of course, negatively impacts Dr. Lieberman's ability to discharge his clinical obligations.

4890-9158-2565, v. 1

**C.**    **By Undermining Dr. Lieberman's Ability To Resume His Academic, Clinical and Research Activities in Retaliation For His February 19, 2022 Personal Tweet, Defendants Not Only Breached the June 1, 2022 Lieberman Activities-Resumption Agreement, But Also Deliberately Contravened the Faculty Policy of the Columbia Medical School Department of Psychiatry**

969.    By employing their Unlawful Scheme for the purpose of deliberately thwarting Dr. Lieberman's resumption of his academic, clinical and research activities as punishment for his February 19, 2022 Personal Tweet, Defendants not only violated Dr. Lieberman's constitutionally and otherwise protected rights, but they also prohibited Dr. Lieberman from engaging in precisely the activities required of a faculty member of the Columbia Medical School Department of Psychiatry.

970.    For example, in its Faculty Compensation Plan for Fiscal Year 2021, the Columbia Medical School Department of Psychiatry made clear that "[e]ach faculty member should be in good standing" and that the criteria for such "good standing" included the following:

- "Highest quality work in the performance of clinical, research, and teaching responsibilities;

- "Research that is appropriate for the faculty member's background, skill set, and academic rank, and consistent with the research goals as defined by the Chairman;

- "Fulfillment of teaching responsibilities to interns, residents, fellows, graduate and medical students;

- "Clinical productivity that meets the clinical mission of the Department;

- "Fulfillment of administrative responsibilities . . .; [and]

- "Perform activities that, in aggregate, generate revenue . . . [including] clinical income, grants, gifts and endowments[.]"

4890-9158-2565, v. 1

971.     With respect to the criteria set forth in the immediately preceding paragraph, above, the Columbia Medical School Department of Psychiatry Faculty Compensation Plan for Fiscal Year 2021 explained:  "These clinical, teaching, research, administrative and financial responsibilities are aspects of professional competency."

972.     The Columbia Medical School Department of Psychiatry Faculty Compensation Plan for Fiscal Year 2021 also made clear that "[f]aculty are expected to attend, on a regular and consistent basis, grand rounds, Departmental and/or Divisional faculty meetings, individual lab or section conferences, journal clubs and/or other Departmental and/or Divisional conferences specific to their specialty or subspecialty."

973.     In retaliation for the content of his February 19, 2022 Personal Tweet, and in furtherance of Defendants' Unlawful Scheme to exploit said Tweet and Defendants' destruction of Dr. Lieberman to advance their overlapping political, social and academic agendas, Defendants have willfully, intentionally and maliciously denied to Dr. Lieberman since February 22, 2022 the opportunities, resources, funding and other support that he needs to perform the academic, clinical and research activities required of a faculty member of the Columbia Medical School Department of Psychiatry.

974.     The Entity Defendants, in concert with the Individual State Actor Defendants, fully appreciate and intend that their continued willful, intentional and malicious denial to Dr. Lieberman of the opportunities, resources, funding and other support necessary to the resumption of his academic, clinical and research activities will not only continue to derail

342

Dr. Lieberman's career, but will soon lead to an intended precipitous decline in his compensation.

975.    As noted, in the April 20, 2022 Armstrong Letter, Dr. Armstrong advised Dr. Lieberman that, when his Compensation Phase-Out Period expires in April 2024, he will be returned to a base-rate salary and thus become "responsible for generating external funding to support [his] salary above the endowment income from [his] professorship."  Of course, by continuing their willful, intentional and malicious denial to Dr. Lieberman of the opportunities, resources, funding and other support that he requires to resume his academic, clinical and research activities, the Entity Defendants, in concert with the Individual State Actor Defendants, are quite deliberately ensuring that Dr. Lieberman will never be able to generate the external funding required to support his salary above the base endowment income provided by his professorship.

## XXIII.

### SINCE FEBRUARY 2022, DEFENDANTS HAVE CONTINUED TO DELIBERATELY THWART DR. LIEBERMAN'S ABILITY TO RESUME HIS ACADEMIC, CLINICAL AND RESEARCH ACTIVITIES BY DENYING HIM NECESSARY ADMINSTRATIVE SUPPORT AND FUNDING

976.    As noted, since February 22, 2022 and continuing to date, the Individual State Actor Defendants have been intimately involved in orchestrating, implementing and prolonging Defendants' Unlawful Scheme against Dr. Lieberman so that the Individual State Actor Defendants and the leadership of the Entity Defendants can continue to pander to the

Targeted Constituencies for the purpose of advancing Defendants' political, social and academic agendas.

977.    Since February 22, 2022 and continuing to date, the Individual State Actor Defendants — through the power wielded by NYSPI and NYS OMH in NYSPI/Columbia/ Presbyterian Psychiatry — have dominated, controlled, encouraged and influenced the Entity Defendants to join with the Individual State Actor Defendants in orchestrating, implementing and prolonging Defendants' Unlawful Scheme against Dr. Lieberman so that the Individual State Actor Defendants and the Entity Defendants can continue to pander to the Targeted Constituencies for the purpose of advancing Defendants' overlapping political, social and academic agendas.

978.    Accordingly, despite their rhetoric to the contrary, Defendants have absolutely no intention of allowing Dr. Lieberman to resume his academic, clinical and research activities on behalf of the Entity Defendants.

979.    Despite having entered into the June 1, 2022 Lieberman Activities-Resumption Agreement, and despite having promised orally and in e-mails on multiple other occasions to provide Dr. Lieberman with the same level of opportunities and administrative, logistical, facilities and funding support that other tenured Columbia Medical School Department of Psychiatry Professors receive to enable them to perform their respective academic, clinical and research activities, Defendants have continued to withhold deliberately from Dr. Lieberman

4890-9158-2565, v. 1

virtually all such substantive support for the purpose of undermining his attempts to resume such activities.

980.     In retaliation for the content of his February 19, 2022 Personal Tweet, and in furtherance of Defendants' Unlawful Scheme to exploit said Tweet and Defendants' destruction of Dr. Lieberman to advance their political, social and academic agendas, Defendants have continued to treat Dr. Lieberman in the most gratuitously demeaning and dismissive manner.

981.     ***Defendants would not have treated a convicted felon with the unbridled derision with which they have treated Dr. Lieberman since February 22, 2022***.

A.     **Defendants' Petty Insults To Dr. Lieberman Continue**

982.     In December 2022, when Dr. Lieberman suggested that Linda Rosenberg, Director of External Relations for the Columbia Medical School Department of Psychiatry, include in the Columbia Medical School Department of Psychiatry newsletter a review of Dr. Lieberman's then soon-to-be-published book, *Malady of the Mind: Schizophrenia and the Path To Prevention* (Simon & Schuster 2023), Ms. Rosenberg advised Dr. Lieberman that she could not include the review in the newsletter because Dr. Simpson had made clear to Department personnel that they are to make no reference to Dr. Lieberman in any Department announcements.

983.     Dr. Simpson thus subordinated the obvious benefits to the Columbia Medical School Department of Psychiatry of publicizing the most recently published book on

345

schizophrenia by Dr. Lieberman, as a member of said Department, to Dr. Simpson's commitment

to Defendants' efforts, through the Unlawful Scheme (including the Negative PR Campaign), to

continue to pander to the Targeted Constituencies for the purpose of advancing Defendants'

overlapping political, social and academic agendas.

**B.      Defendants Continue To Deny
          Research Funding To Dr. Lieberman**

984.      In furtherance of Defendants' Unlawful Scheme, Dr. Simpson has been

instrumental in denying Dr. Lieberman access to grants, donations and other research funding

that Dr. Lieberman himself had played a pivotal role in soliciting to support his and others' work

(collectively, the "***Lieberman-Raised Funds***")

985.      As Defendants intended and know full well, without access to the

Lieberman-Raised Funds, Dr. Lieberman's ability to conduct his academic, clinical and research

activities as a member of the Columbia Medical School Department of Psychiatry and of the

Presbyterian/Columbia Hospital has been severely compromised.

986.      By an e-mail dated July 14, 2022, Dr. Lieberman, still trusting in Dr.

Armstrong's promises, wearily called to her attention the untenable situation in which he found

himself as a result of his February 19, 2022 Personal Tweet:  "I have been trying to resume some

of my academic activities[,] but still have no support staff or workspace."

987.      On July 25, 2022, Dr. Lieberman e-mailed Fran Caracappa, Vice President

of Finance and Controller of Columbia Medical School, and Ms. Odeh-Ramadan to ask if there

was "any news with respect to my request about funds access?  I know you've got a lot on your plate[,] but without any support staff, I'm virtually helpless."

988.    In a November 18, 2022 e-mail exchange with Marlon Nieto, Administrative Director of the Division of Psychotic Disorders at NYSPI, concerning Dr. Lieberman's access to certain grants, gifts and other funding accounts, Dr. Lieberman again explained:

> "*[T]he small amount of funds allocated to me of the large number of accounts containing funds that I raised and should have given to me will soon be expended and then I will be left with no resources or means to pursue any activities.  I can't understand the rationale for this other than to prevent me from me from engaging in any further academic activities other than seeing patients.*  Clearly Marlon you had nothing to do with this and am sorry to burden you with these unpleasant facts but *as you are managing my meager resources I wanted you to be aware of these circumstances which are forcing me into exile and inactivity*."  (Emphasis added.)

989.    In addition to deliberately denying Dr. Lieberman access to the Lieberman-Raised Funds for the purpose of thwarting his ability to conduct his academic, clinical and research activities on behalf of the Entity Defendants, Defendants have blocked donors from earmarking new funds to support such activities.

990.    By means of an e-mail dated January 21, 2023, Dr. Lieberman alerted Mr. Nieto that "several donors . . . are unhappy that their donations are not available for my use. Before they express their displeasure to [the] development office, I wanted to let you know."

991.    Columbia University and the Columbia Medical School Department of Psychiatry have been aware for several years of the desire of Dr. Michael Tapper, a graduate of

Columbia Medical School, that, upon his death, his estate (the "***Tapper Estate***") donate a substantial sum of money to Columbia University to launch a project to enhance Columbia University's existing mental health program for students (the "***Tapper Columbia Student Mental Health Project***").

992.    In connection with the Tapper Columbia Student Mental Health Project, representatives of the Tapper Estate enlisted the assistance of Dr. Lieberman, who, among other things, participated in numerous meetings with representatives of the Tapper Estate and assembled for the Tapper Columbia Student Mental Health Project a group of faculty members from the Columbia Medical School Department of Psychiatry with expertise in adolescent mental health and suicide prevention.

993.    Dr. Lieberman and his assembled faculty group prepared a proposal for the Tapper Columbia Student Mental Health Project, which identified as Project participants seven members of the Columbia Medical School Department of Psychiatry, including Dr. Lieberman, who was identified as the Project Coordinator.

994.    Since February 22, 2022, Columbia University and the Columbia Medical School Department of Psychiatry have been blocking the launch of the Tapper Columbia Student Mental Health Project because Dr. Lieberman's involvement in said Project would conflict with Defendants' objective, in furtherance of their Unlawful Scheme, to continue to ostracize Dr. Lieberman in retaliation for the content of his February 19, 2022 Personal Tweet, thereby advancing Defendants' overlapping political, social and academic agendas.

995.    On February 14, 2023, counsel for the Tapper Estate e-mailed Remi

Silverman, who, upon information and belief, is an attorney with the Columbia University Office

of General Counsel, concerning the Tapper Columbia Student Mental Health Project, noting that

"[i]t is now over 3 months since we agreed that Dr. Lieberman could put a team together for

Phase I [research] to review the existing Columbia College program(s) and to make

suggestions/recommendations for the Executor/Trustees to consider[,] [but] Dr. Lieberman has

not be[en] able to assemble the team due to some internal administrative issues.  We really want

to move this along so please contact me ASAP as to what the problem is and how we can address

it."

996.    Upon information and belief, during a telephone conversation with

counsel for the Tapper Estate that was held on or about February 15, 2023, Ms. Silverman stated,

in words or substance, that, while Columbia University and the Columbia Medical School

Department of Psychiatry were prepared to move forward with the Tapper Columbia Student

Mental Health Project that is to be funded by the Tapper Estate, they will not permit Dr.

Lieberman to participate in the Project.

997.    On February 20, 2023 Ms. Silverman sent an e-mail to the counsel for the

Tapper Estate — the entity seeking to make a significant monetary donation to fund the Tapper

Columbia Student Mental Health Project — and advised as follows:  "This note is to follow up

on our conversation of February 15th[, 2023].  The College is ready to move ahead with Phase 1

[of the Tapper Columbia Student Mental Health Project], conducting an assessment of the

College's existing mental health program, to be conducted by faculty from the Department of

349

Psychiatry who have specific expertise in this area.  As we discussed, ***Dr. Lieberman will not be part of this process***."  (Emphasis added.)

998.    Upon information and belief, by letter dated April 4, 2023, Ms. Silverman advised counsel for the Tapper Estate, in part, as follows:  "***The fact is that having Dr. Lieberman participate in the [Tapper Columbia Student Mental Health Project] assessment and report is not feasible.  . . .  [W]e aren't able to have Dr. Lieberman participate in Phase 1***." (Emphasis added.)

999.    While it stopped short of naming Dr. Simpson, the April 4, 2023 letter from Ms. Silverman that is referenced in the immediately preceding paragraph, above, made it quite clear that it is in fact Dr. Simpson, in her role as Interim Chair of the Columbia Medical School Department of Psychiatry and a key perpetrator of the ongoing Unlawful Scheme against Dr. Lieberman, who is blocking Dr. Lieberman's participation in the Tapper Columbia Student Mental Health Project.  In her letter, Ms. Silverman reminded counsel for the Tapper Estate that it is "necessary to work through the University's Department of Psychiatry[.]"

C.    **The Deficient Haven Avenue Office Space**
      **To Which Dr. Lieberman Has Been Relegated**

1000.   Sometime in or about the fall of 2022, Dr. Lieberman was advised by certain executives of the Entity Defendants that the only office space that he would be permitted to use to conduct his academic, clinical and research activities was one located on the below-ground floor of a building located at 60 Haven Avenue in Manhattan (the "***Haven Avenue Office***").

350

1001.   Dr. Lieberman had been advised by Defendants that his personal items (such as books, awards, diplomas and photos), as well as correspondence; research-grant information; materials relating to Dr. Lieberman's membership in professional societies; reports; and the like (collectively the "***Lieberman Original Office Files***") that had been in his NYSPI/Columbia/Presbyterian Psychiatry office at 1051 Riverside Avenue in Manhattan as of February 22, 2022 — the evening of which he was banned by Defendants from ever visiting his office again —  had been boxed and moved to the Haven Avenue Office for storage.

1002.   On or about March 7, 2023, Dr. Lieberman visited the Haven Avenue Office to retrieve certain of his personal files and other materials for the purpose of completing his tax returns and addressing certain medical licensure renewal matters (the "***March 2023 Haven Avenue Office Visit***").

1003.   When he arrived for the March 2023 Haven Avenue Office Visit, Dr. Lieberman was surprised and disappointed to see the state of disrepair of the office and the adjacent hallway areas.  As demonstrated in the two paragraphs immediately below, the contrast between the below-grade Haven Avenue Office and Dr. Lieberman's NYSPI/Columbia/ Presbyterian Psychiatry office at 1051 Riverside Avenue in Manhattan to which he was not permitted by Defendants to return after February 22, 2022 is stark.

1004.   Set forth immediately below are photographs, taken prior to February 23, 2022, of Dr. Lieberman's NYSPI/Columbia/Presbyterian Psychiatry office at 1051 Riverside Avenue in Manhattan:





1005.   Set forth immediately below are photographs, taken in early March 2023, of the Haven Avenue Office, including the document-storage area and surrounding hallway:





1006.   When he arrived for the March 2023 Haven Avenue Office Visit, Dr.

Lieberman discovered that the boxes containing the Lieberman Original Office Files had been

stacked in a small area in the below-grade Haven Avenue Office to which he had been relegated.

1007.   During the March 2023 Haven Avenue Office Visit, Dr. Lieberman's review of the boxes containing the Lieberman Original Office Files that had been stacked in a small area in the Haven Avenue Office revealed that many of the Lieberman Original Office Files were missing.

1008.   Among the Lieberman Original Office Files that Dr. Lieberman discovered were missing during the March 2023 Haven Avenue Office Visit were all of his files containing his correspondence, scholarly papers, research records, patient charts, information related to his research grants, reports and the like.

1009.   On March 10, 2023, Dr. Lieberman sent an e-mail to Ms. Odeh-Ramadan and Ms. Friedman, stating:

> "On Tuesday, March 7, I visited the 60 Haven Avenue office (Room 413) that you have assigned to me.  The purpose of my visit was to retrieve some of my personal effects, which had previously been collected from my NYSPI office and packed up and held in storage.  When I was informed that they had been transferred to the Haven office I assumed that I could now access them.

> "Among the items that I was seeking to retrieve at the Haven Avenue site were my New York State Medical License and DEA license, as well as some documents that I require to prepare my income tax returns.  Much to my surprise and disappointment, none of my extensive files, including my correspondence, research-grant information, materials relating to my membership in professional societies, reports and the like that had been stored at my former office at 1051 Riverside Drive were in the boxes.  These materials had been stored in my office proper, in the secretarial suite, in Iris's office and in the store room adjacent to the board room.

> "Please let me know where my missing materials are located and how and when I can access them.   Thank you."

354

1010.   To date, Dr. Lieberman has not received a response from Ms. Odeh-Ramadan or Ms. Friedman to his March 10, 2023 e-mail that is quoted in the immediately preceding paragraph, above.

1011.   As the Entity Defendants fully intended as part of their Unlawful Scheme, the Haven Avenue Office places Dr. Lieberman at a serious disadvantage in attempting to resume his academic, clinical and research activities.

1012.   As the Entity Defendants fully intended as part of their Unlawful Scheme, the Haven Avenue Office's inconvenient location and lack of amenities render it an unsuitable space in which Dr. Lieberman can see patients.  Accordingly, for purposes of seeing patients, Dr. Lieberman likely will be forced to attempt to reserve alternative space by the hour at the Columbia Medical School Department of Psychiatry's midtown Manhattan location.

1013.   As the Entity Defendants fully intended as part of their Unlawful Scheme, the Haven Avenue Office is located apart from the research clinics, laboratories and conference rooms housed in the NYSPI facilities, which, although so integral to Dr. Lieberman's academic, clinical and research activities, have been placed off limits to Dr. Lieberman in accordance with Defendants' Buildings-Access Prohibition.

1014.   Putting aside the deficient nature of the Haven Avenue Office, Dr. Lieberman has asked the Entity Defendants to clarify whether they are requiring Dr. Lieberman — to whom Defendants have willfully, intentionally and maliciously denied the Lieberman-Raised Funds that he was instrumental in raising for his academic, clinical and research activities

355

(*see* Background Section XXIII(B), above) — to bear the costs of the Haven Avenue Office and essential staff.

        1015.   For example, on November 10, 2022, Dr. Lieberman e-mailed Maria Delgado, Executive Director for Space Planning, copying Ms. Friedman, Ms. Odeh-Ramadan and Project Manager Misa Radulov, concerning, among other things, the Haven Avenue Office. Dr. Lieberman explained:

> "[B]efore proceeding I would like to know the terms of my space assignment, specifically what space is being allocated to me (my understanding is that I've been offered one office and a desk in the outer reception area on the basement floor of 60 Haven Ave), what is the sq. footage, what is the rental cost, who is responsible for payment and for how long.

> "Moreover, my ability to estimate my current and future space needs is difficult for the following reasons. ***Currently, I have no staff and minimal money. The funds I had from sponsored research and gift accts are almost wholly not available to me. In addition, my ability to pursue sponsored research or academic initiatives is limited as psychiatry faculty and staff are either unwilling, afraid or prohibited from associating with me***. Finally, I am unable to teach and prohibited from interacting with trainees. Thus, it is unclear to what purposes I would be using the space other than as a storage site for the effects of my former office in NYSPI, that have been packed up and placed in temporary storage.

> "This is not to say that I do not want space on the CU Health Sciences campus to go to every day and begin to resume my career and continue to pursue my academic and clinical activities. I desperately do. ***However, . . . while Dean Armstrong and NYP [Presbyterian/Columbia Hospital] have reinstated my faculty and medical staff status and permitted me to resume all manner of activities, the reality is that the numerous restrictions and impediments that exist, de facto have made it virtually impossible***. Hence my questions about the amount of space, cost and responsibility for payment.

> "Once again, I appreciate your efforts on my behalf and look forward to the favor of your reply." (Emphasis added.)

1016.   To date, Dr. Lieberman has not received a response from the Entity Defendants advising what the costs to him will be if he uses the Haven Avenue Office.

## XXIV.

### THROUGH THEIR UNLAWFUL SCHEME, DEFENDANTS HAVE DELIBERATELY SOUGHT TO UNDERMINE DR. LIEBERMAN'S RELATIONSHIPS WITH THIRD PARTIES

1017.   To enhance their pandering to the Targeted Constituencies for the purpose of advancing Defendants' overlapping political, social and academic agendas, Defendants have used the Unlawful Scheme, including the critical Negative PR Campaign, to deliberately poison not only Dr. Lieberman's relationships with members of the NYSPI/Columbia/Presbyterian Psychiatry community, but also Dr. Lieberman's existing relationships with third parties.  Said third parties include, among others, publishers of medical journals; professional associations; research-project participants and sponsors; pharmaceutical companies; and biotech business ventures.

1018.   Defendants have worked tirelessly in concert to ensure that, for the remainder of his career, Dr. Lieberman will continue to be defamed, marginalized and ostracized from the NYSPI/Columbia/Presbyterian Psychiatry community and the larger field of psychiatry. In this way, Defendants will achieve their twin goals of being forever able to (a) boast to the Targeted Constituencies, whose support is deemed crucial to the continuing advancement of Defendants' overlapping political, social and academic agendas, that Defendants destroyed Dr. Lieberman in retaliation for the content of his February 19, 2022 Personal Tweet and (b) point to

357

their destruction of Dr. Lieberman as an example and warning to silence Dissenting Community Members.

1019.   Through the implementation of their Unlawful Scheme, including Defendants' Negative PR Campaign, Defendants have largely achieved their intended objective of persuading third parties in the field of psychiatry who had maintained relationships with Dr. Lieberman prior to February 22, 2022 (the "***Psychiatry Third Parties***") to terminate or suspend those relationships in response to the content of his February 19, 2022 Personal Tweet.

1020.   By immediately and publicly stripping Dr. Lieberman of his leadership roles within NYSPI/Columbia/Presbyterian Psychiatry and implementing the rest of their Unlawful Scheme (including the Negative PR Campaign) against him in retaliation for his February 19, 2022 Personal Tweet, Defendants have sent a loud, intended and unmistakable message to the Psychiatry Third Parties that NYS OMH/NYSPI, the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry deem Dr. Lieberman to be radioactive and therefore any Psychiatry Third Parties who maintain relationships with him do so at their political peril.

1021.   Upon information and belief, had Defendants instead permitted Dr. Lieberman to continue to lead NYSPI/Columbia/Presbyterian Psychiatry and refrained from launching the other aspects of their Unlawful Scheme (including the Negative PR Campaign) against him in retaliation for his February 19, 2022 Personal Tweet, the Psychiatry Third Parties would have continued their respective relationships with Dr. Lieberman.

1022.    Among the Psychiatry Third Parties who severed or suspended their relationships with Dr. Lieberman upon Defendants' implementation of their Unlawful Scheme (including Defendants' Negative PR Campaign) against him in retaliation for his February 19, 2022 Personal Tweet are the ones addressed immediately below in this Background Section XXIV.

1023.    On or about February 23, 2022, as a direct result of Defendants' Unlawful Scheme (including Defendants' Negative PR Campaign) in response to Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman was advised that an affiliate of OrbiMed Healthfund Management had canceled the funding for a proposed psychiatry-related start-up company with which Dr. Lieberman was involved.

1024.    On or about February 24, 2022, as a direct result of Defendants' Unlawful Scheme (including Defendants' Negative PR Campaign) in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman was advised by Dr. Eric Rubin, the Editor-in-Chief of the *New England Journal of Medicine* that Dr. Lieberman would have to resign his position on the *Journal*'s editorial board.

1025.    Dr. Lieberman learned subsequently that, as a direct result of Defendants' Unlawful Scheme (including Defendants' Negative PR Campaign) in retaliation for the content of the February 19, 2022 Personal Tweet, he had been removed from all NIMH-sponsored research projects in connection with which he was the Principal Investigator or Co-Investigator.

4890-9158-2565, v. 1

1026.   On or about March 9, 2022, as a direct result of Defendants' Unlawful Scheme (including Defendants' Negative PR Campaign) in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman learned that he would not be permitted to make a scheduled presentation at a then upcoming conference hosted by South by Southwest addressing the effects of stress on competitive athletes.

1027.   On or about March 9, 2022, as a direct result of Defendants' Unlawful Scheme (including Defendants' Negative PR Campaign) in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman was advised that Cerevel Therapeutics, which, upon information and belief, is a clinical-stage biopharmaceutical company that focuses upon the biology and neurocircuitry of the brain in exploring and developing new therapies, had decided to cancel its support for a study by Dr. Lieberman (for which he had obtained funding) of a drug to treat cognitive impairment and negative symptoms of schizophrenia.  Dr. Lieberman was also asked at this time to resign from the Scientific Advisory Board of Cerevel Therapeutics.

1028.   On or about March 10, 2022, as a direct result of Defendants' Unlawful Scheme (including Defendants' Negative PR Campaign) in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman was advised by the National Academy of Medicine that it was withdrawing his invitation to speak as a panel member at the March 30, 2022 National Academies Workshop on Psychedelics.

360

1029.   On or about March 11, 2022, as a direct result of Defendants' Unlawful Scheme (including Defendants' Negative PR Campaign) in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman was advised that he had been removed from the Scientific Advisory Board of Intra-Cellular Therapies, a biopharmaceutical company.

1030.   On or about March 15, 2022, as a direct result of Defendants' Unlawful Scheme (including Defendants' Negative PR Campaign) in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman was advised that the American Psychiatric Association's Board of Trustees had voted to rescind the Association's invitation to Dr. Lieberman to present at the following sessions of the Association's 2022 Annual Meeting: "Catching Up on Schizophrenia: What You Need to Know from New Research" and "Taming Madness: The Story of Schizophrenia and the Path to Prevention."

1031.   On or about April 1, 2022, as a direct result of Defendants' Unlawful Scheme (including Defendants' Negative PR Campaign) in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman learned that he had been asked to resign from the Karuna Therapeutics Scientific Advisory Board.

1032.   On or about July 22, 2022, as a direct result of Defendants' Unlawful Scheme (including Defendants' Negative PR Campaign) in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman received an e-mail from Elsevier, a Dutch health and medical sciences organization, advising that

361

Dr. Lieberman had been suspended for two years, commencing August 1, 2022, from the editorial positions that he held at Elsevier-owned journals — *Journal of Psychiatric Research*, *Personalized Medicine in Psychiatry*, *Psychiatry Research* and *Schizophrenia Research* — due to "the recent events surrounding your social media post of February [19, 2022,]" notwithstanding that Elsevier does "recognize [Dr. Lieberman's] contributions to these journals."

      1033.   On or about November 22, 2022, Dr. Lieberman received an e-mail from the Nominating Committee of the American College of Neuro-psychopharmacology (the "*ACNP*") soliciting nominations for certain officer positions. In response, Dr. Lieberman sent an e-mail to the Nominating Committee on November 25, 2022, stating the following:

> "I am aware that several ACNP member colleagues have submitted my name in nomination for the Presidency and that the unusual circumstances occasioned by the events of February [19, 2022] that led to the abrupt change in my academic position make my nomination, much less election, unlikely.  However, I felt that it was important to take the unusual step of sharing the following thoughts with you about my situation and its relevance to the College's electoral process.  I apologize for the unusual nature of this communication and for any inconvenience or awkwardness it causes.

> "The incident that occurred on February [19], 2022 in which a clumsily worded tweet, intended to be complimentary, led to my abrupt removal as chair of Columbia Psychiatry and Director of the New York State Psychiatric Institute without any due process (see attached, 'One Graceless Tweet' [the March 1, 2022 McWhorter Opinion Piece]).  ***The terms of my removal imposed a 90 day period of virtual 'house arrest' in which I was required to stay at home and prohibited from coming to my office, coming on campus, communicating with any of my staff, faculty, patients, donors and cut off from the servers on which all of my contacts, communications, data and documents were stored.  In June [2022], I was reinstated as a tenured professor with an endowed chair and full faculty***

362

***rights with my medical privileges restored, though I have no office or access to my grants and funds***.

"The reason that I have taken the unusual step of writing to you and sharing this information is because I believe that it is precisely [because of] these circumstances (which make my candidacy unlikely) that I should be nominated. Though I have no illusions about being elected, my nomination by the Committee would signal the College's refusal to be dictated to by the woke sensibility and canceled by the complicity of craven institutions who reflexively cower in fear and abandon reason and due process in a manner reminiscent of the 'Red Scare' in the 1950's in the U.S. and Mao's 'Cultural Revolution' of the 1960's in China (see article by Anne Appelbaum [*sic*] from the Atlantic attached [The Atlantic New Puritan Article]). Therefore, I felt that it is important for me to appeal to you — the aforementioned circumstances related to the events of 2/22/22 notwithstanding. The following narrative summarizes my qualifications and reasons for seeking office.

"*Over its seven-decade history, the ACNP has counted as its members the scientific elite and stood for scientific and academic excellence. However, it now faces many challenges that obstruct its path and cloud its future. These include the fluctuating nature of the NIH budget and research funding priorities, controversies such as stem cell research and animal rights, and the challenges of junior faculty development, the promotion of underrepresented minorities and woman in science, and the management of conflicts of interest. There are also numerous practical matters beginning with the identity of and diversity in the College, the balance between basic and clinical research and how to limit the size and find the optimal venue for the annual meeting.*

"*I have been a member of the ACNP for 35 years and served as a Council member, Chair of the Credentials Committee, member of the Program, Advocacy and Education Committees as well as on the Editorial Board of the ACNP journal Neuropsychopharmacology. I have devoted my entire career to psychiatric research. In the process[, I] have won the ACNP's Julious Axelrod Mentor and Media Awards and come to understand the nature and importance of translational research. I have witnessed the application of basic science disciplines to the understanding of human brain function and disease and believe that clinical research must frame the questions and provide the context for applied basic science research.*

"*I'm concerned that the biomedical research enterprise, and particularly neuropsychiatric research, does not receive the support and attention it deserves. In addition, the COVID-19 Pandemic and social and economic disruption that it*

*is causing is having a dramatic impact on academic medicine and the biomedical research enterprise to which we must be prepared to adapt.*

"Consequently, apart from the message my nomination would send, I feel well qualified to have a leadership role in these uncertain times in which I would hope to mobilize the ACNP and use its prestige and influence for more proactive advocacy of our mission to the government, media and private sector funding sources on behalf of our members.  Toward that end, I ask you to consider granting me the privilege of nominating me for ACNP President.

"I appreciate your consideration and wish you a happy thanksgiving holiday and good rest of the year."  (Boldfaced italics added; non-boldfaced italics in original.)

1034.    Although Dr. Lieberman received very gracious responses on November 25, 2022 from Anissa Abi-Dargham, a member of the ACNP Nominating Committee, thanking him for his "thoughtful message" and noting that she was "really sorry to hear about what you are going through," Dr. Lieberman was not nominated for ACNP President.

1035.    Upon information and belief, Defendants were aware of the pre-February 22, 2022 professional and commercial relationships that Dr. Lieberman maintained with the Psychiatry Third Parties addressed herein.

1036.    Through the implementation of their Unlawful Scheme, including Defendants' Negative PR Campaign, Defendants have sought to persuade Psychiatry Third Parties to terminate or suspend their respective relationships with Dr. Lieberman in response to the content of his February 19, 2022 Personal Tweet.

1037.    As demonstrated in detail herein, as a direct and proximate result of Defendants' willful, intentional and malicious efforts to persuade Psychiatry Third Parties to

terminate or suspend their respective relationships with Dr. Lieberman in response to the content of his February 19, 2022 Personal Tweet, Dr. Lieberman has been injured and damaged in multiple ways, including, but not limited to, suffering personal and professional reputational damage, suffering personal and professional humiliation and suffering economic loss.

## XXV.

### THE INJURIES AND DAMAGES SUFFERED BY DR. LIEBERMAN AS A DIRECT AND PROXIMATE RESULT OF THE EGREGIOUS WRONGDOING PERPETRATED AGAINST HIM BY DEFENDANTS

1038. As demonstrated in detail herein, through their willful, intentional and malicious Unlawful Scheme (including their Negative PR Campaign) in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Defendants have unleashed during the past 15 months a continual, well-coordinated Blitzkrieg of deliberate wrongful actions designed to destroy Dr. Lieberman's professional and personal reputation, professional career and relationships with Psychiatry Third Parties.

1039. The injuries and damages suffered by Dr. Lieberman as a direct and proximate result of their Unlawful Scheme (including Defendants' Negative PR Campaign) are not limited to Dr. Lieberman's personal and professional reputational damage, personal and professional humiliation and economic loss.

1040. The injuries and damages suffered by Dr. Lieberman as a direct and proximate result of their Unlawful Scheme also include Dr. Lieberman's physical impairment, mental anguish and other emotional harm.

365

1041.   As a direct and proximate result of Defendants' willful, intentional and malicious Unlawful Scheme (including their Negative PR Campaign) in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman has suffered severe anxiety, upset, depression, sleeplessness and other emotional distress.  Within a few days of his February 22, 2022 Forced Resignation from NYSPI, Dr. Lieberman was therefore compelled to seek the care of a third-party psychiatrist.

1042.   Because of Defendants' continual perpetration since February 22, 2022 of their Unlawful Scheme (including their Negative PR Campaign) in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman has required the care of said third-party psychiatrist for the past year or so.

1043.   In addition to suffering severe anxiety, upset, depression, sleeplessness and other emotional distress as a direct and proximate result of Defendants' Unlawful Scheme, Dr. Lieberman, as noted, has suffered stress-induced atrial flutter, which is an irregular and often very rapid heart rhythm or arrhythmia.

1044.   Upon information and belief, atrial flutter increases the risk of stroke, heart failure and other heart-related complications.

1045.   Sometime by early April 2022, Dr. Lieberman was placed under the care of a cardiologist for his stress-induced atrial flutter.  Dr. Lieberman remains under the care of that cardiologist and continues to take the medications prescribed thereby for said condition.

4890-9158-2565, v. 1

**FIRST CLAIM FOR RELIEF**

**(AGAINST THE INDIVIDUAL STATE ACTOR DEFENDANTS, IN THEIR INDIVIDUAL CAPACITIES, FOR MONEY DAMAGES UNDER 42 U.S.C. § 1983 FOR THEIR INTENTIONAL, ONGOING RETALIATION AGAINST DR. LIEBERMAN FOR EXERCISING HIS FREE-SPEECH RIGHTS UNDER THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION)**

1046.   Plaintiff repeats and realleges Paragraphs 1 through 1045, above, as if set forth in their entirety here.

1047.   As demonstrated in detail herein, in engaging in Defendants' Unlawful Scheme in concert with the leadership of the Entity Defendants in willful, intentional and malicious retaliation against Dr. Lieberman for the content of his February 19, 2022 Personal Tweet, each of the Individual State Actor Defendants — Dr. Sullivan, Ms. Tashjian, Dr. Smith and Dr. Simpson — acted under the color of New York State law.

1048.   As demonstrated in detail herein, by engaging in Defendants' ongoing Unlawful Scheme in concert with the leadership of the Entity Defendants for the purpose of willfully, intentionally and maliciously retaliating against Dr. Lieberman for the content of his February 19, 2022 Personal Tweet, the Individual State Actor Defendants have deprived (and continue to deprive) Dr. Lieberman of the rights, privileges and immunities secured to him by the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment thereof.

1049.   As demonstrated in detail herein, by engaging in Defendants' ongoing Unlawful Scheme in concert with the leadership of the Entity Defendants for the purpose of

367

willfully, intentionally and maliciously retaliating against Dr. Lieberman for the content of his February 19, 2022 Personal Tweet, the Individual State Actor Defendants, each of whom reported directly or indirectly to the New York State Governor, acted pursuant to the policies and protocols concerning Dr. Lieberman that the Individual State Actor Defendants adopted for NYS OMH and NYSPI at the direction of certain senior decision-makers in the New York State Governor's Office or Chambers (the "**_NYS OMH/NYSPI Lieberman Protocols_**") .

1050.   As demonstrated in detail herein, pursuant to the NYS OMH/NYSPI Lieberman Protocols, the Individual State Actor Defendants, in concert with the leadership of the Entity Defendants, implemented Defendants' Unlawful Scheme to willfully, intentionally and maliciously destroy Dr. Lieberman's reputation, career and ability to resume his academic, clinical and research activities in retaliation for the content of his February 19, 2022 Personal Tweet, thereby currying favor with the Targeted Constituencies and advancing Defendants' overlapping political, social and academic agendas.

1051.   As demonstrated in detail herein, pursuant to the NYS OMH/NYSPI Lieberman Protocols, the Individual State Actor Defendants used the influence, power, control and dominance of NYS OMH/NYSPI over the other members of NYSPI/Columbia/Presbyterian Psychiatry to encourage the leadership of the Entity Defendants to join with the Individual State Actor Defendants in implementing Defendants' Unlawful Scheme against Dr. Lieberman in retaliation for the content of his February 19, 2022 Personal Tweet, thereby ingratiating themselves with the Targeted Constituencies and advancing Defendants' overlapping political, social and academic agendas.

368

1052.   The Entity Defendants became enthusiastic, willing partners of the Individual State Actor Defendants in implementing Defendants' Unlawful Scheme in orchestrated retaliation against Dr. Lieberman for the content of his February 19, 2022 Personal Tweet, thereby currying favor with the Targeted Constituencies and advancing Defendants' overlapping political, social and academic agendas.

1053.   As demonstrated in detail herein, as a direct and proximate result of the Individual State Actor Defendants' willful, intentional, malicious and unconstitutional perpetration of their and the Entity Defendants' coordinated Unlawful Scheme in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman has suffered substantial compensatory damages in an amount to be proven at trial.  Each of the Individual State Actor Defendants is liable for said compensatory damages in his or her individual capacity under 42 U.S.C. § 1983.

1054.   Because the Individual State Actor Defendants have engaged in a willful, intentional, malicious and truly outrageous conspiratorial Unlawful Scheme against Dr. Lieberman in retaliation for the content of his February 19, 2022 Personal Tweet, thereby advancing Defendants' overlapping political, social and academic agendas, Dr. Lieberman is entitled to recover punitive damages, in an amount to be determined at trial.  Each of the Individual State Actor Defendants is liable for said punitive damages in his or her individual capacity under 42 U.S.C. § 1983.

4890-9158-2565, v. 1

1055.   As demonstrated in detail herein, as a direct and proximate result of the Individual State Actor Defendants' willful, intentional, malicious and unconstitutional perpetration of their and the Entity Defendants' coordinated Unlawful Scheme in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman has been forced to incur, and will continue to incur through the duration of this litigation, attorneys' fees and costs.   Each of the Individual State Actor Defendants is liable for said attorneys' fees and costs in his or her individual capacity under 42 U.S.C. § 1988.

1056.   But for the Individual State Actor Defendants' willful, intentional, malicious and unconstitutional perpetration of their and the Entity Defendants' coordinated Unlawful Scheme in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman would not have been injured and damaged by the violation of his First Amendment rights and protections.

**A.     Each of the Individual State Actor Defendants Acted**
**Under Color of New York State Law**

1057.   As demonstrated in detail herein, during the Relevant Time Period, each of the Individual State Actor Defendants — Dr. Sullivan, Ms. Tashjian, Dr. Smith and Dr. Simpson — held senior employment positions with, duly represented and was paid a salary by the State of New York.   *See* Background Section XII, above.

1058.   As demonstrated in detail herein, during the Relevant Time Period, Dr. Sullivan has been involved in the Psychiatric Activities of NYSPI/Columbia/Presbyterian

370

Psychiatry, a New York State-dominated, controlled and influenced academic, clinical and research Association.

1059.   As demonstrated in detail herein, Dr. Sullivan intentionally conspired and otherwise worked in concert with the other Defendants to implement Defendants' Unlawful Scheme against Dr. Lieberman in willful, intentional and malicious retaliation for the content of his February 19, 2022 Personal Tweet.

1060.   As noted, during the Relevant Time Period, Dr. Sullivan served as the Commissioner of the NYS Office of Mental Health.  Upon information and belief, during the Relevant Time Period, Dr. Sullivan reported directly to New York State Governor Kathy Hochul.

1061.   As demonstrated in detail herein, during the Relevant Time Period, Ms. Tashjian has been involved in the Psychiatric Activities of NYSPI/Columbia/Presbyterian Psychiatry, a New York State-dominated, controlled and influenced academic, clinical and research Association.

1062.   As demonstrated in detail herein, Ms. Tashjian intentionally conspired and otherwise worked in concert with the other Defendants to implement Defendants' Unlawful Scheme against Dr. Lieberman in willful, intentional and malicious retaliation for the content of his February 19, 2022 Personal Tweet.

1063.   As noted, during the Relevant Time Period, Ms. Tashjian served as the Executive Deputy Commissioner of the NYS Office of Mental Health.  Upon information and belief, during the Relevant Time Period, Ms. Tashjian reported directly to Dr. Sullivan.

371

1064.   As demonstrated in detail herein, during the Relevant Time Period, Dr.
Smith has been involved in the Psychiatric Activities of NYSPI/Columbia/Presbyterian
Psychiatry, a New York State-dominated, controlled and influenced academic, clinical and
research Association.

1065.   As demonstrated in detail herein, Dr. Smith intentionally conspired and
otherwise worked in concert with the other Defendants to implement Defendants' Unlawful
Scheme against Dr. Lieberman in willful, intentional and malicious retaliation for the content of
his February 19, 2022 Personal Tweet.

1066.   As noted, during the Relevant Time Period, Dr. Smith served as the Chief
Medical Officer of the NYS Office of Mental Health, briefly as the Interim Executive Director of
NYSPI and as a faculty member of the Columbia Medical School Department of Psychiatry.

1067.   Upon information and belief, during the Relevant Time Period, Dr. Smith,
in his position as Chief Medical Officer of the NYS Office of Mental Health, reported directly to
Dr. Sullivan and Ms. Tashjian.

1068.   As demonstrated in detail herein, during the Relevant Time Period, Dr.
Simpson was involved in the Psychiatric Activities of NYSPI/Columbia/Presbyterian Psychiatry,
a New York State-dominated, controlled and influenced academic, clinical and research
Association.

1069.   As demonstrated in detail herein, Dr. Simpson intentionally conspired and
otherwise worked in concert with the other Defendants to implement Defendants' Unlawful

372

Scheme against Dr. Lieberman in willful, intentional and malicious retaliation for the content of his February 19, 2022 Personal Tweet.

1070.   As noted, for a portion of the Relevant Time Period, Dr. Simpson served as the Vice Chair of Research for the Columbia Medical School Department of Psychiatry and reported directly to Dr. Lieberman.  Dr. Simpson also served, and continues to this day to serve, as the Interim Executive Director of NYSPI, the Interim Chair of the Columbia Medical School Department of Psychiatry and the Interim Psychiatrist-in-Chief of Presbyterian/Columbia Hospital.

**B.      Dr. Lieberman's February 19, 2022 Personal Tweet Was Posted in His Personal Capacity**

1071.   As demonstrated in detail herein, Dr. Lieberman's February 19, 2022 Personal Tweet was posted by him in his personal capacity from his home on the Saturday evening of a holiday weekend after his wife, Rosemarie, who was at the time engaged with him in the recreational perusal of their social media accounts, had quite enthusiastically brought to his attention the stunning photo of Ms. Gatwech that then appeared shortly thereafter as part of the Original Gatwech Tweet to which Dr. Lieberman responded.  *See* Background Section XIV, above.

**C.      Through His February 19, 2022 Personal Tweet, Dr. Lieberman Commented Upon a Matter of Public Concern**

1072.   As demonstrated in detail herein, by means of his February 19, 2022 Personal Tweet, Dr. Lieberman, in response to the Original Gatwech Tweet, commented upon

the exquisite beauty of an internationally-renowned celebrity fashion model, Nyakim Gatwech, who is known as the "Queen of the Dark" and who had celebrated and heightened public awareness of the beauty of darker-skinned models and non-models alike.  *See* Background Section XIII, above.

1073.   Indeed, by the time of Dr. Lieberman's February 19, 2022 Personal Tweet, Ms. Gatwech, as the self-proclaimed Queen of the Dark, had made it a critical part of her personal and professional mission to proudly raise public awareness of, provide a keener appreciation for and generate increased societal commentary on the beauty of darker-skinned fashion models, as well as darker-skinned individuals generally.  *See* Background Section XIII, above.

1074.   For example, as noted above, it has been reported that, "[i]n March [2017], Nyakim Gatwech, a Minnesota-based Sudanese model, was sitting in an Uber on her way to a job interview in St. Paul when her driver, who she describes as a 'light-skinned black man,' asked if she'd ever consider bleaching her much-darker-toned skin for $10,000.  'He said, "Wow, you're dark,"' Gatwech says. 'I'm like, "Yeah, I know."  [Laughs] .  .  .  I can tell when somebody has never seen a Sudanese person before, somebody as dark as me.'  When this happened, Gatwech, now 24, recently had gotten attention for her part in a photo series called 'Different Melanin,' which depicted herself with three other models of varying shades of brown skin.  She posted another picture with other Sudanese friends a few days later and shared her Uber story in the caption.  She was surprised to see that image gain even more traction and supportive comments than the first viral snap."  *Cosmopolitan* (bracketed notation in original), accessible at

374

*https://www.cosmopolitan.com/style-beauty/fashion/a13443263/nyakim-gatwech-model-interview/.*

1075.   Upon information and belief, following her social media posts about her March 2017 exchange with the Uber driver, Ms. Gatwech's notoriety, and thus her modeling career, reached new heights, as she affirmed publicly the beauty of her exquisitely dark skin and embraced the nickname "Queen of the Dark."

1076.   It has been reported that Ms. Gatwech responded to the "Queen of the Dark" nickname as follows: "'I actually like the name[;] there is nothing wrong with darkness and [being called a] queen is just Cherry on the top[.]  .  .  .  So I am the queen of the dark who bring[s] light and love to those around me.'"  *See* Khoo/*HuffPost*, accessible at *https://www. huffpost.com/archive/ca/entry/sudanese-model-nyakim-gatwech_ca_5cd4e393e4b07bc 72972ece2.*

1077.   It has been reported that "[Ms.] Gatwech is also using her platform to preach self-love and self-acceptance and redefine conventional beauty ideals with her dark skin. Thanks to her stunning modelling shots, the Sudanese model is proving that black is beautiful, too."  *See HuffPost*, accessible at *https://www.huffpost.com/archive/ca/entry/sudanese-model-nyakim-gatwech_ca_5cd4e393e4b07bc72972ece2.*

1078.   It has been reported that, in a social media post, Ms. Gatwech explained: "'My hope is that this post can remind you every day of why you should be proud of your melanin.  Why you should be proud of your heritage regardless of how light or dark your skin is.

375

Stop comparing your skin [to] anyone.  Change can only happen once you can truthfully look in the mirror and love that Deep Chocolate, Cinnamon, Mocha, or Caramel complexion.'"  *See HuffPost*, accessible at *https://www.huffpost.com/archive/ca/entry/sudanese-model-nyakim-gatwech_ca_5cd4e393e4b07bc72972ece2.*

> **D.    Through Defendants' Unlawful Scheme, the Individual State Actor Defendants Retaliated Against Dr. Lieberman For the Content of His February 19, 2022 Personal Tweet**

1079.   As demonstrated in detail herein, the Individual State Actor Defendants, in concert with the leadership of the Entity Defendants, employed their Unlawful Scheme (including their Negative PR Campaign) for the express purpose of willfully, intentionally and maliciously retaliating against Dr. Lieberman for the content of his February 22, 2022 Personal Tweet, about which retaliation Defendants boasted to curry favor with the Targeted Constituencies for the purpose of advancing Defendants' overlapping political, social and academic agendas.  *See* Background Sections XVI through XXV, above.

1080.   But for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, the Individual State Actor Defendants would not have conspired with the leadership of the Entity Defendants to perpetrate the Unlawful Scheme through which Defendants, among other things, (a) forced Dr. Lieberman to resign his position as Executive Director of NYSPI; (b) barred Dr. Lieberman from NYSPI/Columbia/Presbyterian Psychiatry buildings; (c) subjected Dr. Lieberman to Defendants' Negative PR Campaign; (d) stripped Dr. Lieberman of his position as Chair of the Columbia Medical School Department of Psychiatry; (e) stripped Dr. Lieberman of his position as Psychiatrist-in-Chief of Presbyterian/Columbia Hospital; and (f)

4890-9158-2565, v. 1

have continued to thwart Dr. Lieberman's ability to resume his academic, clinical and research activities on behalf of the Entity Defendants.

1081.   As demonstrated in detail herein, the content of Dr. Lieberman's February 19, 2022 Personal Tweet was quite clearly the reason that the Individual State Actor Defendants (in concert with the Entity Defendants) launched and have continued to perpetrate their Unlawful Scheme against Dr. Lieberman.

1082.   At a very minimum, the content of Dr. Lieberman's February 19, 2022 Personal Tweet has been a motivating factor in the decision of the Individual State Actor Defendants (in concert with the Entity Defendants) to launch and continue to perpetrate their Unlawful Scheme against Dr. Lieberman.

E.    **Dr. Lieberman's February 19, 2022 Personal Tweet
      Caused No Disruption To the Functioning of the Operations
      of NYSPI/Columbia/Presbyterian Psychiatry or the Entity
      Defendants, Especially in Light of Their Strong Commitment
      To Free Expression and the Exchange of Competing Viewpoints**

1083.   Dr. Lieberman's February 19, 2022 Personal Tweet caused no disruption, or threat of disruption, to the operations of NYSPI/Columbia/Presbyterian Psychiatry or the Entity Defendants.

1084.   As a result of Dr. Lieberman's February 19, 2022 Personal Tweet — of which much of the NYSPI/Columbia/Presbyterian Psychiatry community, the Entity Defendants community and the larger community was not even aware until Defendants launched their Unlawful Scheme (including their Negative PR Campaign) — there was no interference, or

377

substantive threat of interference, with any of the Psychiatric Activities of NYSPI/Columbia/ Presbyterian Psychiatry or the academic, clinical, research, administrative or other functions, activities or operations of the Entity Defendants.

1085.   In short, in response to Dr. Lieberman's February 19, 2022 Personal Tweet, no academic, clinical, research, administrative or other function, activity or operation of NYSPI/Columbia/Presbyterian Psychiatry or the Entity Defendants was actually impeded or otherwise negatively impacted, or threatened to be impeded or otherwise negatively impacted, in any way whatsoever by any members of the NYSPI/Columbia/Presbyterian Psychiatry community, the Entity Defendants' communities or the community at large.

1086.   Moreover, even if there had been a significant organic outpouring of dissent in opposition to Dr. Lieberman's February 19, 2022 Personal Tweet (and there certainly was not), such dissent would have fallen within the routine functioning of the academic environment in which NYSPI/Columbia/Presbyterian Psychiatry and the Entity Defendants operated and continue to operate.

1087.   As demonstrated in detail above, the precedents of the United States Supreme Court, the pronouncements of the United States Congress and the free-expression policies and protocols of Columbia University that govern the activities of NYSPI/Columbia/ Presbyterian Psychiatry make crystal clear that freedom of expression and the robust exchange of competing viewpoints are to be championed, especially in the academic environment in which

378

NYSPI/Columbia/Presbyterian Psychiatry and the Entity Defendants operate.  *See* Background Section XV, above.

1088.   As demonstrated in detail above, NYSPI/Columbia/Presbyterian Psychiatry is an academic, clinical, research and fundraising Association whose inextricably intertwined Psychiatric Activities include, but are not limited to, the academic teaching and training of students and others, the clinical teaching and training of students and others, and the performance of clinical and other research related to the mission of NYSPI/Columbia/ Presbyterian Psychiatry.  As such, NYSPI/Columbia/Presbyterian Psychiatry is subject to the free-expression precedents of the United States Supreme Court, the academic free-expression pronouncements of the United States Congress and the academic free-expression policies and protocols of Columbia University.  *See* Background Section XV, above.

1089.   As noted, the Supreme Court has underscored the need for First Amendment protection of the robust exchange of ideas and opinions in academic environments such as that in which NYSPI/Columbia/Presbyterian Psychiatry and the Entity Defendants operate:

> "[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. . . . The college classroom with its surrounding environs is peculiarly the 'marketplace of ideas,' and we break no new constitutional ground in reaffirming this Nation's dedication to safeguarding academic freedom." *Healy v. James*, 408 U.S. 169, 180-81 (1972).

1090.   As also noted, in 20 U.S.C. § 1011a, the United States Congress declared: "It is the sense of Congress that . . . an institution of higher education should facilitate the free and open exchange of ideas."  *See* 20 U.S.C. § 1011a(a)(2)(C).

1091.   As noted, NYSPI/Columbia/Presbyterian Psychiatry and the Entity Defendants have long espoused policies underscoring the critical importance of freedom of expression and diversity of ideas and opinions among its community members.

1092.   As discussed above, Section 440 of the Columbia Rules of Conduct provides, in part:

> "***The Rules of University Conduct, found in Chapter XLIV of the Statutes of Columbia University, are intended to ensure that all members of our community may engage in our cherished traditions of free expression and open debate.  The University, as a forum for the pursuit and attainment of knowledge in every field of human endeavor, has a special role in fostering free inquiry***.  *A principal reason why universities have endured and flourished over centuries is that they provide a place for ideas to be tested, for values to be questioned, and for minds to be changed with as few constraints as possible.  Like society at large, but even more so, the University has a vital interest in fostering a climate in which nothing is immune from scrutiny.  And Columbia, in particular, has a long tradition of valuing dissent and controversy and in welcoming the clash of opinions onto the campus*.
>
> "***To be true to these principles, the University cannot and will not rule any subject or form of expression out of order on the ground that it is objectionable, offensive, immoral, or untrue*.  *Viewpoints will inevitably conflict, and members of the University community will disagree with and may even take offense at both the opinions expressed by others and the manner in which they are expressed.  But the role of the University is not to shield individuals from positions that they find unwelcome.  Rather, the University is a place for received wisdom and firmly held views to be tested, and tested again, so that members of the University community can listen, challenge each other, and be challenged in return*."  *See* Columbia Rules of Conduct, Section 440 (emphasis added), accessible at *https://universitypolicies.columbia.edu/content/rules-university-conduct*.

380

1093.   Section 440 of the Columbia Rules of Conduct also provides in part, as follows:

> "*Every member of our community therefore retains the right to demonstrate, to rally, to picket, to circulate petitions and distribute ideas, to partake in debates, to invite outsiders to participate, and to retain the freedom to express opinions on any subject whatsoever, even when such expression invites controversy and sharp scrutiny.  Although the University values the civil and courteous exchange of viewpoints, it does not limit discussion because the ideas expressed might be thought offensive, immoral, disrespectful, or even dangerous.  We expect that members of our community will engage in public discussions that may confront convention, and free expression would mean little if it did not include the right to express what others may reject or loathe*."  *See* Columbia Rules of Conduct, Section 440 (emphasis added), accessible at *https://universitypolicies.columbia.edu/content/rules-university-conduct*.

1094.   As noted, the Columbia Rules of Conduct, including Section 440 thereof, apply to "all members of the University community: administrators, administrative staff, research staff, library staff, supporting staff, faculty, and students" and are applicable to any "University facility," which is defined as a "place where a University function occurs."  *See* Columbia Rules of Conduct, Section 442 (Jurisdiction), accessible at *https://universitypolicies.columbia.edu/content/rules-university-conduct*; Columbia Rules of Conduct, Section 441 (Definitions), accessible at *https://universitypolicies.columbia.edu/content/rules-university-conduct*.

1095.   As noted, a "University function" is defined in the Columbia Rules of Conduct as "any charter or statutory operation or activity of the University, including instruction, research, study, administration, habitation, social life, space allocation and control, food supply, and other functions directly related thereto.  Specifically included are both functions of fixed-time duration (*e.g.*, classes, examinations, lectures, etc.) and functions of continuing duration (*e.g.*, the operation of libraries, research laboratories, maintenance shops, computers, business

offices, etc.).  Also included are functions ancillary to directly educational purposes, such as meetings, disciplinary proceedings, and athletic and social events sponsored by any University-approved organization."  *See* Columbia Rules of Conduct, Section 441 (Definitions), accessible at *https://universitypolicies.columbia.edu/content/rules-university-conduct*.

1096.   For all the reasons demonstrated herein, NYSPI/Columbia/Presbyterian Psychiatry is a New York State-dominated, controlled and influenced academic, clinical, research and fundraising Association whose inextricably intertwined Psychiatric Activities include, but are not limited to, the academic teaching and training of students and others, the clinical teaching and training of students and others, and the performance of clinical and other research related to the mission of NYSPI/Columbia/Presbyterian Psychiatry.

1097.   The Columbia Rules of Conduct, including Section 440 thereof, therefore apply to each University facility in which NYSPI/Columbia/Presbyterian Psychiatry conducts its activities — including, but not limited to, 1051 Riverside Drive in Manhattan —because each such building constitutes a "place where a University function occurs."  *See* Columbia Rules of Conduct, Section 441 (Definitions), accessible at *https://universitypolicies.columbia.edu/ content/rules-university-conduct*.

1098.   Because, as demonstrated herein, NYSPI/Columbia/Presbyterian Psychiatry is a fully-integrated, New York State-controlled and influenced academic, clinical, research and fundraising Association that conducts its Psychiatric Activities in New York State-owned, Columbia University-owned and Presbyterian/Columbia-owned buildings located on and

adjacent to the Columbia University campus in New York City, each of the activities of

NYSPI/Columbia/Presbyterian Psychiatry constitutes a "University function."  *See* Columbia

Rules of Conduct, Section 441 (Definitions), accessible at *https://universitypolicies.columbia.*

*edu/content/rules-university-conduct*.

      1099.   Accordingly, the Columbia University Rules of University Conduct,

including Section 440 thereof, apply to each activity engaged in by NYSPI/Columbia/

Presbyterian Psychiatry because each such activity constitutes a "University function," as defined

in said Rules.  *See* Columbia Rules of Conduct, Section 441 (Definitions), accessible at

*https://universitypolicies.columbia.edu/content/rules-university-conduct*.

      1100.   As noted, Columbia University President Lee Bollinger reaffirmed the

Columbia community's commitment to the free exchange of competing ideas and viewpoints:

> "We're just not going to be a place that allows speakers to be shut down or
> disrupted.  We're just not going to be that kind of place. . . .  The University,
> over many, many years, has embraced this idea that in public discussion of public
> issues on the campus, students invite speakers, faculty invite speakers, schools
> invite speakers, and so on. ***We're simply not going to let the people who are***
> ***offended by the messages — even reasonably offended by the messages — to***
> ***stop the speech from happening***." *See* Aaron Holmes, "Bollinger Discusses
> White Nationalist Speakers, Free Speech on Campus," *Columbia Spectator* (Oct.
> 16, 2017) (emphasis added), accessible at *https://www.columbiaspectator.com/*
> *news/2017/10/16/transcript-bollinger-discusses-white-nationalist-speakers-free-*
> *speech-on-campus/*.

**F.**     **Because Dr. Lieberman's February 19, 2022 Personal Tweet**
**Caused No Disruption To the Functioning of the Operations of**
**NYSPI/Columbia/Presbyterian Psychiatry or the Entity Defendants,**
**the Individual State Actor Defendants (in Concert With the Entity**
**Defendants) Endeavored Disingenuously To Manufacture the**
**Appearance of Disruption Among the Targeted Constituencies**

1101.   As demonstrated in detail above, it was precisely because Dr. Lieberman's

February 19, 2022 Personal Tweet caused no organic disruption to the functioning of

NYSPI/Columbia/Presbyterian Psychiatry or the Entity Defendants that the Individual State

Actor Defendants, through the Unlawful Scheme that they perpetrated in concert with the

leadership of the Entity Defendants, undertook to affirmatively manufacture a sense of

victimhood among the Targeted Constituencies whose support Defendants coveted for the

purpose of advancing Defendants' overlapping political, social and academic agendas.  *See*

Background Section XVI, above.

1102.   As demonstrated in detail above, upon learning of Dr. Lieberman's

February 19, 2022 Personal Tweet, the Individual State Actor Defendants (in concert with the

leadership of the Entity Defendants) retaliated immediately and ferociously in an effort to distort

and exploit the Tweet's language to advance their overlapping political, social and academic

agendas.

1103.   As demonstrated in detail above, through their Unlawful Scheme

(including their Negative PR Campaign against Dr. Lieberman), the Individual State Actor

Defendants (in concert with the Entity Defendants) endeavored to foment a sense of community

4890-9158-2565, v. 1

backlash against Dr. Lieberman to justify Defendants' instantaneous, willful, intentional and malicious destruction of Dr. Lieberman's reputation and career.

1104.   To this end, Defendants held multiple town hall meetings and other assemblies for the purpose of persuading the Targeted Constituencies, through, among other techniques, intimidation and peer pressure, that they should feel victimized by Dr. Lieberman's well-intentioned February 19, 2022 Personal Tweet and therefore applaud and endorse Defendant's swift, unconstitutional retaliation against Dr. Lieberman in response thereto.

1105.   As demonstrated in detail above, Defendants recognized that it was not enough to simply convince the Targeted Constituencies to view themselves as traumatized victims of Dr. Lieberman's February 19, 2022 Personal Tweet and to endorse his destruction by Defendants.  Defendants recognized that they also had to convince the Targeted Constituencies to embrace Defendants as heroes whose destruction of Dr. Lieberman had saved the community and whose hosting of "safe" discussion spaces through town hall meetings and the like was the only way for the Targeted Constituencies to "heal."

1106.   As demonstrated in detail above, by continuing to espouse Defendants' false narrative about Dr. Lieberman's February 19, 2022 Personal Tweet and working to manufacture a sense of victimization among the Targeted Constituencies, Defendants sought and continue to seek to dissuade Dissenting Community Members from voicing their objection to Defendants' outrageous treatment of Dr. Lieberman.  The Individual State Actor Defendants, in concert with the leadership of the Entity Defendants, have continued to point to Defendants'

destruction of Dr. Lieberman as a warning to Dissenting Community Members to remain mute or suffer similar consequences.

1107.   As demonstrated in detail above, by continuing to espouse Defendants' false narrative concerning the content of Dr. Lieberman's February 19, 2022 Personal Tweet and redoubling their efforts to fan the manufactured flames of victimization, the Individual State Actor Defendants, in concert with the leadership of the Entity Defendants, sought (and continue to seek) to secure the critical support of the Targeted Constituencies that they believe is required to advance Defendants' overlapping political, social and academic agendas.

1108.   As demonstrated in detail above, the Individual State Actor Defendants (in concert with the leadership of the Entity Defendants) believe that, by demonstrating their zealous commitment to the destruction of Dr. Lieberman through the Unlawful Scheme in retaliation for the content of his February 19, 2022 Personal Tweet, Defendants will continue to advance their overlapping political, social and academic agendas.

1109.   Finally, the Individual State Actor Defendants believe that, by pandering to the Targeted Constituencies by means of the Unlawful Scheme in concert with the leadership of the Entity Defendants, the Individual State Actor Defendants will continue to insulate themselves from criticism from the Targeted Constituencies and thereby strengthen Defendants' hold on power.

1110.   As noted, Professor Pantazatos observed astutely in the February 24, 2022 Pantazatos E-Mail Objection that any disruption to the NYSPI/Columbia/Presbyterian Psychiatry

community had been caused not by Dr. Lieberman's February 19, 2022 Personal Tweet, but by the willful, intentional and malicious mistreatment of Dr. Lieberman that had been perpetrated through Defendants' Unlawful Scheme.

1111.   As addressed above, in the February 24, 2022 Pantazatos E-Mail Objection, Professor Pantazatos wrote:  "I find it incredibly unjust for [Dr. Lieberman] to lose his livelihood over a momentary lapse in tact and judgment for which he has already apologized for [sic].  ***I believe people in the department will be much more shaken up and upset by this fact alone, rather than the actual contents of the tweet.  His world has turned on a dime, and it seems he (and those who depend on him) are the ones who need the most support right now***."  (Emphasis added.)

1112.   As noted, during the June 23, 2022 Simpson Zoom Meeting, Dr. Lieberman observed politely, in words or substance, that any disruption to the Department had been the direct result of the Draconian actions that had been taken against him by Defendants in retaliation for the content of his February 19, 2022 Personal Tweet.  During the June 23, 2022 Simpson Zoom Meeting, Dr. Lieberman noted, in words or substance, that "it was the actions taken by the State and then the University and Hospital following suit abruptly, within 24 hours" that caused any disruption.

1113.   As Dr. Lieberman explained in measured tones during the June 23, 2022 Simpson Zoom Meeting, Defendants' willful, intentional and malicious acts against him sent the

unmistakable message to the NYSPI/Columbia/Presbyterian Psychiatry community and the public at large that Dr. Lieberman was a pariah or criminal to be shunned and exiled.

**G.  The Individual State Actor Defendants Are
Not Entitled To Qualified Immunity**

**(i)  The Individual State Actor Defendants Knew Full Well That
the Willful, Intentional and Malicious Acts Perpetrated by
Them (in Concert With the Entity Defendants) Against
Dr. Lieberman Pursuant To Defendants' Unlawful Scheme
Violated Dr. Lieberman's First Amendment Free-Speech Rights**

1114.   The First Amendment, as applied to the states through the Fourteenth Amendment, prohibits state government actors from, as here with respect to Dr. Lieberman, punishing a state employee in retaliation for the content of speech expressed in the employee's personal capacity on matters of public concern.

1115.   The prohibition against retaliating against government employees, by means of suspension, termination or otherwise, for the content of their speech under the circumstances set forth herein has been clearly established by the United States Supreme Court since at least 1968.

1116.   The Individual State Actor Defendants knew full well that the willful, intentional and malicious acts perpetrated by them (in concert with the Entity Defendants) against Dr. Lieberman pursuant to Defendants' Unlawful Scheme in retaliation for the content of his February 19, 2022 Personal Tweet violated Dr. Lieberman's First Amendment free-speech rights.

388

1117.   Moreover, it would have been objectively unreasonable for the Individual State Actor Defendants to have somehow believed that the willful, intentional and malicious acts perpetrated by them (in concert with the Entity Defendants) against Dr. Lieberman pursuant to Defendants' Unlawful Scheme in retaliation for the content of his February 19, 2022 Personal Tweet did not violate Dr. Lieberman's First Amendment free-speech rights.

**(ii)     It Was Not Objectively Reasonable For the Individual State Actor Defendants To Have Acted (and To Continue To Act) With the Willfulness, Intent and Malice Embodied in the Unlawful Scheme Perpetrated Against Dr. Lieberman in Retaliation For the Content of His February 19, 2022 Personal Tweet**

1118.   As demonstrated in detail herein, the Individual State Actor Defendants, in concert with the Entity Defendants, perpetrated their willful, intentional and malicious Unlawful Scheme (including their Negative PR Campaign) against Dr. Lieberman in retaliation for the content of his February 22, 2022 Personal Tweet for the purpose of currying favor with the Targeted Constituencies in an effort to advance Defendants' overlapping political, social and academic agendas.  *See* Background Section XVI, above.

1119.   As such, Dr. Lieberman has asserted herein a retaliatory intent/motive-based conspiracy claim against the Individual State Actor Defendants under 42 U.S.C. § 1983.

1120.   For qualified immunity purposes, among others, it was not objectively reasonable for the Individual State Actor Defendants to have acted (and to continue to act) with the willfulness, intent and malice embodied in the Unlawful Scheme that they (in concert with

389

the Entity Defendants) have deliberately perpetrated against Dr. Lieberman over the past 15

months in retaliation for the content of his February 19, 2022 Personal Tweet.

## SECOND CLAIM FOR RELIEF

## (AGAINST THE ENTITY DEFENDANTS, AS STATE ACTORS, FOR MONEY DAMAGES UNDER 42 U.S.C. § 1983 FOR THEIR INTENTIONAL, ONGOING RETALIATION AGAINST DR. LIEBERMAN FOR EXERCISING HIS FREE-SPEECH RIGHTS UNDER THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION)

1121.   Plaintiff repeats and realleges Paragraphs 1 through 1120, above, as if set

forth in their entirety here.

### A.    The Entity Defendants Are State Actors With Respect To Their Intimate Involvement With the State of New York Through NYSPI/Columbia/Presbyterian Psychiatry and Defendants' Unlawful Scheme

1122.   By virtue of the deeply intertwined, intimate relationship that the Entity

Defendants have developed with the State of New York during their approximately century-long

involvement with NYS OMH and NYSPI in the creation, funding and day-to-day operation of

NYSPI/Columbia/Presbyterian Psychiatry (which, as demonstrated in detail in Background

Sections XII and XXI, above, has included the sharing of office and research space, personnel

and other resources), the Entity Defendants' coordinated actions with the Individual State Actor

Defendants in furtherance of the Unlawful Scheme against Dr. Lieberman constitute the actions

of the State of New York for purposes of Dr. Lieberman's claims against the Entity Defendants

under 42 U.S.C. § 1983.

1123.   NYSPI/Columbia/Presbyterian Psychiatry has been in existence for almost 100 years, including from the commencement of Dr. Lieberman's tenure as head of NYSPI/Columbia/Presbyterian Psychiatry in 2005 through the present.

1124.   As demonstrated in detail herein, including in Background Section XII, above, because for almost 100 years, including the present, the State of New York, through NYSPI, has (a) exercised coercive and pervasive power over the Columbia Medical School Department of Psychiatry, the Presbyterian/Columbia Hospital Department of Psychiatry and their respective personnel, (b) provided significant encouragement, overtly and covertly, to the Columbia Medical School Department of Psychiatry, the Hospital Department of Psychiatry and their respective personnel and (c) maintained such an intimately close nexus with the Columbia Medical School Department of Psychiatry, the Hospital Department of Psychiatry and their respective personnel, the Psychiatric Activities of NYSPI/Columbia/Presbyterian Psychiatry — and the Psychiatric Activities of each of NYSPI, Columbia Medical School Department of Psychiatry, the Hospital Department of Psychiatry and their respective personnel separately — have constituted the actions of the State of New York.

1125.   As noted above, the NYSPI Audit Response boasted of the unique, symbiotic relationship among and between the members of  NYSPI/Columbia/Presbyterian Psychiatry, explaining as follows:

"The NYSPI is a psychiatric research institute that is owned by New York State (NYS) and operated by OMH. . . .

"We begin with some background on the importance of our longstanding partnership with Columbia University (CU), as this relationship is the focus of the OSC [Office of State Comptroller] audit report. . . . We feel that a more complete understanding of the nature and benefits of this kind of collaborative research enterprise is necessary for the required evaluation of NYSPI's use and control of State resources.

"***OMH and NYSPI recognize that NYSPI, and its complex historical relationship with CU, are not typical of most State facilities, agencies and institutions that OSC reviews. We appreciate the significant time and effort invested by OSC in trying to understand this unique affiliation. We recognize that the complexity of the affiliation*** in operation ***made it difficult, in some cases, to discern between NYSPI and Columbia Department of Psychiatry activities; however, we would like to emphasize that the same integration and synergism that makes that exercise difficult is what makes the affiliation so successful and so valuable to the State***. NYSPI agrees with OSC about the importance of ensuring the proper utilization of State resources.

"We at NYSPI sincerely believe and are confident that the State's investment in personnel and facilities, and its interests in intellectual property are managed appropriately and directly in the service of NYS. ***Moreover, we believe that the affiliation between NYSPI and CU provides enormous value in scientific progress, quality of mental health care services and economic development to the citizens of New York State***." 2011 NYSPI Audit Report at 22, accessible at *https://web.osc.state.ny.us/audits/allaudits/093011/08s145.pdf* (non-boldfaced italicized emphasis in original; boldfaced italicized emphasis added).

      1126.    The NYSPI Audit Response provided further historical background with

respect to NYSPI/Columbia/Presbyterian Psychiatry:

"***In 1924 NYS resolved to locate the NYSPI on the health sciences campus of CU and established a covenant with CU setting forth the principles of this affiliation. In the ensuing 86 years the New York State OMH/Columbia affiliation has become an historic and uniquely successful public-private partnership in academic medicine. The decision to locate NYSPI on the campus of a major university and medical center ushered in a new era for care for the mentally ill and for the field of psychiatric medicine***. Columbia's intellectual resources, technologies and facilities made available to NYSPI by the

392

University and Medical School, then, as now, enrich and complement the State's own resources and further its mission.

"*Today, the vast majority of NYSPI researchers and many clinicians at NYSPI maintain faculty appointments at Columbia University because a Columbia title provides access to university collaboration (e.g., genetics, brain imaging, laboratory facilities, and clinical populations)*.  It enables NYSPI to compete for grants and awards in an increasingly competitive funding environment. It enables multi-disciplinary collaborations (e.g., with neurology, neuroscience, psychology, maternal-fetal medicine) so that we may contribute to a broader understanding of brain and behavior.  *In simplest terms, Columbia enables NYSPI to recruit and retain world-class scientists and clinicians to perform cutting edge scientific research and provide state of the art health care*.

"*A highly integrated NYSPI-Columbia Department of Psychiatry is now widely viewed as one of the foremost academic and research centers in psychiatry in the world*.  Last year we received more grant income from NIH than any other psychiatric research program in the U.S.  Such grants bring revenue to New York and serve to create and maintain jobs.  Finally, together NYSPI and Columbia have educated and trained generations of scientists, clinicians, and administrators in the range of mental health disciplines in New York and around the world.  Such efforts require sharing and coordination of commitment, resources, and staff toward common goals."  2011 NYSPI Audit Report at 23, accessible at *https://web.osc.state.ny.us/audits/allaudits/093011/08s145.pdf* (emphasis added).

1127.   The NYSPI Audit Response further elaborated upon the benefits of the

intimate affiliation of NYSPI, Columbia Medical School Department of Psychiatry and the

Presbyterian/Columbia Hospital Department of Psychiatry within NYSPI/Columbia/Presbyterian

Psychiatry since the 1920s:

"*OMH/NYSPI considers sharing space at the Institute with Columbia to be a vital part of their public-private partnership.  Indeed, the principle of sharing space and facilities was integral to the original covenant between CU and NYS in 1926.  Space sharing serves OMH and the NYSPI's interests by providing for the integration and exchange of research and academic resources, contributing significantly to the Institute's success in realizing its mission.  It also promotes efficiency for researchers who have roles in supervising both NYSPI and Department-funded research projects, taking care of NYSPI patients, managing NYSPI programs and teaching future mental health professionals*.

393

"*For more than eighty years, Columbia professional staff working in the Department of Psychiatry have occupied space alongside NYSPI staff while NYSPI staff have had access to the resources of a world class academic medical center.  The result has been a uniquely rich collaboration in research, training and clinical care, which has substantially enhanced NYSPI's ability to attract grants to support its mission*.  .  .  .

"To treat Columbia's occupancy of Institute space as a commercial lease transaction and apply a fair market value rent is not only inconsistent with the affiliation, the 1924 and 1925 agreements, and two existing deed covenants, it would undermine the historical foundation of the relationship upon which the affiliation was built.  *The co-location of Columbia and Institute staff is an important part of the architecture of the agreement Columbia and OMH conceived of in 1924*.  At that time, OMH agreed to accept the donation of land for NYSPI subject to the condition that 'the Student bodies and professional staffs of the University and the Hospital and associated institutions shall have [such facilities] available [to them] during the continuance and existence of the said Psychiatric Institute and Hospital, subject to the rules and regulations of the State Hospital Commission.'  That land donation was the land upon which the former Building 1 of NYSPI was built.  *The condition for the use of NYSPI by the students and professional staffs of the University and the Hospital was incorporated into the deed for the property and a second agreement between the parties*.

"In 1974, Columbia donated a second parcel of land to the State for NYSPI's Kolb Annex, providing in the deed a covenant that 'the student bodies and professional staffs of [Columbia] and The Presbyterian Hospital in the City of New York and associate institutions shall have available during the continuance and existence of the said extension to the Psychiatric Institute  and Hospital, the facilities of said extension to the Psychiatric Institute and Hospital in the same manner as they have available the facilities of the main Psychiatric Institute  and  Hospital pursuant to the Agreement between [Columbia and NYSPI], dated December 16, 1925.'  *Like the earlier covenant, this covenant was intended to support the affiliation between NYSPI and the Department by providing for the sharing of resources and efficiencies in operation which were considered integral to achieving their common objectives*."  2011 NYSPI Audit Report at 25-26, accessible at *https://web.osc.state.ny.us/audits/allaudits/093011/08s145.pdf* (emphasis added).

1128.   As also noted, the NYSPI Audit Response contrasted the unique, intimate relationship that NYSPI has through NYSPI/Columbia/Presbyterian Psychiatry with the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry, on the one hand, with the arm's-length relationship that NYSPI has with the Columbia University School of Public Health, on the other hand:

> "There are important differences between OMH's occupancy of space in the School of Public Health and Columbia's occupancy of space at the Institute[,] which warrant treating them differently.  ***The School of Public Health and OMH do not have an affiliation, do not share a common mission, do not share a leadership structure, and have distinct faculties unlike the Department of Psychiatry and NYSPI***.  The location of OMH in premises owned and occupied by the School of Public Health does not serve any interest of the School of Public Health or the Columbia University Medical Center or the Columbia Department of Psychiatry.  Columbia owns the building free and clear of any deed restrictions on its use.  From a legal perspective, OMH's location in the School of Public Health is the equivalent of occupying a building owned by a private landlord with no connection to Columbia and from whom one would expect no concessions.
>
> ***From the inception, NYSPI/OMH and CU have interpreted the 'sharing' provision in the agreement and in the deed covenants to apply to the resources of NYSPI as a whole and not only to those located on the particular land at issue in the particular deed***.  When NYSPI outgrew its original building and was re-located, there simply was never an intention on the part of any party to change the way in which the affiliation operated or the amount of costs any party would be expected to assume.  For all these reasons, OMH believes that it would be detrimental to the affiliation, and thus detrimental to NYSPI's mission, to pursue rent for the space occupied at NYSPI by Columbia psychiatry employees."  2011 NYSPI Audit Report at 27, accessible at *https://web.osc.state.ny.us/audits/allaudits/093011/08s145.pdf* (emphasis added).

1129.   As noted above, the 2018 Department of Psychiatry Overview contains a pie chart that illustrates the intertwined funding sources for NYSPI/Columbia/Presbyterian Psychiatry.  The pie chart, which reflects the same basic funding structure that has continued to date, is reproduced in Background Section XII, above.

**B.    The Entity Defendants Are Liable For Willfully, Intentionally and Maliciously Engaging in Defendants' Unlawful Scheme (in Concert With the Individual State Actor Defendants) in Retaliation For the Content of Dr. Lieberman's February 19, 2022 Personal Tweet**

1130.   As demonstrated in detail herein, in conspiring with the Individual State Actor Defendants to perpetrate the Unlawful Scheme in willful, intentional and malicious retaliation against Dr. Lieberman for the content of his February 19, 2022 Personal Tweet, each of the Entity Defendants acted under the color of New York State law.

1131.   As demonstrated in detail herein, in conspiring with the Individual State Actor Defendants to perpetrate the Unlawful Scheme in willful, intentional and malicious retaliation against Dr. Lieberman for the content of his February 19, 2022 Personal Tweet, the Entity Defendants willfully, intentionally and maliciously deprived (and continue to deprive) Dr. Lieberman of the rights, privileges and immunities secured to him by the First Amendment to the United States Constitution.

1132.   As demonstrated in detail herein, the leadership of the Entity Defendants during the Relevant Time Period — including, but not limited to, Dr. Rustgi, in his role as Interim Dean of the Columbia Medical School; Dr. Simpson, in her respective roles as Interim Executive Director of NYSPI, Interim Chair of the Columbia Medical School Department of Psychiatry and Interim Psychiatrist-in-Chief of Presbyterian/Columbia Hospital; Dr. Armstrong, in her respective roles as Dean of the Columbia Medical School and Chief Executive Officer of the Columbia University Irving Medical Center; and Dr. Corwin, in his role as Chief Executive

396

Officer of Presbyterian/Columbia Hospital — constituted final decision-makers who exercised on behalf of the respective Entity Defendants the authority, among other powers, to (a) suspend Dr. Lieberman from the respective leadership positions that he held with the Entity Defendants; (b) strip Dr. Lieberman of the respective leadership positions that he held with the Entity Defendants; (c) restrict Dr. Lieberman's access to facilities owned and used by the Entity Defendants in connection with the Psychiatric Activities; and (d) otherwise thwart Dr. Lieberman's ability to resume his academic, clinical and research activities on behalf of the Entity Defendants.

1133.   Upon information and belief, during the period in which Dr. Rustgi served as Interim Dean of the Columbia Medical School, he reported directly to Columbia University President Lee Bollinger.

1134.   Upon information and belief, since becoming Dean of the Columbia Medical School on or about March 1, 2022, Dr. Armstrong has reported directly to Columbia University President Lee Bollinger.

1135.   Upon information and belief, since becoming Interim Chair of the Columbia Medical School Department of Psychiatry in late February 2022, Dr. Simpson reported directly to Dr. Rustgi, as Interim Dean of the Columbia Medical School, and, since March 1, 2022, has reported directly to Dr. Armstrong, in her role as the Dean of Columbia Medical School.

4890-9158-2565, v. 1

1136.   Upon information and belief, since becoming Interim Psychiatrist-in-Chief of the Presbyterian/Columbia Hospital in late February 2022, Dr. Simpson has reported ultimately to Dr. Corwin, in the latter's role as Chief Executive Officer of Presbyterian/Columbia Hospital.

1137.   Upon information and belief, the Entity Defendants granted their respective leadership members — including, but not limited to, Dr. Rustgi, Dr. Simpson, Dr. Armstrong and Dr. Corwin — the discretion, as final decision-makers, to adopt and implement internal policies and protocols on behalf of the Entity Defendants, including policies and protocols that provided said leadership with the final authority to punish (and continue to punish) Dr. Lieberman, as an employee thereof, for the content of his February 19, 2022 Personal Tweet.

1138.   As demonstrated in detail herein, in furtherance of Defendants' Unlawful Scheme against Dr. Lieberman, which was launched in concert with the Individual State Actor Defendants on February 22, 2022 and has continued to this day, the leadership of the Entity Defendants — including, but not limited to, Dr. Rustgi, Dr. Simpson, Dr. Armstrong and Dr. Corwin — adopted and implemented internal policies and protocols on behalf of the Entity Defendants, as embodied in Defendants' Unlawful Scheme, that were and are designed to punish Dr. Lieberman for the content of his February 19, 2022 Personal Tweet (the "***Entity Defendants' Lieberman Protocols***").

1139.   As demonstrated in detail herein, the punishment that the leadership of the Entity Defendants — including, but not limited to, Dr. Rustgi, Dr. Simpson, Dr. Armstrong and

Dr. Corwin — imposed upon Dr. Lieberman in accordance with the Entity Defendants'
Lieberman Protocols, and in concert with the Individual State Actor Defendants, to further
Defendants' Unlawful Scheme was designed to willfully, intentionally and maliciously punish
Dr. Lieberman on an ongoing basis in retaliation for the content of his February 19, 2022
Personal Tweet, thereby advancing Defendants' overlapping political, social and academic
agendas.

1140.   The punishment that the leadership of the Entity Defendants — including,
but not limited to, Dr. Rustgi, Dr. Simpson, Dr. Armstrong and Dr. Corwin — have imposed
upon Dr. Lieberman in accordance with the Entity Defendants' Lieberman Protocols, and in
concert with the Individual State Actor Defendants, to further Defendants' Unlawful Scheme
include, among other things, (a) willfully, intentionally and maliciously suspending and then
stripping Dr. Lieberman of the leadership positions that he held with the Entity Defendants; (b)
willfully, intentionally and maliciously engaging in the Negative PR Campaign to destroy Dr.
Lieberman's reputation within the NYSPI/Columbia/Presbyterian Psychiatry community, within
the Entity Defendants community, within the psychiatry community generally and within the
public community at large; (c) willfully, intentionally and maliciously prohibiting Dr. Lieberman
from teaching his courses as a tenured Professor; (d) willfully, intentionally and maliciously
barring Dr. Lieberman from accessing the very buildings to which he requires access to perform
his academic, clinical and research activities on behalf of the Entity Defendants; (e) willfully,
intentionally and maliciously denying Dr. Lieberman access to the Lieberman-Raised Funds that
he was instrumental in attracting and which are critical to his ability to engage in research

activities on behalf of the Entity Defendants; and (f) willfully, intentionally and maliciously barring Dr. Lieberman from teaching or otherwise interacting with Presbyterian/Columbia Hospital Residents.

1141.   As demonstrated in detail herein, pursuant to the Entity Defendants' Lieberman Protocols, the leadership of the Entity Defendants, including, but not limited to Dr. Rustgi, Dr. Simpson, Dr. Armstrong and Dr. Corwin, have since February 22, 2022 joined willingly with the Individual State Actor Defendants in implementing Defendants' Unlawful Scheme to willfully, intentionally and maliciously destroy Dr. Lieberman's reputation, career and ability to resume his academic, clinical and research activities in orchestrated retaliation against him for the content of his February 19, 2022 Personal Tweet, thereby currying favor with the Targeted Constituencies and advancing Defendants' overlapping political, social and academic agendas.

1142.   The Entity Defendants became enthusiastic, willing partners of the Individual State Actor Defendants in implementing Defendants' Unlawful Scheme against Dr. Lieberman in willful, intentional and malicious retaliation for the content of his February 19, 2022 Personal Tweet.  Indeed, by doing so, the leadership of the Entity Defendants has not only pandered knowingly to the Targeted Constituencies to advance Defendants' overlapping political, social and academic agendas, but has sought deliberately to ingratiate the Entity Defendants with the Individual State Actor Defendants, NYS OMH, NYSPI and the New York State Governor's Office.

1143.   As demonstrated in detail herein, as a direct and proximate result of the Entity Defendants' willful, intentional, malicious and unconstitutional perpetration of their and the Individual State Actor Defendants' coordinated Unlawful Scheme in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman has suffered substantial compensatory damages in an amount to be proven at trial.  Each of the Entity Defendants is liable for said compensatory damages under 42 U.S.C. § 1983.

1144.   Because the Entity Defendants have engaged in a willful, intentional, malicious and truly outrageous conspiratorial Unlawful Scheme against Dr. Lieberman in retaliation for the content of his February 19, 2022 Personal Tweet, thereby advancing Defendants' overlapping political, social and academic agendas, Dr. Lieberman is entitled to recover punitive damages, in an amount to be determined at trial.  Each of the Entity Defendants is liable for said punitive damages under 42 U.S.C. § 1983.

1145.   As demonstrated in detail herein, as a direct and proximate result of the Entity Defendants' willful, intentional, malicious and unconstitutional perpetration of their and the Individual State Actor Defendants' coordinated Unlawful Scheme in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman has been forced to incur, and will continue to incur through the duration of this litigation, attorneys' fees and costs. Each of the Entity Defendants is liable for said attorneys' fees and costs under 42 U.S.C. § 1988.

1146.   But for the Entity Defendants' willful, intentional, malicious and unconstitutional perpetration of their and the Individual State Actor Defendants' coordinated

Unlawful Scheme in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman would not have been injured and damaged by the violation of his First Amendment rights and protections.

### C.    Dr. Lieberman's February 19, 2022 Personal Tweet Was Posted in His Personal Capacity

1147.   As demonstrated in detail herein, Dr. Lieberman's February 19, 2022 Personal Tweet was posted by him in his personal capacity from his home on the Saturday evening of a holiday weekend after his wife, Rosemarie Fernandez Larios, who was at the time engaged with him in the recreational perusal of their social media accounts, had quite enthusiastically brought to his attention the extraordinary photo of Ms. Gatwech that then appeared shortly thereafter as part of the Original Gatwech Tweet to which Dr. Lieberman responded.  *See* Background Section XIV, above.

### D.    Through His February 19, 2022 Personal Tweet, Dr. Lieberman Commented Upon a Matter of Public Concern

1148.   As demonstrated in detail herein, by means of his February 19, 2022 Personal Tweet, Dr. Lieberman, in response to the Original Gatwech Tweet, commented upon the exquisite beauty of an internationally-renowned celebrity fashion model, Nyakim Gatwech, who is known proudly as the "Queen of the Dark" and whose extraordinarily dark skin had long been raised by her and others as a matter of public concern and discussion.  *See* Background Section XIII, above.

402

1149.   As noted, by the time of Dr. Lieberman's February 19, 2022 Personal Tweet, Ms. Gatwech, as the self-proclaimed Queen of the Dark, had made it an overarching part of her personal and professional mission to proudly raise public awareness of, provide a deeper appreciation for and generate increased social commentary on the beauty of darker-skinned fashion models, as well as darker-skinned individuals generally.

### E.   Through Defendant's Unlawful Scheme, the Entity Defendants Retaliated Against Dr. Lieberman For the Content of His February 19, 2022 Personal Tweet

1150.   As demonstrated in detail herein, the Entity Defendants, in concert with the Individual State Actor Defendants, employed their Unlawful Scheme (including their Negative PR Campaign) for the willful, intentional and malicious purpose of retaliating against Dr. Lieberman for the content of his February 22, 2022 Personal Tweet.  The Entity Defendants, in concert with the Individual State Actor Defendants, then boasted of their punishment of Dr. Lieberman in an attempt to curry favor with the Targeted Constituencies, whose support is deemed imperative to advancing Defendants' overlapping political, social and academic agendas.  *See* Background Sections XVI through XXV, above.

1151.   But for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, the leadership of the Entity Defendants would not have engaged with the Individual State Actor Defendants in perpetrating the Unlawful Scheme through which the Entity Defendants, among other things, have conspired to (a) force Dr. Lieberman to resign his position as Executive Director of NYSPI; (b) bar Dr. Lieberman from NYSPI/Columbia/Presbyterian Psychiatry buildings; (c) subject Dr. Lieberman to Defendants' Negative PR Campaign; (d) strip Dr.

Lieberman of his position as Chair of the Columbia Medical School Department of Psychiatry; (e) strip Dr. Lieberman of his position as Psychiatrist-in-Chief of Presbyterian/Columbia Hospital; and (f) continue to thwart Dr. Lieberman's ability to resume his academic, clinical and research activities on behalf of the Entity Defendants.

1152.   Accordingly, as demonstrated in detail herein, it was precisely the content of Dr. Lieberman's February 19, 2022 Personal Tweet that caused the Entity Defendants, in concert with the Individual State Actor Defendants, to launch their Unlawful Scheme against Dr. Lieberman and to continue to perpetrate it unrelentingly over the past 15 months.

1153.   At a very minimum, the content of Dr. Lieberman's February 19, 2022 Personal Tweet has been a motivating factor in the decision of the Entity Defendants, in concert with the Individual State Actor Defendants, to launch and continue to perpetrate their Unlawful Scheme against Dr. Lieberman.

F.     **Dr. Lieberman's February 19, 2022 Personal Tweet
Caused No Disruption To the Functioning of the Operations
of NYSPI/Columbia/Presbyterian Psychiatry or the Entity
Defendants, Especially in Light of Their Strong Commitment
To Free Expression and the Exchange of Competing Viewpoints**

1154.   As demonstrated in detail herein, including in Background Section XVI, above, and First Claim For Relief, Section F, above, Dr. Lieberman's February 19, 2022 Personal Tweet caused no actual or substantive threat of interference with any academic, clinical, research, administrative or other function, activity or operation of NYSPI/Columbia/Presbyterian Psychiatry or the Entity Defendants.

404

1155.   As a result of Dr. Lieberman's February 19, 2022 Personal Tweet, no academic, clinical, research, administrative or other function, activity or operation of NYSPI/Columbia/Presbyterian Psychiatry or the Entity Defendants was impeded or otherwise negatively impacted in any way whatsoever.

1156.   Moreover, as noted, even if there had been a significant organic outpouring of dissent in opposition to Dr. Lieberman's February 19, 2022 Personal Tweet (there was no such outpouring whatsoever), such dissent would have fallen completely within the routine functioning of the academic environment in which NYSPI/Columbia/Presbyterian Psychiatry and the Entity Defendants operated and continue to operate.

1157.   As demonstrated in detail above, the precedents of the United States Supreme Court, the pronouncements of the United States Congress and the free-expression policies and protocols of Columbia University (including, but not limited to Section 440 of the Columbia Rules of Conduct and the declarations of Columbia University President Lee Bollinger) that govern the activities of the Entity Defendants and NYSPI/Columbia/Presbyterian Psychiatry make crystal clear that freedom of expression and the robust exchange of competing viewpoints are to be protected, especially in the academic environment in which the Entity Defendants and NYSPI/Columbia/Presbyterian Psychiatry operate.  *See* Background Section XV, above.

**G.      Because Dr. Lieberman's February 19, 2022 Personal Tweet Caused
No Disruption To the Functioning of the Operations of NYSPI/
Columbia/Presbyterian Psychiatry or the Entity Defendants, the
Entity Defendants (in Concert With the Individual State Actor
Defendants) Endeavored Disingenuously To Affirmatively Manufacture
the Appearance of Disruption Among the Targeted Constituencies**

1158.   As demonstrated in detail above, it was precisely because Dr. Lieberman's

February 19, 2022 Personal Tweet caused no organic disruption to the functioning of

NYSPI/Columbia/Presbyterian Psychiatry or the Entity Defendants that the Entity Defendants,

through their carefully orchestrated conspiracy with the Individual State Actor Defendants,

undertook as a critical objective of Defendants' Unlawful Scheme to affirmatively manufacture a

sense of victimhood among the Targeted Constituencies, whose support the Entity Defendants

(and the Individual State Actor Defendants) sought (and continue to seek) desperately for the

purpose of advancing Defendants' overlapping political, social and academic agendas.  *See*

Background Section XVI, above; First Claim for Relief, Section F, above.

1159.   As demonstrated in detail herein, through their Unlawful Scheme

(including their Negative PR Campaign against Dr. Lieberman), the Entity Defendants (in

concert with the Individual State Actor Defendants) endeavored to foment a sense of community

backlash against Dr. Lieberman — through choreographed town hall meetings and other

communications — to justify Defendants' malicious destruction of Dr. Lieberman's reputation

and career.  *See* Background Section XVI, above; First Claim for Relief, Section F, above.

1160.      As demonstrated in detail above, by continuing to espouse through the

Negative PR Campaign Defendants' false narrative about Dr. Lieberman's February 19, 2022

Personal Tweet and working to manufacture a sense of victimization among community members, the Entity Defendants (in concert with the Individual State Actor Defendants) sought to intimidate Dissenting Community Members from voicing their objection to Defendants' outrageous treatment of Dr. Lieberman — pointing to Defendants' destruction of Dr. Lieberman as a warning to Dissenting Community Members to remain mute or suffer similar consequences. *See* Background Section XVI, above; First Claim for Relief, Section F, above.

1161.   As demonstrated in detail above, by continuing to espouse Defendants' false narrative about Dr. Lieberman's February 19, 2022 Personal Tweet and redoubling their efforts to fan the manufactured flames of victimization, the Entity Defendants (in concert with the Individual State Actor Defendants) sought to secure the critical support of the Targeted Constituencies that they believed, and continue to believe, is required to advance Defendants' overlapping political, social and academic agendas.  *See* Background Section XVI, above; First Claim for Relief, Section F, above.

1162.   As noted, Professor Pantazatos observed astutely in the February 24, 2022 Pantazatos E-mail Objection that any disruption to the NYSPI/Columbia/Presbyterian Psychiatry community had been caused not by Dr. Lieberman's February 19, 2022 Personal Tweet, but by the shameful, unjust and deliberate mistreatment of Dr. Lieberman that had been perpetrated through Defendants' Unlawful Scheme.  *See* Background Section XVI, above; First Claim for Relief, Section F, above.

4890-9158-2565, v. 1

**H.     The Entity Defendants Are Not Entitled**
        **To Qualified Immunity**

1163.   As private entities that have functioned, through NYSPI/Columbia/

Presbyterian Psychiatry and otherwise, as state actors for purposes of this Section 1983 Money

Damages Claim, the Entity Defendants have conspired with the Individual State Actor

Defendants since February 22, 2022 to perpetrate Defendants' Unlawful Scheme against Dr.

Lieberman in retaliation for the content of his February 19, 2022 Personal Tweet.

1164.   As private entities that conspired — and continue to conspire — with the

Individual State Actor defendants to perpetrate the Unlawful Scheme against Dr. Lieberman in

violation of his First Amendment free-speech rights, the Entity Defendants are not entitled to

assert qualified immunity in response to this Section 1983 Money Damages Claim.

1165.    Even if the Entity Defendants were permitted to assert qualified immunity

in response to this Section 1983 Money Damages Claim (they are not), the Entity Defendants

would not be entitled to qualified immunity for the same reasons the Individual State Actor

Defendants are not entitled to qualified immunity, as addressed in the First Claim for Relief,

Section G.

408

**THIRD CLAIM FOR RELIEF**

**(AGAINST THE INDIVIDUAL STATE ACTOR DEFENDANTS IN THEIR OFFICIAL
CAPACITIES FOR PERMANENT INJUNCTIVE RELIEF UNDER 42 U.S.C. § 1983
FOR THEIR INTENTIONAL, ONGOING RETALIATION AGAINST DR. LIEBERMAN
FOR THE CONTENT OF HIS FEBRUARY 19, 2022 PERSONAL TWEET)**

1166.   Plaintiff repeats and realleges Paragraphs 1 through 1165, above,
including the allegations set forth in Sections A through G of the First Claim for Relief, above,
as if set forth in their entirety here.

1167.   As demonstrated in detail herein, by engaging and continuing to engage in
Defendants' Unlawful Scheme in concert with the leadership of the Entity Defendants in willful,
intentional and malicious retaliation for the content of Dr. Lieberman's February 19, 2022
Personal Tweet, each of the Individual State Actor Defendants — Dr. Sullivan, Ms. Tashjian, Dr.
Smith and Dr. Simpson — willfully, intentionally and maliciously deprived (and continues to
deprive) Dr. Lieberman of the rights, privileges and immunities secured to him by the First
Amendment to the United States Constitution.

1168.   As demonstrated in detail herein, as a direct and proximate result of the
Individual State Actor Defendants' willful, intentional and malicious perpetration of their
Unlawful Scheme in concert with the leadership of the Entity Defendants in retaliation for the
content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman has been injured
and damaged over the past 15 months.

409

1169.   For the reasons demonstrated in detail herein, Dr. Lieberman is likely to continue to suffer injury for the foreseeable future because the Individual State Actor Defendants, acting in their respective official capacities pursuant to the NYS OMH/NYSPI Lieberman Protocols, *continue* to perpetrate Defendants' Unlawful Scheme against Dr. Lieberman in retaliation for the content of his February 19, 2022 Personal Tweet and have demonstrated no intention whatsoever of ending said Unlawful Scheme.

1170.   For the reasons demonstrated in detail herein, only a permanent injunction under 42 U.S.C. § 1983 enjoining the Individual State Actor Defendants from continuing to engage in their Unlawful Scheme will redress the willful, intentional and malicious wrongs that the Individual State Actor Defendants continue to perpetrate against Dr. Lieberman pursuant to the NYS OMH/NYSPI Lieberman Protocols.

1171.   For the reasons demonstrated in detail herein, absent the entry of a permanent injunction under 42 U.S.C. § 1983 enjoining the Individual State Actor Defendants from continuing to engage in their Unlawful Scheme, Dr. Lieberman will continue to suffer real and imminent irreparable harm.

1172.   For the reasons demonstrated in detail herein, Dr. Lieberman has no adequate remedy at law for the Individual State Actor Defendants' continuing willful, intentional and malicious perpetration of the Unlawful Scheme against him pursuant to the NYS OMH/NYSPI Lieberman Protocols.

4890-9158-2565, v. 1

1173.   For the reasons demonstrated in detail herein, the balance of hardships tips decidedly in favor of Dr. Lieberman's request for a permanent injunction under 42 U.S.C. § 1983 enjoining the Individual State Actor Defendants from continuing to engage in their Unlawful Scheme.

1174.   For the reasons demonstrated in detail herein, the public interest will be very clearly served by the issuance of a permanent injunction under 42 U.S.C. § 1983 enjoining the Individual State Actor Defendants from continuing to engage in their Unlawful Scheme against Dr. Lieberman in retaliation for his having exercised his First Amendment free-speech rights to post his February 19, 2022 Personal Tweet.

## FOURTH CLAIM FOR RELIEF

### (AGAINST THE ENTITY DEFENDANTS, AS STATE ACTORS, FOR PERMANENT INJUNCTIVE RELIEF UNDER 42 U.S.C. § 1983 FOR THEIR INTENTIONAL, ONGOING RETALIATION AGAINST DR. LIEBERMAN FOR THE CONTENT OF HIS FEBRUARY 19, 2022 PERSONAL TWEET)

1175.   Plaintiff repeats and realleges Paragraphs 1 through 1174, above, including the allegations set forth in Sections A through H of the Second Claim for Relief, above, as if set forth in their entirety here.

1176.   As demonstrated in detail herein, by engaging and continuing to engage in Defendants' Unlawful Scheme in concert with the Individual State Actor Defendants in willful, intentional and malicious retaliation against Dr. Lieberman for the content of his February 19, 2022 Personal Tweet, each of the Entity Defendants willfully, intentionally and maliciously

411

deprived (and continues to deprive) Dr. Lieberman of the rights, privileges and immunities secured to him by the First Amendment to the United States Constitution.

1177.   As demonstrated in detail herein, as a direct and proximate result of the Entity Defendants' willful, intentional and malicious perpetration of their Unlawful Scheme in concert with the Individual State Actor Defendants in retaliation for the content of Dr. Lieberman's February 19, 2022 Personal Tweet, Dr. Lieberman has been injured over the past 15 months.

1178.   For the reasons demonstrated in detail herein, Dr. Lieberman is likely to continue to suffer injury for the foreseeable future because the Entity Defendants, acting pursuant to the Entity Defendants' Lieberman Protocols, **continue** to perpetrate Defendants' Unlawful Scheme against Dr. Lieberman in retaliation for the content of his February 19, 2022 Personal Tweet and have demonstrated no intention whatsoever of ending said Unlawful Scheme.

1179.   For the reasons demonstrated in detail herein, only a permanent injunction under 42 U.S.C. § 1983 enjoining the Entity Defendants from continuing to engage in their Unlawful Scheme will redress the willful, intentional and malicious wrongs that the Entity Defendants continue to perpetrate against Dr. Lieberman pursuant to the Entity Defendants' Lieberman Protocols.

1180.   For the reasons demonstrated in detail herein, absent the entry of a permanent injunction under 42 U.S.C. § 1983 enjoining the Entity Defendants from continuing to engage in their Unlawful Scheme, Dr. Lieberman will continue to suffer real and imminent irreparable harm.

1181.   For the reasons demonstrated in detail herein, Dr. Lieberman has no adequate remedy at law for the Entity Defendants' continuing willful, intentional and malicious perpetration of the Unlawful Scheme against him pursuant to the Entity Defendants' Lieberman Protocols.

1182.   For the reasons demonstrated in detail herein, the balance of hardships tips decidedly in favor of Dr. Lieberman's request for a permanent injunction under 42 U.S.C. § 1983 enjoining the Entity Defendants from continuing to engage in their Unlawful Scheme.

1183.   For the reasons demonstrated in detail herein, the public interest will be very clearly served by the issuance of a permanent injunction under 42 U.S.C. § 1983 enjoining the Entity Defendants from continuing to engage in their Unlawful Scheme against Dr. Lieberman in retaliation for his having exercised his First Amendment free-speech rights to post his February 19, 2022 Personal Tweet.

413

**FIFTH CLAIM FOR RELIEF**

**(AGAINST THE ENTITY DEFENDANTS FOR VIOLATION
OF SECTION 201-d(2)(c) OF THE NEW YORK LABOR LAW)**

1184.   Plaintiff repeats and realleges Paragraphs 1 through 1183, above, as if set forth in their entirety here.

1185.   Section 201-d(2)(c) of the New York Labor Law provides:

"Unless otherwise provided by law, it shall be unlawful for any employer or employment agency to refuse to hire, employ or license, or to discharge from employment or otherwise discriminate against an individual in compensation, promotion or terms, conditions or privileges of employment because of . . . ***an individual's legal recreational activities***, including cannabis in accordance with state law, outside work hours, off of the employer's premises and without use of the employer's equipment or other property[.]"  (Emphasis added.)

1186.   Section 201-d(1)(b) of the New York Labor Law defines "recreational activities," as that term is used in Section 201-d(2)(c) thereof, to mean "any lawful, leisure-time activity, for which the employee receives no compensation and which is generally engaged in for recreational purposes, including but not limited to sports, games, hobbies, exercise, reading and the viewing of television, movies and similar material[.]"

1187.   Section 201-d(1)(c) of the New York Labor Law defines "work hours," as that term is used in Section 201-d(2)(c) thereof, to mean "all time, including paid and unpaid breaks and meal periods, that the employee is suffered, permitted or expected to be engaged in work, and all time the employee is actually engaged in work."

1188.   Dr. Lieberman's posting of his February 19, 2022 Personal Tweet constituted lawful, leisure-time activity for which he received no compensation and which, like

414

reading and the viewing of television, movies and similar material, is generally engaged in for recreational purposes.

1189.   As such, Dr. Lieberman's posting of his February 19, 2022 Personal Tweet is protected under Section 201-d(2)(c) of the New York Labor Law.

1190.   By stripping Dr. Lieberman of his respective leadership positions with the Entity Defendants and otherwise punishing him for the content of his February 19, 2022 Personal Tweet, as demonstrated in detail herein, the Entity Defendants willfully, intentionally and maliciously violated (and continue to violate) Dr. Lieberman's rights under Section 201-d(2)(c) of the New York Labor Law.

1191.   As demonstrated in detail herein,  as a direct and proximate result of the Entity Defendants' willful, intentional and malicious violation of Dr. Lieberman's rights under Section 201-d(2)(c) of the New York Labor Law, Dr. Lieberman has been injured and damaged in an amount to be proven at trial.

1192.   Each of the Entity Defendants is liable to Dr. Lieberman for the injuries and damages suffered by him as a direct and proximate result of the Entity Defendants' willful, intentional and malicious violation of Dr. Lieberman's rights under Section 201-d(2)(c) of the New York Labor Law.

4890-9158-2565, v. 1

**A.    Dr. Lieberman's February 19, 2022 Personal Tweet Was
Posted From His Own Twitter Account From Home
Over a Holiday Weekend**

1193.   As demonstrated in detail herein, Dr. Lieberman's February 19, 2022

Personal Tweet was posted by him through his own personal Twitter account in the course of his

and his wife's engaging in legal recreational social media activities from their own home outside

work hours on a Saturday evening of a holiday weekend.  *See* Background Section XIV, above.

**B.    Dr. Lieberman's February 19, 2022 Personal
Tweet Constituted Recreational Activity**

1194.   Dr. Lieberman's February 19, 2022 Personal Tweet falls squarely within

the definition of "recreational activities" set forth in Section 201-d(1)(b) of the New York Labor

Law because said Tweet was posted by Dr. Lieberman in the course of his engaging in routine

social media activities on a Saturday evening in connection with which activities he "receive[d]

no compensation" from the Entity Defendants (or NYSPI) and which social media activities are

"generally engaged in for recreational purposes," much like "reading and the viewing of

television, movies and similar material[.]"

1195.   As noted, Section 201-d(1)(b) of the New York Labor Law defines

"recreational activities," as that term is used in Section 201-d(2)(c) thereof, to "***includ[e][,] but

not [be] limited to[,]*** . . . hobbies, . . . reading and the viewing of television, movies and similar

material[.]"  (Emphasis added.)

416

1196.   Like hundreds of millions, perhaps billions, of people worldwide, Dr. Lieberman has engaged in various social media activities on his personal time as a form of recreation and entertainment.

1197.   Upon information and belief, "[a]s of 2022, the United States ha[d] the third-largest social media audience worldwide, after China and India.  It [wa]s home to over 302 million social media users[.]"  *See* S. Dixon, "Social Media Usage in the United States — Statistics and Facts" (July 8, 2022), Statista, accessible at *https://www.statista.com/topics/ 3196/social-media-usage-in-the-united-states/*.

1198.   Upon information and belief, as of early 2021, approximately "seven-in-ten Americans use[d] social media to connect with one another, engage with news content, share information and entertain themselves."  *See* "Social Media Fact Sheet," *Pew Research Center* (April 7, 2021), accessible at *https://www.pewresearch.org/internet/fact-sheet/social-media/*.

1199.   In their 2021 study titled *Social Media and Society*, Professors Regina Luttrell and Adrienne A. Wallace explain that "social media can be thought of as forms of electronic communication through which users create online communities to share information, ideas, personal messages, and other content via the social sphere.  . . .  Social media is not a solitary act.  What makes social media so effective is the participatory nature inherent in its platforms."  Regina Luttrell & Adrienne A. Wallace, *Social Media and Society* (The Rowman & Littlefield Publishing Group, Inc. 2021) (hereinafter, "***Luttrell & Wallace***") at 5.

1200.   Luttrell & Wallace explain further as follows:  "Social networking sites (SNSs) allow users to share personal information with friends or family.  By creating a profile, users can share videos, text, photos, or audio.  The most common and well-known social networks are Facebook, Pinterest, Twitter, WeChat, and Instagram. . . .  [A] social networking site (SNS) is a platform for communicating with others.  Think of social media as the communications channel and an SNS as a mechanism for two-way communication.  Facebook, Twitter, Pinterest, LinkedIn, Instagram, and Snapchat are all social networking sites; their users can register, develop a profile, connect with others, and comment on topics."  Luttrell & Wallace at 6, 8.

1201.   Luttrell & Wallace also observed as follows:

"Most people spend more time on social media than reading or exercising! . . .

"Few of us read printed newspapers or watch the news on TV anymore.  Instead, we view stories, often in real time, on our social media timelines.

\*   \*   \*

"[During an] 'Internet minute' [in 2019:]  2.1 million snaps [were] created; 87,500 people tweet[ed]; 1.4 million swipe[d] on Tinder; 41.6 million instant messages [were] sent via WhatsApp and Facebook Messenger; and 347,222 images [were] scrolled through and 'loved' in Instagram.

\*   \*   \*

"[S]ocial media platforms are used by one in three people in the world.  One in three!  Just a few short years ago, approximately 2.65 billion people were using social media worldwide; that number is projected to increase to almost 3.5 billion soon[.]"  Luttrell & Wallace at 27-28, 34, 187.

1202.   By 2020, the social media usage during an "Internet minute" had increased as follows:  2.5 million snaps were created; 194,444 people tweeted; 1.6 million swiped on

4890-9158-2565, v. 1

Tinder; 59 million instant messages were sent via WhatsApp and Facebook Messenger; and

694,444 images were scrolled through Instagram.  Luttrell & Wallace at 35.

      1203.   Luttrell & Wallace further explained as follows:

"Most of us cannot imagine a day without social media.  . . .  Media consumption
and interaction is at an all-time high.  In fact, as MarketWatch reports,

> Americans spend more time than ever watching videos [and] browsing
> social media. . . .  American adults spend more than 11 hours per day
> watching, reading, listening to or simply interacting with media. That's up
> from nine hours and 32 minutes just four years ago.

". . .  **_Seven in ten Americans use social media to connect with one another,
read news content, share information, and simply entertain themselves_**.  One
thing's for sure, we are a connected society, making a comprehensive framework
for social media key in today's ever-evolving digital atmosphere." Luttrell &
Wallace at 4 (emphasis added).

      1204.   In their study, *Social Media as Leisure Culture* (2014), accessible at First

Monday, *https://firstmonday.org/ojs/index.php/fm/article/view/4877/3867*, Professors Anne-

Mette Bech Albrechtslund and Anders Albrechtslund (jointly hereinafter, "***Albrechtslund***")

focused on the unmistakable recreational/leisure nature of social media usage.  Albrechtslund

summarized their research as follows:

"In this paper, **_we . . . emphasize how social media practices associated with
leisure and playfulness rather than functionality and tasks, and therefore
seemingly 'useless' in a strictly utilitarian sense, are practices which are
meaningful_**.  **_To be clear, when we analyze and discuss social media in the
following, we specifically refer to the everyday, mundane or leisurely use of
these services_**."  *See https://firstmonday.org/ojs/index.php/fm/article/
view/4877/3867* (emphasis added).

      1205.   Albrechtslund concluded that, "when users of social media engage in what

appears to be time-wasting, gullible, or escapist activities, they are also actively taking part in a

419

meaningful enactment of identity in a network of social relations." *See https://firstmonday.org/ ojs/index.php/fm/article/view/4877/3867.*

1206.   Professors Anita Whiting and David Williams, in their work titled *Why People Use Social Media: A Uses and Gratifications Approach* (Emerald Insights 2013), accessible at *https://www.emerald.com/insight/content/doi/10.1108/QMR-06-2013-0041/full/html* (hereinafter, "***Whiting & Williams***"), focused on the various purposes of social-media usage, including as a means of recreation, entertainment and relaxation.

1207.   Professors Whiting and Williams identified multiple recreational objectives of social-media usage, including using social media as a means of social interaction, as a way to pass time, as a means of entertainment and as a means of relaxation:

"*Social interaction*

"***Relying on uses and gratifications literature, this usage theme is defined as using social media to communicate and interact with others*** . . .  After reviewing the literature, we preferred the term social interaction because it was narrower than interpersonal utility but broader than companionship.

\* \* \*

"*Pass time*

"***This uses and gratifications theme is defined as using social media to occupy time and relieve boredom*** . . . .

"*Entertainment*

"***This type of social media usage is defined as using social media to provide entertainment and enjoyment*** . . .  ***Korgaonkar and Wolin (1999) also had a related factor for internet use which they called escapism.  They defined escapism as pleasurable, fun, and enjoyable***.

"*Relaxation*

420

"***This social media usage category is defined as using social media to relieve day-to-day stress*. *Palmgreen and Rayburn (1979) included this dimension in their uses and gratifications of television viewing*.** Korgaonkar and Wolin (1999) also included relaxation in their dimension of entertainment. Based on the uses and gratifications scale development of Palmgreen and Rayburn (1979) we believe that entertainment and relaxation are two separate constructs. Relaxation provides relief from stress while entertainment focuses on enjoyment." Whiting & Williams (boldface, italicized emphasis added; non-boldfaced italics in original), accessible at *https://www. emerald.com/insight/content/doi/10.1108/QMR-06-2013-0041/full/html*.

1208.   Professors Whiting and Williams reported that "88 percent of the respondents mentioned using social media for social interaction. Respondents mentioned that Facebook is 'a place to interact and socialize with others[,]' that they 'have more contact with people via social media than face to face[,]' and that 'social media gives them a social life[.]'" Whiting & Williams, accessible at *https://www.emerald.com/insight/content/doi/10.1108/QMR-06-2013-0041/full/html*.

1209.   Professors Whiting and Williams further reported that "76 percent reported using social media to pass the time. Respondents stated that they use social media when they have idle time or when they are bored and want something to do." Whiting & Williams, accessible at *https://www.emerald.com/insight/content/doi/10.1108/ QMR-06-2013-0041/full/html*.

1210.   Professors Whiting and Williams also reported that "***64 percent of respondents reported that they used social media as a source of entertainment*.** Some of the entertainment activities reported were playing games, listening to music, and watching videos. ***Others mentioned that they use social media for humor and comic relief. Some of their***

421

comments were 'listening to jokes[,]' 'reading comments and stuff makes me laugh[,]' and 'watching the crazies on Facebook, and how they display themselves, provides entertainment to me[.]'"  Whiting & Williams (emphasis added), accessible at *https://www.emerald.com/ insight/content/doi/10.1108/QMR-06-2013-0041/full/html*.

1211.   Professors Whiting and Williams reported that "*60 percent of respondents used social media for relaxation purposes.  Some of their comments were 'it is relaxing to go through profiles[,]' 'looking on Facebook does not take any thought[,]' 'it is an escape from reality[,]' and 'it takes my mind off things*[.]'  Respondents also mentioned how social media helps them escape from reality and escape the stress of the real world."  Whiting & Williams (emphasis added), accessible at *https://www.emerald.com/insight/content/doi/10.1108/QMR-06-2013-0041/full/html*.

1212.   Professor Gina Masullo Chen, in her study titled "Tweet This: A Uses and Gratifications Perspective on How Active Twitter Use Gratifies a Need To Connect With Others," *Computers in Human Behavior* (Vol. 27, Issue 2, March 2011) at 755-62, accessible at *https://www.sciencedirect.com/science/article/abs/pii/S0747563210003213?via%3Dihub* (hereinafter, "*Chen*"), focused on the desire for social connection that is satisfied by Twitter usage.

1213.   Professor Chen's study concluded with several findings, including the following:

"[P]eople who are active on social networks, such as Facebook are more likely to feel connected. . . .  ***Additionally, these findings offer support[ ] for the idea that Twitter is not just virtual noise of people talking at each other, as some critics contend, but that it is a medium that people actively seek out to gratify a need to connect with others***.  This supports the idea that U&G [the uses and gratifications approach] is a suitable approach for study of online social networks.  . . .  ***Clearly, this study shows that people who actively seek out Twitter are doing so out of a basic human need to connect with others that they can then gratify by using this computer medium***."  Chen (emphasis added), accessible at *https://www.sciencedirect.com/science/article/abs/pii/S0747563210003213? via%3Dihub*.

      1214.  As demonstrated in detail herein, the Entity Defendants, in direct retaliation against Dr. Lieberman for posting his February 19, 2022 Personal Tweet, have willfully, intentionally and maliciously engaged in Defendants' Unlawful Scheme pursuant to which they, in concert with the Individual State Actor Defendants, among other things, (a) have suspended Dr. Lieberman from his leadership employment positions with the Entity Defendants; (b) have stripped Dr. Lieberman of his leadership position as Chair of the Columbia Medical School Department of Psychiatry; (c) have stripped Dr. Lieberman of his leadership position as Psychiatrist-in-Chief of Presbyterian/Columbia Hospital; (d) have denied Dr. Lieberman access to certain of the Entity Defendants' premises; (e) have denied Dr. Lieberman access to NYSPI/Columbia/Presbyterian Psychiatry facilities; (f) have barred Dr. Lieberman from teaching his academic courses as a tenured faculty member; (g) have barred Dr. Lieberman from teaching or otherwise interacting with Presbyterian/Columbia Hospital Residents; (h) have denied Dr. Lieberman access to the Lieberman-Raised Funds that he was instrumental in attracting to the Entity Defendants and which he requires to engage in research activities; and

(i) have thwarted Dr. Lieberman's ability to resume his academic, clinical and research activities as an employee of the Entity Defendants.

1215.   By engaging with the Individual State Actor Defendants in Defendants' Unlawful Scheme, the Entity Defendants, as summarized in the immediately preceding paragraph, above, willfully, intentionally and maliciously retaliated against Dr. Lieberman (and continue to retaliate against him) for posting his February 19, 2022 Personal Tweet, a legal recreational activity in which he engaged through his personal Twitter account in his personal capacity from his own home on the Saturday evening of a holiday weekend.  The Entity Defendants therefore violated Dr. Lieberman's rights under Section 201-d(2)(c) of the New York Labor Law.

1216.   In violation of Section 201-d(2)(c) of the New York Labor Law, the Entity Defendants wrongfully discriminated (and continue to wrongfully discriminate) against Dr. Lieberman "in compensation, promotion or terms, conditions or privileges of employment because of . . . [Dr. Lieberman's] legal recreational activities[.]"

1217.   In perpetrating their willful, intentional and malicious Unlawful Scheme against Dr. Lieberman continually from February 22, 2022 to date in retaliation for the content of his February 19, 2022 Personal Tweet, the Entity Defendants have engaged in continuing wrongful conduct in violation of Section 201-d(2)(c) of the New York Labor Law.

1218.   As demonstrated in detail herein, as a direct and proximate result of the Entity Defendants' violation of Dr. Lieberman's rights under Section 201-d(2)(c) of the New York Labor Law, Dr. Lieberman has been injured and damaged in an amount to be proven at trial.

1219.   The Entity Defendants are liable to Dr. Lieberman for the injuries and damages suffered by Dr. Lieberman as a direct and proximate result of the Entity Defendants' violation of Dr. Lieberman's rights under Section 201-d(2)(c) of the New York Labor Law.

1220.   But for the Entity Defendants' violation of Dr. Lieberman's rights under Section 201-d(2)(c) of the New York Labor Law, Dr. Lieberman would not have been injured and damaged.

## SIXTH CLAIM FOR RELIEF

### (AGAINST THE ENTITY DEFENDANTS FOR BREACH OF THE JUNE 1, 2022 LIEBERMAN ACTIVITIES-RESUMPTION AGREEMENT)

1221.   Plaintiff repeats and realleges Paragraphs 1 through 1220, above, as if set forth in their entirety here.

1222.   As demonstrated in detail herein, in or about early June 2022, the Entity Defendants and Dr. Lieberman entered into the June 1, 2022 Lieberman Activities-Resumption Agreement, which constitutes a valid, enforceable contract.

1223.   By means of the June 1, 2022 Lieberman Activities-Resumption Agreement, the Entity Defendants — after having willfully, intentionally and maliciously perpetrated the Unlawful Scheme in concert with the Individual State Actor Defendants since February 22, 2022 — agreed to permit Dr. Lieberman to resume his academic, clinical and research activities on behalf of the Entity Defendants in exchange for his satisfying certain obligations set forth in said Agreement.

1224.   Confirming that Dr. Lieberman does "remain a tenured faculty member at Columbia University[,]" the June 1, 2022 Lieberman Activities-Resumption Agreement provides in material part as follows:

> "This memorandum serves to clarify the terms of your transition out of the Chair position at Columbia and your service as a Columbia faculty member.  The memorandum also covers the terms for your return to active status on the [Presbyterian/Columbia] Hospital's medical staff.
>
> "**<u>Columbia</u>**
>
> 1.   Columbia has identified a new faculty office and Columbia will work with you to schedule a tour of this space.  Also, Columbia will facilitate a move of your personal belongings and Columbia records and files to that location as soon as possible.
>
> 2.   Columbia will compensate you at your current Columbia salary during your two-year transition period.  You will be eligible for all employee benefits in accordance with the terms of Columbia's benefits programs.
>
> 3.   Upon your compliance with the Hospital's terms of discontinuing your Administrative Time Out, Columbia will restore your access to the clinical systems, clinical activity, and clinical research.
>
> 4.   As required by the Columbia Department of Psychiatry's faculty practice plan, all patient revenue from physician billing belongs to Columbia.  All patient records must be kept in Epic and all patients must be billed for services.  All faculty practice patient records belong to Columbia. Appropriate recordkeeping for all patients is essential.

426

5.     Your swipe access to all University facilities has been active and will
       remain active so long as you are a full-time faculty member of Columbia
       in good standing.  Accordingly, you will continue to have access to your
       University email account.  Your access to University systems is subject to
       all University policies and terms of use.  However, any misuse of
       University systems will result in immediate suspension of your systems
       access.

6.     Any future interactions regarding fundraising must only happen in
       conjunction with the Office of Development.

7.     You do not have institutional signatory authority and may not sign-off on
       behalf of the Department of Psychiatry or Columbia.  Consistent with
       Columbia policy, you may use your name and faculty title but may not
       represent the University, CUIMC, or the Department of Psychiatry.  (You
       were not, and are not, able to sign agreements on behalf of the Hospital.)

8.     Going forward, the Chair of the Department of Psychiatry [who, since late
       February 2022, has been Dr. Simpson on an interim basis] (or designee)
       will solicit formal feedback from key stakeholders quarterly on your
       observed behaviors.  The Chair (or designee) will review feedback with
       you one- on-one and course correct where necessary.  You will meet with
       the Chair (or designee) 60 minutes quarterly to review feedback and drive
       accountability.

"If there are any issues that need immediate attention with regard to Columbia,
please feel free to contact Rudi Odeh-Ramadan at . . . .  Columbia is committed to
working with you to facilitate a smooth transition from your role as Chair of the
Department of Psychiatry at Columbia.

## "NewYork-Presbyterian

1.     Subject to your ongoing compliance with Hospital by-laws, policies,
       procedures, rules, and regulations, including, without limitation, the
       Hospital's Code of Conduct, the Hospital will discontinue your
       Administrative Time Out upon:

   •   your successful completion of training which is available to you through
       Workday and must be completed within ten (10) days of your receipt of
       this letter and in advance of your return:

- *Invisible Influencers Online Training Program on Unconscious Bias*
  *(30 minutes)*
- *Press PAUSE Video Series (30 minutes)*
- *Micro-Aggressions e-Learning Course (10 Minutes)*
- *Macro Behaviors a-Learning Course (30 minutes)*
- *Review the Hospital's Social Media Policy online on Workday and sign*
  *an attestation (10 minutes);*

   *and*

- your successful completion, within ten (10) days of your receipt of this
  letter and in advance of your return, of the Intercultural Development
  Inventory (IDI) Assessment online with debrief of results (20 minutes for
  assessment; 60 minutes for debrief), a link to which will be sent to you by,
  and which debrief will be conducted by, leadership coach Bart Bailey
  (and/or designee);

   *and*

- leading up to and immediately following your return, your active
  participation in 1:1 individual leadership coaching with Bart Bailey
  (and/or or designee) for a continuous three months of intensive
  coaching/follow-up/check-ins, for which you will be contacted directly by
  Bart Bailey (and/or designee)."

1225.   Dr. Lieberman has performed all of his obligations under the June 1, 2022

Lieberman Activities-Resumption Agreement.

1226.   For all of the reasons demonstrated in detail herein, the Entity Defendants

have breached their obligations under the June 1, 2022 Lieberman Activities-Resumption

Agreement.

1227.   The Entity Defendants breached the June 1, 2022 Lieberman Activities-

Resumption Agreement in multiple ways, including as follows:

4890-9158-2565, v. 1

(a)      Although Columbia University and Columbia Medical School committed to securing new office space for Dr. Lieberman to which "Columbia will facilitate a move of [Dr. Lieberman's] personal belongings and Columbia records and files . . . as soon as possible[,]" neither Columbia University nor Columbia Medical School, as demonstrated in detail herein, in fact delivered all of Dr. Lieberman's "personal belongings and Columbia records and files" to said office.

(b)      Although Columbia University and Columbia Medical School committed to "restor[ing] [Dr. Lieberman's] access to the clinical systems, clinical activity, and clinical research[,]" Columbia University and Columbia Medical School, as demonstrated in detail herein, have continued to thwart Dr. Lieberman's access to such clinical systems, activities and research.

(c)      Although Columbia University and Columbia Medical School "committed to working with [Dr. Lieberman] to facilitate a smooth transition from [his] role as Chair of the Department of Psychiatry at Columbia[,]" Columbia University and Columbia Medical School, as demonstrated in detail herein, have continued to undermine at every turn Dr. Lieberman's ability to resume his academic, clinical and research activities.

(d)      Although Presbyterian/Columbia Hospital committed to Dr. Lieberman's "return to active status on the Hospital's medical staff[,]" the Entity Defendants, as demonstrated in detail herein, have continued to undermine at every turn Dr. Lieberman's ability to resume his academic, clinical and research activities, including through the Hospital's prohibition against Dr. Lieberman's teaching or otherwise interacting with Hospital Residents.

1228.   As demonstrated in detail herein, the Entity Defendants, in direct retaliation against Dr. Lieberman for posting his February 19, 2022 Personal Tweet, have breached (and continue to breach) the June 1, 2022 Lieberman Activities-Resumption Agreement by continuing to willfully, intentionally and maliciously engage in Defendants' Unlawful Scheme after the execution of said Agreement.  Pursuant to the Unlawful Scheme, the Entity Defendants, in concert with the Individual State Actor Defendants, among other things, (a) have continued to deny Dr. Lieberman access to certain of the Entity Defendants' premises; (b) have continued to

429

deny Dr. Lieberman access to NYSPI/Columbia/Presbyterian Psychiatry facilities; (c) have

continued to bar Dr. Lieberman from teaching his academic courses as a tenured faculty

member; (d) have continued to bar Dr. Lieberman from teaching or otherwise interacting with

Presbyterian/Columbia Hospital Residents; (e) have continued to deny Dr. Lieberman access to

grants and funds that he was instrumental in attracting to the Entity Defendants and which he

requires to engage in research activities; and (f) have continued to otherwise thwart Dr.

Lieberman's ability to resume his academic, clinical and research activities as an employee of the

Entity Defendants.

1229.   As demonstrated in detail herein, as a direct and proximate result of the

Entity Defendants' breach of their obligations under the June 1, 2022 Lieberman Activities-

Resumption Agreement, Dr. Lieberman has been injured and damaged in an amount to be proven

at trial.

1230.   But for the Entity Defendants' breach of their obligations under the June 1,

2022 Lieberman Activities-Resumption Agreement, Dr. Lieberman would not have been injured

and damaged.

## SEVENTH CLAIM FOR RELIEF

### (AGAINST THE ENTITY DEFENDANTS
### FOR PROMISSORY ESTOPPEL)

1231.   Plaintiff repeats and realleges Paragraphs 1 through 1230, above, as if set

forth in their entirety here.

430

1232.   Dr. Lieberman pleads this Seventh Claim for Relief in the alternative to the Sixth Claim for Relief in the event that the June 1, 2022 Lieberman Activities-Resumption Agreement is somehow deemed not to be an enforceable contract (which it most certainly is).

1233.   As demonstrated in detail herein, the leadership of the Entity Defendants, including Dr. Armstrong, made clear and unambiguous promises to Dr. Lieberman that, upon Dr. Lieberman's satisfaction of the parties' agreed-upon conditions for resumption of his academic, clinical and research activities on behalf of the Entity Defendants (which conditions Dr. Lieberman fully satisfied), Dr. Lieberman would be able to promptly and fully resume those activities.

1234.   As noted, during the April 20, 2022 Armstrong-Lieberman Meeting, Dr. Armstrong, on behalf of the Entity Defendants, made a clear and unambiguous promise to Dr. Lieberman that, upon his satisfaction of the parties' agreed-upon conditions (which conditions Dr. Lieberman fully satisfied), Dr. Lieberman would be able to promptly and fully resume his academic, clinical and research activities on behalf of the Entity Defendants (the "***April 20, 2022 Armstrong Activities-Resumption Promise***").

1235.   As of April 20, 2022, which was almost two months after Dr. Armstrong had become Dean of the Columbia Medical School on or about March 1, 2022, Dr. Lieberman's limited interactions with Dr. Armstrong had been positive.

1236.   As of April 20, 2022, Dr. Lieberman had no reason to believe that Dr. Armstrong was involved in furthering Defendants' Unlawful Scheme.

431

1237.   Because, as of April 20, 2022, Dr. Armstrong held the position of Dean of Columbia Medical School and because she represented to Dr. Lieberman that she had held discussions concerning these matters with Dr. Corwin, the Chief Executive Officer of Presbyterian/Columbia Hospital, Dr. Lieberman believed reasonably that Dr. Armstrong had the authority and power, on behalf of Columbia University, Columbia Medical School and Presbyterian/Columbia Hospital to restore promptly Dr. Lieberman's ability to engage fully in his academic, clinical and research activities on behalf of the Entity Defendants.

1238.   Accordingly, Dr. Lieberman quite reasonably and foreseeably relied upon the April 20, 2022 Armstrong Activities-Resumption Promise that, upon his satisfaction of the parties' agreed-upon activities-resumption conditions (which conditions Dr. Lieberman fully satisfied), Dr. Lieberman would be permitted to promptly and fully resume his academic, clinical and research activities on behalf of the Entity Defendants.

1239.   Dr. Armstrong knew and fully intended that Dr. Lieberman would rely reasonably upon the April 20, 2022 Armstrong Activities-Resumption Promise.

1240.   As noted, during the June 29, 2022 Armstrong-Lieberman Meeting, Dr. Armstrong, on behalf of the Entity Defendants, again made a clear and unambiguous promise to Dr. Lieberman that, since he had satisfied the parties' agreed-upon conditions, he, as a faculty member of the Columbia Medical School Department of Psychiatry and of the Presbyterian/ Columbia Hospital Department of Psychiatry, was entitled to promptly resume all of his

academic, clinical and research activities on behalf of the Entity Defendants (the "***June 29, 2022 Armstrong Activities-Resumption Promise***").

1241.   Through the June 29, 2022 Armstrong Activities-Resumption Promise, Dr. Armstrong promised Dr. Lieberman that the academic, clinical and research activities that he would promptly be permitted to resume would include all projects and initiatives that fall within the customary role of a faculty member of Columbia Medical School and of Presbyterian/ Columbia Hospital.

1242.   As noted, at approximately 9:58 p.m. on June 29, 2022, Dr. Armstrong sent an e-mail to Dr. Lieberman summarizing the June 29, 2022 Armstrong Activities-Resumption Promise.  Among other things, Dr. Armstrong's June 29, 2022 e-mail confirmed that, "as a faculty member, you [Dr. Lieberman] can engage in projects and initiatives that fall within the customary roles of a faculty member."

1243.   As of June 29, 2022, which was almost four months after Dr. Armstrong had become Dean of the Columbia Medical School on or about March 1, 2022, Dr. Lieberman's limited interactions with Dr. Armstrong had been positive.

1244.   As of June 29, 2022, Dr. Lieberman had no reason to believe that Dr. Armstrong was involved in furthering Defendants' Unlawful Scheme.

1245.   Because, as of June 29, 2022, Dr. Armstrong held the position of Dean of Columbia Medical School and because she represented to Dr. Lieberman that she had held discussions concerning these matters with Dr. Corwin, the Chief Executive Officer of

4890-9158-2565, v. 1

Presbyterian/Columbia Hospital, Dr. Lieberman believed reasonably that Dr. Armstrong had the authority and power, on behalf of Columbia University, Columbia Medical School and Presbyterian/Columbia Hospital to restore promptly Dr. Lieberman's ability to engage fully in his academic, clinical and research activities on behalf of the Entity Defendants.

1246.   Accordingly, Dr. Lieberman quite reasonably and foreseeably relied to his detriment upon the June 29, 2022 Armstrong Activities-Resumption Promise that Dr. Lieberman was entitled to resume promptly and fully all of his academic, clinical and research activities on behalf of the Entity Defendants.

1247.   Dr. Armstrong knew and fully intended that Dr. Lieberman would rely reasonably upon the June 29, 2022 Armstrong Activities-Resumption Promise.

1248.   Despite the very clear April 20, 2022 Armstrong Activities-Resumption Promise and the very clear June 29, 2022 Armstrong Activities-Resumption Promise made by Dr. Armstrong on behalf of the Entity Defendants, said Entity Defendants — in concert with the Individual State Actor Defendants (with or without Dr. Armstrong's knowledge and blessing) — have continued to this day to punish Dr. Lieberman for the content of his February 19, 2022 Personal Tweet by willfully, intentionally and maliciously erecting roadblocks to Dr. Lieberman's resumption of his academic, clinical and research activities on behalf of the Entity Defendants.

434

1249.   As demonstrated in detail herein, as a direct and proximate result of Dr. Lieberman's reasonable, foreseeable and detrimental reliance upon the April 20, 2022 Armstrong Activities-Resumption Promise and the June 29, 2022 Armstrong Activities-Resumption Promise, Dr. Lieberman has been injured and damaged in an amount to be proven at trial.

1250.   The injuries and damages suffered by Dr. Lieberman as a direct and proximate result of his reasonable reliance upon the April 20, 2022 Armstrong Activities-Resumption Promise and the June 29, 2022 Armstrong Activities-Resumption Promise made by Dr. Armstrong on behalf of the Entity Defendants include, but are not limited to, Dr. Lieberman's decision to forgo substantive exploration and consideration of alternative career opportunities with academic institutions and hospitals unaffiliated with the Entity Defendants (the "***Alternative Career Opportunities***").

1251.   The Alternative Career Opportunities included, but were not limited to, opportunities that were brought to Dr. Lieberman's attention, but to which he declined to respond substantively because, in reasonable reliance upon the April 20, 2022 Armstrong Activities-Resumption Promise and the June 29, 2022 Armstrong Activities-Resumption Promise, Dr. Lieberman believed that he would soon be permitted to resume his academic, clinical and research activities on behalf of the Entity Defendants.

1252.   The Alternative Career Opportunities also included, but were not limited to, opportunities of which Dr. Lieberman was aware, but failed to explore substantively because, in reasonable reliance upon the April 20, 2022 Armstrong Activities-Resumption Promise and

the June 29, 2022 Armstrong Activities-Resumption Promise, Dr. Lieberman believed that he would soon be permitted to resume his academic, clinical and research activities on behalf of the Entity Defendants.

1253.   Because he relied reasonably upon the April 20, 2022 Armstrong Activities-Resumption Promise and the June 29, 2022 Armstrong Activities-Resumption Promise made by Dr. Armstrong on behalf of the Entity Defendants, Dr. Lieberman, believing that he would indeed be permitted to resume fully his academic, clinical and research activities on behalf of the Entity Defendants, squandered more than a year during which he declined to give substantive consideration to Alternative Career Opportunities that were brought to his attention.

1254.   Because, as intended by the Entity Defendants, Dr. Lieberman relied reasonably and foreseeably upon the April 20, 2022 Armstrong Activities-Resumption Promise and the June 29, 2022 Armstrong Activities-Resumption Promise made by Dr. Armstrong on behalf of the Entity Defendants, Dr. Lieberman, believing that he would indeed be permitted to resume fully his academic, clinical and research activities on behalf of the Entity Defendants, squandered more than a year during which he declined to engage in any substantive exploration of Alternative Career Opportunities.

1255.   As demonstrated in detail herein, as a direct and proximate result of the Dr. Lieberman's intended, reasonable and foreseeable detrimental reliance upon the April 20, 2022 Armstrong Activities-Resumption Promise and the June 29, 2022 Armstrong Activities-

436

Resumption Promise made by Dr. Armstrong on behalf of the Entity Defendants, Dr. Lieberman

has been injured and damaged in an amount to be proven at trial.

1256.   But for Dr. Lieberman's reasonable, foreseeable, intended and detrimental

reliance upon the April 20, 2022 Armstrong Activities-Resumption Promise and the June 29,

2022 Armstrong Activities-Resumption Promise made by Dr. Armstrong on behalf of the Entity

Defendants, Dr. Lieberman would not have been injured and damaged.

## EIGHTH CLAIM FOR RELIEF

### (AGAINST THE ENTITY DEFENDANTS FOR BREACH OF THE AGREEMENTS THAT GRANT DR. LIEBERMAN, AS A COLUMBIA UNIVERSITY FACULTY MEMBER, ACCESS TO AND USE OF NYS OMH/NYSPI FACILITIES)

1257.   Plaintiff repeats and realleges Paragraphs 1 through 1256, above, as if set

forth in their entirety here.

1258.   As noted in Background Section XII(B)(ii)(2), above, pursuant to the

1924/1925 NYS-Columbia Agreement, New York State agreed to construct a new building to

house NYSPI, which building would be made available to the Columbia Medical School

Department of Psychiatry in perpetuity.

1259.   As also noted in Background Section XII(B)(ii)(2), above, pursuant to the

May 1926 Columbia Deed To NYS, Columbia University transferred to the State of New York

the land upon which the NYSPI building was constructed at 1051 Riverside Drive in Manhattan.

4890-9158-2565, v. 1

1260.   As a result of the 1952 NYSPI-Columbia Psychiatry Educational Partnership, Columbia Medical School Department of Psychiatry faculty appointments were bestowed upon NYSPI faculty and NYSPI trainees received Columbia diplomas.

1261.   The 1984 NYS OMH-Columbia MOU provides that "Columbia University and NYS Psychiatric Institute anticipate that this agreement will remain in effect for thirty years[,]" with certain termination rights upon notice after January 1, 1990.

1262.   The 1984 NYS OMH-Columbia MOU empowers Columbia University, at its expense, to make "[r]enovations and alterations" to the building space provided by NYSPI for the research activities in accordance with the MOU.

1263.   In accordance with the 1985 NYS OMH-Columbia Revocable Permit, NYS OMH agreed to permit Columbia University to occupy and use "for the purpose of conducting psychiatric and related research" four floors of NYS OMH's Lawrence Kolb Building in Manhattan.

1264.   As noted, the 2011 NYS OMH-Columbia MOU recommits the parties to the sharing of physical space and other resources:

> "[W]here appropriate to accomplish joint objectives, realize efficiencies in operation or otherwise be of mutual benefit, *resources of [NYSPI/Columbia/ Presbyterian Psychiatry], including space, equipment and staff, may be shared by mutual agreement and, where applicable, in keeping with the conditions set forth as covenants in the agreement between the New York State Hospital Commission and the Columbia University Joint Administrative Board, acting for Columbia University and the Presbyterian Hospital, dated November 12, 1924 and June 10, 1925, the deed transferring the land upon which NYSPI was built, dated May 14, 1926, and the deed transferring the land upon which the Kolb Annex was built, dated November 8, 1974*.  Unless otherwise agreed, the

438

use of space and equipment and the conduct of activities to be conducted in such space shall be governed by the policies and procedures of the host institution." *See* 2011 NYS OMH-Columbia MOU § 4(H)(1) (emphasis added).

1265.   As also noted, the 2018 Department of Psychiatry Overview explained:

"***The Columbia University Department of Psychiatry is located on the Columbia University Health Sciences campus in northern Manhattan, part of an urban neighborhood that is ethnically, racially and economically diverse.  The Department's research and education programs are primarily housed in buildings owned and maintained by New York State under the auspices of the Office of Mental Health (OMH)***."  (Emphasis added.)

1266.   The 1924/1925 NYS-Columbia Agreement; the May 1926 Columbia Deed To NYS; the 1952 NYSPI-Columbia Psychiatry Educational Partnership; the 1974 Columbia Deed To NYS; the 1984 NYS OMH-Columbia MOU; the 1985 NYS OMH-Columbia Revocable Permit; the 2011 NYS OMH-Columbia MOU and the 2016 Business Associate Agreement are referred to collectively hereinafter as the "***NYS OMH-Columbia Sharing Agreements***."

1267.   The NYS OMH-Columbia Sharing Agreements constitute valid, enforceable contracts.

1268.   The 1974 Columbia Deed To NYS pursuant to which Columbia University transferred to the State of New York for one dollar ($1.00) the land upon which NYSPI's Kolb Annex was constructed adjacent to the predominant headquarters of the Columbia University Department of Psychiatry and NYSPI located at 1051 Riverside Drive in Manhattan,

439

provides that the State of New York shall make the space available for access and use by

personnel of Columbia University and Presbyterian/Columbia Hospital.  The Deed states:

> "*[The State of New York] covenants that the student bodies and professional staffs of [Columbia University] and The Presbyterian Hospital in the City of New York and associate institutions shall have available during the continuance and existence of the said extension to the Psychiatric Institute and Hospital, the facilities of said extension in the Psychiatric Institute and Hospital* in the same manner as they have available for the main Psychiatric Institute and Hospital pursuant to  the Agreement between [Columbia University] and [the State of New York], dated December 16, 1925."  (Emphasis added.)

1269.   As noted, the 2011 NYSPI Audit Report concluded that NYSPI/Columbia/

Presbyterian Psychiatry operates as a unified psychiatric entity:  "***The Institute, located in upper***

***Manhattan, has a long-standing collaborative relationship with neighboring Columbia***

***University (Columbia), and Columbia's affiliated hospital, New York Presbyterian Hospital***

***(Presbyterian).  These three entities share professional and administrative staff, facilities and***

***equipment, and participate in joint training, research and clinical trial endeavors.  Many***

***institute staff are also employees of Columbia.  Institute operations and staff are overseen by***

***the Institute's Executive Director who also serves as the Chair of Columbia's Department of***

***Psychiatry, and as Psychiatrist-in-Chief at Presbyterian.  In effect, Columbia's Department of***

***Psychiatry, Presbyterian's Department of Psychiatry and the Institute operate as a unified***

***psychiatric facility***."  2011 NYSPI Audit Report at 11, accessible at *https://web.osc.state.ny.us/*

*audits/allaudits/093011/08s145.pdf* (emphasis added).

1270.   The 2011 NYSPI Audit Report addressed the sharing by NYS

OMH/NYSPI of building space with the Columbia Medical School Department of Psychiatry

and the Hospital Department of Psychiatry:

440

"We also note that ***the Institute operates from two OMH-owned buildings and from leased space in three privately-owned buildings.  One of the privately-owned buildings is owned by Columbia and houses Columbia's School of Public Health. This building is located on land that had been previously donated to the State by Columbia***.  Since February 2005, the Institute has leased 2 of the building's 19 floors, about 10.5 percent of the total floor space, and under the lease agreement, has paid Columbia 14.1 percent of the building's total operating and maintenance expenses ($611,547 for the year ended June 30, 2008).

"***Conversely, Columbia staff occupies space in two OMH-owned buildings free of charge.  According to an agreement between the parties, Columbia donated the land upon which one of the buildings is situated.  Therefore, Columbia has free access to, and use of, the Lawrence Kolb Research Laboratory.  However, Columbia also occupies space in the Institute's Riverside Drive Building, located at a different site on land owned by OMH***, and for which no similar agreement exists."  2011 NYSPI Audit Report at 17 (emphasis added), accessible at *https://web.osc.state.ny.us/audits/allaudits/093011/08s145.pdf*.

1271.   The 2011 NYSPI Audit Report also relayed NYSPI's view that the building-sharing arrangements are reciprocal and benefit all of the members of NYSPI/Columbia/Presbyterian Psychiatry:

"According to Institute officials, ***Columbia staff has occupied space in the Riverside Drive Building since the building opened in May 1998***.  .  .  .

"***Institute officials told us they were not charging Columbia rent for its use of the Riverside Drive Building because they believed the agreement granting Columbia free use of the Kolb Building also applied to the Riverside Drive Building. Institute officials also indicated that there are circumstances where the Institute has been granted access to Columbia research facilities, the use of which has been — and is — invaluable to the Institute, and for which no payments are made to Columbia.  Citing the close working relationship between the two entities, the Institute and OMH believe that the space-sharing arrangements work well and benefit both Institutions***."  2011 NYSPI Audit Report at 17, accessible at *https://web.osc.state.ny.us/audits/allaudits/093011/08s145.pdf* (emphasis added).

1272.   As noted, the NYSPI Audit Response emphasized the benefits of the office-sharing protocols among NYSPI, the Columbia Medical School Department of Psychiatry and the Presbyterian/Columbia Hospital Department of Psychiatry:

"*OMH/NYSPI considers sharing space at the Institute with Columbia to be a vital part of their public-private partnership.  Indeed, the principle of sharing space and facilities was integral to the original covenant between CU and NYS in 1926.  Space sharing serves OMH and the NYSPI's interests by providing for the integration and exchange of research and academic resources, contributing significantly to the Institute's success in realizing its mission.  It also promotes efficiency for researchers who have roles in supervising both NYSPI and Department-funded research projects, taking care of NYSPI patients, managing NYSPI programs and teaching future mental health professionals*.

"*For more than eighty years, Columbia professional staff working in the Department of Psychiatry have occupied space alongside NYSPI staff while NYSPI staff have had access to the resources of a world class academic medical center.  The result has been a uniquely rich collaboration in research, training and clinical care, which has substantially enhanced NYSPI's ability to attract grants to support its mission*.  .  .  .  *This infusion of grant income*  .  .  .  *is a product of the partnership between NYSPI/OMH and Columbia*.

".  .  .  *The co-location of Columbia and Institute staff is an important part of the architecture of the agreement Columbia and OMH conceived of in 1924.  At that time, OMH agreed to accept the donation of land for NYSPI subject to the condition that 'the Student bodies and professional staffs of the University and the Hospital and associated institutions shall have [such facilities] available [to them] during the continuance and existence of the said Psychiatric Institute and Hospital, subject to the rules and regulations of the State Hospital Commission*.'  That land donation was the land upon which the former Building 1 of NYSPI was built.  *The condition for the use of NYSPI by the students and professional staffs of the University and the Hospital was incorporated into the deed for the property and a second agreement between the parties*.

"*In 1974, Columbia donated a second parcel of land to the State for NYSPI's Kolb Annex, providing in the deed a covenant that 'the student bodies and professional staffs of [Columbia]  and The Presbyterian Hospital in the City of New York and associate institutions shall have available during the continuance and existence of the said extension to the Psychiatric Institute and Hospital, the facilities of said extension to the Psychiatric Institute and Hospital in the same manner as they have available the facilities of the main Psychiatric Institute and Hospital  pursuant to the Agreement between [Columbia and NYSPI], dated December 16, 1925*.'  *Like the earlier covenant, this covenant was intended to support the affiliation between NYSPI and the Department by providing for the sharing of resources and efficiencies in operation which were considered integral to achieving their common objectives*."  2011 NYSPI Audit

442

Report at 25-26, accessible at *https://web.osc.state.ny.us/audits/allaudits/ 093011/08s145.pdf* (emphasis added).

1273.   As a member of the Columbia Medical School Department of Psychiatry faculty and a member of the Presbyterian/Columbia Hospital Department of Psychiatry, Dr. Lieberman is a member of a class of intended third-party beneficiaries of the NYS OMH-Columbia Sharing Agreements.

1274.   As a member of the Columbia Medical School Department of Psychiatry faculty and a member of the Presbyterian/Columbia Hospital Department of Psychiatry, Dr. Lieberman, like other members of said Departments, relies upon access to the New York State-owned/operated buildings of NYSPI/Columbia/Presbyterian Psychiatry, including the Association's headquarters located at 1051 Riverside Drive in Manhattan — which access is guaranteed to him as a member of the class of intended third-party beneficiaries of the NYS OMH-Columbia Sharing Agreements — to fully perform his academic, clinical and research activities on behalf of the Entity Defendants.

1275.   The inability of Dr. Lieberman, as a member of the Columbia Medical School Department of Psychiatry faculty and a member of the Presbyterian/Columbia Hospital Department of Psychiatry, to access and use the New York State-owned/operated buildings of NYSPI/Columbia/Presbyterian Psychiatry, including the Association's headquarters located at 1051 Riverside Drive in Manhattan, impairs significantly Dr. Lieberman's ability to fully perform his academic, clinical and research activities on behalf of the Entity Defendants.

4890-9158-2565, v. 1

1276.   Since late February 2022, the Entity Defendants, in concert with the Individual State Actor Defendants to further Defendants' Unlawful Scheme, have continued to bar Dr. Lieberman from accessing the buildings to which he, as a member of the class of intended third-party beneficiaries of the NYS OMH-Columbia Sharing Agreements, has rightful access for the purpose of conducting his academic, clinical and research activities on behalf of the Entity Defendants.

1277.   By barring Dr. Lieberman from accessing the buildings to which he, as a member of the class of intended third-party beneficiaries of the NYS OMH-Columbia Sharing Agreements, has rightful access for the purpose of conducting his academic, clinical and research activities on behalf of the Entity Defendants, the Entity Defendants have breached said Agreements.

1278.   As demonstrated in detail herein, as a direct and proximate result of the Entity Defendants' breach of the terms of the NYS OMH-Columbia Sharing Agreements of which Dr. Lieberman is a member of a class of intended third-party beneficiaries, Dr. Lieberman has been injured and damaged in an amount to be proven at trial.

1279.   But for the Entity Defendants' breach of the terms of the NYS OMH-Columbia Sharing Agreements of which Dr. Lieberman is a member of a class of intended third-party beneficiaries, Dr. Lieberman would not have been injured and damaged.

## NINTH CLAIM FOR RELIEF

## (AGAINST THE INDIVIDUAL STATE ACTOR DEFENDANTS, IN THEIR INDIVIDUAL CAPACITIES, AND THE ENTITY DEFENDANTS FOR CIVIL CONSPIRACY)

1280.   Plaintiff repeats and realleges Paragraphs 1 through 1279, above, as if set forth in their entirety here.

1281.   As demonstrated in detail herein, Defendants' willful, intentional, malicious and concerted perpetration of their Unlawful Scheme against Dr. Lieberman since February 22, 2022 was and continues to be designed to deliberately destroy Dr. Lieberman's personal reputation, professional reputation and academic, clinical and research career in retaliation for the content of his February 19, 2022 Personal Tweet, thereby currying favor with the Targeted Constituencies for the purpose of advancing Defendants' overlapping political, social and academic agendas.

1282.   In perpetrating their willful, intentional, malicious and concerted Unlawful Scheme against Dr. Lieberman since February 22, 2022, Defendants have engaged in the myriad tortious and other wrongful acts described in detail herein.

1283.   As demonstrated in detail herein, the Individual State Actor Defendants and the leadership of the Entity Defendants entered into at least an understanding and agreement (the "**Conspiracy Agreement**") on or about February 22, 2022 for the purpose of perpetrating Defendants' willful, intentional and malicious Unlawful Scheme against Dr. Lieberman.

445

1284.   Pursuant to their Conspiracy Agreement, Defendants have perpetrated their Unlawful Scheme (including their Negative PR Campaign) against Dr. Lieberman continually from February 22, 2022 through the present.

1285.   As demonstrated in detail herein, the leadership of the Entity Defendants and the Individual State Actor Defendants engaged in multiple choreographed wrongful overt acts in furtherance of their Conspiracy Agreement for the purpose of effectuating their Unlawful Scheme against Dr. Lieberman.

1286.   As demonstrated in detail herein, the leadership of the Entity Defendants and the Individual State Actor Defendants entered into the Conspiracy Agreement to facilitate the willful, intentional and malicious overt acts in which they engaged in furtherance of their Unlawful Scheme against Dr. Lieberman.

1287.   In entering into the Conspiracy Agreement with the Individual State Actor Defendants and thereby perpetrating the willful, intentional and malicious overt acts in furtherance of their Unlawful Scheme against Dr. Lieberman, the Entity Defendants acted in both their capacities as state actors and their capacities as private actors.

1288.   As demonstrated in detail herein, as a direct and proximate result of Defendants' entry into the Conspiracy Agreement pursuant to which they engaged in the willful, intentional and malicious overt acts in furtherance of their Unlawful Scheme that are described in detail herein, Dr. Lieberman has been injured and damaged in an amount to be proven at trial.

1289.   But for Defendants' entry into the Conspiracy Agreement pursuant to which they engaged in the willful, intentional and malicious overt acts in furtherance of their Unlawful Scheme that are described in detail herein, Dr. Lieberman would not have been injured and damaged.

## TENTH CLAIM FOR RELIEF

### (AGAINST THE INDIVIDUAL STATE ACTOR DEFENDANTS, IN THEIR INDIVIDUAL CAPACITIES, AND THE ENTITY DEFENDANTS FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

1290.   Plaintiff repeats and realleges Paragraphs 1 through 1289, above, as if set forth in their entirety here.

1291.   As demonstrated in detail herein, Defendants' willful, intentional, malicious, concerted and continuing perpetration of their Unlawful Scheme (including the Negative PR Campaign) against Dr. Lieberman since February 22, 2022 was and continues to be designed to deliberately destroy Dr. Lieberman's personal reputation, professional reputation and academic, clinical and research career in retaliation for the content of his February 19, 2022 Personal Tweet, thereby currying favor with the Targeted Constituencies for the purpose of advancing Defendants' overlapping political, social and academic agendas.

1292.   As demonstrated in detail herein, since February 22, 2022 and continuing to this date, the overarching objective of Defendants' Unlawful Scheme has been to falsely portray Dr. Lieberman as some evil monster fully deserving of Defendants' extreme, outrageous, carefully choreographed and unrelenting efforts to destroy him as a person, as an academic, as a

physician, as a researcher, as a member of NYSPI/Columbia/Presbyterian Psychiatry and as a member of the broader community.

1293. As demonstrated in detail herein, in conspiring to implement their Unlawful Scheme (including their Negative PR Campaign), the Individual State Actor Defendants and the leadership of the Entity Defendants agreed that only by thoroughly destroying Dr. Lieberman's personal and professional reputations and career through their knowingly false narrative would Defendants be able to garner the support of the Targeted Constituencies that was and is deemed to be so necessary to advancing Defendants' overlapping political, social and academic agendas.

1294. Defendants' relentless perpetration of their Unlawful Scheme (including their Negative PR Campaign) has constituted — and continues to constitute — a deliberate *ad hominem* attack against Dr. Lieberman.

1295. Since February 22, 2022 and continuing to date, the objective of Defendants' Unlawful Scheme has been to falsely depict Dr. Lieberman as a threat to the well-being of the Targeted Constituencies and therefore as someone who must be thoroughly and continually punished, marginalized and ostracized — all because of the content of Dr. Lieberman's spontaneous 15-word February 19, 2022 Personal Tweet in which he dared to compliment the extraordinary beauty of a world-renowned fashion model known as Queen of the Dark.

448

1296.   Since February 22, 2022, Defendants' Unlawful Scheme has been founded upon Defendants' pandering to the Targeted Constituencies for the purpose of advancing Defendants' overlapping political, social and academic agendas.  To obtain the coveted support of the Targeted Constituencies, Defendants set about with Orwellian enthusiasm to demonstrate to the Targeted Constituencies that, in his February 19, 2022 Personal Tweet, Dr. Lieberman expressed unacceptable or "wrong" thoughts the penalty for which is permanent punishment, marginalization and ostracism.

1297.   As demonstrated in detail herein, Defendants' perpetration since February 22, 2022 of their willful, intentional and malicious Unlawful Scheme (including their Negative PR Campaign) against Dr. Lieberman in relentless retaliation for the content of his February 19, 2022 Personal Tweet — Defendants' deliberate destruction of Dr. Lieberman personally and professionally by painting him falsely as some evil threat to civilized society for the purpose of currying favor with the Targeted Constituencies and  thereby advancing Defendants' overlapping political, social and academic agendas — (a) has been beyond all possible bounds of decency, (b) has been atrocious and utterly intolerable in a civilized society and (c) constitutes extreme and outrageous conduct.

1298.   As demonstrated in detail herein, since February 22, 2022 and continuing to date, Defendants have perpetrated against Dr. Lieberman a willful, intentional and malicious Unlawful Scheme whose unequivocal objective has been the complete destruction of Dr. Lieberman's personal and professional reputations, as well as his academic, clinical and research career.  Such complete destruction is critical to Defendants' advancement of their overlapping

political, social and academic agendas.  To maintain the support of the Targeted Constituencies that is so vital to advancing their agendas, Defendants understand that they must continue to punish, humiliate and abuse Dr. Lieberman for the rest of his career.

1299.   In perpetrating their willful, intentional and malicious Unlawful Scheme against Dr. Lieberman continually from February 22, 2022 to date, Defendants have engaged in a continuing tort of intentional infliction of emotional distress against Dr. Lieberman.

1300.   As demonstrated in detail herein, since February 22, 2022, Defendants have continued to engage in the extreme, outrageous and concerted Unlawful Scheme against Dr. Lieberman in relentless retaliation for the content of his February 19, 2022 Personal Tweet with the clear intent to cause, or with reckless disregard of the substantial probability of causing, severe emotional distress to Dr. Lieberman.

1301.   As demonstrated in detail herein, as a direct and proximate result of Defendants' continuing perpetration since February 22, 2022 of their extreme, outrageous and concerted Unlawful Scheme against Dr. Lieberman in relentless retaliation for the content of his February 19, 2022 Personal Tweet, Dr. Lieberman has suffered and continues to date to suffer severe emotional distress.

1302.   As demonstrated in detail herein, the severe emotional distress that Dr. Lieberman has suffered and continues to date to suffer as a direct and proximate result of Defendants' continuing perpetration of their extreme, outrageous and concerted Unlawful

4890-9158-2565, v. 1

Scheme against him since February 22, 2022 has forced Dr. Lieberman to submit to the care of a third-party psychiatrist.

1303.   As demonstrated in detail herein, the severe emotional distress that Dr. Lieberman has suffered and continues to date to suffer as a direct and proximate result of Defendants' continuing perpetration of their extreme, outrageous and concerted Unlawful Scheme against him since February 22, 2022 has also forced Dr. Lieberman to submit to the care of a cardiologist to treat the stress-induced atrial flutter (an irregular and often very rapid heart rhythm or arrhythmia) that Dr. Lieberman has developed as a direct and proximate result of the Unlawful Scheme.

1304.   As demonstrated in detail herein, as a direct and proximate result of Defendants' continuing perpetration of their extreme, outrageous and concerted Unlawful Scheme since February 22, 2022, Dr. Lieberman has suffered and continues to date to suffer severe emotional distress for which the Individual State Actor Defendants are liable in their individual capacities to pay compensatory and punitive damages to Dr. Lieberman in respective amounts to be proven at trial.

1305.   As demonstrated in detail herein, as a direct and proximate result of Defendants' continuing perpetration of their extreme, outrageous and concerted Unlawful Scheme since February 22, 2022, Dr. Lieberman has suffered and continues to date to suffer severe emotional distress for which the Entity Defendants are liable to pay compensatory and punitive damages to Dr. Lieberman in respective amounts to be proven at trial.

451

1306.   But for Defendants' continuing perpetration of their extreme, outrageous and concerted Unlawful Scheme against Dr. Lieberman from February 22, 2022 to date, Dr. Lieberman would not have been injured and damaged.

## ELEVENTH CLAIM FOR RELIEF

### (AGAINST THE ENTITY
### DEFENDANTS FOR AN ACCOUNTING)

1307.   Plaintiff repeats and realleges Paragraphs 1 through 1306, above, as if set forth in their entirety here.

1308.   Upon information and belief, the Entity Defendants are in possession, custody or control of financial records relating to the wrongful conduct described in detail herein.

1309.   Upon information and belief, the Entity Defendants are in possession, custody or control of, among other paper and electronic documents and data, records relating to the Lieberman-Raised Funds and other grants and funds that, as demonstrated in detail herein (including in Background Section XXIII, above), the Entity Defendants, through their willful, intentional and malicious Unlawful Scheme, have wrongfully denied to Dr. Lieberman to undermine his efforts to resume his academic, clinical and research activities on behalf of the Entity Defendants (collectively, the "***Entity Defendants' Grant and Funding Records***").

1310.   Dr. Lieberman has reason to believe that his receipt and review of the Entity Defendants' Grant and Funding Records will reveal additional wrongdoing perpetrated by the Entity Defendants against Dr. Lieberman through Defendants' Unlawful Scheme.

1311.   As demonstrated herein, Dr. Lieberman has made a demand upon the Entity Defendants for, among other things, the Entity Defendants' Grant and Funding Records, but, upon information and belief, has not received from the Entity Defendants the entirety of said Records.

1312.   Dr. Lieberman has a right to receive and review all of the Entity Defendants' Grant and Funding Records.

1313.   Accordingly, the Entity Defendants should be required to produce to Dr. Lieberman as soon as practicable all of the Entity Defendants' Grant and Funding Records that are in the Entity Defendants' possession, custody or control.

1314.   Pending the Entity Defendants' production to Dr. Lieberman of the Entity Defendants' Grant and Funding Records, the Entity Defendants remain under an obligation to preserve said Records (as well as all other paper and electronic data, documents and records relating in any way to any of the other matters addressed in this Complaint).

## TWELFTH CLAIM FOR RELIEF

### (AGAINST ALL DEFENDANTS
### <u>FOR A DECLARATORY JUDGMENT)</u>

1315.   Plaintiff repeats and realleges Paragraphs 1 through 1314, above, as if set forth in their entirety here.

1316.   Section 2201(a) of Title 28 of the United States Code provides, in part, as follows:  "In a case of actual controversy within its jurisdiction, . . .  any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

1317.   Rule 57 of the Federal Rules of Civil Procedure provides, in part, as follows:  "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."

1318.   The matters addressed in detail herein demonstrate a case of actual controversy within the jurisdiction of this Court.

1319.   Accordingly, Dr. Lieberman respectfully requests that this Court enter a declaratory judgment holding that, through the perpetration of their Unlawful Scheme against Dr. Lieberman in direct retaliation for the content of his February 19, 2022 Personal Tweet, Defendants have willfully, intentionally and maliciously violated, and continue to violate, Dr.

454

Lieberman's rights and protections under the First Amendment to the United States Constitution,

New York State statutory law and New York State common law.

———

### THROUGH THE CONTINUAL PERPETRATION OF THEIR UNLAWFUL SCHEME SINCE FEBRUARY 22, 2022, DEFENDANTS HAVE ENGAGED IN CONTINUING WRONGFUL CONDUCT DURING THE PAST 15 MONTHS

1320.   In perpetrating their willful, intentional and malicious Unlawful Scheme

against Dr. Lieberman continually from February 22, 2022 to date, Defendants have engaged in

continuing wrongful conduct.

———

### IN LIGHT OF DEFENDANTS' INTENTIONAL, WILLFUL AND MALICIOUS CONDUCT IN PERPETRATING THEIR UNLAWFUL SCHEME AGAINST HIM, DR. LIEBERMAN IS ENTITLED TO AN AWARD OF PUNITIVE DAMAGES

1321.   As demonstrated in detail herein, Defendants engaged, and are currently

engaged, in a willful, intentional and malicious Unlawful Scheme against Dr. Lieberman in

concerted retaliation for the content of his February 19, 2022 Personal Tweet in an effort to

advance their overlapping political, social and academic agendas.

1322.   As demonstrated in detail herein, Defendants' conduct in perpetrating their

willful, intentional and malicious Unlawful Scheme against Dr. Lieberman was and continues to

be utterly outrageous and reprehensible.

1323.   As demonstrated in detail herein, Defendants' conduct in perpetrating their willful, intentional and malicious Unlawful Scheme against Dr. Lieberman was and continues to be motivated by evil motives and betrays Defendants' intentional and callous indifference to the free-speech rights of Dr. Lieberman that are protected under the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment thereof.

1324.   As demonstrated in detail herein, in perpetrating their Unlawful Scheme against Dr. Lieberman, Defendants acted with deceit and malice.

1325.   Moreover, as demonstrated in detail herein, through the perpetration of their Unlawful Scheme against Dr. Lieberman, Defendants have engaged in repeated, continual instances of egregious misconduct over the course of the past 15 months.

1326.   The purpose of a punitive damages award in this case is to punish Defendants for their outrageous, reprehensible conduct and to deter them and others from engaging in similar conduct in the future.

1327.   For the purpose of punishing the Individual State Actor Defendants, in their individual capacities, for perpetrating their willful, intentional and malicious Unlawful Scheme against Dr. Lieberman, and to deter said Defendants (and others) from engaging in such conduct in the future, Dr. Lieberman is entitled to an award of punitive damages against the Individual State Actor Defendants, in their individual capacities, in an amount to be proven at trial.

1328.   For the purpose of punishing the Entity Defendants for perpetrating their willful, intentional and malicious Unlawful Scheme against Dr. Lieberman, and to deter said Defendants (and others) from engaging in such conduct in the future, Dr. Lieberman is entitled to an award of punitive damages against the Entity Defendants in an amount to be proven at trial.

———

### DR. LIEBERMAN IS ENTITLED TO AN AWARD OF ATTORNEYS' FEES, EXPERT FEES AND COSTS UNDER 42 U.S.C. § 1988

1329.   In accordance with 42 U.S.C. §§ 1988(b) and 1988(c), Dr. Lieberman is entitled to recover from the Individual State Actor Defendants, in their individual capacities, attorneys' fees, expert fees and costs incurred by him in connection with his claims against said Individual State Actor Defendants under 42 U.S.C. § 1983.

1330.   In accordance with 42 U.S.C. §§ 1988(b) and 1988(c), Dr. Lieberman is entitled to recover from the Entity Defendants attorneys' fees, expert witness fees and costs incurred by him in connection with his claims against said Entity Defendants under 42 U.S.C. § 1983.

———

### PLAINTIFF'S JURY DEMAND

1331.   Pursuant to the Seventh Amendment to the United States Constitution and Rule 38 of the Federal Rules of Civil Procedure, Plaintiff respectfully demands a trial by jury of all claims so triable.

4890-9158-2565, v. 1

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that the Court grant relief in

Plaintiff's favor against Defendants, as follows:

A.    Entering judgment in favor of Plaintiff against the Individual State Actor Defendants, in their individual capacities, on the First Claim for Relief alleged herein under 42 U.S.C. § 1983 and awarding Plaintiff compensatory damages and, to the fullest extent permitted by law, punitive damages in connection therewith in respective amounts to be determined at trial;

B.    Entering judgment in favor of Plaintiff against the Entity Defendants, in their capacities as state actors, on the Second Claim for Relief alleged herein under 42 U.S.C. § 1983 and awarding Plaintiff compensatory damages and, to the fullest extent permitted by law, punitive damages in connection therewith in respective amounts to be determined at trial;

C.    Entering judgment in favor of Plaintiff against the Individual State Actor Defendants, in their official capacities, on the Third Claim for Relief alleged herein and therefore entering an Order permanently enjoining the Individual State Actor Defendants and those working in concert with them from continuing to perpetrate against Plaintiff their Unlawful Scheme or any portion thereof;

D.    Entering judgment in favor of Plaintiff against the Entity Defendants, in their capacities as state actors, on the Fourth Claim for Relief alleged herein and therefore entering an Order permanently enjoining the Entity Defendants and those working in concert with them from continuing to perpetrate against Plaintiff their Unlawful Scheme or any portion thereof;

E.    Entering judgment in favor of Plaintiff against the Entity Defendants on the Fifth Claim for Relief alleged herein and awarding Plaintiff compensatory damages in connection therewith in an amount to be determined at trial;

F.    Entering judgment in favor of Plaintiff against the Entity Defendants on the Sixth Claim for Relief alleged herein and awarding Plaintiff compensatory damages in connection therewith in an amount to be determined at trial and specific performance of the June 1, 2022 Lieberman Activities-Resumption Agreement;

458

G.   Entering judgment in favor of Plaintiff against the Entity Defendants on the Seventh Claim for Relief alleged herein and awarding Plaintiff compensatory damages in connection therewith in an amount to be determined at trial;

H.   Entering judgment in favor of Plaintiff against the Entity Defendants on the Eighth Claim for Relief alleged herein and awarding Plaintiff compensatory damages in connection therewith in an amount to be determined at trial and specific performance of the NYS OMH-Columbia Sharing Agreements;

I.   Entering judgment in favor of Plaintiff against the Entity Defendants on the Ninth Claim for Relief alleged herein and awarding Plaintiff compensatory damages in connection therewith in an amount to be determined at trial;

J.   Entering judgment in favor of Plaintiff against the Individual State Actor Defendants, in their individual capacities, on the Tenth Claim for Relief alleged herein and awarding Plaintiff compensatory damages and, to the fullest extent permitted by law, punitive damages in connection therewith in respective amounts to be determined at trial;

K.   Entering judgment in favor of Plaintiff against the Entity Defendants on the Eleventh Claim for Relief alleged herein and therefore directing said Defendants to provide an accounting to Plaintiff;

L.   Entering judgment in favor of Plaintiff against the Entity Defendants on the Twelfth Claim for Relief alleged herein and therefore declaring that, through the perpetration of their Unlawful Scheme against Plaintiff in direct retaliation for the content of his February 19, 2022 Personal Tweet, Defendants have willfully, intentionally and maliciously violated, and continue to violate, Plaintiff's rights and protections under the First Amendment to the United States Constitution, New York State statutory law and New York State common law;

M.   Requiring the Individual State Actor Defendants, in their individual capacities, to reimburse Plaintiff under 42 U.S.C. § 1988 for all attorneys' fees, expert fees and costs incurred by Plaintiff in connection with this lawsuit;

N.   Requiring the Entity Defendants, in their capacities as state actors, to reimburse Plaintiff under 42 U.S.C. § 1988 for all attorneys' fees, expert fees and costs incurred by Plaintiff in connection with this lawsuit; and

459

O.     Entering such other and further relief in favor of Plaintiff against
        Defendants as the Court deems just and proper under the circumstances.

**Dated:  May 19, 2023**

**MELTZER, LIPPE, GOLDSTEIN &**
    **BREITSTONE, LLP**

**By:** /s/ Robert A. Alessi_____
        **Robert A. Alessi (ralessi@meltzerlippe.com)**
        **Kelly Fitzgerald (kfitzgerald@meltzerlippe.com)**
        **Robert S. Plosky (rplosky@meltzerlippe.com)**
**190 Willis Avenue**
**Mineola, New York 11501**
**Tel.: (516) 747-0300**

 **Attorneys for Plaintiff Jeffrey A. Lieberman, M.D.**

460

**APPENDIX**

**LIST OF DEFINED TERMS USED IN THE FOREGOING COMPLAINT**

| Defined Term | Complaint Paragraph in Which Defined |
|---|---|
| 1923 Bond Issue Update | 233 |
| 1924/1925 NYS-Columbia Agreement | 235 |
| 1952 NYSPI-Columbia Psychiatry Educational Partnership | 239 |
| 1974 Columbia Deed to NYS | 241 |
| 1984 NYS OMH-Columbia MOU | 243 |
| 1985 NYS OMH-Columbia Revocable Permit | 249 |
| 2011 NYS OMH-Columbia MOU | 266 |
| 2011 NYSPI Audit Report | 251 |
| 2015 Recruiting Overview | 279 |
| 2016 Business Associate Agreement | 290 |
| 2018 Department of Psychiatry Overview | 294 |
| 2019 L'Oréal Article | 354 |
| 2021 NYSPI/Columbia/Presbyterian Psychiatry Overview | 304 |
|  |  |
| ACLU | 398 |
| ACNP | 1033 |
| Albrechtslund | 1204 |

A-1

| Defined Term | Complaint Paragraph in Which Defined |
|---|---|
| Alternative Career Opportunities | 1250 |
| April 12, 2022 New York Times Indictment Article | 795 |
| April 20, 2022 Armstrong Activities-Resumption Promise | 1234 |
| April 20, 2022 Armstrong All-Columbia E-Mail | 812 |
| April 20, 2022 Armstrong Letter | 809 |
| April 20, 2022 Armstrong-Lieberman Meeting | 799 |
| Association | 5 |
| August 3, 2022 Smith-Lieberman Telephone Conversation | 105 |
| | |
| BET | 351 |
| | |
| Cancel Culture | 88 |
| Chambers | 16 |
| Chen | 1212 |
| Columbia Medical School | Preamble (Page 1) |
| Columbia Psychiatry | 4 |
| Columbia Psychiatry/New York Public Library Outreach Program | 174 |
| Columbia Rules of Conduct | 404 |
| Columbia University | Preamble (Page 1) |

4890-9158-2565, v. 1

| **Defined Term** | **Complaint Paragraph in Which Defined** |
|---|---|
| Columbia University Facilities | 407 |
| Columbia University Facility | 407 |
| Columbia University Function | 408 |
| Columbia University Functions | 408 |
| Compensation Phase-Out Period | 810 |
| Conspiracy Agreement | 1283 |
| Cosmopolitan | 333 |
| CPI | 178 |
|  |  |
| Dean Armstrong | 109 |
| Defendants | 70 |
| Defendants' Buildings-Access Prohibition | 919 |
| Defendants' February 25, 2022 Town Hall Meeting | 737 |
| Defendants' February 28, 2022 Town Hall Meeting | 743 |
| Defendants' Hospital Teaching Prohibition | 957 |
| Defendants' March 1, 2022 Town Hall Meeting | 749 |
| Defendants' Negative PR Campaign | 93 |
| Defendants' Unlawful Scheme | 94 |
| Department | 4 |
| Dissenting Community Member(s) | 678 |

A-3

| **Defined Term** | **Complaint Paragraph in Which Defined** |
|---|---|
| Dr. Armstrong | 109 |
| Dr. Corwin | 109 |
| Dr. Kaplan | 113 |
| Dr. Lieberman | Preamble (Page 1) |
| Dr. Lieberman's Forced Resignation | 556 |
| Dr. Lieberman's May 17, 2022 Draft Apology | 839 |
| Dr. Rustgi | 109 |
| Dr. Simpson | Preamble (Page 1) |
| Dr. Smith | Preamble (Page 1) |
| Dr. Sullivan | Preamble (Page 1) |
| Dr. Wasson | 113 |
| | |
| Early March 2022 Armstrong-Lieberman Meeting | 751 |
| Ejiofor/*HuffPost* | 332 |
| Entity Defendants | 16 |
| Entity Defendants' February 25, 2022 Punishment Memorandum | 733 |
| Entity Defendants' Grant and Funding Records | 1309 |
| Entity Defendants' Lieberman Protocols | 1138 |
| | |
| February 19, 2022 Personal Tweet | 9 |

A-4

| **Defined Term** | **Complaint Paragraph in Which Defined** |
|---|---|
| February 22, 2022 Columbia FPO E-Mail | 528 |
| February 22, 2022 Forced Resignation E-Mail | 588 |
| February 22, 2022 Vice Chairs Apology | 493 |
| February 22, 2022 Vice Chairs Meeting | 465 |
| February 23, 2022 Medscape Article | 705 |
| February 23, 2022 New York Times Lieberman Article | 572 |
| February 23, 2022 Rustgi/Corwin Zoom Meeting | 621 |
| February 23, 2022 Rustgi-Initiated Lieberman Zoom Meeting | 600 |
| February 23, 2022 Smith/Simpson Announcement | 656 |
| February 23, 2022 Sullivan Announcement | 651 |
| February 24, 2022 Ambrose/Baptista Announcement | 719 |
| February 24, 2022 Pantazatos E-Mail Objection | 694 |
| February 24, 2022 Smith/Simpson Announcement | 714 |
| February 24, 2022 Town Hall Meeting | 713 |
| February 25, 2022 NYS OMH Letter | 740 |
| February 25, 2022 Rustgi/Corwin/Booth-Lieberman Zoom Meeting | 732 |
| February 28, 2022 Medscape Article | 708 |

A-5

| **Defined Term** | **Complaint Paragraph in Which Defined** |
|---|---|
| February 28, 2022 NYSPI/Columbia/ Presbyterian Psychiatry Announcement | 709 |
| First February 22, 2022 Lieberman-OMH Telephone Conversation | 482 |
| First February 23, 2022 Rustgi/Corwin E-Mail Announcement | 620 |
| Forced Resignation | 556 |
| Fourth February 22, 2022 Lieberman-OMH Telephone Conversation | 568 |
| FPO | 528 |
| | |
| Harper's Free-Expression Letter | 441 |
| Haven Avenue Office | 1000 |
| Hospital | Preamble (Page 1) |
| Hospital Department of Psychiatry | 4 |
| Hospital Teaching Prohibition | 957 |
| | |
| Individual State Actor Defendants | 71 |
| | |
| June 1, 2022 Lieberman Activities-Resumption Agreement | 853 |
| June 17, 2022 Smith Teaching-Prohibition E-Mail | 868 |
| June 23, 2022 Simpson Zoom Meeting | 874 |
| June 29, 2022 Armstrong Activities-Resumption Promise | 1240 |

| **Defined Term** | **Complaint Paragraph in Which Defined** |
|---|---|
| June 29, 2022 Armstrong-Lieberman Meeting | 906 |
| | |
| Khoo/*HuffPost* | 335 |
| | |
| LGBTQI+ Health Program | 180 |
| Lieberman and Colleagues Wall Mural | 669 |
| Lieberman Original Office Files | 1001 |
| Lieberman-Raised Funds | 984 |
| Luttrell & Wallace | 1199 |
| | |
| March 1, 2022 McWhorter Opinion Piece | 685 |
| March 2023 Haven Avenue Office Visit | 1002 |
| March 5, 2022 New York Times Article on the Russian Invasion of Ukraine | 763 |
| March 7, 2022 NYSPI/Columbia/Presbyterian Psychiatry Meeting | 313 |
| March 18, 2022 New York Times Editorial | 780 |
| May 1926 Columbia Deed To NYS | 236 |
| May 9, 2022 Lieberman Activities-Resumption Agreement | 831 |
| Ms. Tashjian | Preamble (Page 1) |
| | |
| Negative PR Campaign | 93 |
| New York State | 11 |

| **Defined Term** | **Complaint Paragraph in Which Defined** |
|---|---|
| NIH | 155 |
| NIH Columbia/China Grant | 784 |
| NIMH | 166 |
| Non-NYSPI/Columbia/Presbyterian Research Efforts | 931 |
| NYS Office of Mental Heath | 2 |
| NYS OMH | 2 |
| NYS OMH-Columbia Sharing Agreements | 1266 |
| NYS OMH/NYSPI Lieberman Protocols | 1049 |
| NYS Psychiatric Institute | 2 |
| NYSPI | 2 |
| NYSPI Audit Response | 261 |
| NYSPI/Columbia/Presbyterian Psychiatry | 5 |
| | |
| Opportunistic Censors | 471 |
| Original Gatwech Tweet | 8 |
| | |
| PI | 745 |
| Plaintiff | Preamble (Page 1) |
| Popsugar | 344 |
| Presbyterian/Columbia Hospital | Preamble (Page 1) |
| Psychiatric Activities | 228 |
| Psychiatry Third Parties | 1019 |

A-8

| Defined Term | Complaint Paragraph in Which Defined |
|---|---|
| | |
| Relevant Time Period | 2 |
| RFMH | 58 |
| Rosemarie | 8 |
| | |
| Second February 22, 2022 Lieberman-OMH Telephone Conversation | 552 |
| Second February 23, 2022 Rustgi/Corwin E-Mail Announcement | 627 |
| Section 1983 Injunctive Relief Claim | 17 |
| Section 1983 Money Damages Claim | 17 |
| State | 11 |
| | |
| Tapper Columbia Student Mental Health Project | 991 |
| Tapper Estate | 991 |
| Targeted Constituencies | 99 |
| Teen Vogue | 339 |
| The Atlantic New Puritan Article | 444 |
| Third February 22, 2022 Lieberman-OMH Telephone Conversation | 564 |
| Tweet | 7 |
| | |
| Unlawful Scheme | 94 |

4890-9158-2565, v. 1

| **<u>Defined Term</u>** | **<u>Complaint Paragraph in Which Defined</u>** |
|---|---|
| | |
| Whiting & Williams | 1206 |
| WOE Magazine | 358 |

4890-9158-2565, v. 1